# United States Court of Appeals

*for the*

# Third Circuit

---

Case No. 23-2432

CLIFFORD BOYNES CHRIS CHRISTIAN; MARGARET THOMPSON;
DELIA ALMESTICA; CARLOS CHRISTIAN; ANNA REXACH-
CONSTANTINE, Esq.; MERVYN CONSTANTINE; NEAL DAVIS; EDNA
SANTIAGO; GUIDRYCIA WELLS; O'SHAY WELLS; AARON G.
MAYNARD; VERNE MCSWEEN; ROCHELLE GOMEZ; MYRNA
MATHURIN; JOAN MATHURIN; WARRINGTON CHAPMAN;

*(For Continuation of Caption See Inside Cover)*

---

ON APPEAL FROM THE DISTRICT COURT OF THE VIRGIN ISLANDS
IN NOS. 1-21-CV-00253, 1-21-CV-00259,
1-21-CV-00260 AND 1-21-CV-00261
SAT BELOW: HONORABLE WILMA A. LEWIS, U.S.D.J.

## BRIEF FOR DEFENDANT-APPELLANT LIMETREE BAY TERMINALS, LLC AND JOINT APPENDIX
## Volume 1 of 12 (Pages A1 to A144)

STEPHEN M. ORLOFSKY
BLANK ROME LLP
300 Carnegie Center, Suite 220
Princeton, New Jersey 08540
(609) 750-2646

MELANIE S. CARTER
BLANK ROME LLP
130 North 18th Street
One Logan Square
Philadelphia, Pennsylvania 19103
(215) 569-5720

KEVIN J. BRUNO
JANE THOMAS
BLANK ROME LLP
1271 Avenue of the Americas
New York, New York 10020
(212) 885-5000

CARL A. BECKSTEDT III
BECKSTEDT & KUCZYNSKI LLP
2162 Church Street
Christiansted, Street Croix
U.S. Virgin Islands 00820
(340) 719-8086

*Attorneys for Defendant-Appellant
Limetree Bay Terminals, LLC*

CP COUNSEL PRESS    (800) 4-APPEAL • (321000)

ANN MARIE JOHN-BAPTISTE; LEOBA JOHN-BAPTISTE-PELLE; J. M. M., by and through his mother Anna Rexach-Constantine; V. M., by and through his mother Anna Rexach-Constantine; Z. R. C., by and through his mother Anna Rexach-Constantine; M. M., by and through his mother Anna Rexach-Constantine; O. N., by and through his mother Guidrycia Wells,

– v. –

LIMETREE BAY VENTURES LLC; ARC LIGHT CAPITAL PARTNERS; FREEPOINT COMMODITIES; EIG GLOBAL ENERGY PARTNERS; BP PRODUCTS NORTH AMERICA INC; LIMETREE BAY TERMINALS LLC, DBA Ocean Point Terminals; LIMETREE BAY HOLDINGS LLC; LIMETREE BAY PREFERRED HOLDINGS LLC; ARCLIGHT AIV, LP; ARCLIGHT ENERGY PARTNER FUND VI L.P; UNIVERSAL PLANT SERVICES VI LLC; EXCEL CONSTRUCTION MAINTENANCE VI INC.; ELITE TURNAROUND SPECIALISTS LTD.; PINNACLE SERVICES LLC; VERSA INTEGRITY GROUP INC; NATIONAL INDUSTRIES SERVICES LLC; JOHN DOES 1-100,

(D.V.I. Nos. 1-21-cv-00253)

HELEN SHIRLEY; ANISHA HENDRICKS; CRISTEL RODRIGUEZ; JOSIE BARNES; ARLEEN MILLER; ROSALBA ESTEVEZ; ISIDORE JULES; JOHN SONSON; VIRGINIE GEORGE and all others similarly situated,

– v. –

LIMETREE BAY VENTURES LLC; LIMETREE BAY TERMINALS LLC, ; LIMETREE BAY REFINING LLC;

(D.V.I. Nos.1-21-cv-00259)

FRANCIS CHARLES; THERESA J. CHARLES;

– v. –

LIMETREE BAY REFINING LLC; LIMETREE BAY TERMINALS LLC; LIMETREE BAY VENTURES LLC; ARC LIGHT CAPITAL PARTNERS LLC; FREEPOINT COMMODITIES; EIG GLOBAL ENERGY PARTNERS; ARCLIGHT ENERGY PARTNER FUND VI L.P; ARCLIGHT AIV, LP; LIMETREE BAY HOLDINGS LLC; LIMETREE BAY PREFERRED HOLDINGS LLC,

(D.V.I. Nos. 1-21-cv-00260)

BEECHER COTTON; PAMELA L. COLON; SIRDINA ISAAC-JOSEPH; SYLVIA BROWNE; JEAN-MARIE ALVINA ILARRAZA; ESTHER CLIFFORD; RYAN ALLEYNE; AGNES AUGUSTUS; CESARINA MIRANDA

LIMETREE BAY VENTURES LLC; LIMETREE BAY REFINING LLC;
LIMETREE BAY TERMINALS LLC; ARC LIGHT CAPITAL PARTNERS;
FREEPOINT COMMODITIES; EIG GLOBAL ENERGY PARTNERS; BP
PRODUCTS NORTH AMERICA INC; JOHN DOES 1-10; LIMETREE BAY
HOLDINGS LLC; LBR LIQUIDATING TRUST; M. DAVID SUNN; DBA
OCEAN POINT TERMINALS; UNIVERSAL PLANT SERVICES VI, LLC;
EXCEL CONSTRUCTION, MAINTENANCE VI INC; ELITE TURNAROUND
SPECIALISTS LTD.; PINNACLE SERVICES LLC; VERSA INTEGRITY
GROUP INC; NATIONAL INDUSTRIES SERVICES LLC,

(D.V.I. Nos 1-21-cv-00261)

LIMETREE BAY TERMINALS LLC,

*Appellant.*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. P. 26.1(a), Limetree Bay Terminals, LLC (d/b/a Ocean Point Terminals) hereby certifies that its sole parent company is Limetree Bay Cayman Ltd., a privately held corporation.  No publicly traded entity owns 10% or more of the stock of Limetree Bay Cayman Ltd.

# TABLE OF CONTENTS

**Page:**

STATEMENT OF JURISDICTION..........................................................................1

STATEMENT OF ISSUES ................................................................................1

STATEMENT OF RELATED CASES AND PROCEEDINGS ............................4

STATEMENT OF CASE ...................................................................................4

    I.      RELEVANT BACKGROUND FACTS ....................................................4

          A.    The Putative Class Actions ......................................................4

          B.    Terminals And Refining Are Two Separate Legal
               Entities. ...................................................................................5

          C.    Terminals And Refining Respond To The February 4
               And May 12 Releases ...............................................................6

          D.    The Bankruptcy........................................................................8

    II.     RELEVANT FACTS PRESENTED AT THE HEARINGS ..............10

          A.    Phase One Hearing.................................................................10

               1.    Terminals And Refining Were Separate Entities. ..........10

               2.    Only One Named Plaintiff Testified At The Phase
                     One Hearing.................................................................11

               3.    Plaintiffs' Experts' Opinions Do Not Support
                     Plaintiffs' Claim That Harm Occurred. ..........................11

                    i.    Drs. Kaltofen and Henry ......................................11

                      ii.    Dr. Sajo.............................................................14

                      iii.    Only One Testifying Resident (Thompson),
                           And Two Named Plaintiffs Are Reflected In
                            Plaintiffs' Experts' Sampling Data From
                            2021. ...................................................................14

               4.    Plaintiffs' Harm And The Harm Described In The
                         Hearing Is Compensable By Monetary Damages. .........15

           B.    Phase Two Hearing.................................................................16

               1.    Only One Resident Testified At The Phase Two
                       Hearing. .......................................................................16

i

       2.      No Evidence Demonstrated Imminent Harm Or Need For The Water Program. ........................................16

       3.      The Covered Area Exceeds Where Testifying Witnesses Reside And Does Not Reflect Present-Day Harm.......................................................17

       4.      The Response To The May Release Was Precautionary. .................................................18

   C.     Evidence Related To The Amount Of Bond Ordered Was Limited. ....................................................19

   D.     The Injunction Period Is Indefinite. .........................................20

SUMMARY OF ARGUMENT ................................................................20

ARGUMENT .........................................................................................21

I.     THE DISTRICT COURT ERRED IN FINDING THAT PLAINTIFFS WERE LIKELY TO SUCCEEED ON THE MERITS. ..........................................................................21

   A.     Standard of Review ................................................................21

   B.     The District Court's Determination That Plaintiffs Were Likely To Succeed On The Merits Of Their Negligence *Per Se*, Private Nuisance, And Negligent Trespass Claims Was In Error. .................................................23

II.    THE DISTRICT COURT'S FINDING OF IRREPARABLE HARM IS ERRONEOUS AS A MATTER OF FACT AND LAW. ..........................................................................27

   A.     Standard Of Review ................................................................27

   B.     One Named Plaintiff And Four Non-Plaintiff Residents At The Phase One Hearing And One Non-Plaintiff Resident At The Phase Two Hearing Failed To Show Irreparable Harm To All Plaintiffs And All Potential Class Members. ....................................................29

   C.     The District Court Based Its Erroneous Finding Of Irreparable Harm On Stale, Unsupportive Evidence And Improperly Switched The Burden Of Proof To Terminals. ...................................................35

1.  Insufficient Evidence Showed Cistern
    Contamination And *No Evidence* Showed
    Contamination From A Release. ....................................35

2.  The District Court Improperly Shifted The Burden
    To Terminals To Disprove *Present* Cistern
    Contamination..................................................................38

3.  The District Court Improperly Found That
    Contamination Presently Poses Health Risks.................41

4.  The District Court Improperly Relied On
    Plaintiffs' Beliefs Of Harm.............................................43

5.  Nearly No Evidence Supported The District
    Court's Creation Of The Covered Area...........................45

D.  The District Court Erred In Finding Irreparable Harm
    Because The Relief Sought (Free Water) Was
    Compensable With Money Damages. ......................................49

III. THE DISTRICT COURT ERRED IN FAILING TO REQUIRE
    A BOND UNDER RULE 65(C) SUFFICIENT TO PAY THE
    COSTS AND DAMAGES SUSTAINED BY TERMINALS IF
    FOUND TO HAVE BEEN WRONGFULLY ENJOINED...............52

A.  Standard of Review.................................................................52

B.  The Nominal Bond Ordered By The District Court Is
    Arbitrary, Fails To Consider The Substantial Costs And
    Damages Sustained By Terminals In Operating The
    Program, And Provides Terminals With No Adequate
    Remedy ...................................................................................53

CONCLUSION ........................................................................................57

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Acierno v. New Castle Cty.*,
40 F.3d 645 (3d Cir. 1994) ........................................................................28, 38

*Adams v. Freedom Forge Corp.*,
204 F.3d 475 (3d Cir. 2000) ..................................................................*passim*

*Alexander v. Primerica Holdings, Inc.*,
811 F. Supp. 1025 (D.N.J. 1993) ...............................................................55, 56

*Alleyne v. Diageo USVI, Inc.*,
63 V.I. 3894 (V.I. Super. Ct. 2015) .................................................................23

*Antilles Sch., Inc. v. Lembach*,
64 V.I. 400 (V.I. 2016) ....................................................................................24

*Concerned Pastors for Social Action v. Khouri*,
217 F. Supp.3d 960 (E.D. Mich. 2016) .....................................................50, 51

*Continental Group, Inc. v. Amoco Chemicals Corp.*,
614 F.2d 351 (3d Cir. 1980) ............................................................................40

*Corporate Synergies Group, LLC v. Andrews*,
775 F. App'x 54 (3d Cir. 2019) ........................................................................53

*Davis v. Pension Ben. Guar. Corp.*,
571 F.3d 1288 (D.C. Cir. 2009) .......................................................................22

*ECRI v. McGraw-Hill, Inc.*,
809 F.2d 223 (3d Cir. 1987) ............................................................................39

*Ferring Pharmaceuticals, Inc. v. Watson Pharmaceuticals, Inc.*,
765 F.3d 205 (3d Cir. 2014) ............................................................................39

*Frank's GMC Truck Center, Inc. v. General Motors Corp.*,
847 F.2d 100 (3d Cir. 1988) ......................................................................28, 29

*Friends of the Earth v. Laidlaw Environmental Services*,
528 U.S. 167 (2000)............................................................................41, 42, 43

iv

*Garnett v. Zeilinger*,
    313 F. Supp.3d 147 (D.D.C. 2018) ....................................................34

*GenOn REMA, LLC v. EPA*,
    722 F.3d 513, No. 12-1022, 2013 WL 3481486 (3d Cir. July 12,
    2013) .................................................................................................26

*Grant v. Sullivan*,
    131 F.R.D. 436 (M.D. Pa. 1990) ......................................................34

*Holiday Inns of America, Inc. v. B & B Corp.*,
    409 F.2d 614 (3d Cir. 1969) .............................................................27

*Hoxworth v. Blinder, Robinson & Co., Inc.*,
    903 F.2d 186 (3d Cir. 1990) ......................................53, 54, 55, 56

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*,
    882 F.2d 797 (3d Cir. 1989) ...............................................49, 53, 55

*In re Limetree Bay Services, LLC*,
    Case No. 21-03791 (Bankr. S.D.Tx.) ..................................................8

*In re Limetree Bay Services, LLC*,
    Case No. 21-32351-DRJ (Bankr. S.D.Tx.) ..........................................8

*Lyda v. City of Detroit*,
    841 F.3d 684 (6th Cir. 2016) ...........................................................51

*Lyda v. City of Detroit*,
    No. 13-CV-53846, 2014 WL 6474081 (Bankr. E.D. Mich. Nov.
    19, 2014) ......................................................................................50, 51

*Maine People's Alliance and National Resources Defense Council v.
Mallinkrodt*,
    471 F.3d 277 (1st Cir. 2006) .............................................................41

*Maldonado v. Houstoun*,
    177 F.R.D. 311 (E.D. Pa. 1997) .......................................................34

*Mallet & Co. v. Lacayo*,
    16 F.4th 364 (3d Cir. 2021) ...............................................52, 53, 55

*Mazurek v. Armstrong*,
520 U.S. 968 (1997)....................................................................39

*Morton v. Beyer*,
822 F.2d 364 (3d Cir. 1987) ........................................................29

*Nat'l Land & Inv. Co. v. Specter*,
428 F.2d 91 (3d Cir. 1970) ..........................................................22

*Osorio-Martinez v. Att'y Gen. United States of America*,
893 F.3d 153 (3d Cir. 2018) ........................................................22

*Sampson v. Murray*,
415 U.S. 61 (1974)......................................................................21

*Sprint Communs. Co. L.P. v. CAT Communs. Int'l, Inc.*,
335 F.3d 235 (3d Cir. 2003) ..........................................52, 53, 55

*Strong Families v. Att'y Gen. of Delaware*,
793 F.3d 304 (3d Cir. 2015) ..................................................22, 24

*Temple Univ. v. White*,
941 F.2d 201 (3d Cir. 1991) ..................................................54, 56

*Tustin v. Heckler*,
591 F. Supp. 1049 (D.N.J. 1984)..................................................34

*Winter v. Natural Resource Defense Council, Inc.*,
555 U.S. 7 (2008)..................................................................39, 53

*Zambelli Fireworks Mfg. Co. v. Wood*,
592 F.3d 412 (3d Cir. 2010) ........................................................54

**Statutes**

28 U.S.C. § 1292(a)(1)......................................................................1

28 U.S.C. §§ 1331, 1332(a), and 1332(d)............................................1

Bankruptcy Code § 904....................................................................51

Clean Air Act, 42 U.S.C. § 7401, *et seq.*....................................*passim*

Clean Water Act..............................................................................42

Resource Conservation and Recovery Act ..............................................42

**Other Authorities**

40 C.F.R. § 60.102a ......................................................................25

40 C.F.R. § 63.642 ........................................................................25

40 C.F.R. § 63.670 ........................................................................25

Black's Law Dictionary ...............................................................29

Fed. R. Civ. P. 65 ...........................................................52, 53, 56

Appellant, Limetree Bay Terminals, LLC ("Terminals") files this brief in support of its appeal of the April 28 and July 20, 2023 Orders of the District Court of the Virgin Islands (the "District Court") granting Appellees' (hereinafter "Plaintiffs") request for a preliminary injunction, and requiring Terminals to pay for and implement an indefinite water distribution program ("Program") in St. Croix.

## STATEMENT OF JURISDICTION

The District Court had original jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332(d), and 1332(a). Under 28 U.S.C. § 1292(a)(1), this Court has subject matter jurisdiction over the appeal of the District Court's (i) April 28, 2023 Order and Opinion determining a preliminary injunction should be issued for programmatic relief (not remediation), (ii) July 20, 2023 Order and Opinion determining the scope and structure of preliminary injunction, and (iii) July 20, 2023 Order directing Limetree Bay Terminals, LLC's implementation of the Program.

## STATEMENT OF ISSUES

The issue on appeal is whether the District Court committed reversible error in granting Plaintiffs' request for a preliminary injunction. The specific issues for this Court are:

1.    Whether the District Court erred in finding that Plaintiffs were likely to succeed on their negligence per se, private nuisance, and negligent trespass claims against Terminals solely based upon Terminals' presence as a co-permittee on a

Clean Air Act Title V permit of the St. Croix oil refinery (the "Refinery"), which was owned and exclusively operated by a separate entity, Limetree Bay Refining, LLC ("Refining"), in accordance with a legally required operating agreement with the Government of the Virgin Islands ("GVI")?

2.      Whether the District Court erred in its application of this Court's decision in *Adams v. Freedom Forge Corp.*, 204 F.3d 475 (3d Cir. 2000) by issuing a mass injunction against Terminals and inferring, without any present-day supporting evidence, irreparable harm to thousands of potential claimants from four air emission events (the "Releases") from the Refinery two years earlier between February 4, and May 12, 2021, where:

    a. The testimony of purportedly harmed individuals was limited to 1 plaintiff and 5 non-plaintiff residents?

    b. No evidence was presented at either hearing of a "presently existing actual threat" to any plaintiff (or resident witness) as a result of the Releases from the Refinery more than two years prior, and where Plaintiffs presented no evidence of then existing, present-day harm (*e.g.* contaminated cisterns), let alone the present-day existence of contamination that could be connected to the Releases?

    c. The District Court found as putative evidence of present-day cistern contamination the testimony of several residents regarding their

subjective, if not self-serving, "mistrust" of the quality of their cistern water, which they each admitted to never having tested in the two years since the Releases, and where the District Court properly denied Plaintiffs' request for remediation relief (which shows Plaintiffs' failure to demonstrate the existence of present-day contamination)?

    d.  The District Court found as putative evidence of existing, present-day cistern contamination two-year-old statements and advisories relating to the use of cistern water immediately following the Releases from public service announcements, local papers, and government agencies?

    e.  The District Court found, directly contrary to the court's observations raised with Plaintiffs' counsel at argument, that the remedy sought (free water) is properly the subject of preliminary injunctive relief and not compensable with money damages, in particular where each testifying resident witness testified to being able to regularly purchase their own water before the Releases, that they are still using their cisterns for basic water uses, and that they never drink their cistern water?

3.    Whether the District Court erred in ordering an amount of bond ($50,000) that fails to adequately provide "a fund to use to compensate incorrectly enjoined defendants," like Terminals, should this Court determine that the injunction was erroneously ordered?

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This case has not been before the Court. Appellant is unaware of any related case.

## STATEMENT OF CASE

## I. RELEVANT BACKGROUND FACTS

### A. The Putative Class Actions

These cases arise from four air emission events (the "Releases") from Flare #8 at the Refinery between February 4, and May 12, 2021 when Refining sought to restart the Refinery. When the Releases occurred, Terminals owned and operated a marine oil terminal (the "Terminal"), not the Refinery. The four putative class actions are brought by 44 individuals alleging that the Releases contaminated Plaintiffs' and putative class members' properties. The District Court consolidated the cases for the injunction proceedings and held two evidentiary hearings in March 2023 ("Phase One") and June 2023 ("Phase Two"). The contamination at issue focused on Plaintiffs' allegations that the Releases resulted in cisterns remaining contaminated with petroleum hydrocarbons such that the cistern water remained unavailable for ordinary use two years after the Releases. *See* A2747-A2811 (*Boynes* Complaint); A2812-A2921 (*Cotton* Complaint); A2922-A2938 (*Shirley* Complaint), A2939-A2976 (*Charles* Complaint). Plaintiffs brought claims against

several defendants, including Terminals and Refining, on or about May 2021.  *Id.*

## B.    Terminals And Refining Are Two Separate Legal Entities.

As the District Court correctly found, Terminals is and has always been a separate and distinct legal entity from Refining.  *See* A21.  This separateness is evidenced by the operating agreements each entity has entered into separately with the GVI, and witness testimony.   *See* A5050-A5051 ("Terminal Operating Agreement" or "TOA"); A5120-A5121 ("Refinery Operating Agreement" or "ROA"); A1200-A1202 (Charles); A20-A21 (4.28.23 Op.).  Although Terminals once owned the Refinery, in 2018, Terminals sold the Refinery to Refining.  *See* A5304 (DPNR Letter); A5120 (ROA).  Although Refining's and Terminals' facilities sit within the same fenceline and the entities share some services and facilities, their operations are separate.  *See* A5050-A5051 (TOA); A5120-A5121 (ROA); A20-A21 (4.28.23 Op.); LBT1-4; A1209-A1210 (Charles).

Since 1965 the owners and operators of the Refinery and related facilities have been granted rights to conduct the business of the Refinery and related facilities pursuant to a Concession Agreement entered into with the GVI.  *See* A5029 (TOA).  Therefore, when Terminals sold the Refinery to Refining, Terminals and Refining had to enter into separate operating agreements with the GVI governing their rights and obligations for their respective facilities.  A5030 (TOA).

For this reason, Refining and the GVI entered into the ROA dated July 2. 2018, which made clear that Refining would both be solely responsible for the operation of the Refinery "as a standalone facility" and would "not unduly interfere with Terminal Operations." *See* A5120 (ROA). Likewise, Terminals was required to amend its operating agreement with the government for its own separate operations, and did so in the "Amended and Restated Terminal Operating Agreement" also dated July 2, 2018, making clear that Terminals would both be solely responsible for the operation of the Terminal "as a standalone facility" and would "**not unduly interfere with a Refinery Restart or any future Refinery Operations**." A5050 (TOA) (emphasis added).

In addition, the Terminal was and continues to be operated independently, safely, and in EPA compliance by Terminals, including prior to February 2021 and through the course of the Releases. *See* A1220-A1221 (Charles). On June 16, 2021, the Environmental Protection Agency issued a Notice of Violation to Refining which recognized that (1) Terminals sold the Refinery to Refining and (2) Refining (not Terminals) was the owner and operator of the Refinery. *See* A5016 at ¶ 67.

### C.    Terminals And Refining Respond To The February 4 And May 12 Releases

The February 4 Release affected only Estate Clifton Hills. A2184-A2185, A2228 (Charles); A2362-A2363 (Wakefield). Terminals and Refining undertook a "joint effort" to respond to the February Release by canvassing the area and making

offers to remediate property damage or pay for the costs of remediation where damage was found. A2189 (Charles). Refining paid for "one hundred percent" of the response efforts and costs related to the February Release. *Id*.

The May 12 Release affected more estates. Immediately after the May 12 Release, Terminals and Refining "took steps to (a) communicate with the community about the incident that had occurred, (b) work in cooperation with all government agencies, (c) assess and remediate any damage, and (d) amicably resolve claims." *See* A4998 (Charles Declaration). In May 2021, because of the larger impacted area from the May 12 Release, Terminals and Refining retained Sedgwick Claims Management Services ("Sedgwick") to conduct property inspections and community outreach regarding any potential impact. *Id*. During this community outreach, if a call was received about potential impact to a resident's home, a Terminals employee and a Sedgwick adjuster inspected the property. A2299-A2301 (Riviere); A2196-A2199 (Charles); A2347-A2348 (Wakefield).

At the direction of Refining and Terminals, and based *solely* on visual inspections, if there was evidence of even one "speck" of any form of oil on a property the Sedgwick inspectors assumed, without testing, that the property had been contaminated by the May 12 Release and provide a settlement amount for the residents that was conservatively estimated to be sufficient to remediate their property, including but not limited to the cleaning and re-filling of cisterns. A2300-

A2305 (Riviere); A2197-A2201 (Charles); A2353 (Wakefield). Sedgwick inspected 2,209 properties between May and July 2021. A2301 (Riviere); *See* A5714-A5748 (Sedgwick Chart). Because Sedgwick assumed that evidence of any oil was connected to the May 12 Release, Sedgwick did not test any oil droplets; nor did it inspect, or test, any cisterns. A2303 (Riviere); A1866-A1867 (Kuczynski); A2199-A2200 (Charles).

### D. The Bankruptcy

On July 12, 2021, Refining and certain affiliated entities (collectively, "Debtors") filed for bankruptcy. *See In re Limetree Bay Services, LLC*, Case No. 21-32351-DRJ (Bankr. S.D.Tx.). On July 26, 2021, Refining initiated an adversary proceeding in the bankruptcy proceeding against Plaintiffs here and asked for a stay of proceedings in the District Court. *See In re Limetree Bay Services, LLC*, Case No. 21-03791 (Bankr. S.D.Tx.). On August 10, 2021, the Bankruptcy Court entered a Stipulation and Agreed Order ("Mediation Stipulation") pursuant to which the *Cotton*, *Shirley*, and *Boynes* Plaintiffs, Debtors and Committee agreed to a voluntary stay in the District Court to allow the parties to mediate Plaintiffs' claims. *See In re Limetree Bay Services, LLC*, Case No. 21-03791, Dkt. No. 56 (Aug. 10, 2021). The *Charles* Plaintiffs were not a party to the Mediation Stipulation but voluntarily participated in the Mediation. *See* A5250. The four federal actions remained stayed through January 31, 2023. *See* dockets.

On October 29, 2021, the Debtors and Terminals entered into a Stipulation and Agreed Order Adopting Water Distribution Program to distribute water to certain residents in nineteen (19) estates within St. Croix. A5251. Refining paid for one hundred percent of the water distribution program costs. *See* A1219 (Charles).[1] The stipulation capped water amounts to 20 gallons per week per household, and 4 gallons per day. A5253. The Water Stipulation expressly reserved the parties' rights on all issues, including whether a Water Program was even necessary. A5254. The Water Stipulation also expressly provided that the Water Program would be discontinued if the mediation or the Voluntary Stay provided by the Water Stipulation were terminated. *Id.* The Bankruptcy Water Program ended in September 2022 when Plaintiffs terminated the Bankruptcy Court mediation.

The prior Bankruptcy Water Program served as a basis for the District Court to order that Terminals, even without Refining (due to Refining's bankruptcy), reinstate a water program for eligible participants. A1590-A1592 (referencing the prior program as a basis to decide logistics of the Program).

---

[1] After the record for this appeal was closed, counsel for Terminals later understood that Refining paid for all of the water program costs until it was no longer able to do so at some point during the bankruptcy proceeding, after which Terminals was forced to shoulder the costs. *See Boynes*, Dkt. No. 475-1, Declaration of L. Fleming in support of Terminals' Motion to Modify.

## II. RELEVANT FACTS PRESENTED AT THE HEARINGS

### A. Phase One Hearing

#### 1. <u>Terminals And Refining Were Separate Entities.</u>

At the Phase One hearing, Terminals' Chief Operating Officer Jeffrey Charles testified that, when he joined Terminals in August 2019 to become its vice president of terminal operations, Refining was a customer of Terminals. A1201-A1202. He also explained that, while the Terminal and the Refinery were within the same fenceline with certain equipment connected, there were "point[s] of demarcation" within the facility designated by different colors of paint showing where one facility ended and the other began. A1202-A1203 (explaining that Terminals employees would "not go past that valve for any further operations. That's where the [R]efinery would pick up."). Because of the interconnectedness, there was an agreement between Refining and Terminals for shared services (A5165-A5248), but that concerned departments such as security and maintenance, A1207-A1211, not the operations of the Refinery. Mr. Charles also testified that Refining had its own vice president of operations at the time, Brent Woodland, who was Mr. Charles's counterpart. A1211.

Plaintiffs attempted to show that Terminals and Refining are the same legal entities. The District Court properly found otherwise, finding that "[w]hile the shared services evidence indicates that there was some degree of interconnectedness

between the two companies as to those services, that evidence, standing alone, is insufficient—both legally and factually—to establish that Terminals and Refining are not distinct legal entities." *See* A21 (4.28.23 Op.).

### 2. Only One Named Plaintiff Testified At The Phase One Hearing.

Only 1 of the 44 Named Plaintiffs, Margaret Thompson, testified about her individual circumstances and reasons for seeking injunctive relief against Terminals. *See generally* A521-A1579. Other than Ms. Thompson, 4 other St. Croix residents testified at the hearing (Jo Anne Allen-Murphy, Carolyn Urgent, Julio Carino, and Marisela Webster). *Id*. None of these residents is a Named Plaintiff in any of the subject cases. *See, e.g.* A2747; A2812; A2922; A2939 (operative complaints).

### 3. Plaintiffs' Experts' Opinions Do Not Support Plaintiffs' Claim That Harm Occurred.

Plaintiffs presented three experts at the Phase One hearing, Dr. Marco Kaltofen, Dr. Michael Henry, and Dr. Erno Sajo. None of these experts made any attempt to connect any potential detection of petroleum in cisterns with the Releases.

#### i. Drs. Kaltofen and Henry

After the Releases, between July 2021 and early November 2021, Dr. Kaltofen and his team, including Dr. Henry, collected and tested 82[2] samples from

---

[2] The District Court's total of 82 samples, based upon its own review of the sampling records, A30 at n.49, is consistent with Terminals' expert Dr. Murray's calculations, *see* LBT1-16.

various locations on St. Croix, including only 9 of the 39 Named Plaintiffs' properties. A4993; *see also* A5308 (Murray Demonstrative). These samples included 23 cistern water samples, 41 soil samples from varying locations, and 18 cistern swab samples. *See* A30-A31 (4.28.23 Op.). The samples were tested for petroleum hydrocarbons. A647-A648 (Kaltofen).

Terminals' expert witnesses, Drs. Karen Murray and Charles Menzie, analyzed Plaintiffs' experts' sampling data and found no support for Plaintiffs' broad conclusions of petroleum contamination connected to the Releases. *See generally* A1395-A1402 (Murray); A1317-A1320 (Menzie). More than 95% of the cistern water samples collected and analyzed by Plaintiffs' experts were non-detect for the presence of petroleum, meaning the laboratory failed to find any petroleum hydrocarbons (also known as "TPH" or "total petroleum hydrocarbons") in their cistern water. *See generally* A1315 (Menzie); A1392-A1396 (Murray); A5309-A5311 (Murray Demonstrative). Incredibly, Dr. Kaltofen testified that 21 of his 22 cistern water samples were "non-detect" for TPH-DRO. A738-A739 ("I went down and counted all of the results for the water samples for TPH-DRO, and I came up with 21 of the 22 are non-detect."); *see also* A5309-A5310 (Murray Demonstrative). Moreover, for the one water sample that was supposedly a "detect," Dr. Kaltofen failed to take the next obvious step to analyze the sample (by analyzing

chromatograms) to confirm if the substance was actually petroleum. A1393-A1394 (Murray).

As for the soil samples, the one soil sample from Point Udall that Dr. Kaltofen identified as a "background" sample, meaning it came from an area that could not have been impacted by the Releases, had elevated levels of petroleum hydrocarbons. A748-A750 (Kaltofen). This sample contained <48 mg/kg TPH-DRO (diesel range) and 200 mg/kg TPH-ORO (oil range). A5268 (Murray Declaration). Not one of the nine soil samples collected from the Named Plaintiffs' properties exceeded the concentrations of TPH of the background sample. *Id.*

Dr. Kaltofen collected 18 swab samples, and 14 had detected levels of TPH. *See generally* A4993 (Kaltofen Data); A5269 (Murray Declaration). Dr. Kaltofen made no attempt to further analyze the few detections to determine whether they could be directly linked to the Releases, as opposed to myriad other sources of petroleum hydrocarbons present on St. Croix, as he saw was demonstrated from his own "background" sample. *See* A5263-A5264 (Murray Declaration); A1371, A1394-1396 (Murray). In contrast, when Dr. Murray analyzed the chromatograms of these 14 swab samples, they demonstrated the sources were likely **not** even petroleum, meaning there was no evidence of petroleum-related TPH on any of the surfaces from where swab samples were taken, much less petroleum that could be connected to a Release. A1401-A1402 (Murray).

### ii.    Dr. Sajo

Dr. Sajo prepared air models to attempt to show the air (not ground) path of the Releases after each incident.  A826-A827.  Dr. Sajo conceded his opinions were limited because his models concerned air predictions, not impact on the ground.  A861-A863.  Dr. Sajo also admitted he lacked information required to substantiate his air modeling, acknowledging that the extent of a release's impact on the ground depends upon the nature and size of the release, including "numerous additional meteorological factors"; the "time and duration" of a particular condition; and "the quantity of released materials."  A862.  Dr. Sajo had none of this information when he prepared his air models.  *Id*.  Dr. Sajo admitted that, due to meteorological phenomena, neighboring properties could vary in whether and to what extent the Releases affected them.  A862-A863.

### iii.    Only One Testifying Resident (Thompson), And Two Named Plaintiffs Are Reflected In Plaintiffs' Experts' Sampling Data From 2021.

Plaintiffs made no attempt to present sampling data for each Named Plaintiffs' properties, or for all testifying residents.  *See* A4993 (Kaltofen Data); A5263-A5264 (Murray Declaration); A5308 (Murray Demonstrative).  Dr. Kaltofen's sampling data reflects only two Named Plaintiffs, Ms. Thompson and another Named Plaintiff who did not appear in Court, Delia Almestica.  A5308 (Murray Demonstrative).  Of

all the residents testifying at the Phase One hearing, only Ms. Thompson was reflected in Dr. Kaltofen's data. *See* A4993 (Kaltofen Data).

### 4. Plaintiffs' Harm And The Harm Described In The Hearing Is Compensable By Monetary Damages.

The residents appearing at the Phase One hearing (Thompson, Webster, Urgent, Allen-Murphy, and Carino) testified they routinely purchased bottled water **before** the Releases *see* A568-A569 (Allen-Murphy); A924-A925 (Carino); A937 (Thompson), they still use or are able to use their cisterns for basic water uses, *see* A566 (Allen-Murphy); and they never drink their cistern water, *see* A568 (Allen-Murphy), A924-A925 (Carino), A937 (Thompson); or always bought water for cooking, A938 (Thompson). Nonetheless, most witnesses testified they expected compensation for their cisterns even though not one of them tested the water in their cisterns during the two years following the Releases. *See* A559 (Allen-Murphy); A811-A812 (Webster); A917-A925 (Carino); A950 (Thompson). Moreover, not one witness testified that their "mistrust" of the quality of their untested cistern water caused them to give up other "basic necessities" in order to purchase water, the standard for irreparable harm and injunctive relief adopted by the District Court. *See generally* A568 (Allen-Murphy); A794 (Urgent); A937 (Thompson); A924-A925 (Carino). Indeed, during Plaintiffs' closing arguments following the Phase One hearing, the District Court repeatedly pointed out Plaintiffs' failure to elicit such

testimony, a failure the District Court unfortunately later overlooked in finding the existence of irreparable harm.  A1485-A1498 (further detailed herein).

## B.     Phase Two Hearing

### 1.     <u>Only One Resident Testified At The Phase Two Hearing.</u>

At the Phase Two hearing, held to determine the scope of relief, Plaintiffs presented one non-plaintiff resident witness, Marver Antoine, and no testimony from a Named Plaintiff.   Plaintiffs presented no sampling data from Ms. Antoine's property.  Ms. Antoine did not testify that the Releases caused her to give up basic necessities in order to purchase water.  *See generally* A1607-A1648.  Rather, Ms. Antoine testified that her hardship is that she buys fewer cleaning supplies, less gas, and is forced to buy more frozen vegetables.  A1621-A1622.  Ms. Antoine resides in Mount Pleasant.  A1608.

### 2.     No Evidence Demonstrated Imminent Harm Or Need For The Water Program.

Plaintiffs presented no evidence of impact or harm.  Other than Ms. Antoine, the only other witness Plaintiffs called to testify about potential impact was Brian Moore.   Mr. Moore prepared maps using Dr. Sajo's air modeling to depict the impacted area.  The District Court declined to qualify Mr. Moore as an expert and allowed Mr. Moore to testify only about his preparation of maps.  A1732-1744. Ultimately, the District Court found Mr. Moore's mapping of an "EPA Zone of Impact" to be "of little value in assessing the areas that may have been impacted by

the release events." A84. The District Court dismissed the fact that Dr. Sajo's air modeling was limited and lacked variables, accepting that the air modeling provided a "reasonable estimate" of the likely area of impact within six miles of the Refinery. A83.

### 3. The Covered Area Exceeds Where Testifying Witnesses Reside And Does Not Reflect Present-Day Harm.

The District Court relied largely on its analysis of "hits" within different estates from the Sedgwick inspection data to fashion the 35-estate Covered Area. A84-A98. No evidence connected this data to any of the Named Plaintiffs or the other testifying witnesses, who collectively resided in only five of the 35 estates: Smithfield (Thompson, the only Named Plaintiff to testify), Whim (Urgent and Carino), Campo Rico (Allen-Murphy), Williams Delight (Webster), and Mount Pleasant (Antoine). A80 at n.21 (7.20.23 Op.). Most of the estates do not correspond with the 44 Plaintiffs bringing claims against Terminals. The District Court agreed with Terminals that Dr. Sajo's air modeling did not "depict conditions on the ground." A83 (quoting Terminals' Supplemental Briefing). Yet the District Court created a new 35-estate Covered Area nearly double the size of the area in the original, earlier Bankruptcy Water Program, which had included only 19 estates. *See* A5251.

### 4. The Response To The May Release Was Precautionary.

Jeffrey Charles, Terminals' Chief Operating Officer, Joyce Wakefield, a Senior Environmental Specialist for Terminals, and two Sedgwick employees at the time of the Releases, Roland Riviere and Amanda Kuczynski, testified regarding the immediate response to the May 12 Releases. Canvassing teams were sent into the community in response to calls received about potential impacts from the Releases, and inspectors canvassed neighborhoods believed to have been impacted. *See* A1843-A1844, A1847(Kuczynski); A2183-A2184 (Charles); A2300-A2301 (Riviere).

Ms. Kuczynski testified that Terminals' and Refining's "main focus at th[e] preliminary stage [wa]s timeliness of response and getting the community members happy and fairly compensated." A1856-1857. The goal was to respond to as many residents as quickly as possible. A2195 (Charles). As the inspectors conducted visual inspections at various parts of the properties, if they saw even a small "speck" of oily water mix on the property, then they assumed that the property was "impacted" by the May 12 Release and they would offer compensation for cleaning the entire property, including cisterns. A2198-A2199 (Charles); A2353 (Wakefield). These settlement offers were made "out of an abundance of caution." A2198-A2200 (Charles).

Ms. Kuczynski and Mr. Charles also testified that testing was not the priority after the May 12 Release. A1866-A1867 (Kuczynski); A2199-A2200 (Charles). Mr. Riviere testified that Sedgwick inspected 2,209 properties in these response efforts. A2301. Although a "majority" of the inspected properties were found to have "some sort [of] impact" from the May 12 Release, A2302 (Riviere), Mr. Riviere confirmed that a cistern was assumed to be impacted if there was "any indication on the property" that any oil was detected, A2304, whether on "walls, windows, doors, gas tank, [or] cable boxes on the house itself," A2303. The cisterns were not inspected. A2304, A2319, A2333. In fact, no one testified at the Phase Two hearing that anyone inspected their cisterns (whether by Sedgwick or Dr. Kaltofen's team), let alone that cisterns contained petroleum, or that cisterns contained petroleum which might be connected to a Release.

## C. Evidence Related To The Amount Of Bond Ordered Was Limited.

The District Court relied primarily on briefing to set Plaintiffs' bond requirement. A104-A110. Plaintiffs represented that an unknown subset of 11,814 residents in the Covered Area are eligible for injunctive relief. A4187. Terminals estimated that operating the Water Program would cost over $21 million annually. A4187-A4188. Plaintiffs calculated that the potential cost would be over $100 million annually. *Id*. Relying on briefing, the District Court concluded that an initial bond in the amount of $50,000 (approximately $50 per 1,000 households), and

19

subsequently an additional $50 per household that participates in the Program over and above 1,000 households would suffice. A110.

### D. The Injunction Period Is Indefinite.

The District Court's injunction orders do not have a time limitation. A121. Rather, Terminals and Plaintiffs are to provide the District Court with an update every six months as to the number of households participating in the program. *Id.*

## SUMMARY OF ARGUMENT

The District Court improperly found that Plaintiffs were likely to succeed on the merits of their negligence *per se*, private nuisance, and public trespass claims based solely upon Terminals presence on a Title V permit, despite plain language from operating agreements with the GVI stating that **Refining** was solely responsible for operations of the Refinery and Terminals was not allowed to interfere with the operation of the Refinery.

The District Court also committed reversible error in granting Plaintiffs' preliminary injunction in several regards. The injunction orders misapplied Third Circuit precedent in finding irreparable harm existed for thousands of putative class members where (1) the testimony about purportedly harmed individuals was limited to one Named Plaintiff and four other non-plaintiff residents; (2) no evidence was presented at either hearing of a "presently existing actual threat" to anyone; (3) the District Court found as evidence of existing, present-day cistern contamination,

residents' subjective, if not self-serving, "mistrust" of the quality of cistern water they admitted to never having tested during the intervening two years since the Releases, a finding that also directly contradicts the District Court's proper finding that Plaintiffs had not demonstrated sufficient present-day contamination to require the immediate remediation of cisterns; (4) the District Court found as evidence of present-day cistern contamination, statements and advisories from public service announcements, local papers, and government agencies relating to the use of cistern water immediately following the Releases in 2021; and (5) the District Court improperly ordered a remedy (free water), which is an improper form injunctive relief because the harm is compensable with money damages.

Finally, the District Court erred in ordering a $50,000 bond because that amount fails to adequately provide "a fund to use to compensate incorrectly enjoined defendants" (*i.e.*, Terminals) if this Court ultimately reverses the injunction.

## ARGUMENT

## I.   THE DISTRICT COURT ERRED IN FINDING THAT PLAINTIFFS WERE LIKELY TO SUCCEEED ON THE MERITS.

### A.   Standard of Review

"[T]he tool of the preliminary injunction should be reserved for 'extraordinary' situations." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000) (quoting *Sampson v. Murray*, 415 U.S. 61 at 88, 92 (1974)). "'In reviewing the grant or denial of a preliminary injunction, [this Court] employs a

tripartite standard of review: findings of fact are reviewed for clear error, legal conclusions are reviewed de novo, and the decision to grant or deny an injunction is reviewed for abuse of discretion.'" *Osorio-Martinez v. Att'y Gen. United States of America*, 893 F.3d 153, 161 (3d Cir. 2018) (quoting *Del. Strong Families v. Att'y Gen. of Delaware*, 793 F.3d 304, 308 (3d Cir. 2015)). This determination is a legal conclusion subject to plenary review. *See Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009) ("Legal conclusions—including whether the movant has established irreparable harm—are reviewed *de novo*."); *accord Nat'l Land & Inv. Co. v. Specter*, 428 F.2d 91, 95 (3d Cir. 1970) ("Whether appellants demonstrated the irreparable harm or reasonable probability of success on final hearing necessary to the issuance of a preliminary injunction is a question of law…."). Here, the District Court incorrectly found that, as a matter of law, Terminals had a duty to prevent the Releases from a refinery that Terminals did not own and could not legally operate or even attempt to operate in any respect. A21 (4.28.23 Op.). This determination, a legal conclusion, is subject to plenary review.

**B. The District Court's Determination That Plaintiffs Were Likely To Succeed On The Merits Of Their Negligence *Per Se*, Private Nuisance, And Negligent Trespass Claims Was In Error.**

The District Court erred in finding that Plaintiffs were likely to succeed on the merits of their negligence *per se*, private nuisance, and negligent trespass tort claims[3] against Terminals because, under the express combined language of the Refinery Operating Agreement ("ROA") and the Amended and Restated Terminal Operating Agreement ("TOA"), the GVI legally required that **only Refining** could own and operate the Refinery, and that Terminals could "not unduly interfere with a Refinery Restart or any future Refinery Operations." *See* A5050 (TOA); A5120(ROA). The District Court's finding for each cause of action was therefore a clear error of fact and a misapplication of the law.

Negligence *per se* is a recognized cause of action in the Virgin Islands. *See, e.g., Alleyne v. Diageo USVI, Inc.*, 63 V.I. 3894, 402 (V.I. Super. Ct. 2015). Succeeding on a negligence *per se* claim requires "the plaintiff [to] demonstrate that the defendant had a duty to follow the law, failed to follow the law, and that such failure caused **damages** to the plaintiff as a person within the class intended to be

---

[3] The District Court found Plaintiffs' private nuisance and negligent trespass claims were likely to succeed on the merits based on its findings regarding Plaintiffs' negligence *per se* claim. Apr. 28 Op. at 18.

protected by the statute or regulation." *Antilles Sch., Inc. v. Lembach*, 64 V.I. 400, 423 (V.I. 2016) (citations omitted) (emphasis added).[4]

The District Court incorrectly found that Terminals had a duty, as a co-permittee on the Title V permit, to ensure Refining's compliance with the Title V permit and therefore found that the Releases violated the Clean Air Act, subjecting *Terminals* to liability. This determination was incorrect as a matter of law,[5] and contrary to fact.

As the District Court correctly determined, Terminals has always been a distinct legal entity from Refining, and the "mere existence of shared facilities and services" does not change this. *See* A20-A21 (4.28.23 Op.). Refinery was a Terminals customer. A1201-A1202 (Charles). Terminals' services to Refining were limited to providing tanks and piping needed for Refining to move its product through Terminals' piping to and from storage tanks to docks. A1212-A1214 (Charles describing Refining's needs as a customer). Terminals did not provide environmental services to Refining, nor did it provide services relating to the maintenance of Flare #8. *See generally* A5165-A5248 (Shared Services Systems Agreement); *see also* A1174, A1183 (Elizee).

---

[4] That negligence *per se* is compensable by money damages undermines the irreparability of Plaintiffs' harm.

[5] *See Del. Strong Families*, 793 F.3d at 308 (in reviewing the grant of a preliminary injunction, "legal conclusions are reviewed de novo…").

In this context, the Clean Air Act, 42 U.S.C. § 7401, *et seq*., governs air emissions under the auspices of the United States Environmental Protection Agency ("EPA"). Under EPA standards, the owner and operator of the emissions source – here, Refining – is responsible for complying with EPA regulations. *See, e.g.*, 40 C.F.R. § 63.670 ("the owner or operator of a flare used as a control device for an emission point subject to this subpart shall meet the applicable requirements for flares as specified in paragraphs (a) through (q) of this section…"); 40 C.F.R. § 60.102a ("Each owner or operator that is subject to the requirements of this subpart shall comply with the emissions limitations in paragraphs (b) through (i) of this section…"); 40 C.F.R. § 63.642 ("The owner or operator of a Group 1 miscellaneous process vent as defined in § 63.641 shall comply…").

Here, not only did Terminals not own or operate the Refinery or Flare #8 when the Releases occurred, but it was expressly **prohibited** from doing so by the TOA with the GVI, which expressly forbade Terminals from interfering "with a Refinery Restart or any future Refinery Operations." A5050. Terminals had no duty to ensure Refining's compliance with Title V, and requiring it to do so would force Terminals to engage in legally prohibited conduct.

The legal effect of the TOA and ROA, and their separate requirements, is clear; the Clean Air Act further provides "that air pollution prevention…and air pollution control at its source is the primary responsibility of States and local

governments." *Id.* § 7401(a)(3). Thus, the Act employs "cooperative federalism" through which the federal government develops baseline standards that States individually implement and enforce. *GenOn REMA, LLC v. EPA*, 722 F.3d 513, 516, No. 12-1022, 2013 WL 3481486, at *1 (3d Cir. July 12, 2013). States and territories, including the U.S. Virgin Islands[6], may employ their own standards and requirements, such as those contained in the TOA and ROA. *See* 42 U.S.C. § 7416 ("Retention of State Authority"). Section 7416 provides:

> Except as otherwise provided ... nothing in this chapter shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution....

*Id.*

Here, the TOA and ROA unequivocally permit only Refining to operate the Refinery, and unequivocally **forbid** Terminals from operating or interfering with Refinery operations. *See* A5050 (TOA); A5120 (ROA). The ROA makes this even clearer, providing in the 7th Whereas clause at page 8:

> to further facilitate a Refinery Restart, Terminal Operator [, Terminals,] has asked the Government to enter into a new Refinery Operating Agreement to reflect that the Refinery and the Refinery Site will be acquired, held and operated by Refinery Operator, rather than by Terminal Operator, and to govern the contractual relationship

---

[6] *See* 42 U.S.C. § 7602(d) (defining "States" to include the United States Virgin Islands).

26

> between the Government and Refinery Operator in its
> capacity as owner of the Refinery and the Refinery site.

A5100. The TOA includes the same language for Terminals, expressly providing

that Terminals is the "Terminal Operator," and will hold and operate the Terminal

and Terminal Site without interfering with Refinery operations. *See* A5029, A5031-

5032, and A5050. Accordingly, the agreements with the GVI, not the Title V permit,

govern the obligations related to the Refinery's operation, and Terminals had no

legal right or obligation to monitor or enforce Refining's compliance with the Title

V Permit.

The District Court's finding that Plaintiffs were likely to succeed on their

claim for negligence *per se* should be reversed, as should the related findings for

Plaintiffs' private nuisance and negligence trespass claims.

## II. THE DISTRICT COURT'S FINDING OF IRREPARABLE HARM IS ERRONEOUS AS A MATTER OF FACT AND LAW.

### A. Standard Of Review

The District Court's finding of irreparable harm is reviewed in accordance

with the standard articulated in Section I.A above. An "extraordinary" form of relief,

"the *dramatic and drastic power* of injunctive force may be unleashed only against

conditions generating a *presently existing actual threat*." *Adams*, 204 F.3d at 487

(quoting *Holiday Inns of America, Inc. v. B & B Corp.*, 409 F.2d 614, 618 (3d Cir.

1969)) (emphasis supplied in part and added in part). "[T]he risk of irreparable harm

must not be speculative." *Id*. at 488 (citing *Acierno v. New Castle Cty*., 40 F.3d 645 (3d Cir. 1994)). Instead, a preliminary injunction should not issue "unless the moving party [a plaintiff] shows that it **specifically and personally risks** irreparable harm." *Id.* at 487 (citations omitted) (emphasis added).

Where only few plaintiffs testify on behalf of many, the few testifying plaintiffs must "lay an adequate foundation from which one could draw inferences that the testifying plaintiffs are similarly situated—in terms of irreparable harm—to all other plaintiffs." *Id.* "In the absence of a foundation from which one could infer that all (or virtually all) members of a group are irreparably harmed, we do not believe that a court can enter a mass preliminary injunction." *Id.*

"Merely petitioning for class certification cannot provide plaintiffs the right to be treated collectively." *Id*. at 490. This distinction exists because while

> a class action determination focuses on similarities between the legal claims of the parties . . . a preliminary injunction determination, by requiring a showing of irreparable harm, depends in many cases . . . on circumstances entirely independent of legal rights: **the particular resources available to each member of the class to weather hardships pending a trial**.

*Id*. at 490-91 (emphasis added).

No irreparable harm exists if a plaintiff does not "demonstrate[] a significant risk [of] harm that cannot be adequately compensated after the fact by monetary damages." *Id*. at 484-85 (citing *Frank's GMC Truck Center, Inc. v. General Motors*

28

*Corp.*, 847 F.2d 100, 102-03 (3d Cir. 1988)). "[T]he loss of income alone [is not] irreparable harm." *Id*. at 485 (citing *Morton v. Beyer*, 822 F.2d 364, 372 (3d Cir. 1987)). A preliminary injunction should not issue without a showing that plaintiffs (1) "are likely to experience irreparable harm" and (2) "are reasonably likely to succeed on the merits," "regardless of what the equities seem to require." *Adams*, 204 F.3d at 484 (internal citations omitted). The standard is specific to a *plaintiff*, defined by Black's Law Dictionary as "The party who brings a civil suit in a court of law."[7]

### B. One Named Plaintiff And Four Non-Plaintiff Residents At The Phase One Hearing And One Non-Plaintiff Resident At The Phase Two Hearing Failed To Show Irreparable Harm To All Plaintiffs And All Potential Class Members.

Based on exceedingly limited testimony from one Plaintiff and four non-plaintiff resident witnesses, the District Court erroneously concluded that irreparable harm purportedly caused by the Releases had been adequately demonstrated as to all "those within the impacted areas who cannot afford to purchase water without trading off other basic necessities" (A53 (4.28.23 Op.)), who were therefore entitled to programmatic relief. This is clear error. The risk of irreparable harm must be specific and personal. *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir.

---

[7] *See Plaintiff*, BLACK'S LAW DICTIONARY (8TH ED. 2004).

2000) (the moving party must "show[] that it specifically and personally risks irreparable harm").

When few plaintiffs testify on behalf of many, they must "lay an adequate foundation from which one could draw inferences that the testifying plaintiffs are similarly situated—in terms of irreparable harm—to all other plaintiffs." *Adams*, 204 F.3d at 487. Without such a foundation, "we do not believe that a court can enter a mass preliminary injunction." *Id.*

In *Adams*, this Court reversed a finding of irreparable harm where the lower court relied on evidence from "several" plaintiffs who testified how their income limitation affected their abilities to pay higher health insurance premiums. *Adams*, 204 F.3d at 485. This Court found:

> We agree that if all the plaintiffs had presented evidence that they would have to forego medical care because of the heightened costs of the new health plan, each would have established irreparable harm. The difficulty with the District Court's conclusion, however, is that only a small percentage of the plaintiffs testified, and that even among those who did, many did not present any evidence (or even make an assertion) that they would have to forego medical care or other necessities if the proposed change were to take effect. There was thus no basis for inference-drawing.

*Id.*

Here, fewer Plaintiffs (only one) testified than in *Adams* (ten), and no one presented evidence about foregoing basic necessities to purchase water. At the

Phase One closing argument, the District Court challenged Plaintiffs on this point, and Plaintiffs struggled to provide evidentiary examples. A1485-A1498. The District Court first insisted counsel explain what was irreparable about purchasing water. A1485 ("tell me why it is irreparable"). The District Court pressed for evidence supporting counsel's statement that the testifying witnesses were representatives of an impoverished community lacking "options to purchase the sufficient quantity of replacement water." *Id.* ("How do we know that? What evidence tells us that?"). The District Court rejected the suggestion that witnesses testified to this. A1486 ("That was not the testimony of … Miss [Allen-] Murphy."). The District Court highlighted that Ms. Allen-Murphy "was able to purchase water. She didn't testify that she could not purchase water, correct?" A1487.

The District Court rejected Plaintiffs' suggestion that "inconvenience" qualifies as irreparable. A1491 ("But you mentioned inconvenience…. having to stand in line, having to go there early, and those are clearly inconveniences. Does that translate into irreparable harm? That's the issue."). To counsel's argument that irreparable harm is not being able to rely on a water source, the District Court swiftly responded: "That's not irreparable. That's not irreparable if there is some means of compensating for that harm which can ultimately be addressed through money damages at the end of the case in fact. The fact that cisterns are a main stay in the Virgin Islands is not irreparable harm." A1493. Counsel responded that U.S.

Census data shows that the "people in these communities" face "untenable" decisions of choosing between buying water or food; the District Court again asked: "What was the evidence of that?" A1495. Counsel represented that witnesses testified to this, A1496-A1498, but, as discussed below, no one did.[8]

The District Court's first assessment that Plaintiffs lacked evidence of irreparable harm was correct. No witness testified about existing, present-day harm, or imminent threat of harm, or foregoing basic necessities to purchase water. The one Named Plaintiff who testified (Ms. Thompson), did not testify about foregoing basic necessities to purchase water, nor did she provide a reason to purchase additional water, i.e. a contaminated cistern, let alone evidence that a Release caused such contamination. *See generally* A935-A951. Five additional residents testified at the evidentiary hearings: Ms. Allen-Murphy (A526-A587), Ms. Urgent (A785-A797), Ms. Webster (A797-A817), Mr. Carino (A914-A935), and Ms. Antoine (A1607-A1648). Not one of these witnesses testified that they faced "untenable" choices, or provide evidence of a reason to purchase additional water, i.e. a contaminated cistern, let alone evidence that a Releasee caused such contamination. Rather, these witnesses testified they routinely purchased bottled water **before** the Releases *see* A568-A569 (Allen-Murphy), A924-A925 (Carino), A937 (Thompson);

---

[8] Even if they had, as discussed below, an injunction should not issue without irreparable harm, regardless of what the equities seem to require.

they still use or are able to use their cisterns for basic water uses, *see* A566 (Allen-Murphy), A1617 (Antoine); and they never drink their cistern water, *see* A924-A925 (Carino); or always bought water for cooking, A938 (Thompson). Ms. Allen-Murphy testified that, for years, she observed most people in her complex buying bottled water for drinking and cleaning. A568-A569.

Unfortunately, the District Court reversed course following the Phase One hearing, and did not hold Plaintiffs to their required burden of proof in its April 28, 2023 Opinion, instead only conceding: "It is true that, for the most part, the resident witnesses did not expressly attribute their conduct in response to the seemingly contaminated water to financial constraints or to the difficulties associates with securing and transporting sufficient quantities of water…." A51. In so backtracking, the District Court improperly **inferred** that witnesses' testimony indicated "financial constraints," and that one Named Plaintiff and one resident witness took "unusual steps to satisfy their water needs." *Id.* These inferences are not irreparable harm. The District Court made no finding based on evidence (none existed) supporting a determination that either individual gave up basic necessities in order to purchase water, let alone supporting an evidence-based finding that a Release contaminated their cisterns. The only support the District Court used to find irreparable harm, however weak, was **argument** of Plaintiffs' counsel in their post-trial briefing, *see id.*, which is insufficient, not evidence, and clearly erroneous.

The caselaw the District Court relied upon to apply the injunction to "those Plaintiffs and putative class members who cannot afford to meet their daily water needs without being forced to forego other necessities," A53, is inapposite because, no witness testified about foregoing basic necessities in order to purchase water, let alone that they had to do so because their cisterns were contaminated. The cases are also procedurally different because they concerned already certified classes. *See Tustin v. Heckler*, 591 F. Supp. 1049, 1052 (D.N.J. 1984); *Maldonado v. Houstoun*, 177 F.R.D. 311, 335 (E.D. Pa. 1997); *Garnett v. Zeilinger*, 313 F. Supp.3d 147, 154 (D.D.C. 2018); and *Grant v. Sullivan*, 131 F.R.D. 436, 450 (M.D. Pa. 1990). Here, Plaintiffs have not moved for class certification.

The cases are also factually different: the lower courts relied on declarations or testimony from plaintiffs or class members as evidence to find irreparable harm. *Tustin*, 591 F. Supp. at 1054; *Maldonado*, 177 F.R.D. at 333-34; *Grant*, 131 F.R.D. at 449. Tellingly, in *Garnett*, the district court relied on specific declarations from class representatives and members stating that "without benefits, class members are unable to obtain enough food for themselves and their families, requiring them to skip meals and go hungry." 313 F. Supp.3d at 157-58. Here, no similar evidence existed.

**C.** **The District Court Based Its Erroneous Finding Of Irreparable Harm On Stale, Unsupportive Evidence And Improperly Switched The Burden Of Proof To Terminals.**

The District Court improperly relied on outdated (and unsupportive) evidence to find the existence of *present* contamination. A40. Issuance of an injunction, however, requires evidence of "conditions generating a presently existing actual threat." *Adams*, 204 F.3d at 487 (citations and quotations omitted).

**1.** **Insufficient Evidence Showed Cistern Contamination And *No Evidence* Showed Contamination From A Release.**

The District Court erroneously concluded that all Plaintiffs and putative class members demonstrated cistern contamination based on limited evidence: swab samples taken by Plaintiffs' sampling experts from various residential properties beginning in around October 2021 (A38-A39; *see also* A4993); the testimony of the four residents and one Named Plaintiff who testified about the water in their untested cisterns (A39); and the testimony of two non-plaintiffs (Webster and Allen-Murphy) who testified about the "appearance" of their untested water. A41. Plaintiffs' swab samples were never connected to a Release; nor did Plaintiffs make an attempt to make such a connection. In contrast, the only evidence in this regard was presented by Terminals' expert, who found the sample results were likely not petroleum, much less petroleum in some way connected to a Release.

As Terminals' expert Dr. Murray testified (and discussed further below), Plaintiffs' test results showed no contamination. A1366 (Murray). Plaintiffs'

sampling team took 82 samples from July to October 2021: 23 water samples from cisterns, 41 soil samples from varying locations, and 18 swab samples from cisterns, roofs, fences, and other locations.  A30 (4.28.23 Op.); A4993 (Kaltofen Data).  The District Court properly found that Plaintiffs' water and soil samples contained too many deficiencies to determine whether there was contamination.  A38.  The District Court also properly discredited Plaintiffs' soil samples because "Dr. Kaltofen did not consistently explain" the meaning of the data.  *Id.*

As for the swab samples, the District Court improperly found they were "indicative" of contamination, *id.*, but this conclusion is not supported by Plaintiffs' data.  First, the testing only included two Named Plaintiffs' properties, limiting the testing's applicability and scope.  Second, Plaintiffs' samples were taken between July 2021 and October 2021, *see, e.g.* A4993 (Kaltofen Data), months after the Releases, and nearly two years before the District Court entertained injunctive relief, leaving absolutely no present-day testing offered into evidence.

Moreover, Dr. Murray analyzed Plaintiffs' data and found that none of the swab samples contained a profile resembling a petroleum product, even if TPH was detected.  A1401.  Dr. Murray further testified that "none of [the swab samples] came back with any indication of oil."  A1402.  Dr. Murray also found, by reviewing the names associated with the swab samples to the Named Plaintiffs in these cases, that only two swab samples came from a Named Plaintiff's property.  *Id.*; A5308

(Murray Demonstrative showing Plaintiffs Thompson and Almestica are reflected in Kaltofen's testing data). Dr. Murray found that neither swab sample from these two Plaintiffs' properties detected any TPH at all, and therefore no petroleum, let alone petroleum that connected to a Release. *Id.*

The District Court did not address Dr. Murray's testimony about the swab samples, and instead found that those samples indicated contamination because Dr. Henry (a member of Dr. Kaltofen's sampling team) testified that the sampling team swabbed cisterns regardless of whether visible "signs of potential oil deposits" were present. A39 (citing 3.3.23 Tr. at 201). The District Court provided no other explanation. Plaintiffs in no other way connected the swab samples (or any other samples) to petroleum sources from the Refinery, and they failed to counter Dr. Murray's testimony that none of Plaintiffs' swab samples indicated the presence of oil. Moreover, the District Court's finding ignored the fact that the swab samples were not reflective of all Plaintiffs, and that the two samples from Named Plaintiffs' properties indicated no petroleum. This evidence cannot indicate contamination at all, let alone present-day cistern contamination specific and personal to all 44 Named Plaintiffs and all unnamed potential class members. *See Adams*, 204 F.3d at 488 ("In order to obtain a preliminary injunction that would apply to each one of them, the plaintiffs would have had to present affidavits or other evidence from which one could at least infer that each of them was so threatened.").

37

The District Court also concluded that contamination occurred based on limited and speculative testimony of resident witnesses. A39. The resident witnesses testified about their personal observations of what they believed was oil immediately after the Releases, in May 2021, at various locations on their properties. *Id*. Speculation or belief cannot demonstrate harm. "[W]e have also insisted that the risk of irreparable harm must not be speculative." *Adams*, 204 F.3d at 488 (citing *Acierno v. New Castle Cty.*, 40 F.3d 645 (3d Cir. 1994)). The District Court nonetheless found that the resident witnesses' testimony "corroborated contamination," even though only one witness (Thompson) was reflected in Plaintiffs' testing samples (*see* A4993), and Thompson's samples did not indicate the presence of petroleum (*see* A1401-A1402 (Murray)).

The District Court also supported its finding of contamination based upon "multiple press releases noting that a number of neighborhoods were contaminated by the release events", A39, but press releases are not probative of specific and personal harm to cisterns belonging to the witnesses who testified, or all Named Plaintiffs, or all possible class members. *See Adams*, *supra*, at 487.

### 2. The District Court Improperly Shifted The Burden To Terminals To Disprove *Present* Cistern Contamination.

The District Court improperly found that present contamination exists because

"**Terminals has failed to dispel the notion that there is present contamination**,"

A41 (emphasis added), because the burden rests on Plaintiffs, not Terminals, to

establish that an injunction should issue. *See Ferring Pharmaceuticals, Inc. v. Watson Pharmaceuticals, Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) ("The movant bears the burden of showing that these four factors weigh in favor of granting the injunction."). Irreparable harm cannot be based on speculation, and must be specific and personal to *plaintiffs*. *Adams*, *supra*. "[T]he opposite conclusion would…essentially shift the burden to the defendant to disprove widely believed facts and would turn the preliminary injunction balancing process on its head." *Id.* at 487. Yet this is precisely what the District Court did in evaluating clearly insufficient evidence to supporting a finding of irreparable harm.

Contrary to Plaintiffs incessant refrain of widespread cistern contamination, Plaintiffs' purported "belief" is directly contradicted by their own expert's finding that over 95% of the cistern water samples collected and analyzed did not detect **any** contamination. A5309 (Murray Demonstrative. *See Winter v. Natural Resource Defense Council, Inc.*, 555 U.S. 7, 22 (2008) ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.") (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972(1997)); *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987) ("Establishing a risk of irreparable harm is not enough. A plaintiff has the burden of proving a 'clear showing of immediate irreparable

injury.'") (quoting *Continental Group, Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 359 (3d Cir. 1980). Plaintiffs made no attempt to carry their burden to demonstrate present-day contamination of the cisterns caused by a Release.

More frustrating is that the District Court's finding was directly contrary to the evidence, as Drs. Murray and Kaltofen agreed that any concentration of petroleum would dissipate over time. A40. Dr. Kaltofen further testified that if his team performed sampling today "they would 'probably get a different result.'" A777-A778. The District Court nonetheless found that, because both experts also hypothesized that pitch oil, which they agreed was emitted by the May 12 Release, could take longer to degrade, this equated to establishing present-day contamination. A40-41. Likewise, the District Court's reliance on the statements of two non-plaintiff resident witnesses (Allen-Murphy and Webster) about their own self-serving, unverified **observations** of their cistern water to indicate that present-day contamination exists for all Plaintiffs and all potential class members is absolutely untenable. Plaintiffs had every opportunity to test those cisterns for petroleum contamination and they strategically decided to avoid doing so. At bottom, whatever the District Court's view of the substance and reliability of Plaintiffs' 2021 testing data, **none** of that testing data supported the court's conclusion that Plaintiffs demonstrated present-day petroleum contamination of cisterns.

### 3. The District Court Improperly Found That Contamination Presently Poses Health Risks.

The District Court relied on what was, at best, stale evidence to support its erroneous finding that "Plaintiffs and the putative classes are presently suffering harm and are likely to continue suffering harm in the absence of an injunction." A46-47. None of the evidence presented by Plaintiffs and relied upon by the District Court indicates *present* harm making it "reasonable for those in the impacted communities to purchase water instead of relying on their cistern water as they had done before the release events." A46. The District Court used the following evidence to reach the conclusion:

- Refinery Press releases;
- Local paper advisories;
- Press releases from government agencies;
- Visits by refinery representatives to homes to determine whether a home was impacted by the Releases;
- Resident witnesses' (and only one plaintiff's) testimony about their observations of their cisterns, water filters, plumbing, and tap water; and
- Resident witnesses' claims that their loved ones experienced health effects after the Releases.

A46-47. None of this evidence is sufficient to establish present-day petroleum contamination of cisterns, let alone contamination related to a Release.

The District Court grounded its reliance on distinguishable caselaw, *Friends of the Earth v. Laidlaw Environmental Services*, 528 U.S. 167 (2000) and *Maine People's Alliance and National Resources Defense Council v. Mallinkrodt*, 471 F.3d

277 (1st Cir. 2006). *See* A44-46. The primary issue in *Laidlaw* and *Mallinckrodt* concerned whether environmental groups had standing pursuant to citizen suit provisions of the Acts at issue in each case. *See Laidlaw*, 528 U.S. at 173-74 (concerning the Clean Water Act); *Mallinckrodt*, 471 F.3d at 282-86 (concerning the Resource Conservation and Recovery Act). No such acts or citizen suit provisions are at issue here, where individual Named Plaintiffs, not environmental organizations, are bringing claims against Terminals and other defendants.

The nature of the evidence before the District Court here and the district courts in *Laidlaw* and *Mallinkrodt* is also different. First, *Laidlaw* and *Mallinckrodt* concerned final judgments issued after discovery and trial, and were based on more fully developed records, not limited preliminary injunction proceedings. *See Laidlaw*, 528 U.S. at 167-68, 177 (recounting additional findings of (1) continued polluting activities on 13 occasions; (2) 13 monitoring violations; and 10 reporting violations all during the pendency of the case); *Mallinckrodt*, 471 F.3d at 281-82, 285 (relying on a "plethora of … evidence.").

The District Court referenced the resident affidavits relied upon in *Laidlaw*, A45, but the reliance on resident (non-plaintiff) testimony there served the Supreme Court's analysis of whether the environmental organization had sufficient **standing**. *See Laidlaw*, 528 U.S. at 181 ("[a]n association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own

right….") (citations omitted), *id.* at 181-84 (summarizing resident affidavits below). In stark contrast here, only one Named Plaintiff testified about her purported harm, and the other non-plaintiff testifying resident witnesses are not representative of any other party bringing suit.

### 4. The District Court Improperly Relied On Plaintiffs' Beliefs Of Harm.

Citing Plaintiffs' supplemental briefing, **not** evidence, the District Court's April 28 Opinion impermissibly relied on Plaintiffs' speculative argument that Plaintiffs "have no reason to believe that their cistern water is safe to use for drinking or any other household purposes" to find irreparable harm. A44 (citing Pls. Supp. Br. at 3, 5, 22). Yet, as cautioned by *Adams*, irreparable harm cannot be based on speculation and must be specific and personal to *plaintiffs*. *Adams*, *supra*. "[T]he opposite conclusion would…essentially shift the burden to the defendant to disprove widely believed facts and would turn the preliminary injunction balancing process on its head." *Id.* at 487.

Nonetheless, the District Court relied on Plaintiffs' argument that "absent proper clean-up, [Plaintiffs and putative class members] have no reason to believe that their cistern water is safe to use for drinking or any other household purposes….," *id.*; however, Plaintiffs' water sampling evidence refutes this argument. The "reason to believe that their cistern water is safe" is that 95% of the water samples collected and analyzed by Plaintiffs' experts did not detect **any**

petroleum. A738-A739 (Dr. Kaltofen confirming that 21 out of 22 water samples were "non-detect"); A5309-A5311 (Murray Demonstrative). Plaintiffs' actual evidence, water samples taken in July through November 2021, closer in time to the Releases, cannot be overshadowed by a purported present-day general belief of harm two years later. One Plaintiff's and four other residents' beliefs in 2023 about the condition of their untested cistern water are not only self-serving and speculative, but contrary to the evidence.

Not only was Dr. Kaltofen's data weak, the data was also disconnected from all of the testifying witnesses (e.g., only Ms. Thompson's property was reflected). Plaintiffs made no connection to the testifying residents' "concerns" or "mistrust" to existing, confirmed, objective findings of cistern contamination caused by a Release. *See, e.g.* A1608 (Ms. Antoine stated her "cistern is most likely contaminated from oil sitting on that roof" and that led to her "stopp[ing] all use of the cistern" without testing to confirm contamination.). Indeed, despite the witnesses' observations about their cistern water at the time of the Releases (Ms. Allen-Murphy described "oily specks", A530; Ms. Urgent described seeing oily water and oil on walls and windows, A786-A787; Ms. Webster described seeing "gray over the water," A801; Mr. Carino did not describe any personal observations of oil in his water, A914-A935; Ms. Thompson described "a lot of little black spots on walls and on the windows," A938; and Ms. Antoine described seeing "two oil

44

spots on the vehicle and at least six spots on the roof," A1609, they obviously did not have a sufficient concern to test their cisterns during the two years between the time of the Releases and the hearing (Ms. Allen-Murphy: "I did not", A559; Ms. Webster: "No, I haven't," A811-A812; Ms. Thompson: "No. No, I didn't," A950); Ms Antoine: "No I didn't," A1631 and were absent from Dr. Kaltofen's testing (A4993) (except for Ms. Thompson).

Self-serving, unsupported "beliefs" in 2023 cannot override the total absence of evidence showing present-day cistern contamination, let alone contamination originating from the Refinery.[9]

### 5. Nearly No Evidence Supported The District Court's Creation Of The Covered Area.

The District Court's injunction order of water relief for contaminated cisterns applies to an overly broad covered area of 35 estates, not supported by the evidence – and nearly twice the number of estates included in the first Bankruptcy Water Program (*see* A5251). In so deciding, the District Court concluded that cisterns were likely contaminated based primarily on where Sedgwick made offers of settlement for *any* evidence of oil in immediate response to the May 12, 2021 Release. *See* A84-A98 (defining as the "Sedgwick Concentrated Area" and the "Sedgwick Contamination Area"). The estates where Sedgwick responded and found oil

---

[9] Moreover, the District Court's denial of remediation relief, A54, emphasizes that no evidence supports present-day cistern contamination.

droplets on a car, roof or cable box are nowhere near equivalent to a finding that petroleum had actually contaminated a cistern, and that such contamination continues to exist today. The District Court made no attempt to explain this leap in factual findings.

As Mr. Charles testified, Sedgwick made offers of settlement and "compensated for everything" "out of an abundance of caution" even if only a "speck" of oil was observed on a property. A2198-A2199. This is because Terminals' objective in responding to the May 12 Release was to "respond to as many homes as possible quickly." A2195 (Charles). Terminals and Sedgwick therefore defined "impact" as "[a]ny speck whatsoever." A2198. Sedgwick's representative Mr. Riviere testified that Sedgwick inspected 2,209 properties in this response process. A2301. Although Mr. Riviere testified that a "majority" of those properties were found to have "some sort [of] impact" from the May 12 Release, A2302, Mr. Riviere also testified that the assumption was made that a cistern was impacted if there was "any indication on the property" that oil was detected, A2304, whether on "walls, windows, doors, gas tank, [or] cable boxes on the house itself," A2303. This did not mean that cisterns were actually inspected, A2304, and Mr. Riviere affirmatively testified that Sedgwick did **not** inspect cisterns for the presence of petroleum, *id.* (on direct), A2319 (on cross), A2333 (questioned by the District Court).

In addition, the Covered Area is overbroad compared to the number of estates represented by the only Named Plaintiff and other non-plaintiff witnesses to testify. Ms. Thompson resides in Estate Smithfield. A935. The five other non-plaintiff witnesses reside in the following estates: Whim (Urgent, Carino); Campo Rico (Allen-Murphy); Williams Delight (Webster); and Mount Pleasant (Antoine). A80 at n.21 (7.20.23 Op.). Even if these six witnesses provided testimony to demonstrate harm, the five estates where these witnesses reside are a mere fraction of the 35 estates reflected in the Covered Area.

Instead of crafting a Covered Area based on testimony heard in Court from a Named Plaintiff (or the other non-plaintiff residents) (or connected to Plaintiffs' testing of cistern water, the vast majority of which were non-detect), the District Court improperly applied statistics and percentages to devise the Covered Area's contours. *See generally* A86-A98. This use of statistics and percentages (described as "hit rates" by the District Court), untethered to the evidence, expanded the Covered Area to (1) include Clifton Hills based only on how many properties Terminals inspected there following the February 2021 release and how many were found to have specks of oil (no Plaintiff from Clifton Hills testified about the purported harm to their cistern, and how that harm was irreparable), and (2) rationalize the inclusion of estates based primarily on the number of homes Sedgwick inspected following the May 12, 2021 release and how many were found

to have specks of oil (even though no Plaintiff testified concerning a Sedgwick inspection, let alone a connection to irreparable harm due to cistern contamination).[10] As clearly stated by Sedgwick employees (Mr. Riviere and Ms. Kuczynski), and Terminals' witnesses (Mr. Charles and Ms. Wakefield), the purpose of Sedgwick inspections was to quickly respond to the Releases and provide offers of settlement "out of an abundance of caution," without testing cisterns. Mr. Riviere plainly testified that cisterns were **not** tested as a part of this process, and that offers were made if "specks" of oil were observed on roofs, cars, walls, or cable boxes. For this reason, too, the court-created Covered Area of purported cistern contamination, based on "hit rates" of inspections and offers within an estate, does not reflect actual, on-the-ground immediate harm experienced by a Plaintiff.[11]

Ultimately, even if the Covered Area were appropriately tied to actual harm, the Covered Area is based on stale information, and does not reflect present-day, imminent conditions specific and personal to Plaintiffs facing harm.

---

[10] Plaintiffs will latch onto testimony from Mr. Charles to represent that 2,200 properties were "impacted," *see* A2203, but Sedgwick's own representative overseeing the inspections later testified that Mr. Charles was mistaken, and the total number of inspections (not impacted homes) was 2,209, *see* A2301-A2302.

[11] To the extent the District Court also relied on Dr. Sajo's air modeling to support an estate's inclusion, *see, e.g.*, A92-A94, Dr. Sajo's air modeling does not reflect what occurred on the ground, A861-A863 (Sajo), and the District Court recognized this limitation elsewhere in its Phase Two Opinion, A83 ("[T]he Court recognizes that Dr. Sajo's models do not 'depict conditions on the ground.'") (quoting Terminals' Supplemental Briefing, Dkt. No. 267).

**D.    The District Court Erred In Finding Irreparable Harm Because The Relief Sought (Free Water) Was Compensable With Money Damages.**

The District Court's irreparable harm finding was erroneous because Plaintiffs' purported harm can be compensated with money damages. Irreparable harm is "potential harm [that] cannot be redressed by a legal or an equitable remedy following a trial." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). To satisfy this gateway factor, a movant must show a "significant risk that he or she will experience harm that cannot be adequately compensated after the fact by monetary damages." *Adams*, 204 F.3d at 484-85. Plaintiffs' requested relief, free water, is compensable with money damages, and Plaintiffs do not show how they cannot be compensated by monetary damages.[12]

In reaching its conclusion, the District Court properly disregarded Plaintiffs' assertions in their briefs that the environmental impact of the Releases alone permits an inference that Plaintiffs and putative class members will be irreparably harmed without an injunction. A48. The District Court's error, however, arose in crediting Plaintiffs' arguments in *briefing* that "the financial realities faced by Plaintiffs and putative class members mean that they are unable to access enough safe and reliable

---

[12] Although the Court properly denied Plaintiffs' request for property and cistern remediation (showing no present-day cistern contamination), each resident witness testified that they expected to be compensated specific amounts to clean their cisterns. *See* A566-A567 (Allen-Murphy); A788 (Urgent); A800 (Webster); A917, A924 (Carino); A942 (Thompson).

water, and that they are consequently forced to use water from their contaminated cisterns." *Id.* No testimony supported this conclusion, and unsubstantiated argument of counsel cannot replace the burden of proof Plaintiffs failed to satisfy. To the contrary, the witnesses purchased bottled water **before** the Releases, *see* A568-A569 (Allen-Murphy); A924-A925 (Carino); A937 (Thompson), they still use or are able to use their cisterns for basic water uses, *see* A566 (Allen-Murphy), and they never drank their cistern water or always filtered the cistern water prior to drinking, *see* A568 (Allen-Murphy), A924-A925 (Carino), A937 (Thompson), A1642 (Antoine) or always bought water for cooking, A938 (Thompson). The District Court once again backtracked on patent flaws raised at Phase One closing arguments. *See* A1484 ("[i]f, in fact individuals can purchase bottled water… that is a harm that could be compensated at the end with money damages, correct?").

The District Court misapplied two cases, *Concerned Pastors for Social Action v. Khouri*, 217 F. Supp.3d 960 (E.D. Mich. 2016) and *Lyda v. City of Detroit*, No. 13-CV-53846, 2014 WL 6474081, at *1 (Bankr. E.D. Mich. Nov. 19, 2014), in supporting its conclusion. First, both *Lyda* and *Khouri* are non-binding district court decisions from outside this Circuit. More importantly, both cases are factually distinct. Both *Lyda* and *Khouri* involved municipalities that failed to provide its residents with water and safe water, respectively.

In *Lyda*, the plaintiffs brought several claims that related to the City of Detroit's decision to shut off municipal water service to residents who failed to timely pay their water bill. *Lyda*, 2014 WL 6574081 at *2. The *Lyda* court granted the City of Detroit's motion to dismiss the complaint, rendering moot the request for a preliminary injunction. *Id.* at *10. In dicta, the *Lyda* court stated that discontinuing water service likely constitutes an irreparable harm, but found that, "there is no enforceable right to free or affordable water." *Id.* at *12. The *Lyda* court's discussion on the injunction factors, however, was purely academic because § 904 of the Bankruptcy Code prevented the Bankruptcy Court from granting injunctive relief. *See Lyda v. City of Detroit*, 841 F.3d 684, 688 (6th Cir. 2016); *see also* 11 U.S.C. § 904.

In *Khouri*, the District Court for the Eastern District of Michigan considered whether unsafe levels of lead, which indisputably exceeded the EPA's maximum containment levels, in Flint, Michigan's public water supply constituted irreparable harm. *Khouri*, 217 F. Supp. at 964. Given the number of impacted residents and broad geographic scope of the Flint water crisis, the *Khouri* court found that alternative sources of water were not accessible to every household. *Id.* at 978 ("Indeed, the endeavor of hunting for water has become a dominant activity in some Flint residents' daily lives.").

Here, Plaintiffs presented no evidence that a Named Plaintiff (or non-plaintiff resident) engaged in a "hunt" for water that became "a dominant activity" in their lives. The opposite is true – the testifying witnesses stated that they always purchased water, even before the Releases, *see* A567-A568 (Allen-Murphy); A924-A925 (Carino); A937 (Thompson), and it was therefore a common activity. Absolutely no evidence supported the District Court's finding that Named Plaintiffs or the testifying residents were unable "to financially afford water without making impermissible sacrifices." A54.

## III. THE DISTRICT COURT ERRED IN FAILING TO REQUIRE A BOND UNDER RULE 65(C) SUFFICIENT TO PAY THE COSTS AND DAMAGES SUSTAINED BY TERMINALS IF FOUND TO HAVE BEEN WRONGFULLY ENJOINED

### A. Standard of Review

This Circuit reviews district court judgments fixing the amount of an injunction bond for abuse of discretion. *Mallet & Co. v. Lacayo*, 16 F.4th 364, 390, n.35 (3d Cir. 2021) (citing *Sprint Communs. Co. L.P. v. CAT Communs. Int'l, Inc.*, 335 F.3d 235, 239 (3d Cir. 2003)). In addition, although the amount of an injunction bond is reviewed for abuse of discretion, "it is a question of law whether a district court may retroactively increase a bond amount, after the bond has been posted, in order to cover the asserted costs and damages incurred by the enjoined party. On this matter, this Court exercises plenary review." *Sprint*, 335 F.3d at 239.

**B. The Nominal Bond Ordered By The District Court Is Arbitrary, Fails To Consider The Substantial Costs And Damages Sustained By Terminals In Operating The Program, And Provides Terminals With No Adequate Remedy**

The Supreme Court of the United States and the Third Circuit universally recognize that granting injunctive relief under Rule 65 is an extraordinary remedy, permissible only in limited circumstances. *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 24 (2008); *Corporate Synergies Group, LLC v. Andrews*, 775 F. App'x 54, 60 (3d Cir. 2019). Given its extraordinary nature, Rule 65 allows a preliminary injunction only if the movant first provides security to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. Fed. R. Civ. P. 65(c); *Mallet*, 16 F.4th at 390. The purpose of Rule 65(c)'s strict security requirement is to ensure the enjoined party receives sufficient protection to compensate it for the costs and damages sustained if it is later found to have been wrongfully enjoined. *Id.*

The amount of the bond is therefore meant to deter rash applications for injunctions and "cause plaintiff to think carefully beforehand." *Instant Air Freight*, 882 F.2d at 804. It also generally provides the only recourse for a wrongfully enjoined party. *Sprint*, 335 F.3d at 240 ("[T]he bond generally limits the liability of the applicant and informs the applicant of the price it can expect to pay if the injunction was wrongfully issued."); *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 210 n.31 (3d Cir. 1990) ("defendants injured by wrongfully issued

preliminary injunctions can recover only against the bond itself.").  This means "the consequences of wrongfully enjoining a defendant could be dire" when the district court underestimates the economic impact of an injunction.  *Mallet*, 16 F.4th at 391. The deference given to district courts is therefore not unlimited, as the Court must consider the impact of the injunction on the enjoined party and place on the record the reasoning for setting the specific bond amount.  *Id*. at 391-92.

Here, the District Court did not provide any analysis, detailed calculation or reasoned basis in setting the $50,000 bond.  Rather, it focused on various reasons, including that certain of the parties' other bond proposals were inadequate, and then arbitrarily determined—without any stated justification—that a nominal bond of $50,000 should be posted.

More specifically, the District Court first analyzed whether the exception to the bond requirement established in *Temple Univ. v. White*, 941 F.2d 201 (3d Cir. 1991) was still good law following the Third Circuit's subsequent decision in *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 426 (3d Cir. 2010).  The District Court found that it was, but also determined that the exception does not apply here and that the bond requirement should not be waived.  A104-A108. Second, the District Court analyzed whether the alternative proposed by Terminals—to set the bond amount at the cost of testing a participating household's cistern, with the agreement that if such testing showed no contamination then the

household would no longer qualify for the Program—was appropriate. The District Court found that it was not, as the testing protocol could, *inter alia*, lead to unintended consequences. A108-110.

Having determined these two issues, the District Court skipped any further analysis and merely concluded that a "minimal" $50,000 bond was "more appropriate than an outright waiver" of the bond requirement. A110. Although the District Court did not provide any detailed explanation or calculation, the $50,000 bond, for an estimated initial 1,000 households participating in the Program, equates to **$50 per household**. The District Court provided no analysis as to how $50 per household is meant to cause Plaintiffs to "think carefully" before seeking an injunction. *Instant Air Freight,* 882 F.2d at 804. Nor does it consider the substantial costs involved for Terminals to run the Program, which could eventually exceed several million dollars per month, if Plaintiffs' estimates are correct. A4188.

Indeed, despite this Court's guidance, the District Court in no way tied "the scope of the injunction to the bond amount it decide[d] to set." *Mallet*, 16 F.4th at 391. Perhaps most importantly, because the bond limits Plaintiffs' liability, the District Court entirely ignored the fact that Terminals will have no adequate remedy at law if and when it is found to have been wrongfully enjoined. *See Sprint*, 335 F.3d at 240; *Hoxworth*, 903 F.2d at 210; *see also Alexander v. Primerica Holdings, Inc.*, 811 F. Supp. 1025, 1038 (D.N.J. 1993) ("[P]osting of a nominal bond would

defeat the very purposes of the bond requirement. Such a result belies both the language and spirit of Rule 65."). More specifically, Terminals could be required to spend millions of dollars on the Program, and only recover $50,000. Such disproportionate considerations are unreasonable, if not incredible.[13]

According to Plaintiffs, some currently unknown subset of 11,814 residents in the allegedly impacted communities are eligible for the Program. A4187. The precise cost of the Program is unknown as it depends on, among other things, the ultimate number of participating households, the amount of water distributed, and the duration of the Program. With the uncertainty inherent in granting a preliminary injunction, Terminals must nonetheless finance and administer the Program prior to

---

[13] To the extent it may be inferred that the District Court internally balanced the substantial harm to Terminals with the economic status of the participants in the Program, the Third Circuit has never held indigence alone to be sufficient for issuing a nominal bond when granting a preliminary injunction. In fact, the Third Circuit implicitly rejected such a broad proposition in *Hoxworth* recognizing that although "[c]ommentators have suggested excusing the bond requirement when plaintiff is indigent or is suing in the public interest[…] these exceptions, *if they are to be drawn at all*, should be drawn narrowly." *Hoxworth*, 903 F.2d at 211 n.32 (emphasis added; internal citations omitted); *see also Alexander v. Primerica Holdings, Inc.*, 811 F. Supp. 1025, 1037-38 (D.N.J. 1993) ("Plaintiffs cite *Temple University* and cases from other Circuits for the proposition that the indigence of plaintiffs is a sufficient reason for excusing the bond requirement. This proposition is neither the law in this Circuit nor does it accurately characterize the holding in *Temple University*. The [Third] Circuit has not held that indigence alone is a sufficient ground for waiving the bond requirement in granting a preliminary injunction."); *Instant Air*, 882 F.2d at 804 (rejecting argument that bond requirement should be waived because plaintiff could not afford to post it).

a final determination that Terminals is liable for any alleged damages. Against this backdrop, the District Court abused its discretion and committed reversible error in failing to consider, articulate and place on the record the bases under which it determined that $50 per participating household is an appropriate bond amount, particularly in light of the millions of dollars in costs and damages that may be sustained by Terminals that it would never be able to recover. *Id.*

To the extent this Court does not reverse the District Court's Orders finding irreparable harm and the need for a water distribution program, this Court should find that the set bond amount is arbitrary, unreasonable, and should be overturned in favor of an appropriate amount that will adequately compensate Terminals for the costs and damages sustained in running the Program.

## CONCLUSION

Terminals respectfully requests that this Court overturn the District Court's injunction orders.

Respectfully submitted,

Dated: January 10, 2024

By:   */s/ Stephen M. Orlofsky*

**BLANK ROME LLP**
Stephen M.Orlofsky, Esq.
300 Carnegie Center, Suite 220
Princeton, NJ08540
Telephone: (609) 750-2646
Stephen.Orlofsky@BlankRome.com

Kevin J. Bruno, Esq.
Jane Thomas, Esq.
1271 Avenue of the Americas
New York, NY 10020
212.885.5000
kbruno@blankrome.com
jane.thomas@blankrome.com

Melanie S. Carter, Esq.
130 N. 18th Street
One Logan Square
Philadelphia, PA 19103
215.569.5720
melanie.carter@blankrome.com

*and*

Carl A. Beckstedt III, Esq.
**BECKSTEDT & KUCZYNSKI LLP**
2162 Church Street
Christiansted, St. Croix
U.S. Virgin Islands 00820
Tel: (340) 719-8086 / Fax: (800) 886-6831
carl@beckstedtlaw.com

*Attorneys for Defendant-Appellant
Limetree Bay Terminals, LLC*

# CERTIFICATE OF BAR MEMBERSHIP

I, Stephen M. Orlofsky, hereby certify that I am a member in good standing of the Bar of the United States Court of Appeals for the Third Circuit.

Dated: January 10, 2024

                    */s/ Stephen M. Orlofsky*
**BLANK ROME LLP**
Stephen M.Orlofsky, Esq.
300 Carnegie Center, Suite 220
Princeton, NJ08540
Telephone: (609) 750-2646
Stephen.Orlofsky@BlankRome.com

Kevin J. Bruno, Esq.
Jane Thomas, Esq.
1271 Avenue of the Americas
New York, NY 10020
212.885.5000
kbruno@blankrome.com
jane.thomas@blankrome.com

Melanie S. Carter, Esq.
130 N. 18th Street
One Logan Square
Philadelphia, PA 19103
215.569.5720
melanie.carter@blankrome.com

*and*

Carl A. Beckstedt III, Esq.
**BECKSTEDT & KUCZYNSKI LLP**
2162 Church Street
Christiansted, St. Croix
U.S. Virgin Islands 00820
Tel: (340) 719-8086
Fax: (800) 886-6831

carl@beckstedtlaw.com

*Attorneys for Defendant-Appellant*
*Limetree Bay Terminals, LLC*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief contains 12,991 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using 14-point Times New Roman font with Microsoft Word.

Dated: January 10, 2024

>  /s/ Stephen M. Orlofsky 
> **BLANK ROME LLP**
> Stephen M.Orlofsky, Esq.
> 300 Carnegie Center, Suite 220
> Princeton, NJ08540
> Telephone: (609) 750-2646
> Stephen.Orlofsky@BlankRome.com
>
> Kevin J. Bruno, Esq.
> Jane Thomas, Esq.
> 1271 Avenue of the Americas
> New York, NY 10020
> 212.885.5000
> kbruno@blankrome.com
> jane.thomas@blankrome.com
>
> Melanie S. Carter, Esq.
> 130 N. 18th Street
> One Logan Square
> Philadelphia, PA 19103
> 215.569.5720
> melanie.carter@blankrome.com
>
> *and*
>
> Carl A. Beckstedt III, Esq.

**BECKSTEDT & KUCZYNSKI LLP**
2162 Church Street
Christiansted, St. Croix
U.S. Virgin Islands 00820
Tel: (340) 719-8086 / Fax: (800) 886-6831
carl@beckstedtlaw.com

*Attorneys for Defendant-Appellant*
*Limetree Bay Terminals, LLC*

**CERTIFICATE OF VIRUS CHECK AND IDENTICAL DOCUMENTS**

I hereby certify that this brief, as filed electronically, was scanned for computer viruses using Microsoft Defender.

This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of this electronic brief is identical to the text of the paper copies.

Dated: January 10, 2024

_/s/ Stephen M. Orlofsky_
**BLANK ROME LLP**
Stephen M.Orlofsky, Esq.
300 Carnegie Center, Suite 220
Princeton, NJ08540
Telephone: (609) 750-2646
Stephen.Orlofsky@BlankRome.com

Kevin J. Bruno, Esq.
Jane Thomas, Esq.
1271 Avenue of the Americas
New York, NY 10020
212.885.5000
kbruno@blankrome.com
jane.thomas@blankrome.com

Melanie S. Carter, Esq.
130 N. 18th Street
One Logan Square
Philadelphia, PA 19103
215.569.5720
melanie.carter@blankrome.com

_and_

Carl A. Beckstedt III, Esq.
**BECKSTEDT & KUCZYNSKI LLP**

2162 Church Street
Christiansted, St. Croix
U.S. Virgin Islands 00820
Tel: (340) 719-8086 / Fax: (800) 886-6831
carl@beckstedtlaw.com

*Attorneys for Defendant-Appellant*
*Limetree Bay Terminals, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 10, 2024 an electronic copy of the foregoing

brief was filed with the Clerk for the United States Court of Appeals for the Third

Circuit using the CM/ECF system.

I further certify that all participants in the case are registered CM/ECF users

and that service will be accomplished via the CM/ECF system.

Dated: January 10, 2024

  */s/ Stephen M. Orlofsky*
**BLANK ROME LLP**
Stephen M.Orlofsky, Esq.
300 Carnegie Center, Suite 220
Princeton, NJ08540
Telephone: (609) 750-2646
Stephen.Orlofsky@BlankRome.com

Kevin J. Bruno, Esq.
Jane Thomas, Esq.
1271 Avenue of the Americas
New York, NY 10020
212.885.5000
kbruno@blankrome.com
jane.thomas@blankrome.com

Melanie S. Carter, Esq.
130 N. 18th Street
One Logan Square
Philadelphia, PA 19103
215.569.5720
melanie.carter@blankrome.com

*and*

Carl A. Beckstedt III, Esq.
**BECKSTEDT & KUCZYNSKI LLP**

2162 Church Street
Christiansted, St. Croix
U.S. Virgin Islands 00820
Tel: (340) 719-8086 / Fax: (800) 886-6831
carl@beckstedtlaw.com

*Attorneys for Defendant-Appellant*
*Limetree Bay Terminals, LLC*

**APPENDIX**

# TABLE OF CONTENTS

## Volume One

Defendant Limetree Bay Terminals, LLC's Notice of Appeal, Filed
August 7, 2023 ..........................................................................................A1

Order, Filed April 28, 2023 .....................................................................A4

Memorandum Opinion, Filed April 28, 2023 ..........................................A8

Order, Filed July 20, 2023......................................................................A60

Memorandum Opinion, Filed July 20, 2023...........................................A65

Order Implementing Water Distribution Program, Filed July 20, 2023 .............A112

Order, Filed August 14, 2023................................................................A125

Memorandum Opinion, Filed August 14, 2023 .....................................A127

Memorandum Opinion And Order, Filed August 22, 2023 ..................A137

## Volume Two

*Boynes et al. v. Limetree Bay Ventures, LLC et al.,* Civil Docket,
Case No. 1:21-cv-00253-WAL-EAH..................................................A145

*Shirley et al. v. Limetree Bay Ventures, LLC et al.,* Civil Docket,
Case No. 1:21-cv-00259-WAL-EAH..................................................A237

*Charles et al. v. Limetree Bay Refining, LLC et al.,* Civil Docket,
Case No. 1:21-cv-00260-WAL-EAH..................................................A294

*Cotton et al. v. Limetree Bay Ventures, LLC et al.,* Civil Docket,
Case No. 1:21-cv-00261-WAL-EAH..................................................A349

Reporter's Transcript of Status Conference, Dated February 1, 2023................A436

## Volume Three

Reporter's Transcript of Preliminary Injunction Hearing, Dated
March 2, 2023 ......................................................................................A521

Reporter's Transcript of Evidentiary Hearing, Dated March 3, 2023 ...............A819

i

## Volume Four

Reporter's Transcript of Preliminary Injunction Hearing,
Dated March 6, 2023.........................................................................A1030

Reporter's Transcript of Preliminary Injunction Hearing,
Dated March 7, 2023.........................................................................A1354

Reporter's Transcript of Status Conference Hearing, Dated May 8, 2023.......A1580

## Volume Five

Reporter's Transcript of Preliminary Injunction Hearing,
Dated June 6, 2023...........................................................................A1601

Reporter's Transcript of Preliminary Injunction Hearing,
Dated June 7, 2023...........................................................................A1898

## Volume Six

Reporter's Transcript of Preliminary Injunction Hearing, Dated June 8, 2023
(Before FTR)..................................................................................A2159

Reporter's Transcript of Preliminary Injunction Hearing, Dated
June 8, 2023 ...................................................................................A2172

Reporter's Transcript of Preliminary Injunction Hearing June 9, 2023 ..........A2497

Limited Consolidation Order, Filed January 25, 2023 ....................................A2735

Order, Filed February 2, 2023...........................................................A2740

## Volume Seven

*Boynes* First Amended Complaint, Filed February 3, 2023.............................A2747

*Cotton* First Amended Complaint, Filed January 20, 2023 .............................A2812

*Shirley* Complaint, Filed June 24, 2021...........................................................A2922

*Charles* Second Amended Complaint, Filed January 31, 2023 ........................A2939

ii

Amended Motion for Temporary Restraining Order and Preliminary Injunction Against Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC, Filed February 3, 2023 ..................................................................................A2977

Memorandum in Support of Amended Motion for Temporary Restraining Order and Preliminary Injunction Against Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC, Filed February 3, 2023 ..........................................................A2981

    Exhibit 1: Clean Air Act Emergency Order,
    CAA-02-2021-1003, Dated May 14, 2021............................................A3003

    Exhibit 2: Declaration of Dr. Erno Sajo, Ph.D., Dipl. Ing.,
    Dated January 13, 2023 ........................................................................A3049

    Exhibit 3: Declaration of Dr. Marco Kaltofen,
    Dated January 17, 2023 ........................................................................A3058

    Exhibit 4: Stipulation and Agreed Order Adopting Water
    Distribution Program, Dated October 29, 2021.....................................A3071

    Exhibit 5: Declaration of Philip V. Steed,
    Dated December 9, 2022 .......................................................................A3083

Plaintiffs' Supplemental Brief Regarding Waiver of Security Requirement or Imposition of a Nominal Bond, Filed February 8, 2023...................................A3090

Limetree Bay Terminals, LLC's Motion for Continuance of Preliminary Injunction Hearing and Related Deadlines, Filed February 10, 2023 ...............................A3104

    Exhibit A: Letter from Carl A. Beckstedt III Re: Motion for
    Continuance, Dated February 9, 2023 ...................................................A3108

    Exhibit B: Letter from Lee J. Rohn Re: Response to Letter
    Dated February 9, 2023, Dated February 10, 2023 ................................A3110

Limetree Bay Terminals, LLC's Memorandum of Law in Support of Motion for Continuance of Preliminary Injunction Hearing and Related Deadlines, Filed February 10, 2023 ........................................................................................A3116

    Exhibit 1: Declaration of Mark A. Chavez, Dated February 10, 2023...A3128

        Exhibit A: Letter from Carl A. Beckstedt III, Dated
        February 8, 2023............................................................................A3136

Order Denying Defendant Limetree Bay Terminals, LLC's Motion for Continuance of Preliminary Injunction Hearing and Related Deadlines, Filed February 16, 2023 ..............................................................................A3139

**Volume Eight**

Limetree Bay Terminals, LLC's Combined Response in Opposition to Plaintiffs' Motions for Preliminary Injunction, Filed February 21, 2023 ........................A3145

    Exhibit A: Summary of Complaints, Claims, and Classes ....................A3181

    Exhibit B: Declaration of Akeel St. Jean, Dated February 21, 2023......A3184

    Exhibit C: Notice of Violation, Dated June 16, 2021............................A3190

    Exhibit D: Stipulation and Agreed Order Adopting Water Distribution Program, Dated October 29, 2021.......................................A3211

    Exhibit E: Declaration of Karen J. Murray, Ph.D., Dated February 21, 2023 ........................................................................A3223

        Exhibit 1: Karen J. Murray, Ph.D.'s CV ......................................A3235

Notice of Typographical Error in Limetree Bay Terminals, LLC's Combined Response in Opposition to Plaintiffs' Amended Motions For Preliminary Injunction, Filed February 24, 2023 ................................................................A3242

Plaintiffs' Combined Reply Brief in Support of Their Amended Motions for Preliminary Injunction, Filed February 24, 2023 ............................................A3245

    Exhibit 1: Email from Robert Buettner, EPA, to Limetree Bay Energy, re: Restrictions on use of Limetree Flare, Dated June 24, 2021 ......................................................................................A3268

    Exhibit 2: Complaint, *United States v. Limetree Bay Refining, LLC & Limetree Bay Terminals, LLC*, No. 1:21-cv-2, Dated June 12, 2021 ..............................................................................A3271

    Exhibit 3: EPA November 16, 2022 Letter to West Indies Petroleum Limited and Port Hamilton Refining and Transportation, LLLP and Attachment..............................................................................................A3291

iv

Exhibit 4: Declaration of Dr. Michael Henry,
Dated February 24, 2023 ........................................................A3318

Exhibit 5: Declaration of Stephen King, Ph.D., M.P.H,
Dated February 23, 2023 ........................................................A3326

Exhibit 6: Part 70 Operating Permit ......................................A3344

Exhibit 7: Prevention of Significant Deterioration Permits
("PSD Permits")......................................................................A3570

Exhibit 8: Air Pollution Control Program Permits
("MARPOL Permits") ............................................................A3642

Limetree Bay Terminals, LLC's Notice of Filing Declaration in Support of
Opposition to Plaintiffs' Amended Motions for Preliminary Injunction, Filed
March 1, 2023 .................................................................................A3690

    Declaration of Charles A. Menzie, Ph.D., Dated March 1, 2023 ...........A3693

        Exhibit 1: Charles A. Menzie, Ph.D.'s CV..................................A3702

Exhibit 1: February 17, 2021 Letter from Equal Employment Opportunity
Commission, Filed March 7, 2023......................................................A3718

Limetree Bay Terminals, LLC's Post-Hearing Memorandum of Law Regarding
Plaintiffs' Failure to Establish Irreparable Harm,
    Filed April 3, 2023 ...................................................................A3726

Exhibit A: Reporter's Transcript of Evidentiary Hearing,
Dated March 2, 2023 ...............................................................A3748

Exhibit B: Reporter's Transcript of Evidentiary Hearing,
Date of Proceedings March 3, 2023 .......................................A3795

**Volume Nine**

Exhibit C: Reporter's Transcript of Evidentiary Hearing,
Date of Proceedings March 6, 2023 .......................................A3839

Exhibit D: Reporter's Transcript of Evidentiary Hearing,
Date of Proceedings March 7, 2023 .......................................A3856

Exhibit E: Ex. LBT-16: Karen J. Murray, Ph.D. Demonstrative............A3878

v

Exhibit F: Ex. P-80: Kaltofen Data .......................................................A3886

Exhibit G: Decision Hearing ...............................................................A3888

Exhibit H: Ex. P-122: EPA Cisterns in the US Virgin Islands ..............A3906

Plaintiffs' Post-Hearing Supplemental Brief, Filed April 4, 2023 ...................A3909

Exhibit 1: February 2, 2021 Limetree Letter to Equal Employment
Opportunity Commission, Filed April 13, 2023 .....................................A3935

Plaintiffs' Memorandum in Support of Motion/Amended Motions for Temporary
Restraining Order and Preliminary Injunction, Filed May 23, 2023...............A3941

Declaration of Brian Moore, May 20, 2023 ...........................................A3963

Data from LBT following February 4, 2021 Release...........................A3976

Declaration of David Neumark, Dated May 19, 2023 ..........................A3982

Appendix A: David Neumark's CV ...........................................A3992

Limetree Bay Terminals, LLC's Response and Opposition to Plaintiffs' Second
Phase Brief, Filed May 30, 2023 ....................................................A4024

Exhibit 1: [Proposed] Injunction Order Implementing Water
Distribution Program, Undated................................................A4046

Exhibit 2: Declaration of Daniel P. Maloney, in Support of
Limetree Bay Terminals, LLC's Response and Opposition to
Plaintiffs' Second Phase Brief, Dated May 26, 2023 ...........................A4060

Exhibit 1: Daniel P. Maloney's CV ..............................................A4083

Exhibit 3: Stipulation and Agreed Order Adopting Water
Distribution Program, Dated October 26, 2021.....................................A4087

Exhibit 4: Clean Air Act Emergency Order CAA-02-2021-1003 ..........A4099

Exhibit 5: Declaration of Christopher G. Desautels, M.S.,
Dated May 26, 2023 ..................................................................A4145

Exhibit 6: Exhibit PL-53: Declaration of Dr. Erno Sajo,
PhD, Dipl. Ing...........................................................................A4165

Exhibit 7: Brian D. Moore's Resume ....................................................A4174

Exhibit 8: *Cotromano v. Raytheon Technologies Corp.*,
2021 WL 3616051 ..................................................................................A4176

Exhibit 9: Declaration of Karen J. Murray, Ph.D.,
Dated May 26, 2023 ..............................................................................A4179

Limetree Bay Terminals, LLC's Supplemental Brief Regarding Plaintiffs' Request
to Waive Federal Rule of Civil Procedure 65(C)'s Security Requirement or
Imposition of a Nominal Bond, Filed May 30, 2023.......................................A4184

Exhibit 1: Declaration of Daniel P. Maloney in Support of Limetree
Bay Terminals, LLC's Response and Opposition To Plaintiffs'
Second Phase Brief, Dated May 26, 2023 .............................................A4196

Exhibit 1: Daniel P. Maloney's CV .............................................A4219

Exhibit 2: Water Distribution Cost Breakdown/Estimated Costs...........A4223

Exhibit 3: Declaration of Karen J. Murray, Ph.D.,
Dated May 26, 2023 ..............................................................................A4232

Plaintiffs' Reply Brief in Support of Motion/Amended Motions for Temporary
Restraining Order and Preliminary Injunction, Filed May 31, 2023...............A4237

Exhibit 1: Declaration of Dr. Marco Kaltofen, Dated May 31, 2023.....A4262

Exhibit 2: Reply Declaration of David Neumark,
Dated May 31, 2023 ..............................................................................A4269

Plaintiffs' Reply Brief in Support of Waiver of Security Requirement or Imposition
of a Nominal Bond, Filed May 31, 2023 ........................................................A4280

(Corrected Copy) Sedgwick Inspection Data, Filed June 4, 2023...................A4289

Plaintiffs' Second Phase Supplemental Brief, Filed June 21, 2023.................A4335

Exhibit 1: Summary of Sedgwick Data .................................................A4350

Exhibit 2: Map 1 (areas where Sedgwick either (1) offered to settle
claims; (2) estimated value of settlement > $0 or (3) marked
property as "settled.") ............................................................................A4352

vii

Exhibit 3: Map 2 (areas where Sedgwick either (1) offered to settle claims; or (2) estimated value of settlement > $0) .................................A4354

Limetree Bay Terminals' Phase Two Post-Hearing Brief,
Filed June 21, 2023 .........................................................................................A4355.1

Exhibit A: Excerpts of May 8, 2023 Status Conference Transcript . A4355.13

Exhibit B: Declaration of K. Murray, Dated June 21, 2023 ............. A4355.19

Exhibit C: Terminals Summary Table of Sedgwick Data by Estate. A4355.24

Exhibit D: Summary Sedgwick Table prepared by Plaintiffs .......... A4355.26

Exhibit E: Map prepared by Plaintiffs ............................................... A4355.28

Exhibit F: Terminals' Summary Table of Plaintiffs' Overincluded
Properties ........................................................................................... A4355.30

Exhibit G: Map of St. Croix ............................................................. A4355.32

Exhibit H: LIHWAP Fact Sheet | The Administration for Children and
Families (hhs.gov) ............................................................................. A4355.34

Exhibit I: ERAP Checklist ................................................................ A4355.38

Exhibit J: Earned Income Tax Credit (EITC) ................................... A4355.40

Exhibit K: U.S. DHHS, Overview of the State – Virgin Islands 2020,
Subsection B ...................................................................................... A4355.43

Exhibit L: U.S. Bureau of Labor Statistics, Economic News Release,
Table A-11 ......................................................................................... A4355.52

Exhibit M: EPA, How We Use Water ............................................... A4355.54

Plaintiffs' Separate Notice Regarding the Water Program, Filed July 7, 2023 A4356

Joint Notice Regarding Financial Eligibility Criteria, Filed July 8, 2023 ........A4369

**Volume Ten**

Exhibit A: Declaration of Daniel P. Maloney, Dated July 7, 2023 .........A4386

Notice of Defendant Limetree Bay Terminals, LLC's Issues Re: Earned Income Tax Credit and Qualified Income Chart, Filed July 8, 2023 ............................A4402

Exhibit A: Declaration of Daniel P. Maloney, Dated July 7, 2023.........A4406

Joint Notice Regarding the Parties' Proposed Testing Protocol,
Filed July 8, 2023 ...................................................................................A4414

Exhibit A: Declaration Of Karen J. Murray, Ph.D.,
Dated July 7, 2023 ...................................................................A4427

Attachment A: Parties' Proposed Testing Protocol ......................A4433

Notice By Limetree Bay Terminals Regarding the Effect of Sedgwick Inspections and Other Logistics Bearing on The Implementation of The Testing Protocol, And Related Proposed Language to Be Included in The Court's Order,
Filed July 8, 2023.................................................................................A4437

Exhibit A: Declaration Of Karen J. Murray, Ph.D.,
Dated July 7, 2023 ...................................................................A4445

Exhibit B: Email from Hogan Paschal re: Limetree - Proposed Testing Protocol, Dated July 5, 2023 ..................................................A4450

Exhibit C: Email from Kevin J. Bruno re: Limetree - Proposed Testing Protocol, Dated July 5, 2023 ..................................................A4455

Exhibit D: Reporter's Transcript of Evidentiary Hearing,
Date of Proceedings: June 6, 2023 .........................................A4458

**Plaintiffs' Phase One Trial Exhibits**

Pl. Phase One Ex. 5: Title V Permit..................................................A4464

Pl. Phase One Ex. 8: Limetree correspondence with DPNR
April 19-23, 2021...................................................................A4689

Pl. Phase One Ex. 9: Limetree correspondence with DPNR April 25, 2021....A4694

Pl. Phase One Ex. 10: Limetree correspondence with DPNR
May 5-6, 2021........................................................................A4695

Pl. Phase One Ex. 11: Limetree correspondence with DPNR
May 8-12, 2021.......................................................................A4697

Pl. Phase One Ex. 12: Limetree correspondence with DPNR
    May 10-12, 2021 ...................................................................A4699

Pl. Phase One Ex. 20: United States Environmental Protection Agency
    Notice of Violation – Limetree Bay Terminals (CAA-02-2021-1306)
    (April 30, 2021) ...................................................................A4701

Pl. Phase One Ex. 21: Clean Air Act Emergency Order, dated
    May 14, 2021 ........................................................................A4721

Pl. Phase One Ex. 26: Limetree Bay Terminals, LLC and Limetree Bay
    Refining, LLC, Facility Evaluation Impacts to Public Health,
    Welfare and the Environment ...............................................A4766

Pl. Phase One Ex. 31: Image of Flare 8 at Limetree Bay Facility ..................A4772

Pl. Phase One Ex. 32: Image of Limetree Bay Facility ....................................A4773

Pl. Phase One Ex. 53; Declaration of Dr. Erno Sajo, PhD, Dipl. Ing., dated
    January 13, 2023 ...................................................................A4774

Pl. Phase One Ex. 55: Declaration of Dr. Marco Kaltofen ..............................A4782

Pl. Phase One Ex. 57: Figure 1 Sajo Declaration ...........................................A4794

Pl. Phase One Ex. 60: Figure 4 Sajo Declaration ...........................................A4795

Pl. Phase One Ex. 61: Figure 5, Sajo Declaration ..........................................A4796

Pl Phase One Ex. 69: ALS Work Order .........................................................A4797

**Volume Eleven**

Pl Phase One Ex. 70: ALS Work Order .........................................................A4841

Pl Phase One Ex. 71: ALS Work Order .........................................................A4856

Pl Phase One Ex. 72: ALS Work Order .........................................................A4892

Pl Phase One Ex. 73: ALS Work Order .........................................................A4911

Pl Phase One Ex. 74: ALS Work Order .........................................................A4920

Pl Phase One Ex. 75: ALS Work Order .........................................................A4928

Pl Phase One Ex. 76: ALS Work Order ............................................................A4936

Pl Phase One Ex. 77: ALS Work Order ............................................................A4960

Pl Phase One Ex. 79: Dr. Kaltofen Lab Notes ..................................................A4986

Pl Phase One Ex. 80: Dr. Kaltofen St. Croix Data ...........................................A4993

Pl. Phase One Ex. 107: Image of Cistern...........................................................A4994

Pl. Phase One Ex. 115: Limetree Bay Responding to Flare Incident
(May 12, 2021) .........................................................................................A4995

Pl. Phase One Ex. 116: Limetree Bay Response to Flare Incident
(March 3, 2021) ........................................................................................A4996

Pl. Phase One Ex. 118: EPA Responds to HOVENSA Refinery Release
(February 2011) ........................................................................................A4997

Pl Phase One Ex. 121: Jeffrey Charles Declaration..........................................A4999

Pl Phase One Ex. 122: EPA Cisterns in the US Virgin Islands.........................A5001

**Plaintiffs' Phase Two Trial Exhibits**

Pl Phase Two Ex. 125: Summary Statistics with Estate Names .......................A5003

**Limetree Bay Terminals' Phase One Trial Exhibits**

LBT Phase One Ex. 1: United States Environmental Protection Agency
Notice of Violation – Limetree Bay Refining (CAA-02-2021-1307)
(June 16, 2021) ........................................................................................A5003

LBT Phase One Ex. 2: Amended and Restated Terminal Operating Agreement by
and Among the Government of the Virgin Islands and Limetree Bay
Terminals, LLC ........................................................................................A5024

LBT Phase One Ex. 3: Refinery Operating Agreement by and Among the
Government of the Virgin Islands and Limetree Bay Refining, LLC ....A5092

LBT Phase One Ex. 4: Shared Services Systems Agreement...........................A5165

LBT Phase One Ex. 5: Stipulation and Agreed Order Adopting Water Distribution Program, Dkt. No. 126, In re Limetree Bay Services, LLC, Case No. 21-03791 (Bankr. S.D.Tx.) ............................................................................A5249

LBT Phase One Ex. 8: February 21, 2023 Declaration of Karen J. Murray, Ph.D. ......................................................................................A5260

LBT Phase One Ex. 13: Declaration of Charles A. Menzie, Ph.D ..................A5278

LBT Phase One Ex. 15: January 10, 2023 DPNR Letter ................................A5304

LBT Phase One Ex. 16: Karen J. Murray, Ph.D. Demonstrative ....................A5307

LBT Phase One Ex. 17: Charles A. Menzie, Ph.D. Demonstrative.................A5314

**Volume Twelve**

LBT Phase One Ex. 18: LBT Closing Demonstrative.....................................A5325

LBT Phase One Ex. 19: Charles A. Menzie, Ph.D Notes included with Virgin Islands Rules and Regulations – Underground Storage Tanks...............A5385

LBT Phase One Ex. 20: Virgin Islands Rules and Regulations – Underground Storage Tanks ..................................................................A5550

LBT Phase One Ex. 21: USVI Underground Storage Tank Closure Guidance Document ................................................................................A5594

**Limetree Bay Terminals' Phase Two Trial Exhibits**

LBT Phase Two Ex. 5: Sedgwick Claims Management Services All Inspected Chart ................................................................................A5714

LBT Phase Two Ex. 6: Clifton Hill Final Map.................................................A5749

LBT Phase Two Ex. 7: Clifton Hill Tracking Map...........................................A5750

LBT Phase Two Ex. 13: Christopher G. Desautels Figure 1 ...........................A5751

LBT Phase Two Ex. 14: Christopher G. DesautelsFigure 2 ............................A5752

LBT Phase Two Ex. 15: Christopher G. Desautels Figure 3 ...........................A5753

LBT Phase Two Ex. 16: EPA Clean Air Act Emergency Order
    CAA-02-2021-1003 (May 14, 2021)......................................................A5754

LBT Phase Two Ex. 18: February Flare Release Incident Tracking
    Log redacted .............................................................................A5799

LBT Phase Two Ex. 19: May 26, 2023 Declaration of Karen J.
    Murray, Ph.D. ...........................................................................A5806

LBT Phase Two Ex. 21: Declaration of Daniel P. Maloney in support
    of Limetree Bay Terminals, LLC's Response and Opposition to
    Plaintiffs' Second Phase Brief ..................................................A5810

LBT Phase Two Ex. 22: Daniel P. Maloney Figure 1 ......................................A5832

LBT Phase Two Ex. 23: Figure 2..........................................................A5833

LBT Phase Two Ex. 39: February Flare Release Survey Information .............A5834

**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

| | |
|---|---|
| **CLIFFORD BOYNES, et al.,**<br><br>    **Plaintiffs,**<br><br>        **v.**<br><br>**LIMETREE  BAY  VENTURES, LLC,  et**<br><br>**al.,**<br><br>    **Defendants.** | **Civil Action No. 2021-0253** |
| **HELEN SHIRLEY, et al.,**<br>    **Plaintiffs,**<br>        **v.**<br>**LIMETREE  BAY  VENTURES, LLC,  et**<br>**al.,**<br>    **Defendants.** | **Civil Action No. 2021-0259** |
| **FRANCIS E. CHARLES and THERESA J.**<br>**CHARLES,**<br>    **Plaintiffs,**<br>        **v.**<br><br>**LIMETREE  BAY  VENTURES, LLC,  et**<br>**al.,**<br>    **Defendants.** | **Civil Action No. 2021-0260** |
| **BEECHER COTTON, et al.,**<br><br>    **Plaintiffs,**<br>        **v.**<br>**LIMETREE  BAY  VENTURES, LLC,  et**<br>**al.,**<br>    **Defendants.** | **Civil Action No. 2021-0261** |

A1

**DEFENDANT LIMETREE BAY TERMINALS, LLC'S NOTICE OF APPEAL**

PLEASE TAKE NOTICE that Defendant Limetree Bay Terminals, LLC (d/b/a Ocean Point Terminals), by and through the undersigned counsel, hereby appeals to the United States Court of Appeals for the Third Circuit the following orders issued by the Honorable District Judge Wilma A. Lewis:

1. The First Phase Preliminary Injunction Order issued April 28, 2023 (*Boynes*, Dkt. No. 284, *Shirley*, Dkt. No. 139, *Charles*, Dkt. No. 199, *Cotton*, Dkt. No. 334) (merged into the following July 20, 2023 Orders for purposes of appeal);

2. The Second Phase Preliminary Injunction Order issued July 20, 2023 (*Boynes*, Dkt. No. 388, *Shirley*, Dkt. No.222, *Charles*, Dkt. No. 286, *Cotton*, Dkt. No. 435); and

3. The Order Implementing the Water Distribution Program issued July 20, 2023 (*Boynes*, Dkt. No. 390, *Shirley*, Dkt. No. 224, *Charles*, Dkt. No. 288, *Cotton*, Dkt. No. 437).

Plaintiffs posted a bond in the amount of $50,000 on August 4, 2023 (*Boynes*, Dkt. No. 405, *Shirley*, Dkt. No. 229, *Charles*, Dkt. No. 293, *Cotton*, Dkt. No. 443).

DATED: August 7, 2023          By:       s/ *Carl A. Beckstedt III, Esq.*

Carl A. Beckstedt III, Esq.
VI Bar No. 684
**BECKSTEDT & KUCZYNSKI LLP**
2162 Church Street
Christiansted, St. Croix
U.S. Virgin Islands 00820
Tel: (340) 719-8086 / Fax: (800) 886-6831
carl@beckstedtlaw.com

*and*

A2

**BLANK ROME LLP**

Kevin J. Bruno, Esq.
*admitted pro hac vice in Cotton, Civ. No. 2021-0261*
1271 Avenue of the Americas
New York, NY 10020
212.885.5000
kbruno@blankrome.com

Melanie S. Carter, Esq.
*admitted pro hac vice in Shirley, Civ. No. 2021-0259*
130 N. 18th Street
One Logan Square
Philadelphia, PA 19103
215.569.5720
melanie.carter@blankrome.com

*Counsel for Limetree Bay Terminals, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing with the Court's ECF system on August 7, 2023, which sent notice to all counsel of record.

s/ *Carl A. Beckstedt III, Esq.*

A3

## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | |
|---|---|
| **CLIFFORD BOYNES, et al.,** ) | |
| ) | **Civil Action No. 2021-0253** |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **LIMETREE BAY VENTURES, LLC, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| ————————————————————) | |
| ) | |
| **HELEN SHIRLEY, et al.,** ) | |
| ) | **Civil Action No. 2021-0259** |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **LIMETREE BAY VENTURES, LLC, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| ————————————————————) | |
| ) | |
| **FRANCIS E. CHARLES and THERESA J. CHARLES,** ) | |
| ) | **Civil Action No. 2021-0260** |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **LIMETREE BAY VENTURES, LLC, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| ————————————————————) | |
| ) | |
| **BEECHER COTTON, et al.,** ) | |
| ) | **Civil Action No. 2021-0261** |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **LIMETREE BAY VENTURES, LLC, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| ————————————————————) | |

A4

**Attorneys:**

**John K. Dema, Esq.,**
**Lee J. Rohn, Esq.,**
St. Croix, U.S.V.I.
**Jennifer Jones, Esq.,**
St. Thomas, U.S.V.I.
**Hugh P. Lambert, Esq.,**
**Brian James Mersman, Esq.,**
**Kerry J. Miller, Esq.,**
**C. Hogan Paschal, Esq.,**
**Paul C. Thibodeaux, Esq.,**
**Rebekka C. Veith, Esq.,**
**J. Christopher C. Zainey, Jr., Esq.,**
New Orleans, Louisiana
    *For the Boynes Plaintiffs*


**Vincent A. Colianni, II, Esq.,**
**John-Russell Bart Pate, Esq.,**
**Lee J. Rohn, Esq.,**
St. Croix, U.S.V.I.
**Warren T. Burns, Esq.,**
**Daniel H. Charest, Esq.,**
Dallas, Texas
**Charles Jacob Gower, Esq.,**
**Hugh. P. Lambert, Esq.,**
**Korey A. Nelson, Esq.,**
**Harry Richard Yelton, Esq.,**
New Orleans, Louisiana
    *For the Shirley Plaintiffs*


**John K. Dema, Esq.,**
**Lee J. Rohn, Esq.,**
St. Croix, U.S.V.I
**Hugh. P. Lambert, Esq.,**
**Brian James Mersman, Esq.,**
**J. Christopher C. Zainey, Jr., Esq.,**
New Orleans, Louisiana
    *For the Charles Plaintiffs*


**Vincent A. Colianni, II, Esq.,**
**Rhea Lawrence, Esq.,**
**Marina Leonard, Esq.,**
**Lee J. Rohn, Esq.,**
St. Croix, U.S.V.I
**Shanon Jude Carson, Esq.,**
**Daniel H. Charest, Esq.,**
**Quinn Burns, Esq.,**
**Warren T. Burns, Esq.,**
Dallas, Texas
**John Quin Kerrigan, I, Esq.,**
Doylestown, Pennsylvania
**John Albanese, Esq.,**
Minneapolis, Minnesota
**Dena R. Young, Esq.,**
Philadelphia, Pennsylvania
**Charles Jacob Gower, Esq.,**
**Hugh. P. Lambert, Esq.,**
**Harry Richard Yelton, Esq.,**
New Orleans, Louisiana
    *For the Cotton Plaintiffs*


**Carl A. Beckstedt, III, Esq.,**
**Robert J. Kuczynski, Esq.,**
**Ryan C. Stutzman, Esq.,**
St. Croix, U.S.V.I.
**Kevin J. Bruno, Esq.,**
New York, New York
**Melanie S. Carter, Esq.,**
Philadelphia, Pennsylvania
    *For Defendant Limetree Bay*
    *Terminals, LLC*

2

A5

## ORDER

THIS MATTER comes before the Court on Plaintiffs' "Amended Motion[s] for Temporary Restraining Order and Preliminary Injunction;"[1] Defendant Limetree Bay Terminals' Response;[2] Plaintiffs' Reply;[3] and the parties' Supplemental Briefs.[4] Plaintiffs request that the Court order Defendant to "supply . . . safe, clean, and potable water" ("programmatic relief"), and "remediate . . . contaminated roofs, pipes, and cisterns" ("remedial relief").[5] A first phase evidentiary hearing was held over four days from March 2-7, 2023, and the parties filed their Supplemental Briefs on April 3, 2023.

For the reasons stated in the accompanying Memorandum Opinion, filed contemporaneously herewith, it is hereby

**ORDERED** that, Plaintiffs having satisfied the preliminary injunction factors with respect to those Plaintiffs and putative class members who cannot afford to purchase water without trading off other basic necessities, preliminary injunctive relief for a water provision program for that group of individuals is warranted; and it is further

**ORDERED** that Plaintiffs' request for preliminary injunctive relief is otherwise **DENIED**; and it is further

**ORDERED** that a status conference is **SCHEDULED** for **May 8, 2023** at **1:00 p.m.** in STX Courtroom 1 before District Judge Wilma A. Lewis to discuss scheduling, logistical, and other matters that bear on the manner in which the Court will proceed in the second

---

[1] Civ. No. 2021-0253, Dkt. Nos. 141, 142; Civ. No. 2021-0260, Dkt. Nos. 68, 68-1; Civ. No. 2021-0261, Dkt. Nos. 170, 171; Civ. No. 2021-0259, Dkt. No. 41.

[2] Civ. No. 2021-0253, Dkt. No. 168 ("Resp."); Civ. No. 2021-0260, Dkt. No. 100; Civ. No. 2021-0261, Dkt. No. 226.

[3] Civ. No. 2021-0253, Dkt. No. 180 ("Rep."); Civ. No. 2021-0260, Dkt. No. 107; Civ. No. 2021-0261, Dkt. No. 240.

[4] Civ. No. 2021-0253, Dkt. Nos. 144, 267, 269; Civ. No. 2021-0260, Dkt. Nos. 86, 195, 197; Civ. No. 2021-0261, Dkt. Nos. 206, 331, 332.

[5] Civ. No. 2021-0261, Dkt. No. 171 at 1.

A6

phase hearing to determine the scope and structure of the relief to be awarded and the appropriate bond; and it is further

ORDERED that counsel who will be speaking on behalf of Terminals and each of the *Cotton*, *Boynes, Charles,* and *Shirley* Plaintiffs are required to appear in person at the status conference; and it is further

ORDERED that all other counsel, including counsel for all other parties may, but are not required to, attend the status conference, and, if attending, may do so via videoconference; and it is further

ORDERED that the Clerk's Office shall contact counsel for the parties to provide the necessary call-in information for counsel who will be observing the status conference via videoconference.

SO ORDERED.

Date:   April 28, 2023

_____/s/_____
WILMA A. LEWIS
District Judge

A7

## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | | |
|---|---|---|
| **CLIFFORD BOYNES, et al.,** | ) | |
| | ) | |
| | ) | **Civil Action No. 2021-0253** |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LIMETREE BAY VENTURES, LLC, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| ——————————————————— | ) | |
| | ) | |
| **HELEN SHIRLEY, et al.,** | ) | |
| | ) | |
| | ) | **Civil Action No. 2021-0259** |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LIMETREE BAY VENTURES, LLC, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| ——————————————————— | ) | |
| | ) | |
| **FRANCIS E. CHARLES and THERESA J. CHARLES,** | ) | |
| | ) | |
| | ) | **Civil Action No. 2021-0260** |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LIMETREE BAY VENTURES, LLC, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| ——————————————————— | ) | |
| | ) | |
| **BEECHER COTTON, et al.,** | ) | |
| | ) | |
| | ) | **Civil Action No. 2021-0261** |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LIMETREE BAY VENTURES, LLC, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| ——————————————————— | ) | |

A8

**Attorneys:**

**John K. Dema, Esq.,**
**Lee J. Rohn, Esq.,**
St. Croix, U.S.V.I.
**Jennifer Jones, Esq.,**
St. Thomas, U.S.V.I.
**Hugh P. Lambert, Esq.,**
**Brian James Mersman, Esq.,**
**Kerry J. Miller, Esq.,**
**C. Hogan Paschal, Esq.,**
**Paul C. Thibodeaux, Esq.,**
**Rebekka C. Veith, Esq.,**
**J. Christopher C. Zainey, Jr., Esq.,**
New Orleans, Louisiana
   *For the Boynes Plaintiffs*

**Vincent A. Colianni, II, Esq.,**
**John-Russell Bart Pate, Esq.,**
**Lee J. Rohn, Esq.,**
St. Croix, U.S.V.I.
**Warren T. Burns, Esq.,**
**Daniel H. Charest, Esq.,**
Dallas, Texas
**Charles Jacob Gower, Esq.,**
**Hugh P. Lambert, Esq.,**
**Korey A. Nelson, Esq.,**
**Harry Richard Yelton, Esq.,**
New Orleans, Louisiana
   *For the Shirley Plaintiffs*

**John K. Dema, Esq.,**
**Lee J. Rohn, Esq.,**
St. Croix, U.S.V.I
**Hugh. P. Lambert, Esq.,**
**Brian James Mersman, Esq.,**
**J. Christopher C. Zainey, Jr., Esq.,**
New Orleans, Louisiana
   *For the Charles Plaintiffs*

**Vincent A. Colianni, II, Esq.,**
**Rhea Lawrence, Esq.,**
**Marina Leonard, Esq.,**
**Lee J. Rohn, Esq.,**
St. Croix, U.S.V.I
**Shanon Jude Carson, Esq.,**
**Daniel H. Charest, Esq.,**
**Quinn Burns, Esq.,**
**Warren T. Burns, Esq.,**
Dallas, Texas
**John Quin Kerrigan, I, Esq.,**
Doylestown, Pennsylvania
**John Albanese, Esq.,**
Minneapolis, Minnesota
**Dena R. Young, Esq.,**
Philadelphia, Pennsylvania
**Charles Jacob Gower, Esq.,**
**Hugh. P. Lambert, Esq.,**
**Harry Richard Yelton, Esq.,**
New Orleans, Louisiana
   *For the Cotton Plaintiffs*

**Carl A. Beckstedt, III, Esq.,**
**Robert J. Kuczynski, Esq.,**
**Ryan C. Stutzman, Esq.,**
St. Croix, U.S.V.I.
**Kevin J. Bruno, Esq.,**
New York, New York
**Melanie S. Carter, Esq.,**
Philadelphia, Pennsylvania
   *For Defendant Limetree Bay*
   *Terminals, LLC*

## <u>MEMORANDUM OPINION</u>

**Lewis, District Judge**

THIS MATTER comes before the Court on Plaintiffs' "Amended Motion[s] for Temporary Restraining Order and Preliminary Injunction;"[1] Defendant Limetree Bay Terminals' Response;[2] Plaintiffs' Reply;[3] and the parties' Supplemental Briefs.[4] Plaintiffs request that the Court order Defendant to remediate the cisterns and property of, and establish a program to provide free bottled water to, Plaintiffs and other similarly situated residents during the pendency of this litigation. A first phase evidentiary hearing was held over four days from March 2-7, 2023, and the parties filed their Supplemental Briefs on April 3, 2023.

For the reasons that follow, the Court finds that Plaintiffs have met their burden to establish that some, but not all, members of the group on behalf of whom they seek preliminary relief are entitled to such relief. Specifically, the Court finds that Plaintiffs have satisfied the four preliminary injunction factors with respect to those Plaintiffs and putative class members who cannot afford to purchase water without trading off other basic necessities, but that Plaintiffs have satisfied these factors with respect to this population only. The Court also finds that preliminary injunctive relief for a water provision program is warranted, while such relief for the remediation of Plaintiffs' cisterns and property is not.

---

[1] Civ. No. 2021-0253 ("*Boynes*"), Dkt. Nos. 141, 142 ("Mot."); Civ. No. 2021-0260 ("*Charles*"), Dkt. Nos. 68, 68-1; Civ. No. 2021-0261 ("*Cotton*"), Dkt. Nos. 170, 171; Civ. No. 2021-0259 ("*Shirley*"), Dkt. No. 41.

[2] *Boynes*, Dkt. No. 168 ("Resp."); *Charles*, Dkt. No. 100; *Cotton*, Dkt. No. 226.

[3] *Boynes*, Dkt. No. 180 ("Rep."); *Charles*, Dkt. No. 107; *Cotton*, Dkt. No. 240.

[4] *Boynes*, Dkt. Nos. 144, 267 ("LBT Supp. Br."), 269 ("Pls. Supp. Br."); *Charles*, Dkt. Nos. 86, 195, 197; *Cotton*, Dkt. Nos. 206, 331, 332.

A10

## I.   BACKGROUND

On the south shore of St. Croix sits an oil refinery. The refinery began production in the 1960s and increasingly expanded its operations over the next fifty years, becoming one of the largest refineries in the United States. Following a series of environmental violations, in 2011 the refinery's then-owner, HOVENSA, agreed to pay millions of dollars in fines and expend hundreds of millions of dollars in new pollution controls.[5] The refinery ceased production shortly thereafter, in the spring of 2012, and HOVENSA declared bankruptcy three years later.[6] Ownership of the refinery then passed to Limetree Bay Terminals, LLC ("Terminals"), one of the defendants in these four associated cases.

Beginning in 2018, Terminals began maintenance and repair work on the refinery with the goal of restarting operations. After three years of this "startup" work—much of which Terminals shared with its "sister company," Limetree Bay Refining, LCC ("Refining")—production resumed on February 1, 2021.[7] Three days later, a flare at the refinery—in essence, a large smokestack intended to safely dispose of excess gas—exceeded its operating capacity and released what a refinery representative later characterized as a "mist with heavy oil in it."[8] Within hours, the refinery began receiving calls from residents of

---

[5] *See United States v. HOVENSA, LLC*, No. 11-CV-00006, Dkt. No. 6 (D.V.I. Jun. 7, 2011) (order granting motion to enter consent decree).

[6] *See In re HOVENSA, LLC*, No. 15-BK-10003, Dkt. No. 1 (Bankr. D.V.I. Sep. 15, 2015) (Chapter 11 petition).

[7] LBT Ex. 15 (Air Permitting Letter); Mar. 6 Tr. at 159-60.

[8] Pls. Ex. 21 (Clean Air Act Emergency Order, dated May 14, 2021, addressed to Terminals and Refining) at 12 (hereinafter "Emergency Order"); *see also* Pls. Ex. 20 (Notice of Violation, dated April 30, 2021, addressed to Terminals) (hereinafter "Terminals Notice of Violation"); LBT Ex. 1 (Notice of Violation, dated June 16, 2021, addressed to Refining) (hereinafter "Refining Notice of Violation"). The background that the Court provides in this introduction is principally drawn from witness testimony and the Environmental Protection Agency's ("EPA") descriptions of the 2021 events in the Emergency Order and Notices of Violation, insofar as those descriptions rely on quotes the EPA attributes to Terminals and/or Refining representatives, or third-party characterizations of the same. Although the Court accepts these EPA descriptions for purposes of these preliminary injunction proceedings—where the rules of evidence are relaxed, *see Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700,

4

St. Croix's Clifton Hill neighborhood complaining of oil droplets on their vehicles and homes, and refinery representatives later reported to the Environmental Protection Agency ("EPA") that nearly 200 residences were potentially contaminated by the event. (Hereinafter, the "first release event.")

The remainder of February and March passed without incident, but on April 19, 2021 the same flare, Flare 8, began emitting hydrogen sulfide—a colorless gas that smells like rotten eggs—over regulatory limits. Flare 8 exceeded these limits over the next week, prompting the Virgin Islands Department of Planning and Natural Resources ("DPNR") to issue a press release addressing a "foul, gaseous smell permeating throughout the Frederiksted area," and the Virgin Islands Department of Health ("DOH") to issue a release warning residents of potential health risks associated with the same.[9] (Hereinafter, the "second release event.") Similar emissions exceedances occurred the following month, on May 5 and May 7, leading the Governor of the Virgin Islands to mobilize the National Guard and Virgin Islands Territorial Emergency Management Agency ("VITEMA") after residents sought medical attention for nausea and headaches. (Hereinafter, the "third release event.")

The refinery's operations continued unabated from the first to third release events, except for a brief period in early April during which the refinery temporarily halted production to make "operational adjustments."[10] However, in what the EPA later characterized as a "flare rainout" event, on May 12, 2021, Flare 8 began spewing flames dozens of feet high, resulting in a long plume of smoke trailing off to the northwest of the refinery.[11] Refinery representatives later confirmed that this incident deposited droplets of oil

---

718-19 (3d. Cir. 2004)—they do not constitute findings of fact established by a preponderance of the evidence.

[9] Pls. Ex. 21 (Emergency Order) at 15-16.

[10] Pls. Ex. 21 (Emergency Order) at 13.

[11] Pls. Ex. 21 (Emergency Order) at 12, 24.

A12

on residences at least as far as the Enfield Green neighborhood, and residents to the west of the refinery also reported witnessing a large "black cloud" heading toward Frederiksted, smelling noxious odours, and observing numerous specks of oil on their homes and in their cisterns.[12] (Hereinafter, the "fourth release event.") Two days later, the EPA issued an emergency order addressed to Terminals and Refining, requiring—among other things—that the refinery cease operations.[13] The refinery has not resumed production since that time.

***

The 44 plaintiffs in these four associated cases—which have been consolidated for purposes of these preliminary injunction proceedings—allege injuries stemming from the release events, principally relating to contamination of their properties and cisterns with petroleum products. Plaintiffs bring over a dozen causes of action against over a dozen defendants, including Terminals, Refining, and their investors.[14] Plaintiffs bring these claims on behalf of both themselves and other yet-to-be-identified St. Croix residents affected by the release events.[15]

Although two years have elapsed since the release events, Plaintiffs' cases remain in their very earliest stages. This is largely due to the fact that a number of companies associated with the refinery declared bankruptcy in the summer of 2021, resulting in a stay of proceedings in this Court.[16] While Plaintiffs and various debtors associated with the refinery

---

[12] *See infra*, Section III.B.2.

[13] Pls. Ex. 21 (Emergency Order) at 32-42.

[14] Refining is now a nominal defendant in the case. *See infra*, note 16.

[15] The *Boynes*, *Shirley*, and *Cotton* cases are putative class actions; the *Charles* case is not.

[16] *See In re Limetree Bay Services LLC*, No. 21-BK-32351, Dkt. No. 1454 (Bankr. S.D. Tex. May 20, 2022) (order confirming Chapter 11 plan). The six debtors in the Bankruptcy Court action were Refining; Limetree Bay Services, LLC; Limetree Bay Refining Holdings, LLC; Limetree Bay Refining Holdings II, LLC' Limetree Bay Refining Operating, LLC; and Limetree Bay Refining Marketing, LLC. Following the Bankruptcy Court's approval of the debtors' proposed Chapter 11 Plan in May 2022, the debtors were succeeded in interest by LBR Liquidating Trust, which is not a defendant in these cases.

A13

attempted to mediate an agreement in the Bankruptcy Court, the debtors agreed to expand a pre-existing program providing free bottled water to residents during the pendency of the mediation.[17] Under the expanded program, the debtors agreed to provide free bottled water to the approximately 20,000 persons residing in the Frederiksted, Southcentral, Northcentral, and Southwest subdistricts of St. Croix, subject to limits on the amount of water individual residents could receive and a monthly cap on total expenses, among other conditions.[18] Both the expanded program and its predecessor program ended in September 2022—days after Plaintiffs terminated the Bankruptcy Court mediation—and this Court subsequently returned the four associated cases to the active trial docket.

Plaintiffs now seek a preliminary injunction ordering Terminals to: (1) "remediate [the] contaminated roofs, pipes, and cisterns" of Plaintiffs and putative class members (hereinafter, "remedial relief); and (2) "supply [] safe, clean, and potable water" to Plaintiffs and putative class members during the pendency of this litigation (hereinafter, "programmatic relief").[19] By Order dated February 2, 2023, this Court determined that the complexity of Plaintiffs' Motions warranted dividing the evidentiary hearing in this matter into two phases:

---

[17] *See* LBT Ex. 5 (Stipulation and Agreed Order Adopting Water Distribution Program, dated October 29, 2021) at 3 (hereinafter, "Agreed Order"); *see also id*. at 6 (listing other conditions subsequent).

[18] LBT Ex. 5 (Agreed Order) at 2-5. Under the expanded program, residents of these four subdistricts could pick up water not only at the Limetree Distribution Center but at Sunshine Mall and Frederiksted Ball Park as well—two locations that had not been part of the initial, non-expanded program. Although not a debtor in the Bankruptcy Court action, Terminals was involved in establishing the predecessor program and also participated in the expanded program. Terminals, like the debtors, has expressly stated that its participation in the expanded program in no way functioned as an admission of wrongdoing, nor as an admission that all or even anyone in the four subdistricts was impacted by the release events. *Id.* at 3. Plaintiffs likewise reserved rights to later argue that areas outside the four subdistricts were affected by the release events. *Id.*

[19] *Boynes*, Dkt. Nos. 141, 142; *Charles*, Dkt. Nos. 68, 68-1; *Cotton*, Dkt. Nos. 170, 171; *see also Shirley*, Dkt. No. 41 (*Shirley* Plaintiffs' Not. of Joinder in *Cotton* Plaintiffs' Am. Mot.). The *Charles* Plaintiffs also request a third form of relief—namely, that the Court appoint a special master to oversee any programmatic relief. Plaintiffs withdrew their request for a TRO at the February 1, 2023 status conference.

a first phase "entitlement" hearing, to determine whether Plaintiffs are entitled to the preliminary injunctive relief they now seek; and—provided that the Court determined that any such relief was warranted following the first phase hearing—a second phase hearing to determine the precise scope and structure of such relief and the appropriate bond.[20] The first phase hearing was held over four days from March 2-7, 2023, during which the Court received testimony from fourteen witnesses—specifically, four former or current employees of Terminals and Refining; five expert witnesses; and five residents reporting that their cisterns were contaminated by the first and fourth release events.

***

The Court has reviewed the parties' principal briefing and exhibits; the testimony and evidence presented at the first-phase hearing; and the parties' supplemental briefs, filed on April 3, 2023. For the reasons that follow, the Court finds that Plaintiffs have met their burden to establish that some, but not all, members of the group on behalf of whom they seek preliminary injunctive relief are entitled to such relief. Specifically, the Court finds that Plaintiffs have satisfied the four preliminary injunction factors with respect to those Plaintiffs and putative class members who cannot afford to purchase water without trading off other basic necessities, but that Plaintiffs have satisfied these factors with respect to this population only. The Court also finds that, while Plaintiffs have demonstrated entitlement to a preliminary injunction affording programmatic relief, they have not done so with respect to remedial relief.

Accordingly, the Court will convene a status conference on May 8, 2023, at which the Court will: (1) schedule the second phase hearing to address the precise contours of the population the Court here finds is entitled to programmatic relief and the logistics surrounding the provision of the same; and (2) set the corresponding briefing deadlines in

---

[20] *Boynes*, Dkt. No. 136; *Charles*, Dkt. No. 42; *Shirley*, Dkt. No. 79; *Cotton*, Dkt. No. 196.

consultation with the parties. The Court will deny Plaintiffs' Motions insofar as Plaintiffs seek remedial relief, and the Court will also deny Plaintiffs' Motions insofar as Plaintiffs seek programmatic relief with respect to those Plaintiffs and putative class members who can afford to purchase water without trading off basic necessities.

## II.   APPLICABLE LEGAL PRINCIPLES

Preliminary injunctions provide a mechanism through which courts may enjoin a party either to perform a particular act or to refrain from performing the same during the pendency of litigation. *United States v. Price,* 688 F.2d 204, 212 (3d Cir. 1982). To obtain a preliminary injunction, the movant must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Id.* at 20; *Swartzwelder v. McNeilly*, 297 F.3d 228, 234 (3d Cir. 2002). The first and second factors are "gateway factors" that the movant must establish. *Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 102-103 (3d Cir. 2022). If these two gateway factors are satisfied, a court then determines whether "all four factors, taken together, balance in favor of granting the requested preliminary relief." *Greater Phila. Chamber of Com. v. City of Phila.*, 949 F.3d 116, 133 (3d Cir. 2020).

Because a preliminary injunction necessarily issues before the parties have had a full opportunity to present their claims and defenses, it is an "extraordinary remedy," which may only be awarded upon a "clear showing" that the movant is entitled to preliminary relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Additionally, where, as here, a movant seeks mandatory injunctive relief,[21] the movant's burden is "particularly heavy," *Punnett v. Carter,* 621 F.2d 578, 582 (3d Cir.1980), meaning the movant must "show a

---

[21] "An injunction is mandatory if the injunction will . . . 'alter the status quo by commanding some positive act'[.]" *Coast to Coast Entm't, LLC v. Coastal Amusements, Inc.*, No. 05-CV-03977, 2005 WL 7979273, at *9 (D.N.J. Nov. 7, 2005) (quoting *Tom Doherty Assocs. v. Saban Entm't*, 60 F.3d 27, 33-34 (2d Cir. 1995)), *aff'd*, 931 F.3d 215 (3d Cir. 2019).

9

A16

substantial likelihood of success on the merits and that its 'right to relief [is] indisputably clear.'" *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 320 (3d Cir. 2020) (alteration in original) (quoting *Trinity Indus., Inc. v. Chi. Bridge & Iron Co.*, 735 F.3d 131, 139 (3d Cir. 2013)).

## III.   DISCUSSION

### A.   Likelihood of Success on the Merits

Plaintiffs argue that they are likely to succeed on the merits of at least four of their claims: negligence *per se*, nuisance, negligent trespass, and intentional trespass. (Mot. at 13-17). The Court must determine whether Plaintiffs "can likely meet" the elements of one or more of these claims. *Fres-co Sys. USA, Inc. v. Hawkins*, 690 F. App'x 72, 76 (3d Cir. 2017). While a "likelihood" of success "does not mean more likely than not," *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (en banc), "more than a mere possibility of relief is required," which means that Plaintiffs' "chance of success on the merits [must] be better than negligible." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (internal quotations omitted). In other words, Plaintiffs must show that they have a substantial "probability of success" on these claims, but not a "certainty" that they will ultimately prevail. *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 173 (3d Cir. 2001); *Hope*, 972 F.3d at 320.

The Court begins with Plaintiffs' negligence *per se* claims. To succeed on a claim of negligence *per se* under Virgin Islands law, a plaintiff must demonstrate that the defendant "had a duty to follow the law, failed to follow the law, and that such failure caused damages to the plaintiff as a person within the class intended to be protected by the statute or regulation." *Antilles Sch., Inc. v. Lembach*, 64 V.I. 400, 423 (2016). Plaintiffs initially argued that Terminals violated duties imposed upon it by two federal statutes—the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, and the Comprehensive Environmental Response, Compensation, and

10

A17

Liability Act, 42 U.S.C. § 9601 *et seq.*—as well as duties imposed by the Virgin Islands' Air Pollution Control Act, 12 V.I.C. § 201 *et seq.*, and Water Pollution Control Act, 12 V.I.C. § 181 *et seq.* (Mot. at 13-16). The arguments and evidence presented at the first phase evidentiary hearing, however, focused primarily on the Clean Air Act, and in particular on the duties Terminals allegedly assumed as a permittee for the refinery's "Clean Air Act Title V Permit." The Court will therefore focus its analysis on the same.

Terminals does not dispute that Plaintiffs and the putative class members fall within the scope of persons Congress intended the Clean Air Act to protect. *See* 42 U.S.C. § 7401(b) (noting purpose of statute is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare," among other things). Terminals also does not dispute that the exceedances Flare 8 experienced during the release events constituted breaches of the Clean Air Act,[22] or that Plaintiffs' injuries are traceable to those violations.[23] Indeed, Terminals does not specifically contest any element of Plaintiffs' negligence *per se* claims, nor does it contest specific elements of the other three claims on which Plaintiffs rely. Instead, Terminals stresses that it "is and has always been a separate and distinct legal entity from Refining," and that it "sold the [r]efinery to Refining prior to the release events." (Resp. at 4). On these bases, Terminals argues that it does not bear responsibility for the release events and accuses Plaintiffs of exploiting Terminals' and Refining's "common ownership,

---

[22] *See* 40 C.F.R. § 63.670 (regulating flare control devices); *see also* Pls. Ex. 21 (Emergency Order) at 29-41 (detailing violations of Clean Air Act); Pls. Ex. 20 (Terminals Notice of Violation) at 16-17 (similar); LBT Ex. 1 (Refining Notice of Violation) at 17-18 (similar); Pls. Exs. 8-12 (representatives of Terminals and Refining reporting various exceedances to DPNR relating to the second, third, and fourth release events).

[23] The Court notes that Terminals has argued in passing that Plaintiffs' expert evidence does not conclusively establish a link between the refinery and any contamination reflected in the relevant samples. (Resp. at 14). The Court does not view this argument as sufficient to raise any legitimate challenge that the Clean Air Act violations were themselves not causally connected to Plaintiffs' alleged injuries. As the Third Circuit has held, "mere allusion or reference is not enough" to raise an issue and "it is not enough" for a party "to mention relevant facts without explaining how they relate to [an] argument[.]" *Seifert v. Pennsylvania Hum. Rels. Comm'n*, 301 F. App'x 194, 196-97 (3d Cir. 2008).

similar names and close proximity to each other" to "improperly lump Terminals with the now-insolvent [Refining]," which—Terminals strongly implies—is the entity that really bears responsibility for the release events.[24] *Id.* at 2, 4, 28-31.

Plaintiffs do not dispute that Terminals sold the refinery's refining grounds and equipment to Refining prior to the release events or that Terminals owned only the refinery's terminal grounds and equipment during the events. Instead, Plaintiffs argue: (1) that, in reality, Terminals and Refining did not function as separate and distinct entities; and (2) that Terminals assumed—and, as of the release events, had not relinquished—a duty to ensure that the refinery, as a whole, complied with the Clean Air Act. (Rep. at 10-13).

\*\*\*

The Court begins with the first of Plaintiffs' arguments: that Terminals and Refining are not meaningfully distinct entities. (*See* Rep. at 14 ("The corporate separateness that [Terminals] emphasizes . . . simply does not exist.")). Much of the evidence Plaintiffs introduced at the first phase evidentiary hearing appears to have been directed to this point. This evidence establishes the following:

➢ That, during the startup process, Terminals and Refining employed various "shared services" and "shared facilities," including the refinery's Maintenance Department and "Health Safety and Environmental" Department ("HS&E").[25]

---

[24] While Plaintiffs initially sought preliminary injunctive relief not only from Terminals but also from Refining and the trust into which its interests were liquidated, the Bankruptcy Court has since clarified that its May 20, 2022 Order confirming Refining and the other debtors' Chapter 11 plan bars Plaintiffs from seeking relief from the latter entities at this time. *See In re Limetree Bay Services, LLC,* No. 21-BK-32351, Dkt. No. 1681-1 (Bankr. S.D. Tex. Feb. 17, 2023) (order granting liquidating trustees' emergency motion to enforce May 20, 2022 confirmation order). Plaintiffs subsequently withdrew their Motions insofar as they seek relief from Refining, the liquidating trust, and the liquidating trustee. (*See Boynes*, Dkt. No. 161; *Shirley,* Dkt. No. 54; *Charles*, Dkt. Nos. 99; *Cotton*, Dkt. Nos. 169, 223).

[25] *See* Mar. 2 Tr. at 100-102, 112-116 (Sales); Mar. 3 Tr. at 53-56 (McKowen); Mar. 6 Tr. at 140-42 (Elizee), 185-92 (Charles); Pls. Ex 101 (Chart, "Process Units By Area"); Pls. Ex. 106 (Map, "Limetree Bay Refinery Restart Project"); LBT Ex. 4 (Shared Services Agreement).

> ➢ That employees from the refinery's HS&E Department would communicate with DPNR and the EPA while making representations on behalf of both Terminals and Refining.[26]

> ➢ That Terminals employees in the Maintenance Department were part of Refining's Organization Chart and reported to Refining employees in the course of their duties.[27]

> ➢ That employees of Terminals would identify issues with, and perform maintenance on, Refining property, and vice versa.[28]

> ➢ That Terminals' equipment and property were necessary for the refinery to resume operations in the spring of 2021.[29]

Despite the emphasis Plaintiffs have placed on this evidence, it remains unclear as to what relevant conclusion follows. In their initial briefing, Plaintiffs argued that the HS&E Department was understaffed, that the Department was responsible for approving whether the refinery could restart after each release, and that the Department should not have authorized any restarting of operations. (Rep. at 13). However, Plaintiffs failed to introduced evidence sufficient to corroborate these contentions.[30] Nor have Plaintiffs explained how Terminals' liability somehow follows from the mere fact that its equipment was necessary for the refinery's restart.[31]

Plaintiffs' first argument, then, appears to reduce to the contention that the mere existence of shared facilities and services establishes that Terminals and Refining are not distinct legal entities such that the actions or omissions of one may be properly attributed to

---

[26] *See* Mar. 6 Tr. at 70-78 (Elizee); Pls. Exs. 8-12 (Limetree-DPNR Correspondence).

[27] *See* Mar. 3 Tr. at 56, 66, 72, 92-95 (McKowen); Mar. 6 Tr. at 185-92 (Charles); Pls. Ex 104 (Chart, "Shared Services Limetree Facility Maintenance").

[28] *See* Mar. 3 Tr. at 92-95 (McKowen); Mar. 6 Tr. at 185-92 (Charles).

[29] Mar. 2 Tr. at 112-16, 126 (Sales); Pls. Ex 101 (Chart, "Process Units By Area").

[30] Plaintiffs' submission—after their supplemental briefing—of a filing by Terminals in an Equal Employment Opportunity proceeding in which Terminals stated that "the Terminal Division and the Refinery Division were merged" does not add any real substance beyond what was already provided at the first phase hearing. (*See Boynes*, Dkt. No. 271-1 (Letter from Terminals to Equal Employment Opportunity Commission, dated February 2, 2021) at 4). Specifically, testimony was elicited at the hearing in the context of shared services, reflecting that the Maintenance Department included both Terminals and Refining maintenance employees.

[31] *See* Mar. 7 Tr. at 106-17.

the other. While the shared services evidence indicates that there was some degree of interconnectedness between the two companies as to those services, that evidence, standing alone, is insufficient—both legally and factually—to establish that Terminals and Refining are not distinct legal entities.

***

Plaintiffs' second argument in response to Terminals' contention that it does not bear any responsibility for the release events is that Terminals was legally obligated, as of the release events, to ensure that the refinery as a whole complied with the Clean Air Act. This argument fares significantly better.

In January 2016, Terminals entered into a purchase agreement with HOVENSA, pursuant to which Terminals acquired assets relating to the refinery, including the refinery's Title V Permit, which sets forth emissions controls and other air quality compliance requirements.[32] DPNR then transferred the Title V Permit to Terminals in May 2016.[33] As the sole permittee at this time, Terminals assumed responsibility for the entire refinery, including both its terminal and refining operations.[34] Among many other requirements, the Title V Permit provides that the permittee shall "not cause or permit the discharge from any source whatsoever such quantities of air contaminants or other material which cause injury, detriment, nuisance, annoyance to persons or to the public or which endanger the comfort, repose, health, or safety of any such persons or the public or which cause or have tendency to cause injury or damage to business or property."[35]

Catherine Elizee, a former employee of both Terminals and Refining who was responsible for ensuring that the refinery complied with the Title V Permit during the

---

[32] Pls. Ex. 5 (Title V Permit) at 4; Mar. 6 Tr. at 30-37 (Elizee).

[33] *See* LBT Ex. 15 (Air Permitting Letter) at 1-2 (summarizing history of Title V Permit).

[34] Mar. 6 Tr. at 25; Pls. Ex. 5 (Title V Permit) at 8-10 (Part 1, "Facility Description").

[35] *See* Pls. Ex. 5 (Title V Permit) at 39-51 (Part 2, "Facility Wide Requirements").

A21

"startup" period, confirmed that the Title V Permit is necessary to operate the refinery and that the Permit was in effect at the time of the release events.[36] Terminals argues, however, that the Title V permit did not actually obligate Terminals with respect to the refinery's refining operations as of the release events. In support of this contention, Terminals highlights that, in July 2019, Terminals and Refining each entered into separate "operating agreements" with the Government of the Virgin Islands, and that, at this time, Refining elected to be added as a co-permittee under the Title V Permit—a request DPNR subsequently approved.[37] The two operating agreements delineate, among other things, the respective "environmental" responsibilities of Terminals and Refining, in essence making Terminals responsible for its property and equipment and Refining responsible for its property and equipment.[38] Terminals argues that the refining operation's compliance with the Title V permit became the sole responsibility of Refining at this time

Based on the evidence presently before it, the Court disagrees. In electing to become a co-permittee under the Title V Permit, it appears that Refining assumed the same obligations under the permit as Terminals—in other words, for the refinery's operations as a whole. But there is nothing to indicate that Refining's assumption of this responsibility as a co-permittee affected Terminals' obligations under the Title V Permit. Notably, Refining elected to become a co-permittee to the Title V permit, not the "sole holder" of the same—an option that its operating agreement contemplates and which seemingly would have extinguished Terminals' obligations under the permit.[39] Moreover, the operating agreements were not

---

[36] Mar. 6 Tr. at 32, 36.

[37] *See* LBT Ex. 15 (Air Permitting Letter) at 2.

[38] Mar. 6 Tr. at 144-64; LBT Ex. 2 (Amended and Restated Terminal Operating Agreement) at 47-50 (Article 13, "Covenants of Terminal Operator"); LBT Ex. 3 (Refinery Operating Agreement) at 52-55 (Article 13, "Covenants of Refinery Operator").

[39] *See* LBT Ex. 15 (Air Permitting Letter) at 2 (explaining that DPNR recognized Refining as a co-permittee to the Title V Permit under Section 14.1 of Refining's Operating Agreement); LBT Ex. 3 (Refinery Operating Agreement) at 56 (Section 14.1, providing that Refining

addended to the Title V Permit or otherwise shared with the EPA, nor did the EPA's administration of the Title V Permit appear to be affected by the operating agreements given that the EPA addressed its May 14, 2021 Emergency Order to both Refining and Terminals as respondents.[40] Indeed, the Emergency Order documents that Terminals is "responsible for [the refinery's] Clean Air Act compliance obligations, including for its Refinery Operations, in multiple air permits," including the Title V permit, which "covers the [refinery's] Refinery Operations," as well as three Prevention of Significant Deterioration ("PSD") Permits, "some or all of [which] encompass Refinery Operations."[41]

In short—and as confirmed by Jeffery Charles, Terminals' Chief Operating Officer—it appears that the Title V Permit was never amended to make Terminals responsible for "anything less than the entire facility."[42] The Court therefore finds that Plaintiffs have adequately demonstrated, for preliminary injunction purposes, that Terminals had a duty to ensure that the refinery, as a whole, complied with the Clean Air Act and the requirements imposed by the Title V Permit, and that Terminals failed to ensure the refinery complied with the same. Accordingly, the Court rejects Terminals' contention that it bears no responsibility for the release events and concludes that Plaintiffs are substantially likely to succeed on the merits of their negligence *per se* claims.

*** 

While Plaintiffs are not required to demonstrate that they are substantially likely to succeed on the merits of all four of the claims that they identify, *see New Jersey Retail*

---

"may elect to be added as a co-permittee, co-holder, or sole holder of any environmental Authorization issued to [Terminals] by [DPNR] by giving Notice to the Government," provided that "any election by [Refining] to be added as a sole holder of an environmental Authorization shall be subject to the consent of [DPNR]").

[40] Pls. Ex. 21 (Emergency Order) at 31-41; Mar. 6 Tr. at 171-72 (Elizee).

[41] Pls. Ex. 21 (Emergency Order) at 3-4; *see also* Pls. Ex. 20 (Terminals Notice of Violation) at 1 (noticing Terminals for violations of Title V Permit and PSD Permits).

[42] Mar. 6 Tr. at 211 (Charles).

A23

*Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 400 (3d Cir. 2012), the Court will briefly address Plaintiffs' three remaining claims.[43]

Pursuant to *Banks* analyses, the Superior Court of the Virgin Islands has recognized Negligent Trespass as a cause of action distinct from Intentional Trespass and has defined both causes of action as set forth in the Second Restatement of Torts. *Alleyne v. Diageo USVI, Inc.*, 63 V.I. 384, 407-18 (V.I. Super Ct. 2015). Accordingly, under Virgin Islands law, a defendant is "subject to liability to another for [intentional] trespass, irrespective of whether [the defendant] thereby causes harm to any legally protected interest of the other, if [the defendant] intentionally (a) enters land in possession of the other, or causes a thing or third person to do so, or (b) remains on the land, or (c) fails to remove from the land a thing which [the defendant] is under a duty to remove." *Id.* at 410 (quoting *Restatement (Second) of Torts* § 158). In addition, a defendant "who recklessly or negligently . . . enters land in the possession of another or causes a thing or third person so to enter is subject to liability [for negligent trespass] to the possessor if, but only if, [the defendant's] presence or the presence of the thing or the third person upon the land causes harm to the land, to the possessor, or to a thing or a third person in whose security the possessor has a legally protected interest." *Id.* at 417 (quoting *Restatement (Second) of Torts* § 165). Virgin Islands courts have also consistently applied the definition of private nuisance set forth in the Second Restatement of Torts, under which a defendant is "subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either (a) intentional and unreasonable, or (b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities." *Restatement (Second) of Torts* § 821D; *see Alleyne* 63 V.I. at 404-06 (adopting this rule and collecting cases).

---

[43] While the *Shirley* Plaintiffs joined the *Cotton* Plaintiffs' Motion, the *Shirley* Plaintiffs do not bring claims of negligence *per se* or trespass against Terminals.

At this stage, Plaintiffs have not provided evidence sufficient to demonstrate that Terminals' conduct was intentional, and Plaintiffs' argument that they are substantially likely to succeed on the merits of their intentional trespass claims must therefore fail. However, for the reasons discussed in the context of Plaintiffs' negligence *per se* claims above, the Court finds that Plaintiffs have provided adequate evidence for the Court to conclude that Terminals negligently caused a thing—namely, petroleum products—to enter Plaintiffs' land, and that the presence of the same caused harm to Plaintiffs and their property.[44] Accordingly, the Court concludes that Plaintiffs are also substantially likely to prevail on the merits of their private nuisance and negligent trespass claims.

### B. Irreparable Harm

A preliminary injunction "must protect a plaintiff from the cause of irreparable harm and nothing more." *I.M. Wilson, Inc. v. Grichko*, No. 18-CV-05194, 2019 WL 5394113, at *4 (E.D. Pa. Oct. 22, 2019). Irreparable harm is "potential harm [that] cannot be redressed by a legal or an equitable remedy following a trial." *Instant Air Freight Co. V. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). To satisfy this gateway factor, a movant must show a "significant risk that he or she will experience harm that cannot be adequately compensated after the fact by monetary damages." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484-85 (3d Cir. 2000). "This is not an easy burden." *Id.* at 485. It requires that the movant demonstrate both a "presently existing actual threat," *Holiday Inns of America, Inc. v. B & B Corporation,* 409 F.2d 614, 618 (3d Cir. 1969), and that the threatened harm is "of a peculiar nature, [such] that compensation in money cannot atone for it" after the fact. *Acierno v. New Castle Cnty.,* 40 F.3d 645, 653 (3d Cir. 1994).

Relying on the testimony of both expert and lay witnesses, Plaintiffs argue that the release events discharged petroleum and other contaminants across much of the western

---

[44] The Court elaborates on the precise nature of this harm below.

portion of the island, and that the resulting contamination of Plaintiffs' and putative class members' cisterns—coupled with the financial realties faced by this population—places them in an impossible position. As Plaintiffs frame the matter, they "must either use water that they have no reasonable basis to believe is safe [and] cope with the mental and potential physical injuries that come from doing so," or "go without the single-most essential requirement for human health and comfort." (Pls. Supp. Br. at 3-4).

Terminals makes three arguments in response. First, Terminals argues that the Third Circuit's decision in *Adams v. Freedom Forge Corporation* categorically precludes Plaintiffs from seeking preliminary injunctive relief on behalf of putative class members. (Resp. at 21-22 (citing 203 F.3d at 475)). Second, Terminals argues that Plaintiffs have failed to show *any* harm—let alone irreparable harm—because Plaintiffs' experts' sampling "fails to demonstrate any environmental or public health emergency[.]" *Id.* at 26. Third, Terminals argues that even if Plaintiffs have shown harm, they have failed to demonstrate that such harm cannot be compensated after the fact by money damages.[45] *Id.* at 20.

### 1. Whether *Adams* Precludes Plaintiffs' Requested Relief

The Court begins with the procedural question raised by Terminals: whether *Adams* necessarily limits Plaintiffs' requested relief to the 44 Plaintiffs named in these four associated cases. This question is presented because Plaintiffs' Motions arise in a somewhat unusual posture, insofar as Plaintiffs seek relief on behalf not only of themselves but on

---

[45] Terminals also argues that Plaintiffs slept on their rights by waiting some four months from the date that the pre-existing water provision program terminated to seek a preliminary injunction, and that this delay nullifies any showing of irreparable harm. (Resp. at 27-28). The Court is unpersuaded. The two cases upon which Terminals relies concern delays of more than twice the length at issue here. Moreover, Plaintiffs have represented that they were also negotiating for the resumption of the water provision program during this period—which Terminals' counsel could neither confirm or deny—and that they were also "working to bolster their evidence and otherwise coordinate this exceedingly complex matter" at the same time. (Rep. at 18). The Court therefore finds that this four-month "delay" is immaterial. *Cf. Concerned Pastors for Soc. Action v. Khouri*, 217 F. Supp. 3d 960, 971-72 (E.D. Mich. 2016) (rejecting a similar argument where the movants took "the prudent step of requesting limited discovery to ensure the relief they sought was still needed").

behalf of putative class members as well, in advance of any motion for class certification or ruling on the same. *See Rosenfeld v. Time Inc.,* No. 17-CV-09886, 2018 WL 4177938, at *4 (S.D.N.Y. Aug. 30, 2018) ("Generally, district courts addressing preliminary injunction motions on behalf of a putative class simultaneously address a class certification motion.").

*Adams* concerned 136 plaintiffs seeking to enjoin their former employer from altering health care benefits that it had provided to the plaintiffs since they retired. 204 F.3d at 479. The district court granted a preliminary injunction requiring the former employer to continue to fund the health plans of all 136 plaintiffs. *Id.* As characterized by the Third Circuit, the question presented on appeal was "whether a district court, faced with a large group of plaintiffs whom the court determines are reasonably likely to succeed on the merits, may grant a preliminary injunction to the entire group of plaintiffs if there is evidence that some, but not all, of the plaintiffs will suffer irreparable harm." *Id.* at 479. The Third Circuit concluded that the answer to this question is no. *Id.* at 480.

The Third Circuit began by distinguishing between two types of scenarios: (1) those in which the evidence presented provides the court with an "adequate foundation" from which to infer that "all (or virtually all) members of a group" will be irreparably harmed; and (2) those in which the evidence presented provides the court only with enough information to infer that some or most members of the group—but not all or virtually all members—will be irreparably harmed. *Id.* at 487. The Third Circuit then held that, while courts may properly issue preliminary injunctions in the former scenario, they may not do so in the latter. *Id.* As the Third Circuit explained, this prohibition is nothing more or less than a recognition that harm contemplated by the second factor of the preliminary injunction analysis must not be "speculative"—a corollary of which is that "the preliminary injunction device should not be exercised unless the moving party shows that it *specifically and personally* risks irreparable harm." *Id.* at 487-88 (emphasis added); *see also Marxe v. Jackson*, 833 F.2d 1121, 1127 (3d

Cir. 1987) ("Courts have long required that a party seeking preliminary relief produce affirmative evidence indicating that he or she will be irreparably harmed should that relief be denied[.]"). The Third Circuit ultimately determined that the evidence that the *Adams* plaintiffs offered—through the testimony of eleven plaintiffs—could not justify a preliminary injunction protecting all of the *Adams* plaintiffs because the testimony of those eleven plaintiffs did not provide an adequate foundation from which to infer that "all (or virtually all)" of the *Adams* plaintiffs would suffer irreparable harm absent an injunction. *Id.* at 488.

Contrary to Terminals' contention, there is nothing in this holding that precludes Plaintiffs from seeking, or this Court from entering, a preliminary injunction affording relief to putative class members. Terminals takes critical portions of *Adams* out of context, noting that *Adams* condemned "uncritically treat[ing] a group as a collective when a would-be class has petitioned for certification," and arguing that Plaintiffs seek to be treated as precisely such a collective here. (Resp. at 21 (quoting *Adams*, 204 F.3d at 490)). But the Third Circuit simply held that the mere fact that the plaintiffs in *Adams* had petitioned for class certification did not afford them the right to be treated collectively—that is, that such a petition did not exempt the plaintiffs from the general rule that plaintiffs must demonstrate individualized harm. The Third Circuit did not hold that any and all putative class members are necessarily part of some improper collective, as Terminals argues.

Were there any residual doubt, the Supreme Court has itself acknowledged the propriety of preliminary injunctions affording relief to members of a putative class in advance of class certification, as have sister circuits. *See Elrod v. Burns,* 427 U.S. 347, 348, 373-74 (1976) (observing that the Court of Appeals "might properly have held that the District Court abused its discretion in denying preliminary injunctive relief" to putative class members "who allege that they were discharged or threatened with discharge solely because of their partisan political affiliation"); *LaForest v. Former Clean Air Holding Co.*, 376 F.3d

21

A28

48, 56 (2d Cir. 2004) (discussing *Adams* in depth and holding that the district court did not abuse its discretion "in concluding that the then-putative class suffered irreparable harm warranting a preliminary injunction."); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018) ("An injunction may extend benefit or protection to nonparties if such breadth is necessary to give prevailing parties the relief to which they are entitled." (quotation marks omitted)). District courts in the Third Circuit have also entered preliminary injunctions affording relief to putative class members post-*Adams*. *See, e.g., Augustin v. City of Philadelphia*, 897 F.3d 142, 147 (3d Cir. 2018) (noting that the district court "entered a preliminary injunction barring the City from filing new liens or collecting on old ones against members of the putative class"); *Gilliam v. United States Dep't of Agric.*, 486 F. Supp. 3d 856, 881 (E.D. Pa. 2020) (entering preliminary injunction enjoining the United States Department of Agriculture from denying certain emergency allotments with respect to "all persons living in Pennsylvania who are, were or will be eligible for SNAP benefits during the period for which Congress has authorized the issuance of emergency allotments during the COVID-19 emergency and who were not provided an emergency allotment").

In short, *Adams* does not preclude Plaintiffs from seeking relief on behalf of putative class members. Instead, *Adams* presents the question here as to whether Plaintiffs have provided an adequate basis from which this Court can infer that the putative class members (and Plaintiffs themselves) "specifically and personally" risk irreparable harm absent an injunction. *Id.* at 487-88. This is necessarily a fact bound inquiry. *See id.* at 490-91 (observing that irreparable harm "depends in many cases on . . . the particular resources available to each member of the class to weather hardships pending a trial"); *see also Groupe SEB USA, Inc. v. Euro-Pro Operating, LLC*, 774 F.3d 192, 205 (3d Cir. 2014) (noting that courts "considering whether to grant injunctive relief must exercise their equitable discretion in a case-by-case, fact specific manner," and that a "critical aspect" of courts' fact-finding is

22

A29

"drawing reasonable inferences from facts in the record."). The Court will therefore return to this question after addressing the parties' evidence.

## 2. Whether Plaintiffs Have Shown Harm

The Court begins with the expert evidence. Plaintiffs called three expert witnesses: Dr. Erno Sajo, who performed air modelling to map the areas likely impacted by each of the four release events;[46] Dr. Marco Kaltofen, who led a small team that conducted sampling of various properties thought to be impacted by the release events;[47] and Dr. Michael Henry, who assisted Dr. Kaltofen with the sampling.[48] In total, it appears that Dr. Kaltofen and his team collected and tested 82 samples from July to November 2021.[49] Of these 82 samples, 23[50] were "water samples" taken from cisterns; 41[51] were "soil samples" taken from various

---

[46] The Court accepted Dr. Sajo as an expert in "aerosol dispersion air modelling" for purposes of these preliminary injunction proceedings only. (Mar. 3 Tr. at 154).

[47] The Court accepted Dr. Kaltofen as an expert in "environmental science," "environmental engineering," and the "fate and transport of petroleum and chemical releases" for purposes of these preliminary injunction proceedings only. (Mar. 2 Tr. at 154).

[48] The Court accepted Dr. Henry as an expert in "physical science and inspections" for purposes of these preliminary injunction proceedings only. (Mar. 3 Tr. at 139).

[49] The parties have reached slightly different totals. After parsing through the sampling records—which are somewhat disorganized—the Court reaches its total of 82 samples as follows: Dr. Kaltofen's "summary sheet" (Pls. Ex. 80) lists 84 samples and reflects that 80 of these 84 samples were tested. (The four untested samples are "STX 006D" (Pls. Ex 80, Row 6), "STX 009S" (Row 9), "STX 013S" (Row 13), and "STX 2021-32S" (Row 84)). Plaintiffs have provided the underlying lab reports (Pls. Ex. 69-77) for all but one of these samples— "STX-005S" (Pls. Ex. 80, Row 5)—and the Court disregards this sample. In addition, the lab reports reflect that three additional samples—which do not appear on the summary sheet— were also tested, for a total of 82 samples that the Court considers here. (The three additional samples are "STX-2021-01-SWB1" (Pls. Ex. 73 at 5), "STX-2021-01-SWB2" (Pls. Ex 73 at 6), and "STX-2021-21 W1" (Pls. Ex 74 at 5)).

[50] This consists of the 22 water samples listed in the summary sheet (Pls. Ex. 80), plus one additional water sample, "STX-2021-21 W1," which is not listed in the summary sheet but appears in the lab reports (Pls. Ex. 74 at 5).

[51] This consists of all 42 soil samples listed in the summary sheet (Pls. Ex. 80), except soil sample "STX-005S" (Row 5), which the Court disregards because no underlying lab report was provided.

A30

locations; and eighteen[52] were "swab samples," with the swabs taken principally from cistern interiors. A brief summary of the results of this sampling is as follows.

### Water Samples

Dr. Kaltofen and his team had a laboratory test the vast majority of the 23 water samples for two types of substances: total petroleum hydrocarbons with a carbon range of ten to 28 atoms, which are called diesel range organics ("TPH-DRO"); and total petroleum hydrocarbons with a carbon range of 28 to 40 atoms, which are called oil range organics ("TPH-ORO"). The equipment that the laboratory used to test the water samples for TPH-DRO and TPH-ORO content had a lower limit of 0.1 parts-per-million ("ppm"), meaning that any TPH-DRO or TPH-ORO below this level would not be detected. One of the 23 water samples detected TPH-DRO of a sufficient quantity to exceed this "non-detect" threshold (at 0.66 ppm), and two samples detected TPH-ORO of a sufficient quantity to exceed the non-detect threshold (at 0.14 ppm and 0.19 ppm).[53] The three positive water samples are from the Frederiksted (Hesselberg), Mount Pleasant, and Williams Delight neighborhoods, which Dr. Sajo's air modelling identifies as areas likely impacted by the release events.[54]

### Soil Samples

Of the 41 soil samples, five were what Dr. Kaltofen has referred to as "background" samples, and 36 were what the Court will call "illustrative" samples. As with the water samples, Dr. Kaltofen and his team also had the laboratory test the 36 illustrative soil samples for TPH-DRO and TPH-ORO content. The lower limit of this sampling generally varied

---

[52] This consists of all sixteen swab samples listed in the summary sheet (Pls. Ex. 80), plus two additional swab samples, "STX-2021-01-SWB1" and "STX-2021-01-SWB2," which are not listed in the summary sheet but appear in the lab reports (Pls. Ex. 73 at 5-6).

[53] "STX 2021 02 W1" (Pls. Ex. 80, Row 18) (0.66 ppm TPH-DRO); "STX-003W" (Pls. Ex. 80, Row 3) (0.19 ppm TPH-ORO); and "STX-010W" (Pls. Ex. 80, Row 10) (0.14 ppm TPH-ORO).

[54] Pls. Ex. 57 (figure illustrating Dr. Sajo's estimate for area impacted by first release event); Pls. Ex. 60 (same, for fourth release event); Pls. Ex. 61 (same, for all four release events).

A31

between approximately 10-15 ppm. Seventeen of the 36 illustrative samples detected TPH-DRO of a sufficient quantity to exceed the non-detect threshold, and the average amount of TPH-DRO detected across these seventeen samples was approximately 25 ppm, with amounts ranging as low as 12 ppm and as high as 53 ppm. 35 of the 36 illustrative samples detected TPH-ORO of a sufficient quantity to exceed the non-detect threshold, and the average amount of TPH-ORO detected across these 35 samples was approximately 86 ppm, with amounts ranging as low as 21 ppm and as high as 260 ppm.

### Swab Samples

Dr. Kaltofen and his team tested the eighteen swab samples for TPH-DRO and TPH-ORO content. Unlike the water and soil samples, the swab samples could not accurately render an analog result measured in parts-per-million, but rather indicate only whether TPH-DRO and/or TPH-ORO are present or not. One of the swab samples detected both TPH-DRO and TPH-ORO;[55] two of the swab samples detected TPH-DRO only;[56] and two of the swab samples detected TPH-ORO only.[57] The five positive samples are from the Frederiksted (Smithfield), Good Hope, Mount Pleasant, Whim, and Williams Delight neighborhoods, which Dr. Sajo's air modelling identifies as areas likely impacted by the release events.[58]

\*\*\*

In addition to the aforementioned expert evidence, Plaintiffs also called five residents who testified that their cisterns have been contaminated since the release events. All five testified that they and their families cannot afford to have their cisterns or roofs—which

---

[55] "STX-2021-17SW" (Pls. Ex. 80, Row 52).

[56] "STX-2021-22SW" (Pls. Ex. 80, Row 62) and "STX-2021-30SW1" (Row 77).

[57] "STX-2021-25SW" (Pls. Ex. 80, Row 67) and "STX-2021-28SW" (Row 73).

[58] Pls. Ex. 57; Pls. Ex. 60; Pls. Ex. 61.

A32

function as the water catchment systems for the cisterns—cleaned.[59] A brief summary of the testimony of each follows.

### JoAnne Allen-Murphy

Ms. Allen-Murphy and her husband live in a housing complex in the Good Hope neighborhood.[60] The complex contains 90 units and houses approximately 85 people, many of whom are senior citizens, struggle financially, and receive government assistance.[61] Ms. Allen-Murphy testified that in the aftermath of the release events, the roofs of the complex had "oily specks all over them;" that she found oil specks on cars in the area; and that the toilets and water filters in her units were covered in an "oily dark substance" that "continued to accumulate" for a significant period of time.[62] Asked about the condition of the complex's two large cisterns, Ms. Allen-Murphy responded that, following the release events, she found a "very large amount" of "oily specks, dark specks" in the water, which changed its color to "very dark . . . grayish dirty color," and that the water was "shiny" and "dirty."[63] She represented that she and the complex's other residents have increasingly added more and more clean water to the cisterns in an attempt to dilute the oil, which has improved matters "significantly."[64] However, the water is still not "a hundred percent clear," with the most recent test indicating that the water is not recommended to drink.[65]

Ms. Allen-Murphy testified that she used her cistern water for cooking, bathing, brushing her teeth, and other ordinary household uses prior to the release events, but that she

---

[59] Mar. 2 Tr. at 77 (Allen-Murphy), 303 (Urgent), 314 (Webster); Mar. 3 Tr. at 101 (Carino), 128 (Thompson).

[60] Mar. 2 Tr. at 36 (Allen Murphy).

[61] Mar. 2 Tr. at 37-39, 50-52, 79-80 (Allen-Murphy); *see also id.* at 39 (explaining that the complex housed approximately 150 people at the time of the release events).

[62] Mar. 2 Tr. at 41-43, 66 (Allen-Murphy).

[63] Mar. 2 Tr. at 41, 46-48, 66 (Allen-Murphy).

[64] Mar. 2 Tr. at 47-49, 74-76 (Allen-Murphy).

[65] Mar. 2 Tr. at 74-76 (Allen-Murphy).

26

A33

and "most people" at the complex purchased bottled drinking water before the release events.[66] She explained that she no longer "trust[s]" the cistern water and now purchases additional water to cook, brush her teeth, and bathe her husband, who is disabled and suffered an adverse reaction after bathing in the post-release cistern water, but that she personally uses the post-release cistern water to bathe and for other household uses.[67] She stressed, however, that her neighbors' financial circumstances are such that many of them "have no choice" but to use the cistern water for cooking and bathing, among other things.[68]

**Carloyn Urgent**

Ms. Urgent lives with her son and elderly parents in a three-bedroom home in the Whim neighborhood.[69] Following the release events, she noticed oil on the walls and windows of her home and that the water coming from her faucet was "oily."[70] She testified that two refinery representatives visited her home shortly after the events, and that the representatives confirmed the presence of oil on her walls and roof and offered her mother $4,600 to remediate the property if she signed a release.[71]

Asked how the release events had impacted her family, Ms. Urgent explained that, as a result of the contamination, she and her family began purchasing water through the Virgin Islands Water and Power Authority ("WAPA") for approximately $125.00 per month to use in place of their cistern water, but that they eventually stopped using WAPA water for two reasons.[72] First, the WAPA water cannot be used for drinking or many household purposes like cooking, brushing teeth, or doing laundry because it is "rusty and red [and] dirty," which

---

[66] Mar. 2 Tr. at 78-79 (Allen-Murphy).

[67] Mar. 2 Tr. at 37, 50-53, 77-79 (Allen-Murphy).

[68] Mar. 2 Tr. at 51-52 (Allen-Murphy).

[69] Mar. 2 Tr. at 295 (Urgent).

[70] Mar. 2 Tr. at 296 (Urgent).

[71] Mar. 2 Tr. at 297-98 (Urgent).

[72] Mar. 2 Tr. at 299 (Urgent).

A34

meant that her family had to purchase significant amounts of additional bottled water in addition to their WAPA bill.[73] Second, the expense of the WAPA water—combined with the cost of purchasing additional bottled water and having to use a laundromat—placed significant financial stress on her family, interfering with their ability to pay the bills and pay for a caretaker for her elderly father, who has dementia.[74] Ms. Urgent testified that she now visits a friend's house to bathe, but purchases bottled water for her family to bathe because of her parents' limited mobility.[75] She estimated that her family currently purchases twenty single gallon bottles of water per day, and explained that these circumstances mean that there is a "great pain in our family right now."[76]

### Marisela Webster

Ms. Webster lives in a home in the Williams Delight neighborhood with her husband and two young children.[77] She testified that, following the release events, her property smells like "old gasoline and old oil . . . every so often;" that the water that comes from her faucet contains oil; and that whenever her family looks at their cisterns, they "always see like a gray [glaze] over the water," which she attributes to "oil or gas."[78] She also testified that two refinery representatives came to her home shortly after the fourth release event and confirmed the presence of oil on the walls of her home, and that the representatives offered her $4,000 to clean her cisterns and roof.[79] She explained that, prior to the release events, she and her family used their cistern water for drinking, cooking, bathing, washing, gardening, and other

---

[73] Mar. 2 Tr. at 299-301 (Urgent).

[74] Mar. 2 Tr. at 299-302 (Urgent).

[75] Mar. 2 Tr. at 301-02, 306 (Urgent).

[76] Mar. 2 Tr. at 303, 306 (Urgent).

[77] Mar. 2 Tr. at 307, 315, 327 (Webster).

[78] Mar. 2 Tr. at 311-13 (Webster).

[79] Mar. 2 Tr. at 309-11, 324-25 (Webster).

A35

household uses, but that they no longer feel safe using the water for anything.[80] Her family now purchases bottled water for cooking and drinking, but they continue to use the cistern water for at least some other purposes because they have "no choice."[81] They also purchase WAPA water.[82] She testified that her family does not feel "safe," and that they cannot afford to have their cistern cleaned because she and her husband live paycheck to paycheck and have bills to pay.[83]

### Julio Carino

Mr. Carino lives in a home in the Estate Whim neighborhood and his mother lives next door.[84] Following the release events, he noticed oil spots on windows and walls of their homes and that his neighbors experienced the same issues; as he characterized it, "oil was everywhere."[85] He described experiencing chest pains, difficulty breathing, and flu-like symptoms in the immediate aftermath of the release events, which a doctor attributed to "chemical exposure."[86] Like Ms. Urgent and Ms. Webster, he testified that two refinery representatives came to his home shortly after the fourth release event and confirmed the presence of oil on both his and his mother's properties, ultimately offering him $14,000 to remediate both properties.[87] He explained that, since the release events, he and his mother "don't use the cistern water at all;" that they purchase drinking water; and that they collect rainwater to use for washing the dishes, bathing, and other household uses.[88]

---

[80] Mar. 2 Tr. at 308-09 (Webster).

[81] Mar. 2 Tr. at 316, 321-23 (Webster).

[82] Mar. 2 Tr. at 314 (Webster).

[83] Mar. 2 Tr. at 314-15 (Webster).

[84] Mar. 3 Tr. at 97-98 (Carino).

[85] Mar. 3 Tr. at 98 (Carino).

[86] Mar. 3 Tr. at 98, 103-04 (Carino).

[87] Mar. 3 Tr. at 99-100 (Carino).

[88] Mar. 3 Tr. at 102 (Carino).

**Margaret Thompson**

Ms. Thompson lives in the Frederiksted (Smithfield) neighborhood of St. Croix.[89] She testified that, following the release events, she noticed a lot of little black spots on the walls and windows of her home, and that she saw oil in water she drew from her cistern.[90] She also testified that two refinery representatives came to her home shortly after the fourth release event and confirmed the presence of oil on the walls of her home, and that the representatives offered her $4,500 to remediate her property.[91] Prior to the release events, Ms. Thompson purchased water for drinking and cooking, but did "everything" else with cistern water, including bathing, brushing her teeth, and washing clothes and dishes.[92] She reported that she got "sick" and had a "rash" on her skin after using the "filthy" water to bathe, and that she now buys water for all her household uses.[93] She uses her social security benefits to pay for this water, and she cannot pay to have her cistern cleaned because she does not have "any money."[94]

***

The parties vigorously contest what follows from the evidence described above. Plaintiffs argue that "Dr. Sajo's zone of impact establishes that the contaminants at issue were dispersed across multiple communities on the western side of St. Croix," and that "the Court can reasonably infer that *every* [resident] in this zone of impact risks irreparable harm caused by [Terminals'] contamination" based on Dr. Kaltofen's sampling and the testimony of the five resident witnesses. (Pls. Supp. at 20 (emphasis in original)). Conversely,

---

[89] Mar. 3 Tr. at 118-19 (Thompson).

[90] Mar. 3 Tr. at 121-22 (Thompson).

[91] Mar. 3 Tr. at 122-25 (Thompson).

[92] Mar. 3 Tr. at 120-21 (Thompson).

[93] Mar. 3 Tr. at 129-30 (Thompson).

[94] Mar. 3 Tr. at 128-30 (Thompson).

Terminals argues: (1) that Plaintiffs have not shown contamination; (2) that, even if Plaintiffs have shown contamination at the time Dr. Kaltofen and his team conducted sampling, they have not shown there is a *present* threat; and (3) that even if Plaintiffs have shown present contamination, they have not shown that the same rises to unsafe levels. (LBT Supp. Br. at 2-4).

**Whether Plaintiffs Have Shown Contamination**

Terminals argues that Plaintiffs' evidence does not establish contamination. The Court concludes that, while there are certainly some deficiencies in the expert evidence and/or its presentation, Plaintiffs' evidence as a whole is indicative of contamination.

Some of the deficiencies are particularly evident in the water and soil samples. The water sampling returned very few results that exceeded the "non-detect" threshold. Further, while, by the numbers, the soil samples appear indicative of contamination, Dr. Kaltofen was unable to satisfactorily explain the relationship between the background samples and the illustrative samples or how the differences between the two sets of samples indicated contamination. In particular, Dr. Kaltofen did not consistently explain whether the soil sampling data should be understood to reflect contamination only where the illustrative samples exceeded the TPH content in the background samples, or whether the data should be understood to reflect contamination even where the TPH content in the illustrative samples was less than the TPH content in the background samples.[95]

The Court finds the swab samples to be indicative of contamination, particularly in light of the fact that Dr. Henry testified that he and the other members of Dr. Kaltofen's team did not specifically sample or swab cisterns with a visible sheen or properties that they

---

[95] *See* Mar. 2 Tr. at 186-89, 261-63 (Kaltofen) (explaining that Dr. Kaltofen's team purposefully took background samples from locations they believed would reflect high levels of petroleum hydrocarbons related to transportation).

31

A38

believed to be contaminated.[96] The Court also finds that the testimony of the resident witnesses corroborated contamination. Ms. Allen-Murphy testified that she has observed specks of oil on her roof, on cars, and "all over" her toilet and water filters, as well as in her cistern.[97] Ms. Urgent testified that she has observed oil on the walls, windows, and roof of her property, as well as coming out of her faucet.[98] Ms. Webster testified that she recurrently smells oil on her property and that she has also observed oil coming from her faucet, as well as a "glaze" over the water in her cistern, "[l]ike a shadow was on the top."[99] Mr. Carino testified that he has observed oil "everywhere," including on his walls and windows of his house, on his mother's house, and on his neighbors' properties, as well as on plants and vehicles in the neighborhood.[100] Ms. Thompson testified that she has observed oil and "black spots" on her walls, windows, and roof, as well as in the water in her cistern and coming from her faucet.[101] In addition to the resident witnesses' personal observations, Terminals and Refining also issued multiple press releases noting that a number of neighborhoods were contaminated by the release events.[102]

In view of the foregoing, the Court finds that the totality of the evidence is indicative of contamination, and rejects Terminals' argument to the contrary.

---

[96] Mar. 3 Tr. at 201 (Henry) ("[W]e swabbed every cistern whether or not we saw any . . . visual signs of potential oil deposits"); *see also id.* at 146-47 (explaining that samples were taken from properties both to the west and east of the refinery).

[97] Mar. 2 Tr. at 40-46, 48, 66-69, 72, 92-93 (Allen-Murphy).

[98] Mar. 2 Tr. at 296-98, 303 (Urgent).

[99] Mar. 2 Tr. at 309-13, 317 (Webster).

[100] Mar. 3 Tr. at 98-99, 111-15 (Carino).

[101] Mar. 3 Tr. at 121-24, 129-33 (Thompson).

[102] Pls. Ex. 115 (Press Release, "Limetree Bay Responding to Flare Incident," dated May 12, 2021); Pls. Ex. 116 (Press Release, "Limetree Bay Response to Flare Incident," dated March 2, 2021).

**Whether Plaintiffs Have Shown *Present* Contamination**

Relying principally on the testimony of Dr. Erin Murray,[103] Terminals argues that even if Dr. Kaltofen's samples provide evidence of contamination, the samples are "not reflective of the present-day circumstances" because the chemical composites of petroleum tend to degrade over time. (LBT Supp. Br. at 15). Dr. Murray testified that she would expect "concentration from any petroleum that might have been in the environment in the middle of 2021 to dissipate," such that she would expect "current environmental conditions to contain less petroleum" and the "concentrations to be lower today."[104] Her testimony aligns with Dr. Kaltofen's, insofar as Dr. Kaltofen noted that "the petroleum hydrocarbons that are present [today] are unlikely to be at exactly the same concentration" as they were at the time of sampling, such that if he and his team were to perform the sampling again today they would "probably get a different result."[105]

Contrary to Terminals' suggestion, the Court does not view this testimony as undermining Plaintiffs' case. While both Dr. Murray and Dr. Kaltofen testified that they would expect less petroleum to be present in cisterns today, both experts also testified that various chemical compounds emitted by the release events tend to persist over time. Acknowledging that the fourth release event emitted "pitch oil," Dr. Murray explained that pitch oil is a "heavier fraction of oil . . . relative to something like gasoline" that is "harder to break down" and persists longer in the environment.[106] Dr. Kaltofen likewise explained that while some of the chemical compounds emitted by the release events "will slowly dissipate

---

[103] The Court accepted Dr. Murray as an expert in "environmental chemistry," "environmental forensics," and the "fate and transport of contaminants" for purposes of these preliminary injunction proceedings only. (Mar. 7 Tr. at 14). Terminals withdrew its request to proffer Dr. Murray as an expert in "public health and safety." *Id.* at 56.

[104] Mar. 7 Tr. at 54 (Murray).

[105] March 2, 2023 Tr. at 287-88 (Kaltofen).

[106] Mar. 7 Tr. at 68 (Murray).

A40

and degrade," there "are [also] other compounds that are extremely long lasting that are present for decades," which "degrade very, very slowly" because they tend to be "absorbed by and interact with" the porous concrete walls of cisterns and the "normal biological materials that you might find in a cistern."[107] The testimony of the resident witnesses also corroborates Dr. Kaltofen's observation that it is "not in the nature of the chemical[s] involved" for them to disappear completely absent cleaning.[108] For example, Ms. Allen-Murphy testified that, while cistern water at her complex has improved over the last two years as clean water has been added, it is still "not a hundred percent clear."[109] And Ms. Webster testified she "always see[s] . . . a gray [glaze] over the water" in her cistern and that the "oil is still there."[110]

In view of the foregoing, the Court finds that Terminals has failed to dispel the notion that there is present contamination, and Terminals' argument to that effect is rejected.

### Whether Plaintiffs Have Shown Contamination Poses Health Risks

Terminals argues that the Court "can and should apply regulatory health screening levels in assessing whether any of the samples with positive detects for possible petroleum creates a human health risk requiring injunctive relief," and that Plaintiffs have not demonstrated that contamination levels exceed these thresholds. (LBT Supp Br. at 14-16). Terminals' argument is based principally on the testimony of Dr. Charles Menzie.[111] Dr. Menzie testified that the relevant regulatory thresholds for the Virgin Islands are 5 ppm for

---

[107] Mar. 2 Tr. at 214-15 (Kaltofen).

[108] Mar. 2 Tr. at 214-15 (Kaltofen).

[109] Mar. 2 Tr. at 47-49, 74-76 (Allen-Murphy).

[110] Mar. 2 Tr. at 311-13, 317 (Webster).

[111] The Court accepted Dr. Menzie as an expert in "risk analysis," "causal analysis," and "human health and ecological risk assessment" for purposes of these preliminary injunction proceedings only. (Mar. 6 Tr. at 284).

34

A41

total TPH in water and 460 ppm for TPH-DRO in soil.[112] Dr. Murray's declaration also specifies these same thresholds.[113]

Dr. Menzie and Dr. Murray are correct that none of Dr. Kaltofen's samples exceed either of these two thresholds. However, three principal considerations lead the Court to reject Terminals' argument.

First, neither Dr. Menzie nor Dr. Murray have satisfactorily explained how or from where these safety thresholds were derived, and Terminals has not adequately corroborated the screening thresholds upon which its two experts relied. Following Dr. Menzie's testimony, the Court requested that Terminals provide sources for these thresholds given the emphasis that both Dr. Menzie and Terminals had placed on them.[114] In response, Terminals provided documentation purporting to corroborate the 460 ppm threshold for TPH-DRO in soil, but did not provide any documentation or citation for the 5 ppm threshold for TPH in water, nor an explanation of how that number was derived.[115] Further, the documentation that Terminals provided with respect to the soil threshold, and upon which Dr. Menzie and Dr. Murray relied, consists of two documents published by the Virgin Islands Government in 2014 titled "Underground Storage Tanks," and "Underground Storage Tank Closure Guidance Document."[116] These two documents set standards applicable to the containment and remediation of industrial petroleum storage.

Neither Terminals nor its experts have offered any reason to suggest that the threshold for underground storage tanks upon which Terminals' experts relied is applicable to

---

[112] Mar. 6 Tr. at 297-30 (Menzie). Dr. Menzie represented that the Virgin Islands does not have a relevant threshold for TPH-ORO in soil. *Id.*

[113]*Boynes*, Dkt. No. 168-5 (Murray Dec.) at 7, 9. While Dr. Murray referenced these thresholds in her declaration and testimony, she testified that Dr. Menzie "provided" them. (Mar. 7 Tr. at 22 (Murray)).

[114] Mar. 6 Tr. at 332.

[115] Mar. 7 Tr. at 84.

[116] LBT Ex. 20 at 27; LBT Ex. 21 at 113-120.

residential properties. The Court agrees with Plaintiffs that "the pathways of exposure to humans and the level of migration of the contaminants [in the two contexts] are entirely different." (Pls. Supp. Br. at 331). The Court therefore assigns this threshold no weight. The seemingly inapplicable threshold proffered by Terminals for TPH-DRO in soil renders the Court even less willing to assign any weight to the wholly uncorroborated threshold that its two experts cite for TPH content in water.[117]

Second, the testimony of the resident witnesses leads the Court to reject the notion that there are no health effects associated with the presence of petroleum in residents' cisterns. Ms. Thompson testified that after bathing in her post-release cistern water she experienced a rash on her skin, and Ms. Allen-Murphy likewise testified that she is forced to purchase water to bathe her husband because he had an adverse reaction to the post-release cistern water.[118] Another resident witness also reported health issues associated with the release events that were attributed to the presence of petroleum products in the air. Mr. Carino testified that, in the days following the fourth release event, he sought medical attention after experiencing difficulty breathing, a sore throat and chest, and other "flu symptom[s]," which his doctor attributed to "chemical exposure."[119]

Third, while the Court does not necessarily agree with Plaintiffs that any amount of contamination is inherently hazardous and detrimental to human health simply because the

---

[117] The Court also rejects Terminals attempts to conflate the purported threshold levels offered by its experts with the EPA's Maximum Contaminant Level Goals and Maximum Contaminant Levels, which the EPA defines as "the level of a contaminant in drinking water below which there is no known or expected risk to health," and "the highest level of a contaminant that is allowed in drinking water," respectively. (LBT Supp. Br. at 17; LBT Ex. 18 at 15-17 (excerpting the EPA's National Primary Drinking Water Regulations ("NPDWR"), a link to which is found in Pls. Ex. 122); *see also* 40 C.F.R. § 141.61 (setting forth "maximum contaminant levels for organic compounds")). Neither the NPDWR nor the relevant regulations appear to directly address TPH, TPH-DRO, or TPH-ORO.

[118] Mar. 3 Tr. at 130 (Thompson); Mar. 2 Tr. at 37, 51-53 (Allen-Murphy).

[119] Mar. 3 Tr. at 103-04 (Carino); *see also* Pls. Ex. 21 (Emergency Order) at 18-20 (noting that residents sought medical attention following the third release event).

substances contained therein are carcinogenic, the Court does not believe that the level of scientific certainty that Terminals demands is appropriate, at least at this stage of the litigation. *See Nat'l Ass'n of Farmworkers Orgs. v. Marshall*, 628 F.2d 604, 613-14 (D.C. Cir. 1980) (finding children were likely to suffer irreparable harm in the absence of an injunction enjoining the Department of Labor from implementing rules that would permit children to work with certain "pesticides and chemicals" during "short season agricultural harvesting" because the substances were "highly toxic," notwithstanding that "current scientific information" was insufficient to establish safety standards and it was unclear whether exposure would harm children); *AquAlliance v. United States Bureau of Reclaimation*, No. 21-CV-01533, 2021 WL 4168534, at *2 (E.D. Cal. Sept. 14, 2021) ("The court does not expect plaintiffs to be able to predict with scientific exactitude the harm which will result if defendants are not enjoined."). Plaintiffs are correct to highlight that "absent proper clean-up, [Plaintiffs and putative class members] have no reason to believe that their cistern water is safe to use for drinking or any other household purposes," and—in effect— that this population must therefore purchase water regardless of whether or not the contamination conclusively rises to unsafe levels. (Pls. Supp. Br. at 3, 5, 22). In this regard, the Court finds the Supreme Court's decision in *Friends of the Earth v. Laidlaw Environmental Services* instructive, notwithstanding that it arises in a slightly different context than that presented here. 528 U.S. 167 (2000).

In *Friends of the Earth*, the defendant—Laidlaw—established a wastewater treatment plant on the banks of the North Tyger River in South Carolina, and the state government authorized Laidlaw to discharge water containing certain pollutants into the river provided that the discharges met certain criteria, including that the discharged water did not contain more than trace amounts of mercury. *Id.* at 167. Evidence emerged that Laidlaw had repeatedly exceeded the mercury discharge limit, and various environmental organizations

A44

representing members residing near the river brought suit seeking to enjoin further excess discharges. *Id.* The question before the Supreme Court was whether the plaintiff organizations had established that they and their members had suffered an "injury in fact" such as to confer standing to bring suit.[120] *Id.* Laidlaw argued that the plaintiff organizations had failed to demonstrate such an injury, highlighting that the district court had expressly found that there was "no demonstrated harm to the environment." *Id.* at 184-85. The plaintiff organizations, on the other hand, argued that it was their members' "reasonable concerns about the effects of [the] discharges" that "directly affected [their] recreational, aesthetic, and economic interests" and established injury. *Id.* at 198.

The Supreme Court began its analysis by looking to the affidavits of six residents of the area, each of whom attested that they had used the river for various recreational activities in the past, and that they no longer used the river because they were concerned that the water was polluted by Laidlaw's discharges and the potential harmful effects of that pollution. *Id.* at 181-84. The Supreme Court then concluded that these affiants' "conditional statements" (to the effect that they would use the river for recreation "if Laidlaw were not discharging pollutants into it") were sufficient to establish the harm required to show injury in fact. *Id.* at 185. In reaching this conclusion, the Supreme Court stressed that at issue was the "reasonableness of [the] fear" that led the residents to respond to Laidlaw's demonstrated discharges "by refraining from use of the North Tyger River and surrounding areas." *Id.* at 184 (alterations in original). The Supreme Court ultimately concluded that it was "entirely reasonable" that "a company's continuous and pervasive illegal discharges of pollutants into

---

[120] To show injury in fact, a plaintiff must show "a harm suffered by the plaintiff that is 'concrete' and 'actual or imminent, not conjectural or hypothetical.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 149 (1990) (additional quotation marks omitted)).

a river would cause nearby residents to curtail their recreational use of that waterway and would subject them to other economic and aesthetic harms."[121] *Id.* at 184-85.

The evidence before the Court leaves the Court with no doubt that it is reasonable for those in the impacted communities to purchase water instead of relying on their cistern water as they had done before the release events. This evidence includes:

> ➢ That the refinery issued press releases in the aftermath of the release events warning affected residents not to consume their cistern water.[122]

> ➢ That a local paper advised residents whose cisterns were impacted by the release events not to consume their cistern water.[123]

> ➢ That multiple government agencies—including DPNR, DOH, VITEMA, and the Virgin Islands Department of Education—issued numerous press releases warning residents of potential health effects associated with the release events; reporting that members of the community had sought medical attention due to the release events; and advising residents with pre-existing health conditions to consider "protective actions, including staying indoors or relocating to less affected areas of the island."[124]

---

[121] *Maine People's Alliance and National Resources Defense Council v. Mallinckrodt* presents circumstances similar to those that arose in *Friends of the Earth.* 471 F.3d 277 (1st Cir. 2006). In *Mallinckrodt,* various environmental organizations brought suit against the defendant—Mallinckrodt, a chemicals company—seeking to enjoin the company to fund a scientific study to determine the "nature and extent of the endangerment" created by the company's discharge of "mercury-laden waste" into Maine's Penobscot River. *Id.* at 276. As in *Friends of the Earth,* the question before the Court was whether the plaintiff organizations had established injury in fact, particularly given that one of the organizations' "principal experts" had opined that, while "there might be a serious endangerment to both human health and the environment resulting from mercury contamination," he had not yet "done the right research" to determine as much. *Id.* at 281. The First Circuit noted that "neither a bald assertion of [] harm nor a purely subjective fear that an environmental hazard may have been created is enough to ground standing"—that is, to establish injury in fact—and further noted that Plaintiffs' expert had admitted he was ultimately uncertain "if there is a problem" or "what the problem is." *Id.* at 283-84; *see also id.* at 284 (noting that "concern about pollution will constitute a cognizable injury only when the concern is premised upon a realistic threat."). However, notwithstanding that Plaintiff's expert could not establish the extent of any contamination or the level of any threat posed by the same, the First Circuit concluded that the evidence of contamination and the toxic effects of mercury "rendered reasonable the actions of the [plaintiff organizations'] members in abstaining from their desired enjoyment of the Penobscot" such as to establish the harm required to show injury in fact.

[122] Pls. Ex. 115 (Press Release, "Limetree Bay Responding to Flare Incident," dated May 12, 2021); Pls. Ex. 116 (Press Release, "Limetree Bay Response to Flare Incident," dated March 2, 2021).

[123] Mar. 2 Tr. at 51 (Allen-Murphy).

[124] Pls. Ex. 21 (Emergency Order) at 15-16, 20, 24-25.

➢ That the EPA issued an emergency shut down order to Terminals and Refining following the fourth release event, documenting potential health risks associated with the release events and reporting that "flare rainout can create both environmental and physical safety hazards," and that "[o]il contamination of soil and water bodies creates environmental and public health hazards."[125]

➢ That refinery representatives visited affected residents' homes, confirmed the presence of contaminants, and offered to remediate cisterns and facilitate clean-up of affected properties.[126]

➢ The pre-existing water provision program, which was put in place following the release events.[127]

➢ Resident witnesses' observations of petroleum products in their cisterns and in their water filters, plumbing, and tap water.[128]

➢ That resident witnesses and their loved ones have experienced health effects from the release events and/or from bathing in the post-release water.[129]

In view of the foregoing, the Court concludes that Plaintiffs and the putative classes are presently suffering harm and are likely to continue suffering this harm in the absence of an injunction. The question therefore becomes whether this harm is irreparable or compensable after the fact by money damages.

### 3. Whether Plaintiffs Have Shown *Irreparable* Harm

As a general matter, costs expended to purchase bottled water or secure an alternative source of water in response to contamination may be compensated by money damages after the fact. *See, e.g., McKeesport Mun. Water Auth. v. McCloskey*, 690 A.2d 766, 773 (Pa. Comm. Ct. 1997) (awarding the plaintiffs damages for expenses they incurred in purchasing bottled water in response to contamination); *Kusnir v. City of Yonkers*, 497 N.Y.S.2d 582,

---

[125] Pls. Ex. 21 (Emergency Order) at 11, 25-29.

[126] Mar. 2 Tr. at 297-98 (Urgent), 309-11, 324-25 (Webster); Mar. 3 Tr. at 99-100 (Carino), 122-25 (Thompson); Pls. Ex. 21 (Emergency Order) at 10, 23.

[127] Mar. 2 Tr. at 53-54 (Allen-Murphy), 301-02 (Urgent), 316-17 (Webster); Mar. 3 Tr. at 102-03 (Carino), 126-27 (Thompson).

[128] *See* Mar. 2 Tr. at 41-49, 74-76 (Allen-Murphy), 296 (Urgent), 309-17 (Webster); Mar. 3 Tr. at 98-103, 114 (Carino), 121-123, 129 (Thompson); Pls. Exs. 91, 92, 96 (photographs of Ms. Allen-Murphy's plumbing and water filtration systems).

[129] Mar. 2 Tr. at 53 (Allen-Murphy); Mar. 3 Tr. at 98, 103-04 (Carino), 129-30 (Thompson).

585-86 (City Ct. 1985) (same).[130] Plaintiffs acknowledge that this is the case, but argue—on two principal grounds—that the harm they and putative class members will suffer in the absence of a preliminary injunction is of a sufficiently "peculiar nature" that it cannot be compensated after the fact in money damages.

First, Plaintiffs argue that the environmental impact of the release events gives rise to an inference that they and putative class members will suffer irreparable harm in the absence of an injunction. (*See* Rep. at 17). It is true that the Supreme Court has observed, in dicta, that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 545 (1987). However, neither of the two forms of relief that Plaintiffs seek would address the type of irreversible environmental harms that undergird the Supreme Court's observation. Here, Plaintiffs seek affirmative relief that addresses their individual personal needs; they do not seek to restrain Terminals in such a way as to prevent future pollution or other harm to the environment. Simply stated, this is not the type of case where the focus of the injunctive relief that Plaintiffs seek is on irreversible harm to the environment.

Second, Plaintiffs stress that the financial realities faced by Plaintiffs and the putative class members mean that they are unable to access enough safe and reliable water, and that they are consequently forced to use water from their contaminated cisterns. (Pls. Supp. 1-2, 5-6). Terminals, in contrast, argues that the fact that the resident witnesses each testified that they are currently buying water means that they "are not in danger of being compelled to drink any cistern water alleged to contain petroleum hydrocarbons," and that none of the

---

[130] *See also North Carolina v. McDevitt,* 142 F. Supp. 2d 710, 716 (W.D.N.C. 2001) (holding that state's costs of providing bottled water to residents affected by release of petroleum are proper response costs under the Resource Conservation and Recovery Act); *Woodman v. United States*, 764 F. Supp. 1467, 1470 (M.D. Fla. 1991) (holding that residents' expenses for bottled water they purchased in response to contamination from landfill is proper response costs under the Comprehensive Environmental Response, Compensation, and Liability Act).

41

A48

resident witnesses testified that purchasing substitute water caused them to "suffer consequences like not being able to buy needed medicine because they had to instead spend their limited financial resources on water." (LBT Supp. at 18). Terminals' arguments echo those raised by the defendants in two comparable cases cited by Plaintiffs.

In *Concerned Pastors for Social Action v. Khouri,* the plaintiffs sought to enjoin the City of Flint, Michigan to establish a program to provide door-to-door delivery of bottled water to residents following revelations of lead contamination in the city's water system. 217 F. Supp. 3d 960, 962 (E.D. Mich. 2016). Flint argued that the steps it had already taken— including distributing water filters to residents and establishing distribution centers to provide free bottled water to residents—meant that no residents were in danger of consuming tainted water, thus negating any showing of irreparable harm. *Id.* at 970-71. The district court disagreed, concluding that the plaintiffs had shown irreparable harm "even in the face of the defendants' evidence of the availability of bottled water and filters," because the measures in place were not "completely effective in providing safe drinking water" to residents. *Id.* at 975. As the district court explained:

> The fact that [free bottled water and water filters] are *available* does not mean that they are reliably accessible or effective in furnishing safe drinking water to every household. Bottled water is heavy, and not all of Flint's residents are capable of transporting the cases of water effectively. Indeed, the endeavor of hunting for water has become a dominant activity in some Flint residents' daily lives. The initial surge of volunteer support last winter aided greatly in the distribution efforts, but as that effort wanes, for any number of reasons, access to water becomes more difficult. Furthermore, leaving water filters at residents' doorsteps—even if the instructions are provided in multiple languages—does not ensure proper installation and maintenance. The likelihood that some of the filters are installed improperly and Flint residents are continuing to consume lead is quite high under the circumstances.

*Id.* at 977.

Likewise, in *Lyda v. City of Detroit,* the plaintiffs sought to enjoin the City of Detroit from shutting off their water because of the plaintiffs' unpaid water bills. No. 13-CV-53846,

2014 WL 6474081, at *1 (Bankr. E.D. Mich. Nov. 19, 2014), *aff'd sub nom. In re City of Detroit*, No. 15-CV-10038, 2015 WL 5461463 (E.D. Mich. Sept. 16, 2015), *aff'd in part, vacated in part sub nom. In re City of Detroit, Mich.*, 841 F.3d 684 (6th Cir. 2016). Detroit argued that the plaintiffs had not shown irreparable harm because "alternative sources" of water were "available" to the plaintiffs, "including purchasing containers of water at local stores." *Id.* at *12. The bankruptcy court rejected this argument, concluding that the plaintiffs had shown irreparable harm for two reasons: (1) because "those sources are much more expensive, and many of the affected people are already in poverty;" and (2) "it is challenging to commit the time and energy necessary to purchase and transport sufficient quantities of water." *Id.*

Plaintiffs argue that here—as in *Khouri*—the status quo is not proving "completely effective" in providing safe and reliable water to residents. (Pls. Supp. at 14 (citing *Khouri*, 217 F. Supp. 3d at 975)). The Court agrees in part. Contrary to Terminals' characterization, the Court does not view the evidence before it as establishing that *all* persons in the affected community have sufficient financial resources such that no one is in danger of using contaminated water. The resident witnesses described that they and other residents continue to use their cistern water for some household uses despite believing it to be unsafe. For example, Ms. Thompson testified that she used her "filthy" cistern water to bathe before getting sick and experiencing a rash, and that she now uses her social security benefits to purchase water for all of her household uses.[131] Ms. Allen-Murphy testified that she used her cistern water to bathe her husband until he also had an adverse reaction, and that—while she now purchases water for her husband to bathe—she herself continues to bathe in the cistern water despite not believing it is safe to do so.[132] Ms. Webster testified that her family uses

---

[131] Mar. 3 Tr. at 128-30 (Thompson).

[132] Mar. 2 Tr. at 37, 50-53, 77-79 (Allen-Murphy).

A50

cistern water for household uses other than drinking and cooking.[133] As Plaintiffs argue, these would appear quintessential examples of residents who "must use water that they have no reasonable basis to believe is safe [and] cop[e] with the mental and potential physical injuries that come from doing so[.]" (Pls. Supp. Br. at 3-4).

It is true that, for the most part, the resident witnesses did not expressly attribute their conduct in response to the seemingly contaminated water to financial constraints or to the difficulties associated with securing and transporting sufficient quantities of water. However, the conclusion that financial constraints are a predominant factor can be readily inferred. For example, Ms. Allen-Murphy testified that her neighbors—many of whom are senior citizens, struggle financially, and receive government assistance—use cistern water to cook and for other household uses because they have "no choice."[134] Ms. Webster also testified that she has "no choice" but to use her cistern water for some household uses.[135] Ms. Thompson testified that she purchases water using her social security benefits.[136] Ms. Urgent testified that she was forced to stop purchasing WAPA water as an alternative to cistern water because doing so interfered with her family's ability to pay the bills and pay for a caretaker for her elderly father.[137] And all of the resident witnesses testified that their personal finances make the costs of professionally cleaning their cisterns prohibitive.[138]

The resident witnesses also described taking unusual steps to satisfy their water needs to the extent they could. Ms. Urgent described visiting a friend's apartment to bathe and

---

[133] Mar. 2 Tr. at 308-09 (Webster).

[134] Mar. 2 Tr. at 51-52 (Allen-Murphy).

[135] Mar. 2 Tr. at 316 (Webster).

[136] Mar. 3 Tr. at 128-30 (Thompson).

[137] Mar. 2 Tr. at 299-302 (Urgent).

[138] Mar. 2 Tr. at 77 (Allen-Murphy), 303 (Urgent), 314 (Webster); Mar. 3 Tr. at 101 (Carino), 128 (Thompson).

collecting rainwater in buckets.[139] Mr. Carino testified that he and his mother collect rainwater for washing the dishes, bathing, and other household uses.[140] And all five of the resident witnesses also described using the pre-existing water provision program to secure free water despite the inconvenience of doing so.[141] As Ms. Thompson described the program, water would typically begin to be distributed at 7:30 a.m., but she would arrive as early as 6:00 a.m. "at least twice a week" because there would not be enough water to go around.[142] Others would arrive even earlier to wait in line.[143]

Plaintiffs argue that the Court can infer, based on this testimony and the demographics and poverty rates in the affected areas, that *everyone* in these areas will suffer irreparable harm in the absence of an injunction. (Pls. Supp. at 20). However, the breadth of Plaintiffs' assertion renders this argument unavailing. The evidence described above does not provide an adequate foundation from which this Court can infer that "all (or virtually all)" residents affected by the release events are struggling to meet their water needs. *Adams*, 204 F.3d at 487. Thus, the "mass injunction" that Plaintiffs urge the Court to enter here relies on precisely the type of inference that *Adams* squarely prohibits.[144] *Id.*

At the same time, however, the Court concludes that the evidence before it establishes that a meaningful proportion of the population on behalf of whom Plaintiffs seek relief do not

---

[139] Mar. 2 Tr. at 301-02, 306 (Urgent).

[140] Mar. 3 Tr. at 102 (Carino).

[141] Mar. 2 Tr. at 53-54 (Allen-Murphy), 301-02 (Urgent), 316-17 (Webster); Mar. 3 Tr. at 102-03 (Carino), 126-27 (Thompson).

[142] Mar. 2 Tr. at 126 (Thompson).

[143] Mar. 2 Tr. at 126 (Thompson).

[144] *Khouri* and *Lyda* are not to the contrary. As Terminals correctly observes, there are factual dissimilarities between the cases. For example, unlike the *Khouri* and *Lyda* plaintiffs, Plaintiffs here have not provided evidence to corroborate that they and the putative class members are unable to access sufficient water because they are incapable of transporting the necessary quantities. *Khouri*, 217 F. Supp. 3d at 977; *Lyda*, 2014 WL 6474081, at *12. Most significantly, however, the Third Circuit's decision in *Adams* bound neither the *Khouri* nor *Lyda* courts.

A52

have the requisite financial resources to secure sufficient water to meet their and their families' needs. Using water one believes to be contaminated or taking drastic steps to ensure that one does not have to do so—by collecting buckets of rainwater, visiting friends' apartments to bathe, or waiting in line for hours to secure six gallons of free water—is not the behavior of those who have feasible alternatives. Rather, it is the behavior of residents who cannot afford to purchase the amount of water they need.

In view of the foregoing, the Court finds that the appropriate line to draw is between those Plaintiffs and putative class members who cannot afford to meet their daily water needs without being forced to forgo other necessities—such that they are forced either to forgo these necessities or to use water they reasonably believe is contaminated—and those who can afford to do so. *See Tustin v. Heckler*, 591 F. Supp. 1049, 1058 (D.N.J. 1984) (finding irreparable harm where there "is a clear likelihood that, without the relief sought, a realistic danger exists that the plaintiffs seeking relief will be without the means to avail themselves of the basic needs of food, shelter, or medical care, much less the means to be self-sustaining."), *vacated in part on other grounds*, 749 F.2d 1055 (3d Cir. 1984); *Grant v. Sullivan*, 131 F.R.D. 436, 449 (M.D. Pa. 1990) (finding irreparable harm where class members "subsist on minimal public assistance payments" and "often lack basic necessities"); *Maldonado v. Houstoun*, 177 F.R.D. 311, 333 (E.D. Pa. 1997) ("[A] reduction in subsistence benefits constitutes irreparable harm to persons on the margin of subsistence."); *Garnett v. Zeilinger*, 313 F. Supp. 3d 147, 157-58 (D.D.C. 2018) (observing that "forgoing food or other necessities [is] clearly irreparable in nature").

The Court therefore concludes that those within the impacted areas who cannot afford to purchase water without trading off other basic necessities will suffer irreparable harm in the absence of an injunction. This conclusion, in turn, raises the question of whether either or

46

A53

both forms of preliminary relief sought by Plaintiffs—programmatic relief and remedial relief—is appropriate.

### 4. Appropriate Form of Relief

"District Courts are afforded considerable discretion in framing injunctions." *Meyer v. CUNA Mut. Ins. Soc.,* 648 F.3d 154, 169 (3d Cir. 2011). However, courts must "closely tailor injunctions to the harm that they address," *ALPO Petfoods, Inc. v. Ralston Purina Co.,* 913 F.2d 958, 972 (D.C. Cir. 1990), such that preliminary injunctions should be "no more burdensome to the defendant than necessary" to provide relief during the pendency of the litigation. *Califano v. Yamasaki,* 442 U.S. 682, 702 (1979).

Here, the programmatic relief that Plaintiffs seek is adequate to protect those Plaintiffs and putative class members who will suffer irreparable harm absent an injunction. The programmatic relief directly addresses those elements of harm that will prove irreparable—namely, the inability to financially afford water without making impermissible sacrifices—and nothing more. As compared with remedial relief, programmatic relief is also less burdensome on Terminals. *Califano*, *442* U.S. at 682.

Accordingly, the Court finds that programmatic relief, but not remedial relief, is appropriate at this stage of the litigation.

### C. Balance of Hardships

The Court begins by considering the harm that would occur during the pendency of this litigation absent an injunction. *See Buck v. Stankovic*, 485 F. Supp. 2d 576, 586 (M.D. Pa. 2007) ("To determine which way the balance of hardship tips, a court must identify the harm to be caused by the preliminary injunction against the possibility of the harm caused by not issuing it."). Plaintiffs argue that such harm would be great because water is a basic necessity and they and the putative class members are unable to afford water without trading

off other necessities. (Mot. at 19; Pls. Supp. at 1-5). Terminals, by contrast, argues that the harm would be minimal on grounds that "[t]here is no water emergency." (Resp. at 34).

Plaintiffs have the more persuasive argument. The Court explained above that it does not take the evidence presented thus far to indicate that there is "no water emergency." To the contrary, the Court has found that the harm occasioned by the release events is significant and continuing, and that—for those who cannot afford water—the harm is irreparable absent an injunction. While the irreparability of harm does not necessarily tilt the balance of equities in Plaintiffs' favor, *see Winter*, 555 U.S. at 27, the Court finds that the seriousness and magnitude of the harm weighs strongly in favor of Plaintiffs here. *See Lyda*, 2014 WL 6474081, at *12 (observing that "water is necessary to sustain life" and that the harms occasioned by its absence "may include a host of serious and even life-threatening medical conditions, as well as adverse consequences in employment, in personal and family relations, and, for children, at school").

The question therefore becomes the harm the injunction itself would cause. Terminals makes only one argument to the effect that this harm is great—namely, that "requiring Terminals to distribute water . . . would violate Terminals' due process rights by holding Terminals accountable for alleged harm that Terminals did not cause." (Resp. at 34). This argument misses the mark.

First, while the Court has explained above that it takes the evidence presently before it as sufficient to establish a substantial likelihood that Terminals is causally connected to the release events, Terminals is incorrect to suggest that its rights would be somehow violated by the issuance of a preliminary injunction even if it were ultimately determined that the release events are not traceable to Terminals. Due process protections do not guarantee particular results, and the abbreviated nature of a preliminary injunction proceeding means the risk of error is necessarily higher at this stage than it is following a trial. It is for this very reason that

48

A55

the Federal Rules governing preliminary injunctions expressly contemplate situations in which a party has been wrongfully enjoined. *See* Fed. R. Civ. P. 65(c) (requiring movants to "give security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained").

Second, at issue here is not the harm to Terminals should it be determined that Terminals was wrongfully enjoined, but rather the burdens that the injunction itself would cause Terminals to bear. *Buck,* 485 F. Supp. 2d at 586. Plaintiffs argue that such burdens are minimal because there are "vast amounts of insurance available to pay for the [relief]," and because any harm to Terminals must be discounted by the fact that any costs Terminals incurs in providing relief have been occasioned by its own fault. (Mot. at 19, 19 n.44 (citing *Kos Pharm.,* 369 F.3d at 728, for the proposition that a party "can hardly claim to be harmed [where] it brought any and all difficulties occasioned by the issuance of an injunction upon itself.")). While the Court does not find Plaintiffs' arguments in this regard particularly persuasive,[145] Terminals has not provided the Court with any reason to believe that an injunction would cause the company to bear an unacceptable burden. *Cf. Friends of Coral Bay v. Reliance Hous. Found., Inc.*, Civ. No. 07-CV-00020, 2006 WL 4012200 (D.V.I. Jan. 26, 2006) (concluding that ongoing discharge of water pollutants into Coral Bay outweighed economic hardship of more than $30 million). Moreover, Terminals' participation in the pre-existing water provision program suggests that the company can bear the costs of the injunction that the Court contemplates here.

In view of the foregoing, the Court concludes that the equities tip in favor of Plaintiffs.

---

[145] Plaintiffs have not established that Terminals' insurance carrier will cover the cost of any preliminary relief, and the Court understands that there is some dispute about this matter. Further, as most if not all parties enjoined are enjoined because they are perceived—for preliminary injunction purposes—to be in some sense at fault, the "at fault" argument can only be taken so far without effectively rendering the balance of hardships factor of the preliminary injunction analysis moot.

**D. Public Interest**

This final factor "requires the court to look beyond the parties' respective interests and to gauge the injunction's potential effects on the community as a whole." *McCahon v. Penn. Turnpike Comm'n*, 491 F. Supp. 2d 522, 528 (M.D. Pa. 2007). Plaintiffs argue that the public has a strong interest in ensuring that community members have access to safe drinking water and that an injunction "would promote the Virgin Islands legislature's public policy 'to promote health, safety and welfare' and 'to prevent injury to human, plant and animal life, and property.'" (Mot. at 19 (quoting 12 V.I.C. § 201)).[146] The Court agrees.

"It is abundantly clear that the public relies every day on the ready availability of safe drinking water at the tap." *Khouri*, 217 F. Supp. at 972. We rely on clean water not only when we drink, shower, and brush our teeth, but when we bathe our children, cook for friends and family, and wash the dishes and our favorite clothes. If we do not often talk about water, it is not because we fail to appreciate its necessity, but because we have come to presuppose access to safe and affordable water as Americans. The Virgin Islands—like all other states and territories—not only has a strong interest in ensuring that its residents have access to safe water within their means, but also a strong interest in recognizing the harmful effects of pollution on the public health and welfare. *See, e.g.,* 12 V.I.C. § 201 (providing "the pollution of the atmosphere about the United States Virgin Islands constitutes a menace to public health and welfare"); 12 V.I.C. § 181 (providing "pollution of the waters of the United States

---

[146] With one exception, Terminals makes the same arguments with regard to this factor as it makes with regard to the balance of hardships factor, which the Court has considered and rejected above. With regard to public interest only, Terminals argues that—per its interpretation of *Adams*—Plaintiffs' relief is limited to the 44 named Plaintiffs, meaning the size of the population entitled to injunctive relief is small and the public's interest in this matter is commensurately reduced. *Id.* The Court has concluded above that *Adams* does not limit Plaintiffs' relief to named Plaintiffs only, but it is true that the Court here considers the harm to a smaller population than that originally envisioned by Plaintiffs. However, the Court finds Terminals' argument unpersuasive because the Court does not view the public's interest as varying directly with population size.

Virgin Islands constitutes a menace to public health and welfare").[147] Simply stated, the public interest in safe water is "fundamental." *United States v. Alisal Water Corp.*, 431 F.3d 643, 656 (9th Cir. 2005). Further, Plaintiffs are correct to note that "members of the Virgin Islands community have an interest in knowing that, should they suffer similar harm to Plaintiffs, 'courts will be willing, under the appropriate circumstances, to step forward and grant relief.'" (Rep. at 18 (quoting *Crouch v. Prior*, 905 F. Supp. 248, 260 (D.V.I. 1995)).

In view of the foregoing, the Court concludes that the public interest favors Plaintiffs.

## IV. CONCLUSION

For the reasons discussed herein, the Court concludes: (1) that Plaintiffs have shown that they are substantially likely to succeed on the merits of three of their claims against Terminals; (2) that Plaintiffs have shown that those Plaintiffs and putative class members who cannot afford to purchase water without trading off other basic necessities are likely to suffer irreparable harm in the absence of a preliminary injunction; (3) that Plaintiffs have not shown that persons falling outside this population are likely to suffer irreparable harm absent a preliminary injunction; (4) that programmatic relief but not remedial relief is appropriate; and (5) that the balance of hardships and the public interest both favor the issuance of a preliminary injunction enjoining programmatic relief.

Accordingly, the Court will convene a status conference on May 8, 2023, at which the Court will: (1) schedule the second phase hearing to address the precise contours of the population the Court here finds is entitled to programmatic relief and the logistics surrounding the provision of the same; and (2) set the corresponding briefing deadlines in

---

[147] *See also Instant Air Freight,* 882 F.2d at 803 (legislative expressions of public policy through statutes bear on "public interest" for purposes of preliminary injunction analysis); *Gov't of Virgin Islands, Dep't of Conservation & Cultural Affs. v. Virgin Islands Paving, Inc.*, 714 F.2d 283, 286 (3d Cir. 1983) (holding district court committed reversible error where "the court did not treat the Virgin Islands statutes as reflecting the public interest" for purposes of the preliminary injunction analysis, because "[t]he enactment of a comprehensive regulatory scheme is a reflection of the Legislature's view of the importance of the interests at stake").

consultation with the parties. The Court will deny Plaintiffs' Motions insofar as Plaintiffs seek remedial relief, and the Court will also deny Plaintiffs' Motions insofar as Plaintiffs seek programmatic relief with respect to those Plaintiffs and putative class members who can afford to purchase water without trading off basic necessities.

Date: April 28, 2023

_____/s/_____
WILMA A. LEWIS
District Judge

52

A59

**DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

| | | |
|---|---|---|
| **CLIFFORD BOYNES, et al.,** | ) | |
| | ) | |
| | ) | **Civil Action No. 2021-0253** |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **LIMETREE BAY VENTURES, LLC, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |
| | ) | |
| **HELEN SHIRLEY, et al.,** | ) | |
| | ) | |
| | ) | **Civil Action No. 2021-0259** |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **LIMETREE BAY VENTURES, LLC, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |
| | ) | |
| **FRANCIS E. CHARLES and THERESA J. CHARLES,** | ) | |
| | ) | |
| | ) | **Civil Action No. 2021-0260** |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **LIMETREE BAY VENTURES, LLC, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |
| | ) | |
| **BEECHER COTTON, et al.,** | ) | |
| | ) | |
| | ) | **Civil Action No. 2021-0261** |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **LIMETREE BAY VENTURES, LLC, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

A60

## ORDER

**UPON CONSIDERATION** of Plaintiffs' "Amended Motion[s] for Temporary Restraining Order and Preliminary Injunction;"[1] Plaintiffs' and Defendant Limetree Bay Terminals' ("Terminals") "second phase" briefing; and for the reasons stated in the Court's April 28, 2023 First Phase Memorandum Opinion[2] and the Court's July 20, 2023 Second Phase Memorandum Opinion, the latter of which is filed contemporaneously herewith, it is hereby

**ORDERED** that Plaintiffs' "Amended Motion[s] for Temporary Restraining Order and Preliminary Injunction"[3] are **GRANTED IN PART**; and it is further

**ORDERED** that Plaintiffs' "Amended Motion[s] for Temporary Restraining Order and Preliminary Injunction," are **GRANTED** insofar as Plaintiffs have established their entitlement, during the pendency of this litigation, to a water distribution program by Terminals for Plaintiffs and putative class members who cannot afford to purchase water without trading off other basic necessities; and it is further

**ORDERED** that the water distribution program shall be established and operated in accordance with the terms set forth in the "Order Implementing Water Distribution Program"; and it is further

**ORDERED** that Plaintiffs' "Amended Motion[s] for Temporary Restraining Order and Preliminary Injunction" are otherwise **DENIED**, as set forth in the Court's April 28, 2023 First Phase

---

[1] Civ. No. 2021-0253 ("*Boynes*"), Dkt. Nos. 141, 142; Civ. No. 2021-0260 ("*Charles*"), Dkt. Nos. 68, 68-1; Civ. No. 2021-0261 ("*Cotton*"), Dkt. Nos. 170, 171; Civ. No. 2021-0259 ("*Shirley*"), Dkt. No. 41.

[2] *Boynes*, Dkt. No. 285; *Charles*, Dkt. No. 200; *Cotton*, Dkt. No. 335; *Shirley*, Dkt. No. 140.

[3] *Boynes*, Dkt. No. 141; *Charles*, Dkt. No. 68; *Cotton*, Dkt. No. 170; *Shirley*, Dkt. No. 41.

A61

Order,[4] for the reasons detailed in the Court's April 28, 2023 First Phase Memorandum Opinion;[5] and it is further

      **ORDERED** that Plaintiffs shall have up to and including **August 4, 2023** to post an initial bond of $50,000 with the Clerk of Court, or, in the alternative, to file a notice informing the Court that Plaintiffs withdraw their request for preliminary injunctive relief; and it is further

      **ORDERED** that Plaintiffs and Terminals shall have up to and including **August 11, 2023** within which to jointly submit, for the Court's approval, a proposed Claim Form consistent with the Court's "Order Implementing Water Distribution Program"; and it is further

      **ORDERED** that Plaintiffs and Terminals shall have up to and including **August 11, 2023** within which to jointly submit, for the Court's approval, a proposed map, to be posted on www.LimetreeWaterProgram.com, depicting the Covered Area consistent with the Court's "Order Implementing Water Distribution Program"; and it is further

      **ORDERED** that Plaintiffs and Terminals shall have up to and including **August 11, 2023** to jointly propose, for the Court's approval, the name and biographical information of an individual to serve as Administrator of the Water Distribution Program; and it is further

      **ORDERED** that Plaintiffs and Terminals shall have up to and including **August 11, 2023** to jointly propose, for the Court's approval, the name and biographical information of an individual to serve as Special Master; and it is further

      **ORDERED** that Plaintiffs and Terminals shall have up to an including **January 12, 2024** within which to each file a notice, not to exceed ten pages, informing the Court as to the status of the

---

[4] *Boynes*, Dkt. No. 284; *Charles*, Dkt. No. 199; *Cotton*, Dkt. No. 334; *Shirley*, Dkt. No. 139.

[5] *Boynes*, Dkt. No. 285; *Charles*, Dkt. No. 200; *Cotton*, Dkt. No. 335; *Shirley*, Dkt. No. 140.

A62

Water Distribution Program and any issues associated therewith that require the Court's attention; and it is further

**ORDERED** that Plaintiffs and Terminals shall have up to an including **January 12, 2024** within which to file a joint notice informing the Court of the number of households participating in the Water Distribution Program; and it is further

**ORDERED** that a status conference regarding the Water Distribution Program is **SCHEDULED** for **January 26, 2024 at 9:30 a.m.** in STX Courtroom 1 before the undersigned District Judge; and it is further

**ORDERED** that Plaintiffs and Terminals are required to attend the status conference, and counsel who will be speaking on behalf of Terminals and each of the *Cotton*, *Boynes*, *Charles*, and *Shirley* Plaintiffs are required to appear in person at the status conference; and it is further

**ORDERED** that all other counsel, including counsel for all other parties may, but are not required to, attend the status conference, and, if attending, may do so via videoconference; and it is further

**ORDERED** that the Clerk's Office shall contact counsel for the parties to provide the necessary call-in information for counsel who will be observing the status conference via videoconference; and it is further

**ORDERED** that Plaintiffs' "Motion to Take Judicial Notice of Certain Exhibits and for Application of Relaxed Evidentiary Standard at Preliminary Injunction Hearing"[6] is **DENIED AS MOOT**; and it is further

---

[6] *Boynes,* Dkt. No. 190; *Charles*, Dkt. No. 118; *Cotton*, Dkt. No. 250; *Shirley*, Dkt. No. 72.

3

A63

**ORDERED** that the *Cotton* Plaintiffs' "Amended Motion to Expedite Discovery Production of Insurance Information"[7] is **DENIED AS MOOT**; and it is further

**ORDERED** that the stay entered by the Court on the *Boynes*, *Shirley*, *Charles*, and *Cotton* cases with respect to "all matters not pertaining to the Amended Motions for Injunctive Relief"[8] is **LIFTED**.

**SO ORDERED**.

Date:   July 20, 2023

_____/s/_____
WILMA A. LEWIS
District Judge

---

[7] *Cotton*, Dkt. No. 179.

[8] *See Boynes*, Dkt. No. 136 (February 2, 2023 Order) at 5; *Charles*, Dkt. No. 79 at 5; *Cotton*, Dkt. No. 196 at 5; *Shirley*, Dkt. No. 42 at 5.

4

A64

**DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

| | | |
|---|---|---|
| **CLIFFORD BOYNES, et al.,** | ) | |
| | ) | **Civil Action No. 2021-0253** |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LIMETREE BAY VENTURES, LLC, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| ——————————————————— | ) | |
| | ) | |
| **HELEN SHIRLEY, et al.,** | ) | |
| | ) | **Civil Action No. 2021-0259** |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LIMETREE BAY VENTURES, LLC, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| ——————————————————— | ) | |
| | ) | |
| **FRANCIS E. CHARLES and THERESA J. CHARLES,** | ) | |
| | ) | **Civil Action No. 2021-0260** |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LIMETREE BAY VENTURES, LLC, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| ——————————————————— | ) | |
| | ) | |
| **BEECHER COTTON, et al.,** | ) | |
| | ) | **Civil Action No. 2021-0261** |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LIMETREE BAY VENTURES, LLC, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| ——————————————————— | ) | |

A65

**Attorneys:**

**John K. Dema, Esq.,**
**Lee J. Rohn, Esq.,**
St. Croix, U.S.V.I.
**Jennifer Jones, Esq.,**
St. Thomas, U.S.V.I.
**Hugh P. Lambert, Esq.,**
**Brian James Mersman, Esq.,**
**Kerry J. Miller, Esq.,**
**C. Hogan Paschal, Esq.,**
**Paul C. Thibodeaux, Esq.,**
**Rebekka C. Veith, Esq.,**
**J. Christopher C. Zainey, Jr., Esq.,**
New Orleans, Louisiana
*For the Boynes Plaintiffs*

**Vincent A. Colianni, II, Esq.,**
**John-Russell Bart Pate, Esq.,**
**Lee J. Rohn, Esq.,**
St. Croix, U.S.V.I.
**Warren T. Burns, Esq.,**
**Daniel H. Charest, Esq.,**
Dallas, Texas
**Charles Jacob Gower, Esq.,**
**Hugh. P. Lambert, Esq.,**
**Korey A. Nelson, Esq.,**
**Harry Richard Yelton, Esq.,**
New Orleans, Louisiana
*For the Shirley Plaintiffs*

**John K. Dema, Esq.,**
**Lee J. Rohn, Esq.,**
St. Croix, U.S.V.I
**Hugh. P. Lambert, Esq.,**
**Brian James Mersman, Esq.,**
**J. Christopher C. Zainey, Jr., Esq.,**
New Orleans, Louisiana
*For the Charles Plaintiffs*

**Vincent A. Colianni, II, Esq.,**
**Rhea Lawrence, Esq.,**
**Marina Leonard, Esq.,**
**Lee J. Rohn, Esq.,**
St. Croix, U.S.V.I
**Shanon Jude Carson, Esq.,**
**Daniel H. Charest, Esq.,**
**Quinn Burns, Esq.,**
**Warren T. Burns, Esq.,**
Dallas, Texas
**John Quin Kerrigan, I, Esq.,**
Doylestown, Pennsylvania
**John Albanese, Esq.,**
Minneapolis, Minnesota
**Dena R. Young, Esq.,**
Philadelphia, Pennsylvania
**Charles Jacob Gower, Esq.,**
**Hugh. P. Lambert, Esq.,**
**Harry Richard Yelton, Esq.,**
New Orleans, Louisiana
*For the Cotton Plaintiffs*

**Carl A. Beckstedt, III, Esq.,**
**Robert J. Kuczynski, Esq.,**
**Ryan C. Stutzman, Esq.,**
St. Croix, U.S.V.I.
**Kevin J. Bruno, Esq.,**
New York, New York
**Melanie S. Carter, Esq.,**
Philadelphia, Pennsylvania
*For Defendant Limetree Bay
Terminals, LLC*

A66

<u>**MEMORANDUM OPINION**</u>

**Lewis, District Judge**

THIS MATTER comes before the Court on Plaintiffs' "Amended Motion[s] for Temporary Restraining Order and Preliminary Injunction,"[1] and Plaintiffs' and Defendant Limetree Bay Terminals' ("Terminals") second phase briefing. For the reasons stated in the Court's First Phase Memorandum Opinion, the Court will grant Plaintiffs' Motions insofar as Plaintiffs have established their entitlement, during the pendency of this litigation, to a water distribution program by Terminals for Plaintiffs and putative class members who cannot afford to purchase water without trading off other basic necessities. For the reasons discussed herein, the Court will order that the water distribution program be established and operated in the manner set forth in the "Order Implementing Water Distribution Program," filed contemporaneously herewith.

## I.   BACKGROUND[2]

St. Croix is home to one of the largest oil refineries in the United States. Terminals and its sister company, Limetree Bay Refining ("Refining"), owned and operated the refinery in the Spring of 2021, when the refinery restarted its operations after nearly a decade of closure. Problems arose almost immediately, as a certain "flare" discharged oil and other toxic gases over the island on four separate occasions. In two of these release events—on February 4, 2021, and May 12, 2021—the flare discharged substantial amounts of oil, at least some of which landed on residents' homes and infiltrated their cisterns, the primary source of

---

[1] Civ. No. 2021-0253, Dkt. Nos. 141, 142; Civ. No. 2021-0260, Dkt. Nos. 68, 68-1; Civ. No. 2021-0261, Dkt. Nos. 170, 171; Civ. No. 2021-0259, Dkt. No. 41. Plaintiffs filed substantially similar motions in each of the four associated cases, and the parties' briefs have mostly been cross-filed among the four cases. Unless otherwise noted, all citations herein refer to the *Boynes* docket, Civ. No. 2021-0253.

[2] The Court assumes the parties' familiarity with the relevant procedural history and factual background, which was detailed at length in the Court's April 28, 2023 Memorandum Opinion. (Dkt. No. 285). The Court provides only a brief summary here.

A67

potable water for many residents. In the other two release events—on April 19, 2021, and from May 5-7, 2021—the flare emitted excessive amounts of hydrogen sulfide, leading the Governor of the Virgin Islands to mobilize the National Guard after residents complained of foul smells and health issues. Two days after the May 12, 2021 release event, the Environmental Protection Agency ("EPA") issued an emergency order addressed to Terminals and Refining, requiring—among other things—that the refinery cease operations.[3] The refinery has not resumed production since that time.

The 44 plaintiffs in these four associated cases allege injuries stemming from the release events, principally relating to contamination of their properties and cisterns with petroleum products. In their "Amended Motion[s] for Temporary Restraining Order and Preliminary Injunction," Plaintiffs requested that the Court order Terminals to remediate the cisterns and property of, and establish a program to provide free bottled water to, Plaintiffs and other similarly situated residents during the pendency of this litigation (hereinafter, "remedial" and "programmatic" relief, respectively). (Dkt. No. 142 at 2).

By Order dated February 2, 2023, this Court determined that the complexity of Plaintiffs' Motions warranted dividing the evidentiary hearing in this matter into two phases: a first phase "entitlement" hearing, to determine whether Plaintiffs are entitled to the injunctive relief that they seek; and—provided that the Court determined that any such relief was warranted following the first phase hearing—a second phase hearing to determine the precise scope and structure of such relief and the appropriate bond. (Dkt. No. 136). The first phase hearing was held over four days from March 2-7, 2023.

For the reasons set forth in the Court's April 28, 2023 First Phase Memorandum Opinion, this Court found that Plaintiffs had met their burden to establish that some, but not all, members of the group on behalf of whom Plaintiffs seek preliminary injunctive relief are

_____

[3] Pls. Ex. 21 (EPA Emergency Order) at 32-42.

entitled to such relief. (Dkt. No. 285). Specifically, the Court found that Plaintiffs had satisfied the four preliminary injunction factors with respect to only those Plaintiffs and putative class members who cannot afford to purchase water without trading off other basic necessities. *Id.* at 8. The Court also found that, while Plaintiffs demonstrated entitlement to a preliminary injunction affording such programmatic relief, they did not do so with respect to remedial relief. *Id.*

Accordingly, by Order dated April 28, 2023, the Court denied Plaintiffs' Motions insofar as Plaintiffs sought remedial relief, and also insofar as Plaintiffs sought programmatic relief for individuals other than those Plaintiffs and putative class members who cannot afford to purchase water without trading off basic necessities. (Dkt. No. 284). The Court then scheduled a second phase hearing to address the "precise contours" of the population that the Court found to be entitled to programmatic relief; the logistics surrounding the implementation and operation of a water distribution program; and other issues bearing upon the provision of relief. (Dkt. No. 289). The second phase hearing was held over four days from June 6-9, 2023.

The Court has reviewed the parties' first and second phase briefing, as well as the testimony and evidence presented at both the first and second phase hearings.[4] For the

---

[4] The parties' first phase briefing included, without limitation: Plaintiffs' Amended Motions (Dkt. Nos. 141, 142); Terminals' First Phase Response (Dkt. No. 168); Plaintiffs' First Phase Reply (Dkt. No. 180); Terminals' First Phase Supplemental Brief (Dkt. No. 267); and Plaintiffs' First Phase Supplemental Brief (Dkt. No. 269). The parties second phase briefing includes, without limitation: Plaintiffs' Second Phase Brief (Dkt. No. 317); Terminals' Second Phase Response (Dkt. No. 327); Plaintiffs' Second Phase Reply (Dkt. No. 331); Plaintiffs' Second Phase Supplemental Brief (Dkt. No. 364); Terminals' Second Phase Supplemental Brief (Dkt. No. 365); Plaintiffs' Supplemental Brief Regarding the Security Requirement (Dkt. No. 144); and Terminals' Supplemental Brief Regarding the Security Requirement (Dkt. No. 323). The parties have also submitted—both jointly and separately—numerous proposed orders and notices regarding issues that were the subject of the parties' second phase negotiations, including, without limitation: the parties' Joint Notice Regarding Second Phase Post-Hearing Issues (Dkt. No. 363); the parties' June 21, 2023 Joint Proposed Order (Dkt. No. 363-1); Plaintiffs' Notice Regarding Proposed Testing Protocol (Dkt. No. 372); the parties' Joint Notice Regarding Economic Criteria (Dkt. No. 373); Terminals'

3

A69

reasons stated herein, the Court will order that the water distribution program—to which the Court found certain Plaintiffs and other similarly situated individuals entitled in its First Phase Memorandum Opinion—shall be established and operated in the manner set forth in the accompanying "Order Implementing Water Distribution Program."

## II.   DISCUSSION

In the aftermath of the Court's First Phase Order and the second phase hearing, the parties reached agreement on many issues bearing upon the implementation and operation of the water distribution program.[5] Other issues remain in dispute. These issues include, without limitation, the economic and geographic eligibility criteria that applicants must meet to participate in the program; the appropriate bond under Rule 65(c) of the Federal Rules of Civil Procedure; and numerous logistical issues.

The accompanying "Order Implementing Water Distribution Program" details the specifics of the water program that Terminals shall establish, including the precise population entitled to participate in the program and other logistics bearing upon the program's implementation and operation. In this Memorandum Opinion, the Court resolves the parties' remaining disputes and addresses the changes that the Court makes to the parties' June 21, 2023 Joint Proposed Order. (Dkt. No. 363-1).[6]

## A.   Economic Eligibility Criteria

As discussed above, the Court previously found that Plaintiffs carried their burden to establish that Plaintiffs and putative class members who cannot afford to purchase water without trading off basic necessities are entitled to relief, but that Plaintiffs failed to carry this

---

Notice Regarding Economic Criteria (Dkt. No. 374); the parties' Joint Notice Regarding Proposed Testing Protocol (Dkt. No. 375); and Terminals' Notice Regarding Proposed Testing Protocol (Dkt. No. 376).

[5] The Court commends the parties for the time and effort expended in meeting and conferring with each other in an attempt to address and resolve many substantial issues.

[6] The Court writes principally for the benefit of the parties and assumes familiarity with the voluminous record that these preliminary injunction proceedings have generated.

burden with respect to any other individuals. (Dkt. No. 285 (First Phase Memo. Op.) at 40-47). At issue in the second phase proceedings is the question of how to capture the population that the Court has found is entitled to relief in a manner that is both reasonable and administratively feasible.

Plaintiffs propose that an applicant be deemed economically eligible for the program if any one of the following six conditions is met:

(1) the applicant or a member of the applicant's household receives public assistance through any one of fifteen enumerated needs-based government programs (Dkt. No. 363-1 (Proposed Order) at § 3.D.i);

(2) the applicant or a member of the applicant's household "would be eligible" to qualify for any one of the fifteen enumerated needs-based government programs, notwithstanding that neither the applicant nor a member of the applicant's household actually receives said benefits, *id.* at § 3.D.ii;

(3) the applicant or a member of the applicant's household receives the Earned Income Tax Credit ("EITC"), *id.* at § 3.D.iii;

(4) the applicant or a member of the applicant's household "would be eligible" to qualify for the EITC based on the EITC's financial criteria, notwithstanding that neither the applicant nor a member of the applicant's household actually receives the EITC, *id.* at § 3.D.iv;

(5) "the Applicant's income (or household income) is below [a] Qualifying Income," which Plaintiffs define as 150% of the federal poverty guideline plus $11,680, which is Plaintiff's "estimated annual cost of water," *id.* at § 3.D.v; or

(6) "[n]either the Applicant nor another related adult in the same house is employed, and at least one adult is unemployed and looking for work within the last four weeks," *id.* at § 3.D.vi.

Terminals disagrees with Plaintiffs' third through sixth proposals, arguing that the EITC, the poverty-line multiple, and unemployment are all poor proxies for the level of need that the Court contemplates here. *Id.* at §§ 3.D.iii-vi. Additionally, while Terminals agrees with thirteen of the fifteen enumerated needs-based government programs that Plaintiffs propose with respect to the first and second criteria, Terminals argues that two of the programs that Plaintiffs propose—the Low-Income Household Water Assistance Program ("LIHWAP"), and the Emergency Rental Assistance Program ("ERAP")—are inappropriate proxies. *Id.* at §§ 3.D.i.

A71

**1. Needs-Based Government Programs**

The parties agree that thirteen of the fifteen proposed needs-based government programs function as adequate proxies for the level of need that the Court contemplates here. (Dkt. No. 413 (Joint Notice) at 2). Following the second phase hearing, the Court ordered the parties to "submit a joint notice that specifies the 'financial eligibility criteria' of each of the fifteen programs enumerated in the parties' Proposed Order, including without limitation the income eligibility requirements for each program expressed, where applicable, as a multiple of the Federal Poverty Guideline, Local Poverty Guideline, Area Median Income, or comparable metric." (Dkt. No. 368 (June 30, 2023 Order) at 3 (quoting Dkt. No. 363-1 (Proposed Order) at § 3.D.ii)). The parties submitted this notice in accordance with the Court's instruction. (Dkt. No. 373 (Joint Notice) at 3-11).

Upon review of the financial criteria governing each of the thirteen undisputed programs, the Court agrees with the parties that the thirteen agreed programs serve as reasonable proxies for the level of need that the Court contemplates here. Each of the thirteen programs provides a well-established and widely accepted basis for identifying individuals who cannot obtain basic necessities without assistance, and eligibility for each program is determined, in part, by household income, with the qualifying income thresholds for these programs varying by relatively low multiples of either the Federal Poverty Guidelines, Local Poverty Level, or other comparable metrics. *Id.*

While Terminals disputes the inclusion of the LIHWAP and the ERAP, it does not contend that the financial criteria necessary for persons to qualify for these two programs is inappropriate. Indeed, the financial eligibility requirements for both programs are comparable to the thirteen agreed programs jointly proposed by the parties. (*See* Dkt. No. 371-1 (Joint Notice Dec.) at 5). Rather, Terminals objects to the inclusion of the ERAP on the grounds that applicants seeking to qualify for that program are not required to submit documentary

6

A72

proof that they meet the program's financial eligibility criteria, but rather may simply attest to their financial resources in lieu of documentary proof. (Dkt. No. 365 (LBT Supp. Br.) at 8). Terminals also objects to the LIHWAP—which "help[s] low-income households pay for their water bill"—on the grounds that households participating in the program "are necessarily connected to another water source" and should be disqualified from participation in the water program on that basis. *Id.* at 7-8.

Plaintiffs argue that Terminals' objection to the inclusion of the ERAP is a "red herring" because "[t]he ERA[P]-related attestation is not being proposed as a standalone criterion for eligibility for the [Water] Program, it is simply the manner in which an applicant may apply to the underlying program." (Dkt. No. 364 (Pls. Supp. Br.) at 6). The Court disagrees.

As noted above, the parties' Proposed Order provides that applicants seeking to demonstrate their economic eligibility for the water program may do so by submitting documentary proof that they are "eligible" to receive benefits under one of the specified programs notwithstanding that they do not actually receive said benefits. (Dkt. No. 363-1 (Proposed Order) at § 3.D.ii). The parties' Proposed Order further provides that applicants seeking to demonstrate eligibility in this fashion must submit "documentary proof that is consistent with the documentary proof required by the particular program for which eligibility is being claimed by the Applicant[.]" *Id.* at § 4.iii. It thus follows that, under the parties' proposed scheme—which the Court adopts here[7]—an applicant could, if the ERAP

---

[7] The Court notes that it previously expressed its doubts that the water program's economic eligibility criteria should encompass those residents who "would be eligible" for the specified programs (pursuant to paragraph 3.D.ii of the parties' Proposed Order)—as opposed to only those residents who actually receive benefits under the specified programs (pursuant to paragraph 3.D.i)—in light of the potential administrative difficulties associated with determining which residents "would be eligible" for the specified programs. In response, the parties assured the Court that they and the Administrator of the water program are capable of efficiently administering this criterion. The Court takes the parties at their word, and

were included, demonstrate economic eligibility for the water program simply by attestation, because such attestation is an acceptable means of proof for financial eligibility in the ERAP itself. Likewise, since residents may also demonstrate economic eligibility for the water program by showing that they actually participate in one of the specified programs, *id.* at § 3.D.i, it follows that including the ERAP in the list of qualifying programs would also permit residents to demonstrate economic eligibility for the water program merely by attestation if, in fact, attestation was the means through which the individual qualified for the ERAP. Terminals' concern with so lax a requirement is well-founded and shared by the Court. The Court will therefore not include the ERAP as a means of qualifying for the water program.

On the other hand, the Court does not view the bare fact that a resident receives water from another source, such as the Virgin Islands Water and Power Authority ("WAPA"), as sufficient grounds upon which to disqualify a resident from participation in the water program. The evidence before the Court indicates that WAPA water is prohibitively costly for certain residents and that WAPA water is not an adequate substitute for cistern water because it "cannot be used for drinking or many household purposes like cooking, brushing teeth, or doing laundry." (Dkt. No. 285 (First Phase Memo. Op.) at 27-28 (summarizing testimony of Carolyn Urgent)). Further, the fact that a resident is currently paying for WAPA water does not mean that the resident can afford to pay for water without trading off other basic necessities. *Id.* Indeed, the fact that the resident is already in a program designed to help with the payment of water bills suggests the opposite. Accordingly, the Court finds that Terminals' objection to the inclusion of the LIHWAP is without merit, particularly in light of the program's comparability to the thirteen agreed programs. The Court will therefore include the LIHWAP as a means of qualifying for the water program.

---

accordingly includes the "would be eligible" criterion in its Order Implementing Water Distribution Program.

## 2. Unemployment

Plaintiffs argue that residents should be deemed economically eligible for the water program where "neither the [resident] nor another related person in the same house is employed and at least one adult [in the household] is unemployed and [has looked] for work [within the last four weeks]" because unemployment implies "low (if any) income[.]" (Dkt. No. 317 (Pls. Br.) at 13). In support of this proposition, Plaintiffs rely principally on the testimony of Dr. David Neumark,[8] who opines that it is reasonable to assume "that the absence of employed adults, and the presence of at least one adult looking for work, implies that the family has no current earnings from work, and hence would likely have to trade off basic necessities in order to purchase water." (Dkt. No. 317-8 (Neumark May 19, 2023 Dec.) at 9).

The Court notes that Plaintiffs have proposed that a resident be deemed economically eligible under this criterion where the resident meets the definition of unemployment utilized by the United States Bureau of Labor Statistics ("BLS"). (Dkt. No. 331 (Pls. Reply) at 14-15). With one exception not relevant here, the BLS definition labels a person as unemployed only if that person is actively seeking out a new job. (Dkt. No. 331-2 (Neumark May 31, 2023 Dec.) at ¶ 8). In this regard, the Court agrees with Plaintiffs that their proposed criterion is not likely to improperly capture retirees, students, or seasonal workers within its scope, as Terminals has argued. (Dkt. No. 327 (LBT Resp.) at 15-16; Dkt. No. 331 (Pls. Reply) at 14-15).

At the same time, however, the BLS definition does not incorporate or reference a person's financial means whatsoever.[9] As Terminals correctly observes, it follows from this

---

[8] The Court accepted Dr. Neumark as an expert in "poverty-related need-based programs," "economic policy," "labor economics," and "poverty policy" for purposes of these preliminary injunction proceedings only.

[9] *See* Dkt. No. 331-2 (Neumark May 31, 2023 Dec.) at ¶ 8 (representing that the BLS defines persons as unemployed where "[t]hey were not employed during the [week that BLS

9

definition that persons may be formally classified as unemployed while still possessing significant financial resources or even investment income. (Dkt. No. 322 (LBT Br.) at 16). Thus, the Court agrees with Terminals that "unemployment" as Plaintiffs define it here—by incorporating the BLS definition—"is simply *not* synonymous with being poor or unable to provide for basic necessities." (Dkt. No. 365 (LBT Supp. Br.) at 9 (emphasis in original)).

Because Plaintiffs' proposed unemployment criterion would include residents with significant financial resources, and because such residents do not fall within the class of persons for whom the Court contemplates relief, the Court will not include the unemployment criterion as a means of qualifying for the water program.

### 3. EITC

Plaintiffs argue that a resident should be deemed economically eligible where the resident or a member of his or her household receives, or would be eligible to receive, the EITC. (Dkt. No. 331 (Pls. Reply) at 13-14). In essence, Plaintiffs' argument for the inclusion of this criterion reduces to the contention that the EITC is a tax credit geared toward low- and moderate-income workers, and that research "suggests that families mostly use the EITC to pay for necessities such as food and housing." (Dkt. No. 331 (Pls. Reply) at 14; Dkt. No. 331-2 (Neumark May 31, 2023 Dec.) at ¶¶ 12-13). Terminals, in contrast, argues that the Court should not include this factor because "it is a federal tax credit that is highly subjective because it changes depending on many different criteria, including household income and household size." (Dkt. No. 374 (LBT Notice) at 2).

The Court does not view the fact that the amount of credit to which households are entitled under the EITC varies based on household size and household income as particularly salient. Indeed, given that federal and local poverty levels vary with household size,

---

surveyed them]"; "[t]hey were available for work during [that] week, except for temporary illness"; and "[t]hey made at least one specific, active effort to find a job during the 4-week period ending with the survey reference week [or] were temporarily laid off and expecting to be recalled to their job").

10

eligibility for virtually all thirteen of the government assistance programs that the parties have jointly proposed also vary according to these same criteria. (*See* Dkt. No. 373 (Joint Notice) at ¶¶ 1-6). However, there is no evidence before the Court indicating that the population of low- and moderate-income workers—to whom the EITC allegedly is geared—substantially overlaps with the population for whom the Court contemplates relief here. The bare fact that "research" indicates that families "mostly" use the EITC to pay for necessities does not militate against this conclusion. Accordingly, the Court will not include Plaintiffs' proposed EITC criterion as a means of qualifying for the water program.

### 4. Poverty Line Multiple

Plaintiffs argue that a resident should be deemed economically eligible where the resident's household income is less than 150% of the Federal Poverty Guideline *plus* $11,680, which is Plaintiffs' "estimated annual cost of water" based on an estimated cost of $1.60 per gallon and an estimated consumption of twenty gallons of water per day per resident. (Dkt. No. 317 (Pls. Br.) at 10). The Court agrees with Terminals that this criterion is unnecessary given that the parties have agreed that not only residents who receive benefits under the specified government programs, but also those residents who "would be eligible" to receive benefits under the financial criteria of those government programs, will be economically eligible for the water program. (Dkt. No. 365 (LBT Supp Br.) at 9). In other words, the Court does not believe that an appreciable fraction of residents who cannot afford to purchase water without trading off other basic necessities would be captured under Plaintiffs' poverty-line multiple criterion without simultaneously being captured under the other economic eligibility criteria that the Court has approved. Further, as Terminals correctly notes, Plaintiffs' proposed poverty line multiple criterion is—unlike the parties' joint proposal regarding needs-based government assistance programs—"arbitrary and devoid of an objective standard or determination made by an entity . . . that a given income level

11

A77

demonstrates financial need." *Id.* Accordingly, the Court will not include Plaintiffs' proposed poverty line multiple criterion as a means of qualifying for the water program.

### 5. Proof of Economic Eligibility

The parties' Proposed Order provides that an applicant must submit "reasonable proof" of his or her economic eligibility for the water program. (Dkt. No. 363-1 (Proposed Order) at § 3.D). The Proposed Order further provides that applicants may satisfy this requirement by submitting "documentary proof" of participation in a listed needs-based government program, and outlines the forms of "documentary proof" that applicants must provide to demonstrate that they receive benefits under a specified program. *Id.* at § 4.i. In substance, the parties' proposed language specifies that "documentary proof" consists of "documents reasonably demonstrating admission into or participation in such program within the previous calendar year," and provides examples of acceptable documentation. *Id.* In the case of applicants who do not participate in a listed program, but seek to establish their eligibility for the water program by demonstrating that they "would be eligible" for a listed program, the Proposed Order requires "proof that is consistent with the documentary proof required by the particular program for which eligibility is being claimed by the Applicant[.]" *Id.* at § 4.iii.

The Court adopts the parties' language regarding documentary proof, notwithstanding that the language defining documentary proof for applicants seeking to establish that they "would be eligible" is not ideal given its lack of specificity.[10] The Court takes the parties at their word insofar as they represent that they "have been researching the proof issue and believe that they, together with the Administrator [of the water program], will be able to

---

[10] The Court notes that it has modified this language to reflect that "documentary proof," for purposes of demonstrating participation in a program, consists of "documents reasonably demonstrating admission into or participation in such program within the *current* calendar year," not the previous calendar year.

12

A78

[provide] notice [to residents as to] what documentary proof is required for each particular program." (Dkt. No. 363 (Joint Notice) at 2 n.3).

## B.  Geographic Eligibility Criteria

Throughout the second phase proceedings, Plaintiffs have continually revised the list of estates that they seek to have included in the "Covered Area"—that is, the geographic area that is covered by the Court's Order Implementing Water Distribution Program. Plaintiffs currently propose that the Covered Area should include 59 estates. (Dkt. No. 363-1 (Proposed Order) at § 1.c). Terminals agrees that 20 of these estates should be included in the Covered Area, but disputes the inclusion of the remaining 39 estates. *Id.*

Plaintiffs contend that six main sources of evidence generally support their proposed Covered Area. (Dkt. No. 253 (Pls. Br.) at 5-8; Dkt. No. 331 (Pls. Reply) at 5-8; Dkt. No. 364 (Pls. Supp. Br.) at 2-3). Specifically, Plaintiffs argue that their proposed Covered Area is consistent with, and supported by:

(1) the testimony of resident witnesses Julio Carino, Joyce Allen Murphy, Margaret Thompson, Carolyn Urgent, Marisela Webster, and Marver Antoine;[11]
(2) what Brian Moore[12] calls the "Zone of Impact" identified by the EPA's Emergency Order;[13]
(3) air modeling of the release events performed by Dr. Erno Sajo[14] ("Sajo Air Modeling");[15]
(4) data collected by Terminals and Refining following the first release event ("Limetree Data");[16]

---

[11] *See* Dkt. No. 285 (First Phase Memo. Op.) at 26-30 (summarizing resident witness testimony); Dkt. No. 364-2 (Pls. Map) at 2 (depicting resident witness testimony in blue).

[12] The Court accepted Mr. Moore's testimony, which involved "mapping geo-location data using geographic information systems."

[13] *See* Dkt. No. 317-2 (Brian Moore Dec.) at 3, 12 (depicting EPA "Zone of Impact" in lavender).

[14] The Court accepted Dr. Sajo, Plaintiffs' expert, as an expert in "aerosol dispersion air modeling" for purposes of these preliminary injunction proceedings only.

[15] *See* Pls. Exs. 2-38, 2-60 (Sajo Air Models); Dkt. No. 322-6 (Sajo Dec.) at 4-5, 7-8.

[16] *See* Dkt. No. 364-2 (Pls. Map) at 2 (depicting Limetree Data in cyan)); LBT Ex. 2-7 (Clifton Hill Tracking Map); LBT Ex. 2-39 (February Flare Release Survey Information); LBT Ex. 2-18 (February Flare Release Tracking Log) at 1.

**(5)** data collected by Sedgwick Claims Management Services, a consultant employed by Terminals and/or Refining, following the fourth release event ("Sedgwick Data");[17] and

**(6)** data collected by Dr. Marco Kaltofen[18] and Dr. Michael Henry[19] following the fourth release event ("Kaltofen Data").[20]

Terminals argues that these sources of evidence are either flawed and uninformative, or do not justify so broad a Covered Area as the one Plaintiffs propose here. (Dkt. No. 327 (LBT Resp.) at 3-9; Dkt. No. 365 (LBT Supp. Br.) at 1-7). The Court agrees in substantial part.

### 1. Six Sources of Evidence

#### a. Resident Witness Testimony

As an initial matter, Plaintiffs are correct that the resident witnesses' testimony is "consistent" with Plaintiffs' proposed Covered Area, insofar as each of the resident witnesses testified that their cistern was contaminated by the release event and each resident witness lives in an estate captured within Plaintiffs' proposal.[21] (*See* Dkt. No. 285 (First Phase Memo. Op.) at 26-30 (summarizing resident witness' testimony)). However, the resident witnesses' testimony applies only to a small fraction of the area that Plaintiffs seek to have included in the Covered Area. Accordingly, the informative value of the resident witnesses' testimony is limited.

---

[17] *See* Dkt. No. 364-1 (Pls. Summary of Sedgwick Data) at 2; Dkt. No. 364-2 (Pls. Map (depicting Sedgwick Data in pink) at 2; Dkt. No. 365-3 (LBT Summary of Sedgwick Data) at 2.

[18] The Court accepted Dr. Kaltofen, Plaintiffs' expert, as an expert in "environmental science," "environmental engineering," and the "fate and transport of petroleum and chemical releases" for purposes of these preliminary injunction proceedings only.

[19] The Court accepted Dr. Henry, Plaintiffs' expert, as an expert in "physical science and inspections" for purposes of these preliminary injunction proceedings only.

[20] *See* Dkt. No. 285 (First Phase Memo. Op.) at 22-25 (summarizing the Kaltofen Data); Dkt. No. 364-2 (Pls. Map) at 2 (depicting Kaltofen Data in yellow and red).

[21] Mr. Carino and Ms. Urgent live in Whim. (March 2 Tr. at 97, 295). Ms. Allen-Murphy lives in Campo Rico. (March 2 Tr. at 37). Ms. Thompson lives in Smithfield. (March 3 Tr. at 118). Ms. Webster lives in Williams Delight. (March 2 Tr. at 307). Ms. Antoine lives in Mount Pleasant.

### b.  Limetree Data

Terminals and Refining employees collected the Limetree Data following the first release event. As Joyce Wakefield, an employee of Terminals/Refining explained, this process involved inspecting over 200 properties in Clifton Hill and sampling the cisterns of at least 160 residences. (*See* LBT Ex. 2-18 (February Flare Release Tracking Log) at 1). The cistern sampling revealed that at least half of the cisterns had been contaminated by the first release event. *Id.* Because this sampling was limited to Clifton Hill, the informative value of the Limetree Data is limited to the Clifton Hill estate. (*See* Dkt. No. 364-2 (Pls. Map) at 2 (depicting the Limetree Data in cyan); LBT Ex. 2-39 (February Flare Release Survey Information).

### c.  Kaltofen Data

The Court discussed the Kaltofen Data in detail in its First Phase Memorandum Opinion. (*See* Dkt. No. 285 (First Phase Memo. Op.) at 22-25). The Court notes that the Kaltofen Data is comprised of a limited number of observations, and that these observations are principally confined to estates near the southwestern edge of the island. (*See* Dkt. No. 364-2 (Pls. Map) at 2 (depicting Kaltofen Data in yellow and red)).

### d.  Sajo Air Modeling

Based on meteorological data and his expertise in aerosol dispersion air modeling, Dr. Sajo created models estimating the areas he believes to have likely been impacted by the release events. He concluded, with respect to the first release event, that "significant portions of the [] Southcentral and Northwest [subdistricts of St. Croix] were likely affected" as well as "the southern part of [the] Northcentral [subdistrict] and the northern part of [the] Southwest [subdistrict]. Frederiksted is also directly downwind, and may have been affected

15

A81

as well."[22] (Dkt. No. 322-6 (Sajo Dec.) at 4; *id.* at 5 (figure overlaying Dr. Sajo's model of the first release event over a map of western St. Croix)). Similarly, Dr. Sajo concluded, with respect to the fourth release event, that "the downwind impact of the released chemicals likely included communities located at Southcentral (west of the release), Southwest, Frederiksted, Northwest, and parts of Northcentral." *Id.* at 7; *see also id.* at 8 (figure overlaying Dr. Sajo's model of the fourth release event over a map of western St. Croix).

Terminals argues that Dr. Sajo's modeling "yields purely speculative results" because Dr. Sajo "conceded" that his "modeling does not depict conditions on the ground" and that "critical pieces of information were unavailable to him in performing his modeling, including the nature, duration, and amount of the Releases" and other information regarding "meteorological conditions and terrain[.]" (Dkt. No. 267 (LBT Supp. Br.) at 18). The Court does not agree that Dr. Sajo's modeling is purely speculative.

It is true that Dr. Sajo acknowledged that his models do not account for various factors. (Mar. 3 Tr. at 41-44). Indeed, Dr. Sajo testified that he selected the relatively simple type of modeling that he performed because he did not have access to certain input variables, including the exact time and duration of the release events or the precise quantity of the materials released during the events. (Mar. 3 Tr. at 44-45). He testified that, as a result of his lack of access to these variables, the models he created are only accurate out to "6 miles or 10 kilometers" from the refinery, while more "sophisticated" modeling—which would have required him to input variables he did not have—would have permitted him to draw

---

[22] The subdistricts of St. Croix are principally used for statistical purposes during censuses. Notwithstanding that Dr. Sajo frames his conclusions in terms of these subdistricts, a map depicting these subdistricts is not in evidence. The Court has confirmed that Dr. Sajo's descriptions of his conclusions (in terms of subdistricts) are accurate insofar as they comport with the figures he has created overlaying his models over maps of St. Croix. *See* Census Bureau, *Understanding the Population of the United States Virgin Islands*, United States Census 2020, https://www.census.gov/content/dam/Census/programs- surveys/sis/resources/2020/sis_2020map_usvi_k-12.pdf (last visited July 20, 2023) (map depicting subdistricts of St. Croix).

conclusions with respect to "longer range dispersions"—that is, to draw conclusions about the likely zone of impact past the six-mile limit of his models. *Id.* at 47-48. In other words, Dr. Sajo testified that, notwithstanding that his modeling is limited by his lack of variables, it provides a "reasonable estimate" of the likely area of impact within six-miles of the refinery, but has nothing to say regarding the area past this six-mile limit. *Id.* at 4.

Ultimately, Terminals has not provided the Court with any reason to doubt Dr. Sajo's conclusion that his model is accurate out to its six-mile limit ("the Sajo Terminus"). (*See* Dkt. No. 364-2 (Pls. Map) at 2 (depicting Sajo model in orange, with the western boundary of the model reflecting the Sajo Terminus)). The Court therefore takes Dr. Sajo's air modeling as evidence that the area falling inside the Sajo Terminus was impacted by the first and fourth release events. At the same time, the Court recognizes that Dr. Sajo's models do not "depict conditions on the ground" (Dkt. No. 267 (LBT Supp. Br.) at 18), and further that, given the lack of input variables, Dr. Sajo's models do not purport to speak to the area outside the Sajo Terminus.

### e. Moore's "EPA Zone of Impact"

On May 14, 2021, the EPA issued an emergency order requiring that the refinery cease operations. (Pls. Ex. 21 (EPA Emergency Order) at 32-42). The emergency order notes that "[a]ccording to [the] EPA['s] review of [relevant] National Weather Service data for February through May 2021"—that is, the period from the first through the fourth release events—"the prevailing wind bl[ew] from the east and east-southeast to the west and west-northwest [such that] [w]ind direction prevalence indicates that communities located within Southcentral, Southwest, Frederiksted, Northwest, and portions of Northcentral [were] located downwind of the Facility [during this period]." *Id.* at 6-7. Mr. Moore created a map depicting what he contends is an area "consistent with the impacted area identified by the EPA" in its order. (Dkt. No. 317-2 (Brian Moore Dec.) at 12). Mr. Moore's map essentially

17

A83

depicts the entire western half of the island as the "Zone of Impact" consistent with the EPA's emergency order. *Id.* at 3 (map depicting the EPA "Zone of Impact" in lavender).

Mr. Moore's "Zone of Impact" is "consistent" with the EPA's description of the relevant wind conditions during the four-month period that included the time of the first and fourth release events.[23] However, it offers nothing more. Unlike Dr. Sajo, Mr. Moore is not an expert in aerosol dispersion air modeling. Moreover, in light of the fact that the "Zone of Impact" does no more than reflect the EPA's summary of some of the relevant wind conditions, Mr. Moore's "Zone of Impact" is of little value in assessing the areas that may have been impacted by the release events. While the Court considers the relevant wind conditions during the release events—as they are described in the EPA's emergency order and elsewhere—the Court assigns no special weight to the fact that an area falls inside or outside of Mr. Moore's "Zone of Impact."

### f. Sedgwick Data

In the immediate aftermath of the fourth release event, Refining and/or Terminals enlisted Sedgwick to survey neighborhoods potentially impacted by the event; determine which residences had been impacted; and extend settlement offers to residents whose residences had been impacted. The Sedgwick Data consists of observations regarding over 2,000[24] properties west of the refinery, and it represents the most voluminous data set presently before the Court. The parties agree that the Sedgwick Data provides the most reliable and complete picture of the extent of contamination. (Dkt. No. 327 (LBT Resp.) at 9;

---

[23] The EPA order does not specify the wind conditions during each of the first and fourth releases specifically, but rather only the prevailing winds during the four-month period between the first and fourth release events. Additional information regarding the wind conditions during the release events is in evidence. (*See, e.g.,* LBT Exs. 2-14, 2-15 (Windrose Diagrams)).

[24] Plaintiffs count 2,027 total observations in the Sedgwick Data. (Dkt. No. 364-1 (Pls. Summary of Sedgwick Data) at 2, col. 2). Terminals counts 2,026 observations. (Dkt. No. 365-3 (LBT Summary of Sedgwick Data) at 2, col. 2).

Dkt. No. 364 (Pls. Supp. Br.) at 2-3). Nonetheless, the parties have registered a number of disagreements regarding the best method to interpret the data. (*See* Dkt. No. 364 (Pls. Supp. Br.) at 2-3; Dkt. No. 365 (LBT Supp. Br.) at 4-7). The Court addresses these disagreements before summarizing the Sedgwick Data.

**Total Number of Properties that Sedgwick Determined to be Impacted**. The parties' first disagreement concerns the appropriate manner to interpret the number of properties Sedgwick found to be impacted by the release events. Sedgwick created a document summarizing its raw data in spreadsheet form. (*See* Dkt. No. 317-4 ("Sedgwick Raw Data")).[25] As relevant here, the spreadsheet identifies: (1) the address of properties that Sedgwick visited, *id.* at cols. 4 ("Address"), 6 ("Inspected Y/N"); (2) whether Sedgwick made an offer to settle with the property owner, *id.* at col. 7 ("Offer Y/N"); (3) whether the property owner's claims were settled, *id.* at col. 8 ("Settled Y/N"); and (4) the amount of the settlement offer in a dollar figure, *id.* at col. 9 ("Amount").

The parties' dispute as to the interpretation of this data arises from the fact that the Sedgwick Raw Data exhibits two primary types of inconsistencies. First, for numerous entries, the spreadsheet specifies a settlement offer amount (in column nine) while simultaneously reflecting that no offer was made (in column seven). *See, e.g., id.* at 1, row 11. Second, for numerous entries, the spreadsheet reflects that no offer was made (in column seven) while simultaneously reflecting that the property owner's claim was settled (in column eight), and neglecting to specify a settlement offer amount (in column nine). *See, e.g., id.* at 9, row 1 (entry with both forms of this type of inconsistency).

Plaintiffs contend that, in tallying the number of properties that Sedgwick determined to be impacted in each estate—and, in particular, in comparing the number of impacted

---

[25] The Court notes that this exhibit reflecting the Sedgwick Raw Data (Dkt. No. 317-4), which was filed before the second phase hearing, is incomplete and only includes data regarding 521 observations.

properties in each estate to the number of properties Sedgwick inspected in that estate to arrive at a "hit count"[26] or portrait of the extent of the contamination within that estate—the Court should count as impacted all properties for which Sedgwick's spreadsheet reflects that the owner received (column seven) or accepted (column eight) an offer, or lists a settlement offer amount (column nine). (Dkt. No. 364 (Pls. Supp. Br.) at 2). Terminals contends, on the other hand, that doing so results in a "grossly misleading" hit count, and argues that the Court should count as impacted only those properties for which Sedgwick's spreadsheet lists a settlement offer amount (column nine). (Dkt. No. 365 (LBT Supp. Br.) at 4).

The Court agrees with Plaintiffs. The second type of inconsistency identified above makes it inappropriate to simply tally column nine ("Amount") to arrive at an accurate total number of properties Sedgwick determined to be impacted. This is because doing so results in an underinclusive tally that neglects to count as impacted: (1) those properties for which Sedgwick represents that it made a settlement offer in column seven ("Offer Y/N")—which Sedgwick only did if it determined the property was impacted—but no settlement offer amount was stated; and (2) those properties for which Sedgwick represents that the owner's claim was settled—which would have been the case only if an offer was made in the first instance because the property was identified as impacted—but again, no settlement offer amount was stated.[27] In addition, interpreting the data in the way Plaintiffs urge here results

---

[26] As used here, a "hit count" is the percentage of properties Sedgwick determined to be impacted within a given estate, calculated as the number of properties Sedgwick determined to be contaminated within that estate over the number of total inspections Sedgwick performed in that estate.

[27] It is likewise impossible to reach an accurate result by individually tallying either column seven ("Offer Y/N") or column eight ("Settled Y/N"). The first type of inconsistency identified above means that simply tallying column seven ("Offer Y/N") results in an underinclusive count because doing so neglects to include those properties for which Sedgwick represents that a specified settlement offer was made in column nine ("Amount")—which Sedgwick only indicated if it determined the property was impacted—but no offer was stated (in column seven); and (2) those properties for which Sedgwick represents that the owner's claim was settled (in column eight)—which Sedgwick only indicated if it determined the property was impacted—but no offer was stated (in column seven). Moreover, simply

20

in figures that comport more closely with the testimony this Court received. Jeffery Charles, Terminals' Chief Operating Officer, estimated that Sedgwick inspected between 2,300 and 2,400 properties, and that Sedgwick identified 2,200 of those properties as impacted (approximately 92%-96%). Plaintiffs' interpretation likewise leads to the conclusion that Sedgwick identified approximately 96% of the properties it inspected as impacted—that is, 1,947 impacted properties of 2,026 (or 2,027) inspections. (*See* Dkt. No. 364-1 (Pls. Summary of Sedgwick Data) at 2, col. 11). Terminals' interpretation, in contrast, leads to the conclusion that Sedgwick identified 1,694 of the of 2,026 (or 2,027) properties it inspected as impacted, or approximately 84%. (Dkt. No. 365-3 (LBT Summary of Sedgwick Data) at 2, col. 4).

The Court therefore considers Plaintiffs' totals for the properties Sedgwick determined to be impacted when analyzing the Sedgwick Data, with one exception noted below. (*See infra*, n.29).

**Plaintiffs' "Lumping" of Sedgwick Data for Certain Estates**. Terminals argues that, in five instances, Plaintiffs have artificially inflated the hit count of certain areas by improperly labelling multiple estates as a singular estate and providing the Court with only the hit count for the singular, "umbrella" estate. (Dkt. No. 365 (LBT Supp. Br.) at 6). Specifically, Terminals argues that Plaintiffs have improperly grouped estates as follows:

(1) the estates of Frederiksted, Hesselberg, Sandy Point, Smithfield, and Two Brothers under the umbrella term of "Two Brothers";
(2) the estates of Campo Rico, Carlton Land, Good Hope, Hope, Whim, Ruans Bay, and Two Williams under the umbrella term of "Whim";
(3) the estates of Bethlehem Old Works, Castle Burke, Fredensborg, and Jealousy under the umbrella term of "Bethlehem Old Works";
(4) the estates of Betty's Hope, Envy, Mannings Bay, Negro Bay, and "part of" Golden Grove under the umbrella term of "Airport";

---

tallying column eight ("Settled Y/N") also results in an underinclusive tally because that column reflects only whether an offer was ultimately accepted by the property owner, which is a variable that is divorced from whether Sedgwick extended a settlement offer because it identified the property as impacted in the first instance.

21

A87

(5) the estates of University of Virgin Islands Campus and Upper Bethlehem under the umbrella term of "Upper Bethlehem"; and

(6) the estates of Mars Hill and Wheel of Fortune under the umbrella term of "Wheel of Fortune."

(*See* Dkt. No. 365-6 (LBT Summary Chart) at 2).

The Court agrees with Terminals that Plaintiffs' presentation[28] of the Sedgwick Data with respect to these 25 estates is misleading in important part. Plaintiffs appear to attempt to implicitly justify their presentation of these estates by noting that they have "corrected [the data set] to address common knowledge, vernacular, and phonetic concerns." (Dkt. No. 364-1 (Pls. Summary of Sedgwick Data) at 2). The Court recognizes that the boundaries of St. Croix's estates are not always precise and well defined, and that certain small estates are frequently referred to, colloquially, as though they were part of a larger neighboring estate. In this respect, the Court finds that the fifth and sixth of Plaintiffs' umbrella terms, as identified above, are defensible. Plaintiffs' third and fourth umbrella terms are less so, especially in light of Plaintiffs' previous references to (for example) Jealousy and Golden Grove as individual estates in the course of arguing for their inclusion during these proceedings. (*See, e.g.,* Dkt. No. 317-1 (Pls. May 23, 2023 Proposed Order) at § 1.c).

Plaintiffs' first and second umbrella terms, however, are simply indefensible. Frederiksted is one of St. Croix's two main towns, and it is not referred to—colloquially or otherwise—as "Two Brothers," which is a smaller, neighboring estate. Likewise, the estate of Hope is noncontiguous both from Whim and the six other estates Plaintiffs group under the umbrella term "Whim." Moreover, Hope is made noncontiguous from these estates by other intervening estates for which Plaintiffs individually identify the relevant Sedgwick Data— namely, Carlton, Cane, and Williams Delight.

---

[28] *See* Dkt. No. 364-1 (Pls. Summary of Sedgwick Data) at 2; Dkt. No. 364-2 (Pls. Map (depicting Sedgwick Data in pink) at 2.

Because of Plaintiffs' unjustified umbrella groupings, the fact that Sedgwick performed few or no inspections in certain areas, or received only few "hits" for the inspections it performed, can be easily overlooked in Plaintiffs' presentation of the data. For purposes of its analysis here, the Court will therefore consider the individual "hit rates" of the Sedgwick Data for each of the 21 estates comprising Plaintiffs' first through fourth umbrella terms.[29]

**Estates Where Sedgwick Performed a Limited Number of Inspections**. Terminals notes that it "disputes the wholesale inclusion of any estate where there have been fewer than seven inspections, offers, or offers in amounts above zero." (Dkt. No. 365 (LBT Supp. Br.) at 5). The Court rejects this argument because the Court is not considering the Sedgwick Data alone in determining the inclusion or exclusion of any particular estate or portion thereof. The

---

[29] Unlike Plaintiffs, Terminals subdivides the data by estate in the correct manner. However, Terminals' presentation of this data raises a different problem. Terminals specifies the relevant totals only in terms of the number of properties that the Sedgwick Raw Data reflects received an offer (in column seven) in each estate, and in terms of the number of properties for which the Sedgwick Raw Data specifies a settlement offer amount (in column nine). (Dkt. No. 365-3 (LBT Summary of Sedgwick Data) at 2). In other words, Terminals' presentation of the data for the subdivided estates does not specify the total number of properties within each estate for which the Sedgwick Raw Data reflects that there was *either* an offer made (in column seven) *or* a specified settlement offer amount (in column nine), nor does it specify the number of properties within each estate that received a settlement (in column eight). The Court therefore counts the highest of the two variables Terminals specifies for purposes of tallying the total number of residences impacted within these 21 areas, which is somewhat underinclusive, per the Court's discussion above.

Thus, the Court considers the following estates to have the following hit rates: Bethlehem Old Works (not lumped): 100% (2/2); Campo Rico: 89% (16/18); Frederiksted: 0% (0/1); Hope: 0% (0/1); Smithfield: 100% (36/36); Two Brothers (not lumped): 88% (14/16); and Whim (not lumped): 79% (440/556). *Id.* Likewise, the Court considers the following estates to have had no inspections performed: Betty's Hope; Castle Burke; Envy; Fredensborg; Golden Grove; Good Hope; Hesselberg; Jealousy; Mannings Bay; Negro Bay; Ruans Bay; and Sandy Point. *Id.* (The Court notes that it considers Carlton Land and Two Williams to be part of Whim and Concordia, respectively, and will not treat Carlton Land and Two Williams as separate estates in which no inspections were performed.)

To the extent not inconsistent with the figures just described, the Court accepts Plaintiffs' figures for all other estates, per above. (*See* Dkt. No. 364-1 (Pls. Summary of Sedgwick Data) at 2; Dkt. No. 364-2 (Pls. Map) at 2 (depicting Sedgwick Data in pink)).

23

Court agrees that the hit rates for estates with a relatively low number of inspections are of limited evidentiary value, and the Court considers the Sedgwick Data—in combination with all other relevant evidence—cognizant of the number of inspections performed.

**Summary of Sedgwick Data.** Based on the Court's interpretation of the Sedgwick Data, as described above, the Court finds that the data shows that the impact of the release events was concentrated in an area that will be defined, very approximately, as an area bounded to the east by East Airport Road, to the north by Centerline Road, and to the west and south by the ocean. The Court will refer to this area as the "Sedgwick Concentrated Area." The scarcity of major or straight roads on St. Croix makes this definition both somewhat underinclusive and overinclusive. As described below, this definition is overinclusive with respect to its eastern, southern, and western borders, and underinclusive with respect to its northern border.

*"Core Estates" in the Sedgwick Concentrated Area.* The Sedgwick Concentrated Area captures the following fifteen estates with both a high hit rate and a relatively high number of inspections: Adventure (100%, 34/34[30]), Cane (97%, 62/64), Cain Carlton (97%, 61/63), Campo Rico (89%, 16/18), Carlton 1 South (90%, 55/61), Carlton 2 (90%, 55/61), Hannah's Rest (99%, 134/135), Diamond (96%, 74/77), Enfield Green (100%, 115/115), Mount Pleasant (98, 182/185), Paradise (100%, 7/7), Stony Ground (100%, 63/63), Whim (not lumped) (79%, 440/556), Whites Bay (100%, 70/70), and Williams Delight (92%, 325/352). Below, the Court refers to these fifteen estates as the "core" estates in the Sedgwick Concentrated Area.[31]

---

[30] The first number in each of the parentheticals represents the hit rate expressed in percentage form. The second set of numbers represents the hit rate expressed as the number of properties Sedgwick determined to be impacted in the estate over the number of inspections Sedgwick performed in the estate.

[31] As discussed below, the Sedgwick Concentrated Area *excludes* five other estates with both a high hit rate and a relatively high number of inspections, because these five estates are

*"Underinclusive Estates" in the Sedgwick Concentrated Area.* The Court's description of the Sedgwick Data is underinclusive with respect to its northern boundary insofar as it excludes estates north of Centerline Road with both a high hit rate and a relatively high number of inspections rendering that hit rate reliable in the first instance. These estates, which cluster toward the western edge of the island, are: Carlton 1 North (90%, 55/61), Concordia (98%, 125/128), Smithfield (100%, 36/36), Two Brothers (not lumped) (88%, 14/16), and Wheel of Fortune/Mars Hill (100%, 7/7). Below, the Court refers to these five estates as the "underinclusive estates" in the Sedgwick Concentrated Area.

*"Overinclusive Estates" in the Sedgwick Concentrated Area.* The Court's description of the Sedgwick Data is overinclusive with respect to its western boundary insofar as it captures Sandy Point and Whites Bay 2, two estates in which Sedgwick performed no inspections. It is overinclusive with respect to its eastern boundary insofar as it captures Golden Grove and Upper Bethlehem, both of which are estates in which Sedgwick performed no inspections.[32] It is overinclusive with respect to its southern boundary insofar as it captures Betty's Hope, Envy, Mannings Bay, and Negro Bay, four estates in which Sedgwick performed no inspections. It is overinclusive with respect to interior estates insofar as it captures Good Hope and Ruans Bay, two estates in which Sedgwick performed no inspections. Below, the Court refers to these ten estates as the "overinclusive estates" in the Sedgwick Concentrated Area.

---

north of Centerline Road. The Court does not refer to these five estates as "core estates," but rather as "underinclusive estates."

[32] The Court notes that the map Plaintiffs have provided inexplicably labels the area to the immediate north of Kingshill as "Upper Bethlehem." (Dkt. No. 264-2 (Pls. Map) at 2). The northwest quadrant of the Golden Grove estate, shaded in pink in Plaintiffs' map, is Upper Bethlehem.

### 2.   Reasonable Inferences from Foregoing Evidence

The Court finds that the force of the various sources of evidence described above leads to the conclusion that the appropriate Covered Area is an area roughly approximating, but not precisely equivalent to, the Sedgwick Concentrated Area.

**Core Estates.** As an initial matter, the Court finds that the evidence supports including the fifteen core estates in the Sedgwick Concentrated Area within the Covered Area. First and foremost among this evidence is the Sedgwick Data itself, which reflects that the hit rates for each of these estates is exceptionally high and particularly reliable (given that the number of inspections yielding these rates is also high). The Sajo Air Modeling also supports including the nine (of fifteen) core estates that are east of, or on the threshold of, the Sajo Terminus, namely: Adventure, Cane, Cain Carlton, Carlton 1 South, Diamond, Enfield Green, Mount Pleasant, Paradise, and Williams Delight. Additionally, the Kaltofen Data supports including the six core estates that are west of the Sajo Terminus—Campo Rico, Carlton 2, Hannah's Rest, Stony Ground, Whim (not lumped), and Whites Bay—because the Kaltofen Data reflects contamination within these six estates or within estates immediately proximate to them. The resident witness testimony also provides limited support for the inclusion of these six estates.[33]

**Overinclusive Estates: Western Boundary.** With respect to the two overinclusive estates at the western boundary—Sandy Point and Whites Bay 2—the Court finds that the evidence supports including these two estates within the Covered Area. Both Sandy Point and Whites Bay 2 are immediately proximate to estates with exceptionally high hit rates that are particularly reliable—namely, Hannah's Rest (99%, 134/135), Smithfield (100%, 36/36),

---

[33] It appears that Terminals disputes the inclusion of only one of the fifteen core estates, Paradise. (Dkt. No. 363-1 (Proposed Order) at § 1(c)). The Court addresses Paradise in additional detail below.

26

Stony Ground (100%, 63/63), Two Brothers (not lumped) (88%, 14/16), Wheel of Fortune/Mars Hill (100%, 7/7), and White's Bay (100%, 70/70). The inclusion of Sandy Point and Whites Bay 2 also finds support in the Kaltofen Data, which reflects contamination within estates immediately proximate to Sandy Point and Whites Bay 2, as well as limited support in the resident witness testimony. It also finds support in the testimony of Roland Riviere, a Sedgwick employee involved in the inspections, who testified that Sedgwick ceased performing inspections before completing inspections of the western edge of the island due to non-payment of its contract by Terminals and/or Refining, notwithstanding that Sedgwick was still receiving reports of contamination from residents at this time.

**Overinclusive Estates: Interior.** With respect to the two overinclusive estates in the interior of the Sedgwick Concentrated Area—Good Hope and Ruans Bay—the Court finds that the evidence supports including these two estates within the Covered Area. Both Good Hope and Ruans Bay are immediately proximate to one another, and are surrounded by estates with exceptionally high hit rates that are particularly reliable—namely, Cane (97%, 62/64), Whim (not lumped) (79%, 440/556), and Williams Delight (92%, 325/352). Moreover, both properties are on the threshold of the Sajo Terminus, and there are numerous core estates west—that is, farther from the refinery—of both estates. The same is true for Paradise, the sole core estate that Terminals disputes.[34] Paradise is surrounded by estates with exceptionally high hit rates that are particularly reliable—namely, Adventure (100%, 34/34), Diamond (96%, 74/77), and Mount Pleasant (98%, 182/185)—and there are numerous core estates to its west. The inclusion of Paradise is also strongly supported by the Sajo Air Modeling given its proximity to the refinery.

---

[34] Terminals appears to object to the inclusion of Paradise, for which the hit rate is 100%, because that hit rate is the product of only seven inspections and is consequently of lower reliability than the other core estates.

**Overinclusive Estates: Southern and Eastern Boundaries.** With respect to the two overinclusive estates at the eastern boundary—Golden Grove and Upper Bethlehem[35]—and the four overinclusive estates at the southern boundary—Betty's Hope, Envy, Mannings Bay, and Negro Bay—the Court finds that the evidence supports including these six estates within the Covered Area. These estates are immediately proximate to one another and to estates with exceptionally high hit rates that are particularly reliable—namely, Adventure (100%,34/34), Diamond (96%, 74/77), Enfield Green (100%, 115/115), and Mount Pleasant (98%, 182/185).[36] Moreover, there are numerous core estates to the west of these estates, and the inclusion of these estates is strongly supported by the Sajo Air Modeling given their proximity to the refinery.

**Underinclusive Estates**. With respect to the five underinclusive estates, which cluster to the north of Centerline Road at the western edge of the island—Carlton 1 North, Concordia, Smithfield, Two Brothers (not lumped), and Wheel of Fortune/Mars Hill—the Court finds that the evidence supports including these estates within the Covered Area. First and foremost among this evidence is the Sedgwick Data itself, which reflects that the hit rates for each of these estates is exceptionally high and particularly reliable. The Kaltofen Data likewise supports the inclusion of these estates, because it reflects contamination within these five estates or within estates immediately proximate to them. The resident witness testimony also provides limited support for the inclusion of these five estates.[37]

---

[35] The Court notes that, in referring to Upper Bethlehem here, it designates the northwest quadrant of Golden Grove shaded in pink in Plaintiffs' map, not the estate labelled "Upper Bethlehem" on that map. (*See* Dkt. No. 264-2 (Pls. Map) at 2).

[36] These estates are also immediately proximate to Paradise (100%, 7/7), which has an exceptionally high hit rate but is not as reliable as the other core estates in light of the relatively lower number of inspections within it.

[37] It appears that Terminals disputes the inclusion of only one of the five overinclusive estates, Wheel of Fortune/Mars Hill. (Dkt. No. 363-1 (Proposed Order) at § 1(c)). This dispute appears to be based principally on Terminals' "lumping" objection, which the Court has addressed above. To the extent that Terminals objects to the inclusion of this estate based

28

A94

**Other Estates.** The Court now addresses those estates that were not included in its initial definition of the Sedgwick Concentrated Area.

*Estates East of East Airport Road*. With the exception of Clifton Hill, discussed below, Plaintiffs have not provided sufficient evidence for the Court to conclude that any of Plaintiffs' proposed estates to the east of East Airport Road should be included in the Covered Area. The estates in this area are supported by the Sajo Air Modeling given their proximity to the refinery, and Plaintiffs also contend that their inclusion is warranted in light of the Sedgwick Data. However, given, as noted above, that the Sajo Air Modeling does not reflect conditions on the ground, the Court does not view the Sajo Air Modeling as sufficient to justify the inclusion of any estates without adequate corroborating data collected from the ground. Such corroborating data is absent here. The Kaltofen Data does not corroborate the Sajo Air Modeling with respect to these estates, nor—contrary to Plaintiffs' contention—does the Sedgwick Data. Indeed, Sedgwick performed no inspections in the vast majority of estates in this area. Moreover, for the six estates in this area in which Sedgwick performed inspections, it performed very few.[38] Given that these estates are not proximate to any estates with both high hit rates and a high number of inspections, the weight of the evidence is insufficient to justify their inclusion.

*Clifton Hill*. Clifton Hill, as previously noted, is an exception. The Limetree Data reflects a substantial degree of contamination within Clifton Hill. (LBT Ex. 2-18 (February Flare Release Tracking Log) at 1.). While Limetree undertook remediation efforts in Clifton

---

on the fact that—like Paradise—its 100% hit rate is the result of only seven inspections, the Court's response is functionally the same as it was for Paradise—Wheel of Fortune/Mars Hill is immediately proximate to numerous estates with exceptionally high hit rates that are particularly reliable.

[38] Barren Spot (100%, 2/2), Bethlehem Middle Works (67%, 2/3), Bethlehem Old Works (not lumped) (100%, 1/1), Colquohom (100%, 1/1), Clifton Hill (100%, 2/2), Profit (100%, 2/2), and Strawberry Hill (100%, 3/3). (Dkt. No. 364-1 (Pls. Summary of Sedgwick Data) at 2; Dkt. No. 365-3 (LBT Summary of Sedgwick Data) at 2).

Hill following the first release event, these efforts were incomplete according to Ms. Wakefield. Accordingly, the Court will include the Clifton Hill estate within the Covered Area.

*Estates North of Centerline Road and West of East Airport Road.* With the exception of the overinclusive estates, discussed above, the one core estate North of Centerline Road—Carlton 1 North—and the four estates discussed below, Plaintiffs have not provided sufficient evidence for the Court to conclude that any of Plaintiffs' proposed estates north of Centerline Road and west of East Airport Road should be included within the Covered Area. Again, Sedgwick performed no inspections in the vast majority of estates in this area and, for the four estates in this area in which Sedgwick performed inspections, it performed very few.[39] The Court is cognizant that a number of the estates in this area are supported by the Sajo Air Modeling, and that Grove Place is supported by two samples in the Kaltofen Data. However, none of this evidence is sufficient to justify inclusion in light of the overall portrait painted by the evidence.

*Frederiksted, Hesselberg, Hogensborg, and La Grange*. Sedgwick performed no inspections in the Hesselberg and La Grange estates, one inspection leading to a non-detect in Frederiksted, and four inspections leading to detects in Hogensborg. However, these estates are immediately proximate to one another and surrounded by estates with exceptionally high hit rates that are particularly reliable—namely, Concordia (98%, 125/128), Cane (97%, 62/64), Carlton 1 North (90%, 55/61), Hannah's Rest (99%, 134/135), Smithfield (100%, 36/36), Stony Ground (100%, 63/63), Two Brothers (not lumped) (88%, 14/16), Wheel of Fortune/Mars Hill (100%, 7/7), Williams Delight (92%, 325/352), and White's Bay (100%, 70/70). The inclusion of these four estates also finds support in the Kaltofen Data, which

---

[39] Hope (100%, 1/1), Mountain (100%, 1/1), and St. George (100%, 4/5). Dkt. No. 364-1 (Pls. Summary of Sedgwick Data) at 2; Dkt. No. 365-3 (LBT Summary of Sedgwick Data) at 2.

reflects contamination within estates immediately proximate to these estates, as well as limited support in the resident witness testimony. It also finds support in the testimony of Mr. Riviere, who testified that Sedgwick ceased performing inspections before completing inspections of the western edge of the island due to non-payment of its contract by Terminals and/or Refining, notwithstanding that Sedgwick was still receiving reports of contamination from residents in and around these estates at the time. The Court concludes that the weight of this evidence warrants inclusion of Frederiksted, Hesselberg, Hogensborg, and La Grange within the Covered Area.

### 3.  Final Geographic Eligibility Criteria

Based on the Court's analysis in Section 2 above, the following estates are included in the Covered Area for purposes of determining geographic eligibility: Adventure, Betty's Hope, Cane, Cain Carlton, Campo Rico, Carlton 1 North, Carlton 1 South, Carlton 2, Clifton Hill, Concordia, Diamond, Enfield Green, Envy, Frederiksted, Golden Grove, Good Hope, Hannah's Rest, Hesselberg, Hogensborg, La Grange, Mannings Bay, Mount Pleasant, Negro Bay, Paradise, Ruans Bay, Sandy Point, Smithfield, Stony Ground, Two Brothers, Upper Bethlehem, Wheel of Fortune/Mars Hill, Whim, Whites Bay, Whites Bay 2, and Williams Delight.

While the Court has defined the Covered Area in terms of estates above, the Court recognizes that labeling and defining the precise contours of estates on St. Croix is difficult. Accordingly, the Court includes the following equivalent description:

Together with Carlton 1 North, Clifton Hill, and Hogensborg:

(A) Residences that are: (1) west of East Airport Road, *and* (2) south of Centerline Road; and

31

A97

(B) Residences that are (1) south of Mahogany Road, *and* (2) would be west of Whim Road if Whim Road was extended consistent with its current path up to Mahogany Road.[40]

### 4. Proof of Geographic Eligibility

The parties' Proposed Order provides that an applicant may demonstrate his or her geographic eligibility for the water program by submitting an identification document (such as a driver's license) *and* submitting either "reasonable proof of occupancy" within the Covered Area (such as a copy of a lease) *or* an attestation to the effect that he or she resides in the Covered Area. ((Dkt. No. 363-1 (Proposed Order) at §§ 3.A.i-iii). As previously expressed, the Court is unwilling to condition applicants' demonstration of eligibility on so lax a requirement as attestation alone. Accordingly, the Court will require that applicants submit *both* "reasonable proof of occupancy" *and* an attestation.

### C.  Disputed Logistical Issues

#### 1.  Quantity of Water

The parties dispute the amount of water to which each eligible household should be entitled under the program. Plaintiffs suggest that eligible households should be entitled to twenty gallons of water per day, equivalent to 140 gallons of water per week. (Dkt. No. 364 at 7). Plaintiffs argue that their request is conservative in light of the fact that the United Nations has cautioned that thirteen to 26 gallons of water per day are "needed to ensure that most basic needs are met and few health concerns arise"; that the EPA has estimated that Americans use an average of 82 gallons of water per day; and that the Virgin Islands Department of Planning and National Resources has found that Virgin Islanders with cisterns use an average of 30 gallons of water per day. (*See* Dkt. No. 117 at 14 (collecting sources); Dkt. No. 164 at 7 (same)). In contrast, Terminals suggests that eligible households should be

---

[40] The Court notes that (A) tracks the Court's definition of the Sedgwick Contamination Area above, while (B) tracks the Court's additional inclusion of the underinclusive estates, plus Frederiksted, Hesselberg, and La Grange.

entitled to four gallons of water per day, with a cap of twenty gallons per week. (Dkt. No. 265 at 10-11). Terminals grounds its proposed figures in the pre-existing water distribution program established by consent of the parties during earlier bankruptcy proceedings, arguing that residents were "satisfied" with this amount of water under the pre-existing program.[41] (Dkt. No. 322 (LBT Resp.) at 18).

The Court does not believe that the amount of water Terminals proposes here is reasonable. Contrary to Terminals' assertion, it does not appear that the twenty gallons of water per week afforded to residents under the pre-existing water program provided residents with enough water to meet their daily needs. Multiple residents who participated in that program testified that twenty gallons of water per week was not enough to meet their needs. (*See* Dkt. No. 264 (Mar. 2 Tr.) at 53 (JoAnne Allen-Murphy); *id.* at 302 (Carolyn Urgent); Dkt. No. 265 (Mar. 3 Tr.) at 102 (Julio Carino)). At the same time, however, Plaintiffs' proposal appears excessive. The purpose of this preliminary injunction—like all preliminary injunctions—is to prevent *irreparable* harm, not all harm. To the extent that certain households may choose to supplement their water needs over and above the amount provided under the program, the Court is of the view that such expenses will not irreparably harm eligible residents.

---

[41] While Plaintiffs and various debtors associated with the refinery attempted to mediate an agreement in the Bankruptcy Court, the debtors agreed to expand a pre-existing program providing free bottled water to residents during the pendency of the mediation. (*See* LBT Ex. 5 (Stipulation and Agreed Order Adopting Water Distribution Program, dated October 29, 2021) at 3). Under the expanded program, the debtors agreed to provide free bottled water to the approximately 20,000 persons residing in the Frederiksted, Southcentral, Northcentral, and Southwest subdistricts of St. Croix, subject to limits on the amount of water individual residents could receive and a monthly cap on total expenses, among other conditions. *Id.* at 2-5. Both the expanded program and its predecessor program ended in September 2022—days after Plaintiffs terminated the Bankruptcy Court mediation—and this Court subsequently returned the four associated cases to the active trial docket. Although not a debtor in the Bankruptcy Court action, Terminals was involved in establishing the predecessor program and also participated in the expanded program. Terminals, like the debtors, has expressly stated that its participation in the expanded program in no way functioned as an admission of wrongdoing, nor as an admission that all or even any residents were impacted by the release events. *Id.* at 3.

Balancing these considerations, the Court concludes that twelve gallons of water per day per household is reasonable, with a weekly cap of 84 gallons per household.

### 2. Five-Gallon Water Containers and Related Issues

The parties have agreed that, to prevent undue environmental impact on the island, Terminals shall use commercially reasonable best efforts to distribute five-gallon sized reusable water containers, rather than one-gallon plastic containers. (Dkt. No. 363-1 (Proposed Order) at § 17). Plaintiffs additionally urge the Court to order Terminals to provide each resident with a "water pump" for five-gallon water containers. *Id.* Terminals objects to this requirement. (Dkt. No. 363 at 4).

The Court does not agree with the parties' joint proposal to the extent that it *requires* the distribution of five-gallon containers if they can be distributed through commercially reasonable best efforts. The weight and size of five-gallon containers will undoubtedly make their transport and use cumbersome and potentially impossible for some residents. As the same time however, the Court—like the parties—is cognizant of the need to prevent undue environmental impact to the island to the greatest extent practicable. Accordingly, the Court will order Terminals to use commercially reasonable best efforts to distribute five-gallon reusable water containers, consistent with the needs of residents.

With regard to the water pump, the parties first apprised the Court of this issue in their Joint Notice following the second phase hearing, *id.*, and they have not offered any evidence addressing the necessity or cost of water pumps. In light of Plaintiffs' failure to present any evidence in this regard, the Court is unwilling to require Terminals to bear the cost of providing these pumps to eligible residents. At the same time, however, the Court notes that such pumps may be required for residents to make use of any five-gallon containers that Terminals provides. Accordingly, the Court will order Terminals to use commercially reasonable best efforts to make water pumps for five-gallon containers available for purchase

34

A100

at cost to those residents who wish to purchase them. Terminals will not be required to provide the pumps free of charge.

### 3. Waivers

Terminals argues that any residents who have had their property remediated or have signed waivers of claims following the first or fourth release event should be disqualified from the water program. (Dkt. No. 365 (LBT Supp. Br.) at 7). Plaintiffs disagree, arguing that the waivers are "invalid." (Dkt. No. 364 (Pls. Supp. Br.) at 6). Plaintiffs further argue that the relevant remediation efforts, and at least some of the waivers at issue, were executed following the first release event but prior to the fourth release event; therefore, residents who were impacted by the fourth release event would be improperly excluded from the program if the Court adopts Terminals' proposal here. *Id.*

The parties have not presented sufficient evidence regarding the waivers at issue, the circumstances surrounding the execution of the waivers, or any remediation efforts undertaken by Terminals or Refining. Further, the complexity of this issue is such as to require a full presentation by the parties. Because this issue has not been properly presented to the Court, the Court will not exclude otherwise eligible residents from the program based on the record before it.

### 4. Recertification

The parties disagree as to the frequency with which eligible residents should be required to submit documentation establishing their continued eligibility for the program. Plaintiffs argue that eligible residents should be required to recertify for the program annually; Terminals argues that eligible residents should be required to recertify for the program every six months. (Dkt. No. 363-1 (Proposed Order) at § 25).

While the geographic location of one's residence may be relatively stable, one's financial circumstances may be more fluid. Accordingly, to help ensure that only eligible residents participate in the program, the Court will require recertification every six months.

### 5.   Attestation Requirements

As set forth in the accompanying Order Implementing Water Distribution Program, residents seeking to qualify for the program must attest: (1) that they currently reside in the "Covered Area"; (2) that they resided in the Covered Area at the time of at least one of the first or fourth release events; (3) that they believe their current residence was impacted by one or both of the first or fourth release events; (4) that their current residence actively uses cistern water or used the same at the time of the first or fourth release events; and (5) that they meet at least one of the economic eligibility criteria. Terminals argues that residents should additionally be required to attest that they do not "receive potable water from any other source" (Dkt. No. 363-1 (Proposed Order) at § 3.B), while Plaintiffs argue that residents should additionally be required to attest that they do not "receive *free* potable water from any other source," *id.* (emphasis added).

The Court does not see value in either of the parties' proposed additions. Accordingly, the Court will not require residents to attest to either of the parties' proposals.

### D.   Special Master

The parties' Proposed Order reflects that the parties have consented to the appointment of a Special Master whose costs will be shared equally by the parties. (Dkt. No. 363-1 (Proposed Order) at §§ 26-27). Per the parties' agreement, the Special Master shall have "the initial authority to decide" any "Eligibility Appeals"[42] and "Home Delivery

---

[42] "Eligibility Appeals" are defined at §§ 28-29 of the parties' Proposed Order, and involve challenges to determinations that individuals are, or are not, eligible to participate in the water program.

A102

Appeals,"[43] as well as the "authority to meet separately and together with the Parties to facilitate communications, [and to] act[] as a facilitator of communications between the Parties on any issues relating to Eligibility Appeals, or Home Delivery Appeals." (Dkt. No. 363-1 (Proposed Order) at §§ 26-27). The Proposed Order further provides that  "[a]ny decisions on Eligibility Appeals, Home Delivery Appeals, or Unreasonable Appeals[44] rendered by the Special Master may be appealed to the United States Magistrate Judge for the District Court of the Virgin Islands within 14 days of any such decision," and that the decision of the Magistrate Judge "relating to Eligibility Appeals and Home Delivery Appeals, or Unreasonable Appeals will be final and shall not be further appealable." *Id.* at § 16.

The Court is of the view that the authority of the Special Master should extend more broadly than the parties' Proposed Order provides, to include, for example, appeals of routine, day to day actions of the Administrator, or routine, day to day operations of the water program. Accordingly, the Court has left room for further discussion with the parties on this subject by including language in the Order Implementing Water Distribution Program that, together with Eligibility, Home Delivery, and Unreasonable Appeals, the Special Master's responsibilities will also include "any other appeals over which the Special Master may be granted authority by agreement of the parties and approval of the Court."

**E.  Security**

Rule 65(c) of the Federal Rules of Civil Procedure provides that a court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The posting of

---

[43] "Home Delivery Appeals" are defined at § 18 of the parties' Proposed Order, and involve challenges to determinations that individuals are, or are not, entitled to home delivery of their water due to a disability or medical infirmity.

[44] "Unreasonable Appeals" are defined at § 17 of the parties' Proposed Order, and involve challenges to determinations by the Special Master that an appeal was unreasonable.

A103

adequate security is a "condition precedent" to injunctive relief, *Hopkins v. Wallin,* 179 F.2d 136, 137 (3d Cir. 1949), and the amount of security required is left to the discretion of the trial judge, *Scanvec Amiable Ltd. v. Chang,* 80 F. App'x 171, 178 (3d Cir. 2003). Once the Court has set the bond, "[t]he applicant then decides whether to accept the preliminary relief by posting the bond or to withdraw its request." *Sprint Commc'ns Co. L.P. v. CAT Commc'ns Int'l, Inc.*, 335 F.3d 235, 240 (3d Cir. 2003).

Here, Plaintiffs request that the Court waive the bond requirement or impose a nominal bond of $250. (Dkt. No. 144 (Pls. Supp. Br.) at 2). In the alternative, Plaintiffs request that the Court initially impose a bond of $50,000, with this figure to be "adjusted as needed" at a rate of $50 per additional household if "materially" more than 1,000 households participate in the water program. (Dkt. No. 372 (Pls. Not.) at 3). Terminals requests that the Court impose a bond equivalent to the "total annual cost to Terminals to run the [water program]," with the bond to be increased each year that the program remains operational. (Dkt. No. 323 (LBT Supp. Br.) at 11). As an alternative to the security requirement, Terminals proposes that the Court impose a "testing protocol" that requires each eligible household participating in the water program to pay a sum equivalent to the cost of testing its cistern for contamination, with the household disqualified from participation in the program and the sum forfeited where testing reveals no detectable contamination. *Id.*

The Court begins with the issue of waiver. As the Third Circuit has observed, "important policies undergird[] a strict application of the bond requirement in most injunction granting contexts," and Rule 65(c) "admits of no exceptions" on its face. *Hoxworth v. Blinder, Robinson & Co.,* 903 F.2d 186, 210 (3d Cir. 1990); *see also W.R. Grace & Co. v. Local 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers,* 461 U.S. 757, 770 n.14 (1983) (noting that "[a] party injured by the issuance of an injunction later determined to be erroneous has no action for damages in the absence of a bond"); *Instant Air*

A104

*Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 804 (3d Cir. 1989) (noting that the bond requirement "deters rash applications for interlocutory orders," and that "the bond premium and the chance of liability on it causes plaintiffs to think carefully beforehand"). Accordingly, the Third Circuit has "interpreted the bond requirement very strictly." *Hoxworth,* 903 F.2d at 210. "While there are exceptions, the instances in which a bond may not be required are so rare that the requirement is almost mandatory," *Frank's GMC Truck Center, Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 110 (3d Cir. 1988).

Plaintiffs argue that the conditions necessary to justify one of these "rare" exceptions obtain here—specifically, the exception recognized by the Third Circuit in *Temple University v. White*. (Dkt. No. 364 (Pls. Supp. Br.) at 9-10 (citing 941 F.2d 201 (3d Cir. 1991))). As the Third Circuit explained in a later case:

> In *Temple University v. White,* we explicitly recognized an exception to the Rule 65(c) bond requirement. . . [I]n *Temple University* we determined that, 'at least in noncommercial cases, the court should consider the possible loss to the enjoined party together with the hardship that a bond requirement would impose on the applicant.' Thus, the *Temple University* exception involves a balance of the equities of the potential hardships that each party would suffer as a result of a preliminary injunction. Where the balance of these equities weighs overwhelmingly in favor of the party seeking the injunction, a district court has the discretion to waive the Rule 65(c) bond requirement.

*Elliott v. Kiesewetter,* 98 F.3d 47, 60 (3d Cir. 1996) (quoting *Temple,* 941 F.2d at 219) (internal citations omitted). "This exception [is] narrow and may only be invoked by the District Court upon specific findings 'regarding the relative hardships to each party.'" *Scanvec Amiable Ltd. v. Chang*, 80 F. App'x 171, 75 (3d Cir. 2003) (quoting *Elliott,* 98 F.3d at 60). In balancing the hardships, a district court should consider "the possible loss to the enjoined party"; "the hardship that a bond requirement would impose on the applicant"; and "the impact that a bond requirement would have on enforcement of [important federal rights

or public interests], in order to prevent undue restriction of [such rights and interests]." *Temple*, 941 F.2d at 219-20.

Terminals does not expressly contest that the conditions necessary to trigger the *Temple* exception are present here. Instead, Terminals argues that *Temple* is no longer good law, characterizing the decisions as "stale" in light of the Third Circuit's subsequent decision in *Zambelli Fireworks Manufacturing Company v. Wood*. (Dkt. No. 323 (LBT Supp.) at 1 (citing 592 F.3d 412 (3d Cir. 2010))). More specifically, Terminals argues that, in *Zambelli*, the Third Circuit "made clear [that the] bond requirement may only be waived in the 'exceptionally narrow circumstance where the nature of the action necessarily precludes any monetary harm to the defendant.'" *Id.* (quoting *Zambelli*, 592 F.3d at 426).

*Zambelli* contains language that can certainly be interpreted—as Terminals interprets it here—to limit the circumstances under which the bond requirement may be waived to those in which a defendant will suffer no monetary harm as a result of the injunction. *See Zambelli*, 592 F.3d at 426 ("We therefore hold that a district court lacks discretion under Rule 65(c) to waive a bond requirement except in the exceptionally narrow circumstance where the nature of the action necessarily precludes any monetary harm to the defendant, and that such bond shall be issued irrespective of any request by the parties."). However, a number of considerations suggest that it is incorrect to read *Temple* as "stale" in light of *Zambelli*.

First, *Zambelli* does not explicitly present as abrogating *Temple*. Indeed, the Third Circuit acknowledged the existence of the *Temple* exception only sentences before articulating its holding. *See id.* at 427 ("We have never excused a District Court from requiring a bond where an injunction prevents commercial, money-making activities. Rather, we have recognized exceptions in other contexts only where 'the balance of [the] equities weighs overwhelmingly in favor of the party seeking the injunction' and when the District Court 'make[s] specific findings.'" (quoting *Elliott v. Kiesewetter,* 98 F.3d at 60, and citing

40

A106

*Temple*, 941 F.2d at 219 n. 26)). Second, *Zambelli* announces its holding only after first finding that the *Temple* exception was inapplicable under the circumstances. *Id.* ("The District Court made no such 'specific finding' here in support of its waiver of the requirements of Rule 65(c)."). Third, a panel of the Third Circuit has cited the *Temple* exception as good law in at least one (unpublished) decision following *Zambelli*. *See PharMethod, Inc. v. Caserta*, 382 F. App'x 214, 222 (3d Cir. 2010) (vacating preliminary injunction where district court did not make specific findings as to applicability of *Temple* exception and requiring that the district court "address and resolve this tension if it refuses to require a bond on this basis" on remand). District courts in this circuit have also interpreted *Temple* as good law after *Zambelli*.[45]

The Court therefore finds that the *Temple* exception remains good law. The Court also notes that this case has attributes of the nature that could arguably place it within the class of "certain narrowly drawn circumstances" in which the Third Circuit deemed a waiver of security to be available in *Temple*. *Temple*, 941 F.2d 201 at 219. For the reasons expressed in the Court's First Phase Memorandum Opinion, the Court does not doubt that the issuance of this injunction is in the public interest or that the balance of the hardships tips overwhelmingly in favor of Plaintiffs here. (*See* Dkt. No. 285 (First Phase Memo. Op.) at 47-

---

[45] As Terminals notes, many of these district court decisions are consistent with *Zambelli* insofar as they conclude that the *Temple* exception warrants waiver of the bond requirement while also finding that the enjoined party would not suffer monetary harm as a result of the injunction. *See, e.g., Marshall v. Amuso*, 571 F. Supp. 3d 412, 430 (E.D. Pa. 2021) (concluding that the *Temple* exception warranted waiver of bond requirement where "[t]here is no evidence of risk of monetary loss to [the defendant]" from compliance with preliminary injunction); *Gilliam v. United States Dep't of Agric.*, 486 F. Supp. 3d 856, 882 (E.D. Pa. 2020) (similar). However, the district court decisions applying the *Temple* exception post-*Zambelli* are not limited to such scenarios. *See, e.g., Doxzon v. Dep't of Hum. Servs.*, No. 20-CV-00236, 2020 WL 3989651, at *12 (M.D. Pa. Jul. 15, 2020) (waiving bond requirement pursuant to *Temple* exception notwithstanding that "the preliminary injunction will impose requirements on the defendants that will cost money," given that "those costs are outweighed by the hardship a bond requirement would impose on [the movant]"); *Cradle of Liberty Council, Inc. v. City of Philadelphia*, 2010 WL 760250, at *3 (E.D. Pa. Mar. 2, 2010) (similar).

51). Further, this injunction does not "prevent[] commercial, money-making activities," *Zambelli*, 592 F.3d at 147, and the Plaintiffs are indigent. (*See* Dkt. No. 285 (First Phase Memo. Op.) at 40-47 (explaining that the Court will afford preliminary injunctive relief only to those Plaintiffs and putative class members who "cannot afford to purchase water without trading off basic necessities")).

Notwithstanding the foregoing, the Court does not agree that the *Temple* exception to the bond requirement should be employed here, particularly in light of Plaintiffs' recent offer to post a considerable sum notwithstanding their indigency. (*See* Dkt. No. 372 (Pls. Not.) at 3 (proposing that the Court impose a bond of $50,000 to be "adjusted as needed"). Indeed, the Court's concern that a waiver of the bond requirement may not be appropriate in this instance is reflected in the Court's numerous requests for additional briefing on this issue.[46]

Pursuant to the Court's direction, a significant portion of the parties' responsive briefing has been dedicated to exploring the logistics and feasibility of Terminals' proposal of substituting a "testing protocol" for a standard bond requirement.[47] Having reviewed the parties' briefs on this issue, the Court has ultimately concluded that Terminals' proposal should not be adopted.[48] At least four intractable issues counsel against adopting Terminals' proposal here.

---

[46] *See, e.g.,* Dkt. No. 136 (February 2, 2023 Order) at 3 (directing Plaintiffs to submit a supplemental brief on the security issue); Dkt. No. 289 (May 8, 2023 Order) at 2 (directing Terminals to submit a supplemental brief on the security issue); Dkt. No. 367 (June 30, 2023 Order) at 5 (directing the parties to submit additional briefing on the security issue).

[47] *See* Dkt. No. 372 (Plaintiffs' Notice Regarding Proposed Testing Protocol); Dkt. No. 375 (Joint Notice Regarding Proposed Testing Protocol); Dkt. No. 376 (Terminals' Notice Regarding Proposed Testing Protocol); *cf.* Dkt. No. 144 (Plaintiffs' Supplemental Brief Regarding the Security Requirement); Dkt. No. 323 (Terminals' Supplemental Brief Regarding the Security Requirement)).

[48] The Court would be remiss not to note that Terminals initially made this creative suggestion cognizant of the fact that imposing a bond equivalent to the annual cost of the program's operations would be fatal to the program in light of the program's likely costs and Plaintiffs' limited financial means. The Court commends Terminals for its creativity in making this proposal, notwithstanding that the Court does not adopt it here.

42

A108

First, and perhaps most obviously, the testing protocol does not function as a true alternative to the bond requirement. In particular, Terminals contemplates that the costs associated with sampling and testing cisterns under the protocol would be passed on to the beneficiaries of the program, only a fraction of which will be Plaintiffs. Unlike the imposition of a "conventional" bond, the imposition of a testing protocol here would not serve to "deter[] rash applications for interlocutory orders" and lead Plaintiffs "to think carefully beforehand[.]" *Instant Air Freight Co.,* 882 F.2d at 804. Nor is it clear that the imposition of a testing protocol would result in any notable sum that could conceivably revert to Terminals if it were ultimately determined that Terminals had been wrongfully enjoined.

Second, notwithstanding that the parties have been able to reach agreement on at least some of the tests that they believe would be appropriate, imposing the costs associated with some or all of those tests—or even a substantial fraction of those costs—on the indigent population afforded relief by this injunction is untenable and would ultimately prove fatal to the program.

Third, the implementation of a testing protocol represents an exceptionally complicated endeavor—starting with the tests to be utilized—as reflected in the parties' inability to reach agreement on several core aspects of a proposed protocol. Simply stated, the Court is not convinced that the implementation or maintenance of a testing protocol is administratively feasible, and is concerned that a testing protocol would be a recipe for endless tangential litigation.

Fourth—and perhaps most importantly—the Court is concerned that households that, as a result of any testing protocol, receive a result that disqualifies them from the program would falsely believe that said result means that the Court has determined that their cistern water is safe to drink, rather than that their cistern water is—to a reasonable degree of certainty—not unsafe because of the Limetree Bay Refinery releases. This issue is made

43

A109

especially salient by the fact that the Court is not presently in a position to determine the scientific reliability of any particular testing regime, or to determine to what extent any such regime would or could ultimately establish the safety (or not) of the sampled water. Consequently, the Court is reluctant to sanction any particular protocol, and is especially concerned that the implementation of any testing protocol could lead to unintended consequences for the very population that this injunction is intended to protect and benefit.

In view of the foregoing, the Court will not implement a testing protocol here. Instead, the Court will require Plaintiffs to post an initial bond of $50,000. Further, the Court will require that the parties file a joint notice every six months to update the Court as to the number of households participating in the program, and will require Plaintiffs to post an additional $50 for each household that participates in the program over and above 1000 households. The Court believes this figure to be appropriate notwithstanding the Plaintiffs' indigency in light of the need to make Plaintiffs "think carefully" before accepting preliminary relief of so substantial a magnitude. Further, while the bond requirement the Court imposes here is certainly minimal relative to the anticipated costs associated with the water program, the Court believes it is more appropriate than an outright waiver of the bond under *Temple*. *Cf. Doe 1 v. Perkiomen Valley Sch. Dist.*, 585 F. Supp. 3d 668, 705 (E.D. Pa. 2022) (noting that "a district court may require a nominal bond even absent an exception to Rule 65") (citing *Temple*, 941 F.2d at 220 n.28). The Court will provide Plaintiffs up to an including August 4, 2023, within which to post an initial bond of $50,000 with the Clerk of Court, or, alternatively, to file a notice informing the Court that Plaintiffs withdraw their request for preliminary injunctive relief.

## III.   CONCLUSION

For the reasons stated in the Court's First Phase Memorandum Opinion, the Court will grant Plaintiffs' "Amended Motion[s] for Temporary Restraining Order and Preliminary

A110

Injunction" insofar as Plaintiffs have established their entitlement, during the pendency of this litigation, to a water distribution program by Terminals for Plaintiffs and putative class members who cannot afford to purchase water without trading off other basic necessities. For the reasons discussed herein, the Court will order that the water distribution program be established and operated as set forth in the "Order Implementing Water Distribution Program," filed contemporaneously herewith.

Date: July 20, 2023

_____/s/_____
WILMA A. LEWIS
District Judge

45

A111

**DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

| | | |
|---|---|---|
| CLIFFORD BOYNES, et al., | ) | |
| | ) | |
| | ) | Civil Action No. 2021-0253 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LIMETREE BAY VENTURES, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| HELEN SHIRLEY, et al., | ) | |
| | ) | |
| | ) | Civil Action No. 2021-0259 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LIMETREE BAY VENTURES, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| FRANCIS E. CHARLES and THERESA J. | ) | |
| CHARLES, | ) | |
| | ) | Civil Action No. 2021-0260 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LIMETREE BAY VENTURES, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| BEECHER COTTON, et al., | ) | |
| | ) | Civil Action No. 2021-0261 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LIMETREE BAY VENTURES, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

A112

## ORDER IMPLEMENTING WATER DISTIBUTION PROGRAM

**WHEREAS**, this matter came before the Court on Plaintiffs' "Amended Motion[s] for Temporary Restraining Order and Preliminary Injunction" ("Plaintiffs' Motions");[1] and

**WHEREAS**, after considering the submissions of the parties and conducting a first phase evidentiary hearing from March 2-7, 2023, and a second phase evidentiary hearing from June 6-9, 2023, the Court granted Plaintiffs' Motions in part, finding that Plaintiffs and putative class members who cannot afford to purchase water without trading off other basic necessities are entitled to preliminary injunctive relief in the form of a water distribution program (the "Water Distribution Program") by Limetree Bay Terminals, LLC ("Limetree Bay Terminals"); and

**WHEREAS**, the Court set forth the reasoning for its holding described above in its First Phase Memorandum Opinion, dated April 28, 2023;[2] and addressed the scope and structure of the Water Distribution Program in its Second Phase Memorandum Opinion, dated July 20, 2023;[3] and

**WHEREAS** the provisions of the Water Distribution Program are set forth in this Order; and

**NOW THEREFORE**, it is hereby,

**ORDERED** that Limetree Bay Terminals shall establish, pay for, and operate the Water Distribution Program set forth below in a manner consistent with the Court's Memorandum Opinions dated April 28, 2023 and July 20, 2023.

---

[1] *See* Civ. No. 2021-0253 ("*Boynes*"), Dkt. Nos. 141, 142; Civ. No. 2021-0260 ("*Charles*"), Dkt. Nos. 68, 68-1; Civ. No. 2021-0261 ("*Cotton*"), Dkt. Nos. 170, 171; Civ. No. 2021-0259 ("*Shirley*"), Dkt. No. 41.

[2] *See Boynes*, Dkt. Nos. 284, 285; *Charles*, Dkt. Nos. 199, 200; *Cotton*, Dkt. Nos. 334, 335; *Shirley*, Dkt. Nos. 139, 140.

[3] *See Boynes*, Dkt. Nos. 388, 389; *Charles*, Dkt. Nos. 286, 287; *Cotton*, Dkt. Nos. 435, 436; *Shirley*, Dkt. Nos. 222, 223.

A113

1.  Water will be made available by Limetree Bay Terminals and at its cost to those residents of St. Croix who meet the following requirements:

   A.  who attest a belief that their residence was impacted by a release from the Limetree Bay Facility on February 4, 2021 or May 12, 2021 (the "Release Events"); **AND**

   B.  who attest that they rely or relied on cistern water; **AND**

   C.  who attest that they reside in the following estates: Adventure, Betty's Hope, Cane, Cain Carlton, Campo Rico, Carlton 1 North, Carlton 1 South, Carlton 2, Clifton Hill, Concordia, Diamond, Enfield Green, Envy, Frederiksted, Golden Grove, Good Hope, Hannah's Rest, Hesselberg, Hogensbord, La Grange, Mannings Bay, Mount Pleasant, Negro Bay, Paradise, Ruans Bay, Sandy Point, Smithfield, Stony Ground, Two Brothers, Upper Bethlehem, Wheel of Fortune/Mars Hill, Whim, Whites Bay, Whites Bay 2, and Williams Delight (the "Covered Area"[4]); **AND**

   D.  who show that they cannot afford to purchase water without trading off other basic necessities, by satisfying one of the criteria described in Section 3.D, below.

   Those residents who meet these requirements, each discussed further below, are referred to as "Eligible Residents" and each individually as an "Eligible Resident."

2.  The requirements must be satisfied by any adult applicant ("Applicant") to participate in the Water Distribution Program, and if the requirements are satisfied as to any adult, then they are

---

[4] While the Court has defined the Covered Area in terms of estates above, the Court recognizes that labeling and defining the precise contours of estates on St. Croix is difficult. Accordingly, the Court includes the following equivalent description:

   Together with Carlton 1 North, Clifton Hill, and Hogensborg:
   **(A)** Residences that are: **(1)** west of East Airport Road, *and* **(2)** south of Centerline Road; and
   **(B)** Residences that are **(1)** south of Mahogany Road, *and* **(2)** would be west of Whim Road if Whim Road was extended consistent with its current path up to Mahogany Road.

2

also deemed to have been satisfied by other members of that person's household residing at the same address (*i.e.*, if an Applicant qualifies, then the household qualifies).

3.   To satisfy the requirements, an Applicant must complete the Water Distribution Program Claim Form ("Claim Form") that includes an attestation under penalty of perjury:

   **A.**   attesting that the Applicant resides in the Covered Area, and attaching reasonable proof of same which shall include the following:

   **i.   Proof of Applicant's Identification**: A copy of an identification document such as a driver's license or government identification card; **AND**

   **ii.   Attestation of Occupancy:**  An attestation by Applicant that he/she currently resides in the Covered Area, and attesting to the Applicant's address; **AND**

   **iii.   Reasonable Proof of Occupancy**: A copy of a lease, mortgage, recent utility bill, credit card statement, deed, or similar document showing that the Applicant resides in the Covered Area;

   **B.**   attesting that the Applicant's current residence actively uses or used cistern water;

   **C.**   attesting that the Applicant has a belief that the Applicant's current residence was impacted by a Release Event;

   **D.**   attesting and providing acceptable proof (as described in Section 4, below) that the Applicant meets one of the following criteria showing that the Applicant cannot afford to purchase water without trading off other basic necessities:

   **i.**   The Applicant or a member of the Applicant's household is currently receiving public assistance through any of the following programs (together the "Listed Programs")[5]: Medicaid; Supplemental Security Income ("SSI"); Social

---

[5] For those programs that do not provide continuous annual benefits, it will be sufficient to demonstrate that the Applicant has been entitled to such benefits during the past six months.

A115

Security Disability Insurance ("SSDI"); the Medical Assistance Program ("MAP"); the Children's Health Insurance Program ("CHIP"); the Housing Choice Voucher Program ("HCVP"); the Supplemental Nutrition Assistance Program ("SNAP"); the Disaster Supplemental Nutrition Assistance Program ("D-SNAP"); the Supplemental Nutrition Assistance Program for Women, Infants and Children ("WIC"); Temporary Assistance for Needy Families ("TANF"); the Low-Income Home Energy Assistance Program ("LIHEAP"); the Low Income Household Water Assistance Program ("LIHWAP"); the Energy Crisis Assistance Program; or Aid to the Blind, Aid to the Disabled, Aid to the Old Aged; **OR**

    **ii.**   The Applicant or a member of the Applicant's household would be eligible to qualify, based on the program's financial eligibility criteria, for the benefits of one of the programs identified in Section 3.D.i, above, as determined by and to the satisfaction of the Administrator of the Water Distribution Program.

**4.**   The following are acceptable forms of proof sufficient to satisfy the requirements of Section 3.D, above:

    **A.**   An Applicant may satisfy the proof required for the eligibility criteria associated with Section 3.D.i, above, by providing documentary proof of participation in a Listed Program. This documentary proof includes documents reasonably demonstrating admission into or participation in such program within the current calendar year, including program cards confirming admission into or participation in the program, emails from the program confirming admission into or participation in the program, internet website printouts confirming admission into or participation in the program, letters confirming admission into or participation in the program,

4

financial documents (including bank statements) reflecting payments from the program, or other similar documents evidencing admission into or participation in a Listed Program.

**B.** An Applicant may satisfy the proof required for the eligibility criteria associated with Section 3.D.ii, above, by providing documentary proof that is consistent with the documentary proof required by the particular program for which eligibility is being claimed by the Applicant.

**5.** Plaintiffs and Limetree Bay Terminals shall work cooperatively and in good faith and shall maintain an updated list of all Eligible Residents (hereinafter, the "Water Program List").

**6.** The parties shall jointly propose to the Court for approval an individual to serve as Administrator, whose responsibilities shall include providing notice of, and administering, the Water Distribution Program. All fees and costs of the Administrator shall be paid by Limetree Bay Terminals.

**7.** The Administrator shall establish the website, www.LimetreeWaterProgram.com, which will provide information about the Water Distribution Program and have the capability of receiving Claim Forms submitted electronically through an online portal. The Administrator shall also accept Claim Forms via mail and email.

**8.** Beginning one week after the Administrator has been selected and is prepared to accept Claim Forms, residents of St. Croix who meet the above eligibility requirements can apply to participate in the Water Distribution Program by submitting a Claim Form using any of the following methods:

**A.** They can go to www.LimetreeWaterProgram.com to apply online via the submission of an online Claim Form, or can apply via U.S. mail or email; **OR**

**B.** They can apply through their retained counsel; **OR**

5

A117

**C.** They can go to any Limetree Distribution Center set forth in Section 14, below, which shall have the capacity to accept Claim Forms and supporting materials on the spot, in which case copies of their Claim Form and supporting materials shall be promptly provided by Limetree Bay Terminals to the Administrator; **OR**

**D.** They can go to any of the following law offices located on St. Croix—which represent one or more groups of Plaintiffs in these actions—to fill out a Claim Form in person, in which case copies of their Claim Form and supporting materials shall be promptly provided by Plaintiffs' Counsel to the Administrator:

| Lee J. Rohn & Associates<br>56 King Street, Third Floor<br>Hamilton House<br>Christiansted, U.S.V.I<br>(340) 778-8855<br>info@rohnlaw.com | Colianni and Leonard<br>2120 Company Street,<br>Christiansted, St. Croix<br>(340) 719-1766<br>marina@colianni.com | Dema Law<br>1236 Strand Street, Suite 103<br>Christiansted, St. Croix<br>(340) 773-6142<br>dsugimura@demalaw.com |
|---|---|---|

**9.** The Administrator shall be the repository of all Claim Forms and shall review the submitted Claim Forms to determine whether the Applicant is eligible to participate in the Water Distribution Program. The Administrator shall record the reason that any Applicant's claim is denied. If an Applicant is denied because of the submission of insufficient proof as required by Section 4, above, such Applicant shall be entitled to resubmit their Claim Form with additional proof.

**10.** On a daily basis, the Administrator shall provide Plaintiffs and Limetree Bay Terminals with an updated emailed list showing all Eligible Resident Households. Once included on the Water Distribution Program List, the Eligible Resident need not present qualifying proof at the Distribution Centers to receive water but need only show their ID to demonstrate that they are on the Water Distribution Program List.

**11.** Notice of the Water Distribution Program shall be provided to residents of St. Croix at Limetree

6

A118

Bay Terminals' cost by the Administrator so that residents of the Covered Area are notified of: **(a)** the existence of and parameters of the Water Distribution Program; **(b)** the requirements to become an Eligible Resident and participate in the Water Distribution Program; and **(c)** the location and hours of operations of each of the Distribution Centers.

**12.**  The notice will consist of daily advertisements of at least a quarter page size to be placed in the Virgin Islands Consortium and through its online website for seven (7) consecutive days (the "Notice Period"), beginning one (1) week after the Administrator has been selected and is prepared to accept Claim Forms.[6]

**13.**  Additionally, during the Notice Period, the Administrator will acquire bundled advertisement time for public announcements or advertisements, including through JKC, Reef Broadcasting, and Da Vybe, which bundled advertising will include spots on the Poppy Pops Senior Show, the St. Claire Show, and the Chucky Hansen Show. After the first week, notice of any changes to the Water Distribution Program, including, without limitation, discontinuance of service, shall be provided, at least seven (7) days in advance of any such change, through www.LimetreeWaterProgram.com, the Virgin Islands Consortium, and at the applicable location.[7]

**14.**  The Water Distribution Program will begin two weeks after the Administrator has been selected and is prepared to accept Claim Forms, and will occur at the previously used "Limetree Distribution Center" from 2:00 p.m. to 9:00 p.m., Monday through Saturday; the previously used "Sunshine Mall Distribution Center" from 7:00 a.m. to 4:00 p.m., Monday, Wednesday,

---

[6] The Virgin Islands Consortium was chosen by agreement of the parties. Its inclusion here does not represent an endorsement by the Court.

[7] JKC, Reef Broadcasting, Da Vybe, the Poppy Pops Senior Show, the St. Claire Show, the Chucky Hansen Show, and the Virgin Islands Consortium were chosen by agreement of the parties. Their inclusion here does not represent an endorsement by the Court.

and Friday; and the previously used "Frederiksted Ball Park Distribution Center" from 7:00 a.m. to 4:00 p.m., Tuesday, Thursday, and Saturday.

15. An updated copy of the Water Distribution Program List (which shall be emailed by the Administrator each morning) will be used by personnel working at each established Distribution Center to confirm an individual's eligibility.

16. The personnel working at the Distribution Centers shall have no discretion to deny residents water and shall not discourage residents from obtaining water from the Distribution Centers if the resident's name or household address is on the Water Distribution Program List. Each Eligible Resident is entitled to up to twelve (12) gallons of water per day per household, with a maximum amount per household of eighty-four (84) gallons of water per week.

17. Limetree Bay Terminals shall use commercially reasonable best efforts to distribute five-gallon sized reusable containers of water at the Distribution Centers, to the extent consistent with the needs of residents. Limetree Bay Terminals shall use commercially reasonable best efforts to make water pumps for five-gallon containers available for purchase at cost to those residents who wish to purchase them. Limetree Bay Terminals is not required to provide the pumps free of charge.

18. Any person on the Water Distribution Program List that affirms under penalty of perjury that they are unable to utilize a Distribution Center because they have a disability or medical infirmity which presents a sufficient hardship to their ability to pick up water from the Distribution Center, may make a written submission to the Administrator, including via an attorney, supported by medical documentation signed by a doctor or hospital, requesting that water be delivered to their residence by Limetree Bay Terminals. If deemed valid by the Administrator, such request will be noted on the Water Distribution Program List, and the Administrator shall so notify Limetree Bay Terminals. Limetree Bay Terminals will thereafter

8

A120

have five (5) business days to file an appeal to oppose the request ("Home Delivery Appeals"), or otherwise shall arrange delivery of water to that person on a weekly basis.

19. Limetree Bay Terminals will use commercially reasonable best efforts to ensure that the Distribution Centers are set up and operational within two (2) weeks after the Administrator has been selected and is prepared to accept Claim Forms.

20. Plaintiffs shall have up to and including **August 4, 2023** to post an initial bond of $50,000, or, in the alternative, to file a notice informing the Court that Plaintiffs withdraw their request for preliminary injunctive relief. Plaintiffs and Limetree Bay Terminals are required to file a joint notice every six (6) months to update the Court as to the number of households participating in the program. Following each six-month review, the Court will require Plaintiffs to post as bond an additional $50 for each household that participates in the program over and above 1000 households.

21. The Water Distribution Program shall remain in full force and effect during this litigation or until further Order of the Court (the "Water Distribution Program Period").

22. The Court will hold a status conference on the Water Distribution Program on **January 26, 2024 at 9:30 a.m.** in STX Courtroom 1 before the undersigned District Judge. Plaintiffs and Limetree Bay Terminals shall have up to an including **January 12, 2024** within which to each file a notice, not to exceed ten (10) pages, updating the Court as to the status of the Water Distribution Program and any issues associated therewith that require the Court's attention. Any additional status conferences shall be set by further Order of the Court following the first status conference.

23. All Eligible Residents shall be required to certify to the Administrator every six (6) months after qualifying for the Water Distribution Program that their circumstances that made them eligible for the Water Distribution Program have not changed. Such certification can be

submitted to the Administrator via the website, mail, or by email to the Administrator.

24. The parties shall jointly propose to the Court for approval an individual to serve as a Special Master. The responsibilities of the Special Master shall include, but not be limited to, serving as the initial decisionmaker on any appeals filed pursuant to Sections 27 and 28, below ("Eligibility Appeals"), and pursuant to Section 18, above ("Home Delivery Appeals"), and any other appeals over which the Special Master may be granted authority by agreement of the parties and approval of the Court.  Any such appeals must be filed with the Special Master.

25. The Special Master has the authority to meet separately and together with the Parties to facilitate communications, and to act as a facilitator of communications between the Parties on any issues relating to Eligibility Appeals, Home Delivery Appeals, and any other appeals over which the Special Master may be granted authority by agreement of the parties and approval of the Court. Communications with the Special Master do not waive privilege. Compensation, at rates mutually agreeable to the Special Master and the Parties, shall be paid to the Special Master on a periodic basis by the Parties. The cost of the Special Master shall be borne equally by Plaintiffs and Limetree Bay Terminals. However, if any Eligibility Appeals, Home Delivery Appeals, or other appeals is deemed unreasonable by the Special Master, the cost of such appeals shall be borne by the appealing party ("Unreasonable Appeals").

26. The Special Master shall retain all records relating to his or her resolution of Eligibility Appeals, Home Delivery Appeals, Unreasonable Appeals, and any other appeals over which the Special Master may be granted authority by agreement of the parties and approval of the Court.

27. Any resident of St. Croix that is deemed by the Administrator to have not met the eligibility criteria to become an Eligible Resident from an Eligible Household, may, through their own counsel or *pro se*, file a Motion to be Declared an Eligible Resident with the Special Master. All responses shall be due within five (5) business days.

10

A122

**28.** Limetree Bay Terminals may also challenge the eligibility of any Applicant deemed to be an Eligible Resident by filing a motion to disqualify the Applicant as an Eligible Resident with the Special Master. In any such motion, Limetree Bay Terminals shall address each eligibility challenge on an individual basis, separately describing why each individual person or household is being challenged. All responses shall be due within five (5) business days.

**29.** The Special Master shall decide any Eligibility Appeals within two (2) weeks from the filing of any responses.

**30.** Any decisions on Eligibility Appeals, Home Delivery Appeals, or Unreasonable Appeals rendered by the Special Master may be appealed to the United States Magistrate Judge for the District Court of the Virgin Islands within fourteen (14) days of any such decision. All responses to any such appeals shall be due within five (5) business days. The decision of the United States Magistrate Judge for the District Court of the Virgin Islands relating to Eligibility Appeals, Home Delivery Appeals, or Unreasonable Appeals will be final and shall not be further appealable. Any issues not otherwise addressed pursuant to this paragraph shall be raised to this Court, to be addressed consistent with the Court's normal procedures.

**31.** All Parties reserve all rights relating to the issues resolved by this Order and any other issues related to the class actions, including, but not limited to, the certifiability of any putative class in the class actions, and any and all defenses to the claims in those class actions. In addition, nothing in this Order shall be deemed an admission of any fact or as to any liability, including, but not limited to, the area impacted by the contamination incidents at the refinery or the necessity of the Water Distribution Program. All rights of the Parties are expressly reserved and preserved.

A123

**32.** The Court shall retain jurisdiction to interpret and enforce this Order.

   **SO ORDERED**.

Date: July 20, 2023        _____/s/_____
                  WILMA A. LEWIS
                  District Judge

A124

**DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

| | | |
|---|---|---|
| **CLIFFORD BOYNES, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Civil Action No. 2021-0253** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LIMETREE BAY VENTURES, LLC, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| ——————————————————— | ) | |
| | ) | |
| **HELEN SHIRLEY, et al.,** | ) | |
| | ) | **Civil Action No. 2021-0259** |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LIMETREE BAY VENTURES, LLC, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| ——————————————————— | ) | |
| | ) | |
| **FRANCIS E. CHARLES and THERESA J.** | ) | |
| **CHARLES,** | ) | |
| | ) | **Civil Action No. 2021-0260** |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LIMETREE BAY VENTURES, LLC, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| ——————————————————— | ) | |
| | ) | |
| **BEECHER COTTON, et al.,** | ) | |
| | ) | **Civil Action No. 2021-0261** |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LIMETREE BAY VENTURES, LLC, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| ——————————————————— | ) | |

A125

## <u>ORDER</u>

THIS MATTER comes before the Court on Defendant Limetree Bay Terminals LLC's ("Terminals") "Motion[s] to Stay Orders Related to Preliminary Injunction Pending Appeal."[1] For the reasons stated in the accompanying Memorandum Opinion, filed contemporaneously herewith, it is hereby

**ORDERED** that Terminals' "Motion[s] to Stay Orders Related to Preliminary Injunction Pending Appeal"[2] are **DENIED**.

**SO ORDERED**.

Date:   August 14, 2023

_____/s/_____
WILMA A. LEWIS
District Judge

---

[1] *See* Civ. No. 2021-0253 ("*Boynes*"), Dkt. No. 412; Civ. No. 2021-0260 ("*Charles*"), Dkt. No. 296; Civ. No. 2021-0261 ("*Cotton*"), Dkt. No. 449; Civ. No. 2021-0259 ("*Shirley*"), Dkt. No. 232.

[2] *Supra n.1*

1

A126

**DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

|  |  |  |
|---|---|---|
| CLIFFORD BOYNES, et al., | ) | |
| | ) | |
| | ) | Civil Action No. 2021-0253 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LIMETREE BAY VENTURES, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————————— | ) | |
| | ) | |
| HELEN SHIRLEY, et al., | ) | |
| | ) | |
| | ) | Civil Action No. 2021-0259 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LIMETREE BAY VENTURES, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————————— | ) | |
| | ) | |
| FRANCIS E. CHARLES and THERESA J. | ) | |
| CHARLES, | ) | |
| | ) | Civil Action No. 2021-0260 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LIMETREE BAY VENTURES, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————————— | ) | |
| | ) | |
| BEECHER COTTON, et al., | ) | |
| | ) | Civil Action No. 2021-0261 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LIMETREE BAY VENTURES, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————————— | ) | |

A127

**Attorneys:**

**John K. Dema, Esq.,**
**Lee J. Rohn, Esq.,**
St. Croix, U.S.V.I.
**Jennifer Jones, Esq.,**
St. Thomas, U.S.V.I.
**Hugh P. Lambert, Esq.,**
**Brian James Mersman, Esq.,**
**Kerry J. Miller, Esq.,**
**C. Hogan Paschal, Esq.,**
**Paul C. Thibodeaux, Esq.,**
**Rebekka C. Veith, Esq.,**
**J. Christopher C. Zainey, Jr., Esq.,**
**Carly Jonakin, Esq.**
**Lee J. Rohn, Esq.**
**Jennifer Jones, Esq.**
New Orleans, Louisiana
      *For the Boynes Plaintiffs*

**Vincent A. Colianni, II, Esq.,**
**John-Russell Bart Pate, Esq.,**
**Lee J. Rohn, Esq.,**
St. Croix, U.S.V.I.
**Warren T. Burns, Esq.,**
**Daniel H. Charest, Esq.,**
Dallas, Texas
**Charles Jacob Gower, Esq.,**
**Hugh. P. Lambert, Esq.,**
**Korey A. Nelson, Esq.,**
**Harry Richard Yelton, Esq.,**
New Orleans, Louisiana
      *For the Shirley Plaintiffs*

**John K. Dema, Esq.,**
**Lee J. Rohn, Esq.,**
St. Croix, U.S.V.I
**Hugh. P. Lambert, Esq.,**
**Brian James Mersman, Esq.,**
**J. Christopher C. Zainey, Jr., Esq.,**
New Orleans, Louisiana
      *For the Charles Plaintiffs*

**Vincent A. Colianni, II, Esq.,**
**Rhea Lawrence, Esq.,**
**Marina Leonard, Esq.,**
**Lee J. Rohn, Esq.,**
St. Croix, U.S.V.I
**Shanon Jude Carson, Esq.,**
**Daniel H. Charest, Esq.,**
**Quinn Burns, Esq.,**
**Warren T. Burns, Esq.,**
Dallas, Texas
**John Quin Kerrigan, I, Esq.,**
Doylestown, Pennsylvania
**John Albanese, Esq.,**
Minneapolis, Minnesota
**Dena R. Young, Esq.,**
**Yechiel M Twersky, Esq.**
Philadelphia, Pennsylvania
**Charles Jacob Gower, Esq.,**
**Hugh. P. Lambert, Esq.,**
**Korey A Nelson**
**Harry Richard Yelton, Esq.,**
New Orleans, Louisiana
      *For the Cotton Plaintiffs*

**Carl A. Beckstedt, III, Esq.,**
**Robert J. Kuczynski, Esq.,**
**Earnesta L. Taylor, Esq.,**
St. Croix, U.S.V.I.
**Kevin J. Bruno, Esq.,**
New York, New York
**Melanie S. Carter, Esq.,**
Philadelphia, Pennsylvania
      *For Defendant Limetree Bay*
      *Terminals*, LLC

## MEMORANDUM OPINION

**Lewis, District Judge**

THIS MATTER comes before the Court on Defendant Limetree Bay Terminals LLC's ("Terminals") "Motion to Stay Orders Related to Preliminary Injunction Pending Appeal" ("Motion to Stay")[1] pursuant to Federal Rule of Civil Procedure 62. (Dkt. No. 412). For the reasons that follow, the Court will deny Terminals' Motion to Stay.

## I.   BACKGROUND

The Court assumes the parties' familiarity with the relevant procedural history and factual background, which were detailed at length in the Court's April 28, 2023 Memorandum Opinion. (Dkt. No. 285) ("Phase One Opinion"). As such, the Court provides only a brief procedural history here.

On January 31, 2023, the Cotton Plaintiffs[2] filed an "Amended Motion for Temporary Restraining Order and Preliminary Injunction" ("Motion for Preliminary Injunction"), which the remaining Plaintiffs joined, seeking, *inter alia*, the establishment of a water distribution program to provide water to individuals whose water supply was allegedly contaminated as a result of the refinery's flare. (Civ. No. 2021-0261, Dkt. No. 170). By Order dated February 2, 2023, this Court determined that the complexity of Plaintiffs' Motion for Preliminary Injunction warranted dividing the motion into two phases: "entitlement" to the relief and, if appropriate, "scope and structure" of

---

[1] Terminals filed its Motion to Stay in each of the four cases, Civ. No. 2021-0253 ("Boynes Dkt."), Dkt. Nos. 412, 413; Civ. No. 2021-0260 ("Charles Dkt."), Dkt. Nos. 296, 297; Civ. No. 2021-0261 ("Cotton Dkt."), Dkt. Nos. 449, 450; Civ. No. 2021-0259 ("Shirley Dkt."), Dkt. Nos. 233, 234, which were consolidated for this stage of the proceedings. (Dkt. No 122).  Unless otherwise noted, all citations herein refer to the Boynes Dkt.

[2] The use of the word "Plaintiffs" refers to plaintiffs in all four of the above-captioned actions unless otherwise specified.

A129

any such relief. (Dkt. No. 136 at 5). On April 28, 2023, and after a four-day evidentiary hearing relating to Plaintiffs' entitlement to a preliminary injunction, the Court issued its Phase One Opinion and an accompanying Order, wherein the Court found that "Plaintiffs having satisfied the preliminary injunction factors with respect to those Plaintiffs and putative class members who cannot afford to purchase water without trading off other basic necessities, preliminary injunctive relief for a water provision program for that group of individuals is warranted." (Dkt No. 284 at 3). The Court otherwise denied Plaintiffs' Motion for Preliminary Injunction. *Id*. On July 20, 2023, and after another four-day evidentiary hearing related to the proper scope and implementation of a water distribution program, the Court issued its Phase Two Opinion, (Dkt. No. 389), and an accompanying Order Implementing Water Distribution Program (Dkt. No. 390) (together with first and second phase preliminary injunction orders ("PI Orders")).  On August 7, 2023, Terminals filed a notice of appeal as to the PI Orders. (Dkt. No. 410). On August 8, 2023, Terminals filed the instant Motion to Stay, seeking to stay the PI Orders pending Terminals' appeal to the Third Circuit. (Dkt. No. 412).

The majority of the arguments Terminals raises in its Motion to Stay are substantially the same arguments Terminals raised in opposition to Plaintiffs' Motion for Preliminary Injunction. For the same reasons articulated in the Court's Phase One and Phase Two Opinions, which are incorporated herein by reference, and for the reasons that follow, the Court will deny Terminals' Motion to Stay.

## II.     APPLICABLE LEGAL PRINCIPLES

"[T]he standard for obtaining a stay pending appeal is essentially the same as that for obtaining a preliminary injunction." *Conestoga Wood Specialties Corp. v. Sec'y of the United States HHS*, 2013 WL 1277419, at *1 (3d Cir. Feb. 8, 2013).  Consequently, the same "four

factors" that the Court previously analyzed at length in considering Plaintiffs' Motion for
Preliminary Injunction are the same four factors currently at issue for Terminals' Motion to Stay.
Those factors are:

> whether the movant has shown a reasonable probability of success on the merits; (2)
> whether the movant will be irreparably injured by denial of the relief; (3) whether granting
> [the stay] will result in even greater harm to the nonmoving party; and (4) whether granting
> the [stay] will be in the public interest.

*N.J. Retail Merchs. Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 385-86 (3d Cir. 2012) (internal
citation and quotation marks omitted). Nonetheless, "a motion for stay pending appeal is not a
second bite at the preliminary injunction apple." *Coalition For Economic Equity v. Wilson*, 1997
WL 70641, at *5 (N.D. Cal. Feb. 7, 1997). Indeed, a motion for stay pending appeal of a granted
preliminary injunction is properly denied where a party's motion to stay merely re-raises the same
arguments the Court already decided in the course of issuing the underlying preliminary injunction.
*See, e.g., Nat'l Shooting Sports Found. v. Platkin*, 2023 WL 2344635, at *1 (D.N.J. Mar. 3, 2023)
("granting Defendant's motion for a stay would arguably be tantamount to a reconsideration and
reversal of the Court's [prior] decision."); *Eli Lilly & Co. v. Arla Foods Inc.*, 2017 WL 2976697,
at *3 (E.D. Wis. July 11, 2017) ("I granted in part Elanco's motion for a preliminary injunction
after already considering many of the same arguments Arla now asserts…Rather than address
those issues in detail, I will incorporate my conclusions set forth during the preliminary injunction
hearing and in my decision on the motion for a preliminary injunction…. Accordingly, Arla's
request for a stay of the preliminary injunction pending appeal will be denied.").

While there are four factors to consider in deciding a motion to stay pending appeal, "[i]f
the movant does not make the requisite showings on either of these first two factors, the inquiry
into the balance of harms and the public interest is unnecessary, and the stay should be denied
without further analysis." *Revel AC, Inc. v. IDEA Boardwalk LLC*, 802 F.3d 558, 571 (3d Cir.

A131

2015) (internal quotation marks and citation omitted); *see Holland v. Rosen*, 895 F.3d 272, 286 (3d Cir. 2018) ("The first two factors are prerequisites for a movant to prevail."). "Likewise, even if a movant demonstrates irreparable harm that decidedly outweighs any potential harm to the [stay opponent] if a stay is granted, [it] is still required to show, at a minimum, serious questions going to the merits." *Revel AC, Inc.*, 802 F.3d at 570 (internal quotation marks and citation omitted); *7-Eleven, Inc. v. Sodhi*, 2017 WL 466514, at *2 (D.N.J. Jan. 31, 2017) ("If the movant fails to demonstrate a likelihood of success on the merits, the Court may deny the motion and decline to analyze any of the remaining three factors"). Re-raising arguments rejected during the issuance of a preliminary injunction is insufficient to establish likelihood of success on the merits for the purposes of a stay of that same preliminary injunction pending appeal. *Theorem, Inc. v. Citrusbyte, LLC*, 2022 WL 1314041, at *2 (C.D. Cal. Jan. 18, 2022) ("Defendants largely rely on the very same arguments that the Court has repeatedly rejected en route to granting Plaintiffs' request for a preliminary injunction…. Defendants include no new arguments or facts in the instant motion to stay pending appeal that would cause the Court to alter its original determination as to likelihood of success."); *Coalition For Economic Equity v. Wilson*, 1997 WL 70641 at *5 (similar).

## III.   DISCUSSION

For the same reasons expressed in its 52-page Phase One Opinion and 45-page Phase Two Opinion, the Court concludes that Terminals has not demonstrated that a stay of the preliminary injunction is warranted. Specifically, Terminals does not raise any new facts or law suggesting its appeal is likely to succeed on the merits. This alone is dispositive.   As to the other factors, Terminals only raises two partially new arguments in support of granting a stay: 1) that operating a water distribution program subjects Terminals to irreparable reputation damage, (Mot. at 5), and 2) that the public interest is not served by an order that risks causing massive panic as to the safety

4

of the water supply, (Mot. at 10).  The Courts finds both arguments unpersuasive and is otherwise unpersuaded by Terminals' repetition of previously rejected arguments.  As such, the Court finds the remaining factors also weigh against granting Terminals' Motion.

### A.  Likelihood of Success on the Merits

Terminals recognizes that it must raise a "serious question going to the merits" in order to prevail on its Motion to Stay. (Mot. at 5). Nonetheless, Terminals' arguments as to likelihood of success on the merits merely echo the arguments the Court has already rejected at length in its Phase One Opinion. Terminals "include[s] no new arguments or facts in the instant motion to stay pending appeal that would cause the Court to alter its original determination as to likelihood of success." *Coalition For Economic Equity v. Wilson*, 1997 WL 70641 at *5. As such, Terminals has not established a serious question as to the likelihood of success on the merits. Failure to do so is dispositive of Terminals' Motion in itself and the Court need not reach the other factors to deny it. *7-Eleven, Inc. v. Sodhi*, 2017 2017 WL 466514 at *2. In any event, the remaining factors do not weigh in Terminals' favor.

### B.  Irreparable Harm

Terminals' arguments as to irreparable harm are focused primarily on the underlying merits of the case and the proper scope of the water distribution program: that there is no evidence of a "water or health crisis warranting such a program;" that the water distribution program provides residents too many gallons of water; that too many households will sign up for the program; and that too many estates are included in the program. (Mot. at 10). These arguments do not show an irreparable harm and were squarely rejected by the Court's Phase One Opinion on the merits of establishing a water distribution program and Phase Two Opinion as to the scope of the water distribution program. *See Eli Lilly & Co.*, 2017 WL 2976697 at *3 ("incorporat[ing] conclusions

5

A133

set forth during preliminary injunction…decision" to address repetitive arguments made in a subsequent motion to stay pending appeal).

Terminals additionally argues that, if it is forced to operate a water distribution program, "residents of St. Croix will *continue* to conflate [Terminals and Refining] and believe that Terminals is responsible for the alleged contamination." (Mot. at 9) (emphasis added). Here, Terminals' suggestion that its reputation may "continue" to suffer is an implicit acknowledgment that any reputational damage has already occurred.  Indeed, a connection between Terminals and the alleged water contamination is already a matter of public record in that Terminals, themselves, as well as government agencies and media networks have already published notices that connect Terminals to the alleged contamination. *See* (Dkt. No. 285 at 4 n.8, 7, 16, 32 n.102). Moreover, Terminals has previously voluntarily participated in a water distribution program on St. Croix in connection with the alleged contamination. *See* (Dkt. No. 285 at 7 n.18).

Further, even if operating the contemplated water distribution program was the first instance in which Terminals was publicly linked to alleged water contamination—which it is not— Terminals has not articulated why such reputational injury would constitute irreparable harm. *See Acierno v. New Castle County*, 40 F.3d 645, 654 (3d Cir. 1994) ("showing some potential harm to reputation is usually insufficient to support a conclusion that irreparable harm exists"); *Noorhasan v. De Jongh*, 2012 WL 1153285, at *6 (D.V.I. Mar. 31, 2012) ("the Third Circuit set a high bar for a plaintiff's reputational damage to constitute irreparable harm"). Terminals does not articulate any basis for concluding that any harm to its reputation would be irreparable.

Since "[t]he first two factors are prerequisites for a movant to prevail," Terminals' failure to raise a new argument suggesting its appeal is likely to be successful and its failure to articulate

6

A134

an irreparable harm are sufficient for the Court to deny Terminals' Motion. *Holland v. Rosen*, 895

F.3d 272, 286 (3d Cir. 2018)

  **C.**  **Balance of Equities**

  Terminals has not provided any new arguments suggesting that the balance of equities

favor granting a stay.  As such, the Court finds that the balance of equities continues to favor

issuance of the preliminary injunction, and, therefore, denial of Terminals' Motion for Stay. (Dkt.

No. 285 at 47-49).

  **D.**  **Public Interest**

  Terminals attempts to rebrand its merits argument that there is no evidence of

contamination in the record into a matter of public concern. Specifically, Terminals argues that

"[i]f the Water Distribution Program is put into place it can *further add to* this fear that there is a

human health crisis on St. Croix as a result of the releases, when this has not been proven." (Mot.

at 10) (emphasis added). First, the Court already discussed at length and rejected the premise of

this argument—that there is no evidence of contamination—in its Phase One Opinion. (Dkt. No.

285 at 31-32) ("the Court finds that the totality of the evidence is indicative of contamination, and

rejects Terminals' argument to the contrary."). Second, Terminals' suggestion that a water

distribution program would "further add to" the fear of a human health crisis is an implicit

acknowledgment that such fear already exists on St. Croix. As with Terminals' irreparable injury

argument, the water distribution program would not be the first instance in which the community

will be confronted with the alleged contamination. To the contrary, fear of the alleged

contamination already exists and, as the Court explained in its Phase One Opinion, is such that "it

is reasonable for those in the impacted communities to purchase water instead of relying on their

cistern water as they had done before the release events." (Dkt. No. 285 at 39-40) (outlining

7

A135

evidence showing the community is aware of the alleged contamination).   Therefore, Terminals'

argument does not alter the Court's prior conclusion that establishing a water distribution program

is in the public interest. *See* (Dkt. No. 285 at 49-50).

### IV.    CONCLUSION

In view of the foregoing, the Court concludes that Terminals has not established the two

pre-requisite factors—likelihood of success on the merits and irreparable harm—necessary to grant

its Motion to Stay, and that, in any case, all four factors favor denying Terminals' Motion.

Accordingly, the Court will deny Terminals' Motion to Stay.

Date: August 14, 2023

_____/s/_____
WILMA A. LEWIS
District Judge

A136

**DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

| | | |
|---|---|---|
| **CLIFFORD BOYNES, et al.,** | ) | |
| | ) | |
| | ) | **Civil Action No. 2021-0253** |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **LIMETREE BAY VENTURES, LLC, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |
| | ) | |
| **HELEN SHIRLEY, et al.,** | ) | |
| | ) | |
| | ) | **Civil Action No. 2021-0259** |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **LIMETREE BAY VENTURES, LLC, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |
| | ) | |
| **FRANCIS E. CHARLES and THERESA J.** | ) | |
| **CHARLES,** | ) | |
| | ) | **Civil Action No. 2021-0260** |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **LIMETREE BAY VENTURES, LLC, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |
| | ) | |
| **BEECHER COTTON, et al.,** | ) | |
| | ) | **Civil Action No. 2021-0261** |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **LIMETREE BAY VENTURES, LLC, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |

A137

**Attorneys:**

**John K. Dema, Esq.,**
**Lee J. Rohn, Esq.,**
St. Croix, U.S.V.I.
**Jennifer Jones, Esq.,**
St. Thomas, U.S.V.I.
**Hugh P. Lambert, Esq.,**
**Brian James Mersman, Esq.,**
**Kerry J. Miller, Esq.,**
**C. Hogan Paschal, Esq.,**
**Paul C. Thibodeaux, Esq.,**
**Rebekka C. Veith, Esq.,**
**J. Christopher C. Zainey, Jr., Esq.,**
**Carly Jonakin, Esq.**
**Lee J. Rohn, Esq.**
**Jennifer Jones, Esq.**
New Orleans, Louisiana
   *For the Boynes Plaintiffs*

**Vincent A. Colianni, II, Esq.,**
**John-Russell Bart Pate, Esq.,**
**Lee J. Rohn, Esq.,**
St. Croix, U.S.V.I.
**Warren T. Burns, Esq.,**
**Daniel H. Charest, Esq.,**
Dallas, Texas
**Charles Jacob Gower, Esq.,**
**Hugh. P. Lambert, Esq.,**
**Korey A. Nelson, Esq.,**
**Harry Richard Yelton, Esq.,**
New Orleans, Louisiana
   *For the Shirley Plaintiffs*

**John K. Dema, Esq.,**
**Lee J. Rohn, Esq.,**
St. Croix, U.S.V.I
**Hugh. P. Lambert, Esq.,**
**Brian James Mersman, Esq.,**
**J. Christopher C. Zainey, Jr., Esq.,**
New Orleans, Louisiana
   *For the Charles Plaintiffs*

**Vincent A. Colianni, II, Esq.,**
**Rhea Lawrence, Esq.,**
**Marina Leonard, Esq.,**
**Lee J. Rohn, Esq.,**
St. Croix, U.S.V.I
**Shanon Jude Carson, Esq.,**
**Daniel H. Charest, Esq.,**
**Quinn Burns, Esq.,**
**Warren T. Burns, Esq.,**
Dallas, Texas
**John Quin Kerrigan, I, Esq.,**
Doylestown, Pennsylvania
**John Albanese, Esq.,**
Minneapolis, Minnesota
**Dena R. Young, Esq.,**
**Yechiel M Twersky, Esq.**
Philadelphia, Pennsylvania
**Charles Jacob Gower, Esq.,**
**Hugh. P. Lambert, Esq.,**
**Korey A Nelson**
**Harry Richard Yelton, Esq.,**
New Orleans, Louisiana
   *For the Cotton Plaintiffs*

**Carl A. Beckstedt, III, Esq.,**
**Robert J. Kuczynski, Esq.,**
**Earnesta L. Taylor, Esq.,**
St. Croix, U.S.V.I.
**Kevin J. Bruno, Esq.,**
New York, New York
**Melanie S. Carter, Esq.,**
Philadelphia, Pennsylvania
   *For Defendant Limetree Bay*
   *Terminals, LLC*

## <u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER comes before the Court on Plaintiffs' and Limetree Bay Terminals' ("Terminals") August 11, 2023 "Notice of Joint Submission Re: July 20, 2023 Order" (Dkt. No. 415)[1] ("Joint Notice"). In the Court's July 20, 2023 Order granting in part Plaintiffs' "Amended Motion[s] for Temporary Restraining Order and Preliminary Injunction" the Court ordered the parties to jointly submit, for the Court's approval, "a proposed Claim Form consistent with the Court's 'Order Implementing Water Distribution Program;'" "a proposed map . . . depicting the Covered Area consistent with the Court's 'Order Implementing Water Distribution Program;'" an individual to serve as Administrator for the Water Distribution Program; and an individual to serve as Special Master for the Water Distribution Program. (Dkt. No. 388 at 2).

In their Joint Notice, the parties submitted an agreed upon proposed Administrator, Epiq Class Action & Claims Solutions, Inc. ("Epiq"), and two agreed upon maps depicting the Covered Area. However, the parties raised a dispute regarding who should be appointed Special Master and three disputes as to the Proposed Claim Form: 1) whether Terminals could change the locations of the distribution centers to grocery stores; 2) whether mortgages and deeds should be used as proof of occupancy; and 3) whether a section of the Claim Form describing how an applicant might be eligible for the Water Distribution Program could "include the $45,000 baseline for a family of four." (Dkt. No. 415 at 1-2).

On August 16, 2023, the Court held a Status Conference to address the disputed issues raised in the Joint Notice. This Memorandum Opinion and Order memorializes the issues

---

[1] The Parties filed their Joint Notice in each of the four actions, *See* Civ. No. 2021-0253 ("Boynes"), Dkt. No. 415; Civ. No. 2021-0260 ("Charles"), Dkt. No. 298; Civ. No. 2021-0261 ("Cotton"), Dkt. No. 451; Civ. No. 2021-0259 ("Shirley"), Dkt. No. 235, which were consolidated for the preliminary injunction stage of the proceedings. (Dkt. No. 122). All citations herein refer to the Boynes Dkt.

A139

discussed and the Court's rulings at the Status Conference, and further addresses those portions of the Parties' Joint Submission requiring the Court's approval.

## DISPUTED ISSUES

A.       Distribution Centers

In the Joint Notice, Terminals seeks to change the locations of the three water distribution centers mandated by the Court's Order Implementing Water Distribution Program to local grocery stores, noting that "[a]t least one of the previous distribution centers, Sunshine Mall, has not yet confirmed that its facility is available for use as a distribution center." (Dkt. No. 415 at 1). The mandated locations that Terminals now seeks to change had been jointly proposed by the parties and were the same locations the parties had used in the earlier water distribution program to which the parties voluntarily agreed during the bankruptcy proceedings.

At the Status Conference, Terminals informed the Court that the Sunshine Mall location was indeed available, although subject to certain new conditions,[2] and that the other two previously locations were also available. Nonetheless, Terminals argued that its proposal to change the locations to local grocery stores would alleviate logistical issues with operating the contemplated water distribution program; ensure that the water distribution program was operational by the Court's deadline; and was a better proposal overall for everyone involved. In response, Plaintiffs argued that there was no issue with the locations to which the parties had agreed and previously used. Plaintiffs additionally argued that the Court had already ordered Terminals to use the prior locations; that Terminals' proposal was a dilatory tactic; that Terminals' proposal would subject Plaintiffs to public embarrassment; that Terminals' proposal would depend on third-party grocery

_____

[2] The Court noted that, should conditions imposed by the Sunshine Mall location be commercially unreasonable, the Court would consider a proposal to move the location to a similar alternative location.

2

A140

stores not contractually obligated or bound by Court order; and that Terminals' proposal was not proposed in sufficient detail or through a formal motion such that Plaintiffs could fairly object.

The Court rejected Terminals' alternative grocery store proposal, noting the untimeliness of the proposal, and the fact that the Court had ordered the use of the specific locations based on the parties' June 21, 2023 Joint Submission in which they agreed to the use of those locations. The Court further noted that any potential change at this point would have to be presented with full briefing by the parties containing specificity and detail so as to allow the Court to make an informed decision.[3]

        B.        <u>Proof of Occupancy</u>

In the Joint Notice, Terminals raised an objection to the inclusion of mortgages and deeds as proof of occupancy because those documents "display ownership and not occupancy." Dkt. No. 415-1 at 1.  At the Status Conference, Terminals repeated their objection and, in response to the Court's questions, acknowledged that the use of mortgages and deeds as proof of occupancy was not likely to be a significant issue as a practical matter. Plaintiffs argued that the parties had agreed to the inclusion of mortgages and deeds as proof of occupancy; they previously used mortgages and deeds in the prior water distribution program without issue; and, that, in conjunction with the required attestation, a mortgage or deed properly serves as proof of occupancy.

The Court concluded that it would not change its Order Implementing Water Distribution Program at this stage because it doubted that the use of mortgages or deeds, to which the parties had agreed, would become a problem. The Court noted that, in the event of a problem, the issue can be raised with the Court.

---

[3] At the Status Conference, there was a suggestion that Terminals could file a motion regarding its alternative proposal. Such a motion would have to be in the form of a Moton to Modify the Court's Order Implementing Water Distribution Program because an Order has already been entered.

3

A141

C.        Income Baseline

In the Joint Notice, the parties disputed whether it was proper to include in the Claim Form a reference to a $45,000 "baseline" indication of financial eligibility for the Water Distribution Program. Plaintiffs argue that the inclusion of the dollar figure was permissible because it was the underlying financial criteria for one of the government programs that serves as a basis for establishing eligibility for the Water Distribution Program. Terminals argued that Plaintiffs' inclusion of a dollar figure on the Claim Form was an improper attempt at relitigating the eligibility criteria that the Court had already decided in its Phase Two Memorandum Opinion and its Order Implementing Water Distribution Program. Terminals further argued that the inclusion of a dollar figure would be more confusing than clarifying because the underlying government program criteria are more complex than Plaintiffs suggest.

The Court agreed with Terminals and ruled that the parties may not include any dollar figure in the Claim Form.

D.        Appointment of a Special Master

At the Status Conference, the parties each proposed their respective candidate for appointment as Special Master. Terminals argued for Gregory H. Hodges, Esq. and Plaintiffs argued for Henry C. Smock, Esq.. While the Court deems both individuals qualified to serve as the Special Master, the Court will appoint Attorney Henry C. Smock based on the amount and relevance of his experience.

E.        Court's Concern Regarding the Claim Form

At the Status Conference, the Court raised a concern that Section 3 of the proposed Claim Form contains language indicating that the Claim Form "*may* be rejected" if it "contains false information." Dkt. No. 415-1 at 2 (emphasis added). The Court specified that the parties must

4

A142

make clear in the Claim Form that forms containing false information *will be* rejected. The parties represented that they could mutually agree on language to resolve the Court's concern.

### UNDISPUTED ISSUES

In the Joint Notice, the parties apprised the Court that they had agreed on two issues: the appointment of Epiq as Administrator, and the maps depicting the Covered Area. The Court will approve both.

*         *         *

In view of the foregoing, and for the reasons stated at the Status Conference and herein, it is hereby

**ORDERED** that the Court's July 20, 2023 Order Implementing Water Distribution Program **IS NOT MODIFIED** to change the locations of the water distribution centers; and it is further

**ORDERED** that the Court's July 20, 2023 Order Implementing Water Distribution Program **IS NOT MODIFIED** to delete mortgages and deeds as documentation that may be used as "Reasonable Proof of Occupancy"; and it is further

**ORDERED** that the Claim Form **SHALL NOT INCLUDE** any reference to a dollar figure or income threshold suggesting that a party is potentially eligible for enrollment in the Water Distribution Program; and it is further

**ORDERED** that the parties shall have up to and including **August 24, 2023** to submit to the Court for approval an updated Claim Form reflecting the Court's Order Implementing Water Distribution Program and this Order; and it is further

**ORDERED** that the parties' jointly proposed maps depicting the Covered Area (Dk. Nos. 415-2 and 415-3) are **APPROVED**; and it is further

5

A143

**ORDERED** that the parties' jointly proposed Administrator, Epiq Class Action & Claims Solutions, Inc., is hereby **APPOINTED** as Administrator for the Water Distribution Program, in accordance with the Court's July 20, 2023 Order; and it is further

**ORDERED** that the parties shall inform Epiq of this Appointment and provide it with a copy of this Order and the Court's Order Implementing Water Distribution Program; and it is further

**ORDERED** that Attorney Henry C. Smock is hereby **APPOINTED** as Special Master for the Water Distribution Program, in accordance with the Court's July 20, 2023 Order; and it is further

**ORDERED** that the parties shall inform Attorney Smock of this Appointment and provide him with a copy of this Order and the Court's Order Implementing Water Distribution Program.

**SO ORDERED**.

Date:   August 22, 2023                    _____/s/_____
                                           WILMA A. LEWIS
                                           District Judge

6

A144