# In the United States Court of Appeals for the Third Circuit

## Case No. 23-2432

CLIFFORD BOYNES CHRIS CHRISTIAN; MARGARET THOMPSON; DELIA
ALMESTICA; CARLOS CHRISTIAN; ANNA REXACH- CONSTANTINE,
Esq.; MERVYN CONSTANTINE; NEAL DAVIS; EDNA SANTIAGO;
GUIDRYCIA WELLS; O'SHAY WELLS; AARON G. MAYNARD; VERNE
MCSWEEN; ROCHELLE GOMEZ; MYRNA MATHURIN; JOAN
MATHURIN; WARRINGTON CHAPMAN;
*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE DISTRICT COURT OF THE VIRGIN ISLANDS IN
NOS. 1-21-CV-00253, 1-21-CV-00259, 1-21-CV-00260 AND 1-21-CV-00261
SAT BELOW: HONORABLE WILMA A. LEWIS,U.S.D.J.

## BRIEF FOR PLAINTIFFS-APPELLEES

Shanon J. Carson
Yechiel Michael Twersky
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000

Daniel H. Charest
Quinn M. Burns
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, TX 75202
Telephone: (469) 904-4550

Kerry J. Miller
Rebekka C. Veith
C. Hogan Paschal
Carly E. Jonakin
FISHMAN HAYGOOD, L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, LA 70170
Telephone: (504) 586-5252

*Additional Counsel on Signature Page*

*Counsel for Plaintiffs-Appellees*

Dated: March 1, 2024

ANN MARIE JOHN-BAPTISTE; LEOBA JOHN-BAPTISTE-PELLE; J. M. M., by and through his mother Anna Rexach-Constantine; V. M., by and through his mother Anna Rexach-Constantine; Z. R. C., by and through his mother Anna Rexach-Constantine; M. M., by and through his mother Anna Rexach-Constantine; O. N., by and through his mother Guidrycia Wells,

− v. −

LIMETREE BAY VENTURES LLC; ARC LIGHT CAPITAL PARTNERS; FREEPOINT COMMODITIES; EIG GLOBAL ENERGY PARTNERS; BP PRODUCTS NORTH AMERICA INC; LIMETREE BAY TERMINALS LLC, DBA Ocean Point Terminals; LIMETREE BAY HOLDINGS LLC; LIMETREE BAY PREFERRED HOLDINGS LLC; ARCLIGHT AIV, LP; ARCLIGHT ENERGY PARTNER FUND VI L.P; UNIVERSAL PLANT SERVICES VI LLC; EXCEL CONSTRUCTION MAINTENANCE VI INC.; ELITE TURNAROUND SPECIALISTS LTD.; PINNACLE SERVICES LLC; VERSA INTEGRITY GROUP INC; NATIONAL INDUSTRIES SERVICES LLC; JOHN DOES 1-100,

(D.V.I. Nos. 1-21-cv-00253)

HELEN SHIRLEY; ANISHA HENDRICKS; CRISTEL RODRIGUEZ; JOSIE BARNES; ARLEEN MILLER; ROSALBA ESTEVEZ; ISIDORE JULES; JOHN SONSON; VIRGINIE GEORGE and all others similarly situated,

− v. −

LIMETREE BAY VENTURES LLC; LIMETREE BAY TERMINALS LLC,; LIMETREE BAY REFINING LLC;

(D.V.I. Nos.1-21-cv-00259)

---

FRANCIS CHARLES; THERESA J. CHARLES;

– v. –

LIMETREE BAY REFINING LLC; LIMETREE BAY TERMINALS LLC;
LIMETREE BAY VENTURES LLC; ARC LIGHT CAPITAL PARTNERS LLC;
FREEPOINT COMMODITIES; EIG GLOBAL ENERGY PARTNERS;
ARCLIGHT ENERGY PARTNER FUND VI L.P; ARCLIGHT AIV, LP;
LIMETREE BAY HOLDINGS LLC; LIMETREE BAY PREFERRED
HOLDINGS LLC,

(D.V.I. Nos. 1-21-cv-00260)

BEECHER COTTON; PAMELA L. COLON; SIRDINA
ISAAC-JOSEPH; SYLVIA BROWNE; JEAN-MARIE ALVINA ILARRAZA;
ESTHER CLIFFORD; RYAN ALLEYNE; AGNES AUGUSTUS;
CESARINA MIRANDA

– v. –

LIMETREE BAY VENTURES LLC; LIMETREE BAY REFINING LLC;
LIMETREE BAY TERMINALS LLC; ARC LIGHT CAPITAL PARTNERS;
FREEPOINT COMMODITIES; EIG GLOBAL ENERGY PARTNERS; BP
PRODUCTS NORTH AMERICA INC; JOHN DOES 1-10; LIMETREE BAY
HOLDINGS LLC; LBR LIQUIDATING TRUST; M. DAVID SUNN; DBA
OCEAN POINT TERMINALS; UNIVERSAL PLANT SERVICES VI, LLC;
EXCEL CONSTRUCTION, MAINTENANCE VI INC; ELITE TURNAROUND
SPECIALISTS LTD.; PINNACLE SERVICES LLC; VERSA INTEGRITY
GROUP INC; NATIONAL INDUSTRIES SERVICES LLC,

(D.V.I. Nos 1-21-cv-00261)

LIMETREE BAY TERMINALS LLC,

*Appellant.*

---

# TABLE OF CONTENTS

COUNTERSTATEMENT OF ISSUES PRESENTED ............................................... 1

STATEMENT OF RELATED CASES AND PROCEEDINGS ............................ 1

COUNTERSTATEMENT OF THE CASE ............................................................ 1

I.      The Release Events ............................................................................... 1

II.     Procedural History ................................................................................ 3

III.    The Significant Evidence Presented at the Two-Phase Hearing .................... 9

        A.      Terminals is responsible for the Refinery's polluting activities. .......... 9

        B.      The Releases caused contamination in neighborhoods immediately
                surrounding and to the west of the Refinery. ...................................... 11

        C.      The district court identified economic eligibility criteria to further
                narrowly tailor the Water Program's scope. ...................................... 13

SUMMARY OF ARGUMENT ....................................................................... 15

ARGUMENT ................................................................................................ 18

I.      The District Court Correctly Determined that Plaintiffs are Likely to
        Succeed on the Merits of their Claims ............................................... 18

        A.      Standard of Review ............................................................... 19

        B.      Terminals, as the Title V permittee, bears responsibility for the
                toxic Releases. ...................................................................... 20

        C.      The ROA and TOA did not—and could not—relieve Terminals of
                its duties under the Title V Permit. ...................................... 24

II.     The District Court Correctly Found that Irreparable Harm Would Result
        to Certain Residents in the Covered Area in the Absence of Injunctive
        Relief ................................................................................................ 27

        A.      Standard of Review ............................................................... 28

        B.      The evidence shows contamination from the Releases ...................... 28

C.    The evidence supports a conclusion of present contamination and present harm. .......................................................................................30

D.    The evidence supports the "Covered Area" outlined by the district court. ...................................................................................................32

E.    The relief sought is not compensable with money damages ...............33

F.    The evidence Plaintiffs presented at the hearings establishes a foundation for group injunctive relief. ................................................36

III.    The District Court Correctly Ordered a Nominal Bond ...............................41

A.    Standard of Review ............................................................................41

B.    The nominal bond is substantially justified. ......................................41

IV.    The Two Remaining Factors for Granting Injunctive Relief Also Weigh in Favor of Plaintiffs, Which Terminals Does Not Dispute ............................46

A.    Standard of Review ............................................................................47

B.    The balance of harm weighs in favor of injunctive relief. .................47

C.    Plaintiffs' injunctive relief is in the public interest. ...........................48

CONCLUSION ......................................................................................................48

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Adams v. Freedom Forge Corp.*,
    204 F.3d 475 (3d Cir. 2000) ........................................................ *passim*

*Antilles Sch., Inc. v. Lembach*,
    64 V.I. 400 (2016) ................................................................. 20, 21

*Ass'n of N.J. Rifle & Pistol Clubs Inc. v. Attorney Gen. N.J.*,
    974 F.3d 237 (3d Cir. 2020) ..................................................19

*Bell v. Cheswick Generating Station*,
    734 F.3d 188 (3d Cir. 2013) ..................................................25

*Bradley v. Pittsburgh Bd. of Educ.*,
    910 F.2d 1172 (3d Cir. 1990) ................................................19

*Concerned Pastors for Soc. Action v. Khouri*,
    217 F. Supp. 3d 960 (E.D. Mich. 2016) ....................................... 34, 35

*DIRECTV Inc. v. Seijas*,
    508 F.3d 123 (3d Cir. 2007) ..................................................25

*Doe 1 v. Perkiomen Valley Sch. Dist.*,
    585 F. Supp. 3d 668 (E.D. Pa. 2022)..................................................42

*Elliott v. Kiesewetter*,
    98 F.3d 47 (3d Cir. 1996) ..................................................43

*Env't Prot. Info. Ctr. v. Carlson*,
    968 F.3d 985 (9th Cir. 2020) ..................................................47

*Frank's GMC Truck Center, Inc. v. General Motors Corp.*,
    847 F.2d 100 (3d Cir. 1988) ..................................................41

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*,
    528 U.S. 167 (2000) ..................................................31

*Garza v. Citigroup Inc.*,
    881 F.3d 277 (3d Cir. 2018) ..................................................25

*Havens v. Mobex Network Servs., LLC*,
   820 F.3d 80 (3d Cir. 2016) .................................................................................19

*In re City of Detroit*,
   No. 15-CV-10038, 2015 WL 5461463 (E.D. Mich. Sept. 16, 2015)...................34

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*,
   882 F.2d 797 (3d Cir. 1989) ...............................................................................45

*Issa v. Sch. Dist. of Lancaster*,
   847 F.3d 121 (3d Cir. 2017) ........................................................................ 19, 28

*Kos Pharms., Inc. v. Andrx Corp.*,
   369 F.3d 700 (3d Cir. 2004) ........................................................................ 28, 47

*Lyda v. City of Detroit*,
   No. 13-CV-53846, 2014 WL 6474081 (Bankr. E.D. Mich. Nov. 16, 2014) ...........
   ........................................................................................................................ 34, 35

*Mallet & Co. Inc. v. Lacayo*,
   16 F.4th 364 (3d Cir. 2021) ................................................................................46

*Neo Gen Screening, Inc. v. TeleChem Int'l, Inc.*,
   69 F. App'x 550 (3d Cir. 2003)...........................................................................41

*Oddi v. Ford Motor Co.*,
   234 F.3d 136 (3d Cir. 2000) ...............................................................................20

*Opticians Ass'n of Am. v. Indep. Opticians of Am.*,
   920 F.2d 187 (3d Cir. 1990) ...............................................................................47

*Osario-Martinez v. Attorney Gen. United States of Am.*,
   893 F.3d 153 (3d Cir. 2018) ........................................................................ 19, 28

*Oxford House, Inc. v. Twp. of Cherry Hill*,
   799 F. Supp. 450 (D.N.J. 1992)...........................................................................48

*PharMethod, Inc. v. Caserta*,
   382 F. App'x 214 (3d Cir. 2010).........................................................................42

*Reilly v. City of Harrisburg*,
   858 F.3d 173 (3d Cir. 2017) ................................................................. 19, 28, 47

iv

*Shell Petroleum, Inc. v. United States*,
  182 F.3d 212 (3d Cir. 1999) ...............................................................25

*Sprint Commc'ns Co. L.P. v. CAT Commc'ns Int'l, Inc.*,
  335 F.3d 235 (3d Cir. 2003) ...............................................................45

*Stecyk v. Bell Helicopter Textron, Inc.*,
  295 F.3d 408 (3d Cir. 2002) ........................................................ 20, 41

*Temple Univ. v. White*,
  941 F.2d 201 (3d Cir. 1991) ........................................................ 42, 43

*United States v. Alisal Water Corp.*,
  431 F.3d 643 (9th Cir. 2005) ...............................................................48

*United Steelworkers of Am. v. Fort Pitt Steel Casting*,
  598 F.2d 1273 (3d Cir. 1979) ...............................................................37

*Univ. of Texas v. Camenisch*,
  451 U.S. 390 (1981) ...............................................................28

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ...............................................................19

*Zambelli Fireworks Mfg. Co., Inc. v. Wood*,
  592 F.3d 412 (3d Cir. 2010) ........................................................ 41, 43

**Statutes**

42 U.S.C. § 7401 ........................................................ 26, 27

42 U.S.C. § 7416 ........................................................ 24, 25

VI ST T. 12, § 201 ...............................................................48

**Rules**

Fed. R. App. P. 32 ...............................................................53

Fed. R. App. Pro. 28(i) ...............................................................57

***Regulations***

40 C.F.R. § 63.670 ...............................................................21

## COUNTERSTATEMENT OF ISSUES PRESENTED

The issues on appeal are whether the district court erred in:

1.     Finding that Plaintiffs-Appellees are likely to succeed on the merits of their negligence per se, private nuisance, and negligent trespass claims against Terminals;

2.     Finding that Plaintiffs-Appellees adequately demonstrated that certain named plaintiffs and putative class members cannot afford to purchase water without trading off other basic necessities and therefore will suffer irreparable harm in the absence of the injunctive relief that was awarded;

3.     Imposing an initial bond of $50,000 in a case in which the population entitled to injunctive relief is indigent and an important public interest, the provision of safe and clean water, is implicated.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This case has not been before the Court. Appellees are unaware of any related case.

## COUNTERSTATEMENT OF THE CASE

### I.     The Release Events

Appellant Limetree Bay Terminals, LLC ("Terminals") is the former owner of, and current Clean Air Act ("CAA") permit holder for, an oil refinery (the "Refinery") located on the south shore of St. Croix. A4464-65 (EPA Emergency Order). Plaintiffs-Appellees' suits arise out of four air pollution emission events

from the Refinery's Flare #8, each of which occurred between February 4 and March 12, 2021 (each individually, a "Release," and collectively, the "Releases"). The first of these pollution events occurred just three days after the Refinery was restarted, following three years of "startup work" by Terminals and its "sister company," Limetree Bay Refining, LLC ("Refining"). A11 (Apr. Mem. Op.).

The first Release on February 4, 2021, was a "mist with heavy oil" that left oil droplets on St. Croix residents' vehicles and homes. A11 (Apr. Mem. Op.); A4729 (EPA Emergency Order). The second and third Releases, which occurred on April 19, 2021, and May 5 and 7, 2021, were emissions of hydrogen sulfide, which caused a "foul, gaseous smell" that was hazardous to residents' health. A12 (Apr. Mem. Op.); A4734 (EPA Emergency Order). The final Release, on May 12, 2021, was a "flare rainout," resulting in a large, trailing plume of smoke from Flare #8, and again spewing liquid droplets of oil on residences and property to the west of the Refinery. A12 (Apr. Mem. Op.); A4741 (EPA Emergency Order). Following this fourth Release, the United States Environmental Protection Agency ("EPA") took the extraordinary step of shutting down the Refinery's operations in their entirety pursuant to an emergency order ("Emergency Order")—an action the EPA had taken only three times since the passage of the CAA. *See* A4751 (EPA Emergency Order).

The Releases contaminated property on St. Croix, including soil, vegetation, and the water cisterns that many residents use for drinking, bathing, and washing

clothes and dishes. Visible oily sheens were observed on water within and on the concrete walls of those cisterns. A957-63 (Dr. Henry Testimony).

Following the February 4 Release, Terminals worked with Refining to dispatch teams to affected areas to identify and clean contaminated cisterns. A1099 (Elizee Testimony). And following the final May Release—which was too large for Terminals to handle on its own—Terminals engaged Sedgwick Claim Management Services ("Sedgwick") to inspect properties for contamination. A1265-69 (Charles Testimony). If Sedgwick detected even "one speck" of contamination at a residence, it offered to "settle" with the owners by providing money for cistern remediation. A1273 (Charles Testimony).

Terminals now downplays Sedgwick's conduct as "precautionary," but this "one speck" standard is consistent with the realities of the contaminants emitted during the Releases. Pitch oil, emitted during the May 12 Release, is heavy, hard to break down, and has a "long lifetime in the environment." A705 (Dr. Kaltofen Testimony); A1111 (Elizee Testimony); A1418 (Dr. Murray Testimony). It follows that "one speck" of total petroleum hydrocarbon ("TPH") would contaminate a cistern used for drinking water.

## II. Procedural History

On May 19, 2021, one week after the May 12 Release, Plaintiffs began to file class action lawsuits against the parties responsible for the Releases, including

3

Terminals, bringing claims on behalf of themselves and those similarly situated who suffered injuries and damages as a result of the toxic Releases.[1] In connection with their investigation of the Releases, counsel for Plaintiffs identified thousands of putative class members with damages as a result of the Releases. A2990 (Mot. for Temporary Restraining Order and Prelim. Injunction). In addition to their initial pleadings, Plaintiffs sought to obtain immediate relief on behalf of impacted St. Croix residents, including by filing motions for injunctive relief.[2]

Before Plaintiffs could litigate these matters, however, Refining and certain related entities filed a Chapter 11 Petition for Bankruptcy in the United States Bankruptcy Court for the Southern District of Texas, which served to automatically stay Plaintiffs' pending cases against the debtor entities. *See* A2991 (Mot. for Temporary Restraining Order and Prelim. Injunction). On July 26, 2021, the bankruptcy court entered a temporary restraining order, extending the stay to Plaintiffs' claims against the non-debtor defendants, including Terminals, for fourteen days. *Id*. The stay was further extended on August 10, 2021, so that the parties could mediate certain exigent health and safety issues, namely, affected St.

---

[1] *See* A177 (showing date original complaint was filed in *Boynes* Docket; A250 (showing date *Shirley* case was removed); A300 (showing date *Charles* case was removed); A373 (showing date *Cotton* case was removed).

[2] *See, e.g.*, A373 (showing, at ECF No. 1-6, that an Emergency TRO had been filed in state court in the *Cotton* case).

Croix residents' urgent need for access to clean water. *Id*. Mediation began on August 26, 2021, and on October 29, 2021, the Plaintiffs, Terminals, and Refining (and other, related debtor entities) entered a Stipulation and Agreed Order Adopting Water Distribution Program. A3072-82 (Stipulation and Agreed Order).

Refining and Terminals quickly fell out of compliance with their obligations to provide safe and clean water to affected residents under the Stipulation and Agreed Order, first reducing the amount of water available for distribution and the hours of distribution and then ultimately ending the water program altogether, despite the continued contamination of Plaintiffs' and putative class members' water. A2991-92 (Mot. for Temporary Restraining Order and Prelim. Injunction).[3]

Plaintiffs thus terminated the mediation on September 26, 2023. Shortly thereafter, Plaintiffs filed with the district court a Notice of Lifting of Bankruptcy Stay, requesting that the district court return their cases to its active docket.[4]

Following the termination of the mediation, in January 2023, Plaintiffs filed

_____

[3] Though the Bankruptcy Water Program served as a point of reference for the district court in crafting the Water Distribution Order at issue here, the earlier program did not, as Terminals asserts, form the "basis" of that court's injunctive relief order. Terminals Appellant Brief ("Br.") at 9. To the contrary, and as further set forth herein, the Water Distribution Order resulted from the district court's own careful review and analysis of the extensive briefing, evidence, argument, and other submissions of the parties across both phases of the district court's injunctive relief proceedings.

[4] *See* A186 (showing Notice of Lifting of Bankruptcy Stay on the *Boynes* docket).

amended pleadings[5] as well as renewed motions for injunctive relief. In those motions, Plaintiffs sought an order from the district court requiring Terminals to provide Plaintiffs and putative class members with safe, clean, and potable water and to remediate, at a minimum, contaminated roofs, pipes, and cisterns.[6]

On January 25, 2023, the district court consolidated Plaintiffs' cases for the limited purposes of proceedings related to Plaintiffs' motions for injunctive relief and, thereafter, set forth a schedule and structure for those proceedings. A2737-39 (Jan. 2023 Order); A2740-46 (Feb. 2023 Order). The district court bifurcated the proceedings on Plaintiffs' motion for injunctive relief into a Phase One hearing to consider Plaintiffs' entitlement to the injunctive relief and, if the court determined the Plaintiffs were so entitled, a Phase Two hearing to consider the scope of relief granted.

*Phase One Hearing*

The Phase One hearing took place from March 2 through 7, 2023. Following the hearing and additional post-trial briefing, the district court found that Plaintiffs had "satisfied the preliminary injunction factors with respect to those Plaintiffs and putative class members who cannot afford to purchase water without trading off

---

[5] *See* A2747-A2976 (Amended Complaints).

[6] *See, e.g.*, A2977-3089 (Mot. for Temporary Restraining Order and Prelim. Injunction).

other basic necessities" and that "preliminary injunctive relief for a water provision program for that group of individuals is warranted." A6 (Apr. Mem. Op.).

The district court first concluded that Terminals "had a duty to ensure that the [R]efinery, as a whole, complied with the Clean Air Act and the requirements imposed by [the Refinery's permits], and that [Terminals] failed to ensure the [R]efinery complied with the same." Thus, Plaintiffs "are substantially likely to succeed on the merits of their negligence per se claims." A23 (Apr. Mem. Op.). Based on its analysis of Plaintiff's negligence per se claims, the district court found that Plaintiffs were also substantially likely to prevail on the merits of their private nuisance and negligent trespass claims, noting that Plaintiffs "provided adequate evidence for the court to conclude that [Terminals] negligently caused a thing— namely, petroleum products—to enter [Plaintiffs'] land, and that the presence of the same caused harm to [Plaintiffs] and their property." A2 (Apr. Mem. Op.).

The district court next considered whether Plaintiffs established irreparable harm, and in so doing analyzed Plaintiffs' expert testimony; the results of water, soil, and swab testing; and the testimony of residents whose cisterns had been contaminated by the Releases. A30-32 (Apr. Mem. Op.). In light of this evidence, and along with "multiple press releases" issued by Terminals and Refining that noted that "a number of neighborhoods were contaminated," the district court determined that the "totality of the evidence is indicative of contamination" and that "a

meaningful proportion of the population on behalf of whom [Plaintiffs] seek relief do not have the requisite financial resources to secure sufficient water to meet their and their families' needs." A38-39, A52-53 (Apr. Mem. Op.). Accordingly, the district court concluded that "those within the impacted areas who cannot afford to purchase water without trading off other basic necessities will suffer irreparable harm in the absence of an injunction," and that the balance of hardships and public interest factors favored Plaintiffs. A53-58 (Apr. Mem. Op.).

*Phase Two Hearing*

The district court held the Phase Two hearing on June 6 through 9, 2023, to consider the scope of the injunctive relief that would be awarded. This hearing focused on evidence related to the geographic area of impact from the Releases; how certain economic criteria could be used to best capture those "who cannot afford to purchase water without trading off other basic necessities," the subset of putative class members to whom the district court's narrowly tailored relief was directed; and the necessity and, if necessary, appropriate amount of, a bond. Following the hearing, the district court ordered Terminals to establish, fund, and operate a water distribution program ("Water Program") to provide water to residents of St. Croix who meet certain requirements with respect to geographic location and economic need. A112-24 (July Order). The district court determined that $50,000 was an appropriate bond and ordered Plaintiffs to pay an additional $50 for each household

beyond the first 1,000 households that participates in the Water Program. A107-10 (July Mem. Op.).

On August 24, 2023, Terminals filed its notice of appeal of the district court's orders granting preliminary injunctive relief. ECF No. 1. Four days later, Terminals moved this Court to stay implementation of the injunctive relief ordered below. ECF No. 10. This Court denied Terminals's request on September 28, 2023. ECF No. 49.

## III. The Significant Evidence Presented at the Two-Phase Hearing

### A. Terminals is responsible for the Refinery's polluting activities.

Based on the evidence presented at the Phase One hearing, the district court appropriately found that Terminals, as co-permittee, was obligated to ensure the Refinery's compliance with the CAA under the Refinery's Title V Permit. Terminals is listed as a permittee on permits required for the Refinery's operations, including a Title V operating permit ("Title V Permit") mandated by the CAA. *See, e.g.*, A4464 (Title V Permit). Pursuant to the mandatory Title V Permit, Terminals, as co-permittee, was legally obligated to ensure the Refinery's operations complied with federal and territorial environmental laws and regulations. *See generally* A4464-4688 (Title V Permit). Terminals never amended the Title V Permit to make itself responsible for "anything less than the entire facility," which included *both* terminal and refining operations. A22 (Apr. Mem. Op.); A1226 (Charles Testimony); A1189-

91 (Elizee Testimony); A4473 (Title V Permit facility map, including both terminals and refining operations).

When the Refinery failed to abide by those permits' requirements, the EPA cited both Terminals and Refining for violations. For example, when Terminals failed to operate five sulfur-dioxide monitors at the Refinery, as required by its status as a co-permittee, the EPA issued a Notice of Violation to Terminals on April 30, 2021. A4701-19 (Terminals Notice of Violation). On June 16, 2021, the EPA issued an additional and separate Notice of Violation to Refining, based on its role as a co-permittee, for its failure to operate the requisite monitors. A3191-210 (Refining Notice of Violation); A3205 (Refining Notice of Violation), at ¶ 75 (identifying Refining's status as additional co-permittee on Title V Permit). The Notice of Violation to Refining did not, however, supersede, amend, or nullify the previous April Notice of Violation issued to Terminals. Additionally, on May 14, 2021, the EPA issued its Emergency Order to *both* Terminals and Refining. A4721 (EPA Emergency Order). The EPA has never rescinded any of its findings as to Terminals's responsibility for the Releases. *See* A1145-46 (Elizee Testimony).

The district court correctly concluded that because Terminals was a co-permittee on the Refinery's Title V Permit, Terminals was: (i) legally obligated to ensure the Refinery's compliance with the CAA, and (ii) responsible for any of the Refinery's CAA violations. The Title V Permit subjects Terminals to strict liability

for non-compliance and expressly provides that "Permittee [*i.e.*, Terminals] shall not cause or permit the discharge from any source whatsoever such quantities of air contaminants or other material which cause injury, detriment, nuisance, annoyance to persons or to the public or which endanger the comfort, repose, health, or safety of any such persons or the public or which cause or have tendency to cause injury or damage to business or property." A4508-09 (Title V Permit). The district court found—as did the EPA in its Emergency Order—that Terminals was responsible for the Releases pursuant to this and other provisions of the Title V Permit. A22 (Apr. Mem. Op.). Because the district court found Terminals responsible for the Release as a co-permittee, the question of whether Terminals and Refining were operated, in fact, as separate legal entities did not affect the district court's analysis.[7]

## B. The Releases caused contamination in neighborhoods immediately surrounding and to the west of the Refinery.

The district court next carefully and correctly determined that a certain geographic "Covered Area" was impacted by the Releases. A97-98 (July Mem. Op.). In addition to analysis by the parties' experts, testimony from resident witnesses,

---

[7] Terminals and Refining were intertwined as more than co-permittees. They shared employees, facilities, and services—including a health, safety, and environmental department that a Terminals employee confirmed was not adequately staffed. A590-93 (Sales Testimony); A1070-75, A1138-40 (Elizee Testimony); A1239 (Charles Testimony); A5165-5248 (Shared Services Agreement). And reports of environmental violations of the Refinery's permits were communicated on behalf of both Terminals and Refining. A1070-75, A1090-98 (Elizee Testimony); A4689-700 (Limetree Correspondence with Department of Planning and Natural Resources).

and documentation by the EPA (to which the court afforded varying weight), the district court relied on data supplied by Sedgwick, which "the parties agree[d] . . . provide[d] the most reliable and complete picture of the extent of contamination" available at the time of the hearings. A84 (July Mem. Op.). Sedgwick inspected between 2,300 and 2,400 properties following the May 12 Release, and a spreadsheet summarizing the results of these inspections identifies: (1) properties Sedgwick inspected; (2) whether Sedgwick made an offer to settle with the property owner; (3) whether the property owner's claims were "settled"; and (4) the amount of the settlement offer. A85, 87 (July Mem. Op.). Jeffrey Charles, Terminals's Chief Operating Officer and Incident Commander at the time of the Releases, testified that approximately 2,200 of the 2,300-2,400 homes inspected by Sedgwick were contaminated by the Releases. A87 (July Mem. Op.); A2203, A2264-65, A2270-72 (Charles Testimony).

The district court carefully parsed the Sedgwick data to identify fifteen "core estates" on St. Croix in which Sedgwick had both high numbers of inspections and high numbers of "hits" (meaning Sedgwick determined anywhere from 79% to 100% of the properties it inspected were contaminated). A90 (July Mem. Op.). This data, coupled with air modeling by Plaintiffs' expert Dr. Erno Sajo and data collected by Plaintiffs' experts Dr. Marco Kaltofen and Dr. Michael Henry, supported the inclusion of those fifteen "core estates" in the Covered Area. A92 (July Mem. Op.).

The district court also included additional estates in the Covered Area based on a detailed analysis of evidence showing that these estates were (in various combinations): (1) proximate to estates with a high number of Sedgwick "hits"; (2) located on the western edge of the island where Sedgwick intended to perform more inspections before it stopped work for nonpayment by Terminals; and/or (3) significantly contaminated by the first February 4 Release. A92-98 (July Mem. Op.).

## C. The district court identified economic eligibility criteria to further narrowly tailor the Water Program's scope.

Following the district court's conclusion that residents within the Covered Area suffered contamination by the Releases, the district court next found that the evidence showed a meaningful proportion of the population for whom Plaintiffs seek relief lack the financial resources to secure sufficient water to meet their and their families' needs. A52-A53 (July Mem. Op.).

At the Phase One hearing, putative class members testified that contamination forced residents to seek out alternative sources of drinking water. *See, e.g.*, A789 (Urgent Testimony); A806 (Webster Testimony); A947 (Thompson Testimony). Those putative class members that continued to use the contaminated water for other household tasks became ill and noticed skin irritation. A946-47 (Thompson Testimony).

Based upon this evidence showing that putative class members used water that they believed to be contaminated or otherwise took "drastic steps to ensure that [they

did] not have to do so—by collecting buckets of rainwater, visiting friends' apartments to bathe, or waiting in line for hours to secure six gallons of free water," the district court concluded that Plaintiffs had shown that "a meaningful proportion of the population on behalf of whom Plaintiffs seek relief do not have the requisite financial resources to secure sufficient water to meet their and their families' needs." A52-53 (Apr. Mem. Op.).

Having determined that residents who cannot afford to purchase water without trading off other basic necessities are entitled to injunctive relief, at the Phase Two hearing, the district court considered what criteria would best measure the financial need giving rise to irreparable harm. A70-79 (July Mem. Op.). The district court accepted testimony from Terminals's expert David Neumark—whose expertise centers on "poverty-related need-based programs," "economic policy," "labor economics," and "poverty policy"—and, based on that testimony and other evidence, determined that putative class members may demonstrate their economic eligibility for the Water Program by submitting documentary proof that they are eligible to receive benefits under one of several government benefits programs specified by the district court. A70-79 (July Mem. Op.); *see also* A4036 ("Terminals agrees it is reasonable to rely on government needs-based programs as an objective standard of poverty.").

The Water Program is thus narrowly tailored to limit injunctive relief only to those who (1) reside in impacted areas and who (2) cannot afford to purchase water without trading off other basic necessities. To that end, there are specific requirements that each applicant to the Water Program must meet showing that they specifically and personally risk irreparable harm. The Order Implementing the Water Program reflects the district court's correct conclusions, based on the factual record, as to eligibility for injunctive relief based on economic need criteria, A72-79 (July Mem. Op.), and geographic scope, A79-103 (July Mem. Op.).

## SUMMARY OF ARGUMENT

The district court's determination that Plaintiffs met the established factors for a preliminary injunction is supported by the facts and law, including, in particular, the significant evidence adduced during both phases of the injunctive relief proceedings. The injunctive relief awarded is appropriately tailored to reach only those Plaintiffs and putative class members at risk of irreparable harm—that is, those who "cannot afford to purchase water without trading off other basic necessities"—and accords with precedent from this Court.

The district court properly found that Plaintiffs are likely to succeed on the merits of their negligence per se, nuisance, and negligent trespass claims, because Terminals failed to meet its obligations under the Title V Permit to ensure that the Refinery complied with the Clean Air Act. And while Terminals tries to escape its

obligations by arguing that agreements with the Government of the Virgin Islands ("GVI"), and not the Title V Permit, should dictate its responsibilities as to the Refinery's operations, Terminals has waived this argument by failing to raise it before the district court. What's more, Terminals's argument regarding the inapplicability of its Title V Permit obligations fails for the following additional reasons: (1) it cites no authority to support this assertion; (2) the argument is internally inconsistent because the Title V Permit was issued by the GVI; (3) the Terminal Operating Agreement ("TOA") and Refinery Operating Agreement ("ROA") did not reduce, but rather reinforced, Terminals's obligations to comply with the Title V Permit; and (4) Plaintiffs have the right to enforce the relevant provisions of the Title V Permit because none of these provisions are "Territory-only enforceable" or "local-only enforceable." In addition to the foregoing, under a Shared Services Agreement with Refining, Terminals also had the contractual right and ability to ensure that the Refinery complied with the terms of the Title V Permit, but Terminals failed to do so. Accordingly, the district court properly found that Plaintiffs are likely to succeed on the merits of their claims for negligence per se, nuisance, and negligent trespass.

The district court also correctly found that irreparable harm would result in the absence of injunctive relief based upon abundant evidence and testimony from both Plaintiffs *and* Terminals (including Terminals's experts and employees)

demonstrating that the Releases caused contamination that persists to the present day in an impacted "Covered Area." The district court thus appropriately awarded injunctive relief to a narrow subset of Plaintiffs and putative class members who reside within its carefully selected Covered Area and who do not have sufficient money to purchase potable water but whose primary water source (their cisterns) are contaminated and unusable.

The relief at issue—the provision of safe and clean water—is not compensable with money damages to the extent that those eligible for the relief are being forced to make the untenable choice of either drinking contaminated water from their cisterns or forgoing other basic necessities in order to purchase water. Under these circumstances, compensating these harmed individuals after the fact is insufficient.

The district court's decision with respect to irreparable harm also comports with this Court's decision in *Adams v. Freedom Forge Corp.*, 204 F.3d 475 (3d Cir. 2000), because the district court determined, consistent with *Adams*, that Plaintiffs provided an adequate basis upon which to infer that certain Plaintiffs and putative class members cannot afford to purchase water without trading off other necessities.

Plaintiffs also satisfy the final two factors for a preliminary injunction: that the balance of harm favors Plaintiffs and that the relief sought is in the public interest. Terminals does not appear to contest the district court's determination as to these two factors. As the district court concluded, the seriousness and magnitude of

the harm occasioned by the Releases for those who cannot afford water—a basic necessity—tips the balance strongly in favor of Plaintiffs. Moreover, the provision of safe and clean water to those who cannot afford it is unquestionably in furtherance of the public interest.

Finally, the district court's $50,000 bond is appropriate. The amount of the bond is supported by this Circuit's case law and the factual circumstances—namely, the indigency of the population entitled to injunctive relief and the important public interest implications, factors that arguably support waiving the bond requirement in its entirety. Rather than waive the bond in its entirety, the district court determined that $50,000 was an appropriate sum to ensure that Appellees "think carefully" before accepting injunctive relief. This determination should not be disturbed.

## ARGUMENT

## I. The District Court Correctly Determined that Plaintiffs are Likely to Succeed on the Merits of their Claims

In determining that Plaintiffs established a likelihood of success on the merits of their claims, the district court made the correct legal and factual findings: that Terminals was a permittee on the Title V Permit of the Refinery; that Terminals' actions violated the Title V Permit; and that certain operating agreements related to Terminals and Refining did not impact Terminals's responsibilities under the Title V Permit. A21-23 (Apr. Mem. Op.).

## A. Standard of Review

This Court has noted that "[d]istrict courts have the freedom to fashion preliminary equitable relief so long as they do so by 'exercising their sound discretion.'" *Reilly v. City of Harrisburg*, 858 F.3d 173, 176, 178-79 (3d Cir. 2017) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). The first factor a court must evaluate when assessing the need for a preliminary injunction is "a reasonable probability of eventual success in the litigation." *Id.* at 176. This standard "requires a showing significantly better than negligible but not necessarily more likely than not." *Id.* at 179.

In reviewing the grant or denial of a preliminary injunction, this Court "employ[s] a tripartite standard of review: findings of fact are reviewed for clear error, legal conclusions are reviewed de novo, and the decision to grant or deny an injunction is reviewed for abuse of discretion." *Osario-Martinez v. Attorney Gen. United States of Am.*, 893 F.3d 153, 161 (3d Cir. 2018); *see also Ass'n of N.J. Rifle & Pistol Clubs Inc. v. Attorney Gen. N.J.*, 974 F.3d 237, 245 (3d Cir. 2020), *vacated on other grounds*, 142 S. Ct. 2894 (2022) (mem.) ("We will affirm a district court's order on a preliminary injunction 'unless the court abused its discretion, committed an obvious error of law, or made a serious mistake in considering the proof.'" (quoting *Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1175 (3d Cir. 1990))).

A finding of fact is clearly erroneous only if it is "completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data." *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 130 (3d Cir. 2017) (quoting *Havens v. Mobex Network Servs., LLC*, 820 F.3d 80, 92 (3d Cir. 2016)). An abuse of discretion exists only when a judicial action is "arbitrary, fanciful or clearly unreasonable." *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 412 (3d Cir. 2002). The Court "will not disturb a trial court's exercise of discretion unless 'no reasonable person would adopt the district court's view.'" *Id.* (quoting *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000)).

## B. Terminals, as the Title V permittee, bears responsibility for the toxic Releases.

To succeed on a claim of negligence per se under Virgin Islands law, a plaintiff must demonstrate that the defendant "had a duty to follow the law, failed to follow the law, and that such failure caused damages to the plaintiff as a person within the class intended to be protected by the statute or regulation." *Antilles Sch., Inc. v. Lembach*, 64 V.I. 400, 423 (2016) (citations omitted).

Here, the district court found that Plaintiffs are substantially likely to succeed on the merits of their negligence per se claims based upon Terminals's failure to ensure that the Refinery complied with the Clean Air Act—a failure that was confirmed by the EPA in its Emergency Order. A4464-65 (EPA Emergency Order). In 2016, Terminals applied for and received a transfer of the Refinery's Title V

Permit from the Refinery's previous operator. A3345-48 (Title V Permit). The district court (and the EPA) found that, as the permittee, "[Terminals] had a duty to ensure that the refinery, as a whole, complied with the Clean Air Act and the requirements imposed by the Title V Permit." A23 (Apr. Mem. Op.). Terminals, however, "failed to ensure the refinery complied with" the requirements of the Title V Permit. *Id.*[8] Specifically, as permittee, Terminals agreed that it "shall not *let, permit, suffer, or allow* any emission of sulfur oxides which results in ground level concentrations of sulfur oxides" beyond permissible limits and "shall not cause or permit the emission of hydrogen sulfide from any premises" that create concentrations in ambient air beyond permissible limits. A3391 (Title V Permit) (emphasis added). But Terminals breached those obligations by permitting the Refinery to emit hydrogen sulfide in quantities that exceeded regulatory limits. A12 (Apr. Mem. Op.).

Additionally, Terminals agreed that it "shall not cause *or permit* the discharge from any source whatsoever such quantities of air contaminants or other material

---

[8] Terminals did not oppose, and does not now contest, the district court's findings that "the exceedances Flare 8 experienced during the release events constituted breaches of the CAA, or that Plaintiffs' injuries are traceable to those violations." A18 (Apr. Mem. Op.) (citing 40 C.F.R. § 63.670 (regulating flare control devices); A4749-61 (Emergency Order); A4716-17 (Terminals Notice of Violation); A5020-21 (Refining Notice of Violation); A4689-4700 (Limetree Correspondence with Department of Planning and Natural Resources)).

which cause injury, detriment, nuisance, annoyance to persons or to the public or which endanger the comfort, repose, health, or safety of any such persons or the public or which cause or have tendency to cause injury or damage to business." A4508-81 (Title V Permit) (emphasis added). Terminals breached that obligation on multiple occasions, further supporting the conclusion that Plaintiffs are likely to succeed on the merits of their negligence per se claims. A12-13, A38-41 (Apr. Mem. Op.). And, because this breach negligently caused petroleum products to enter onto Plaintiffs' land, the district court also correctly found that Plaintiffs are likely to succeed on their private nuisance and negligent trespass claims. A23-25 (Apr. Mem. Op.).

Notwithstanding the Title V Permit's plain language, Terminals argues that only the "owner or operator" of a facility can violate the CAA. Terminals Appellant Brief ("Br.") at 25. Terminals suggests it cannot be liable for failing to comply with its obligations as the permittee because it "was not allowed to interfere with the operation of the Refinery" and because "Terminals had no legal right or obligation to monitor or enforce Refining's compliance with the Title V Permit" pursuant to the TOA and ROA to which the GVI is a party. Br. at 20 and 27. But the Title V Permit provides, and Terminals agreed—without caveat or limitation—that Terminals "shall comply with all conditions of this operating permit" and that "*[a]ny*

permit noncompliance constitutes a violation of the Federal Clean Air Act and the Virgin Islands Rules and Regulations." A3554 (Title V Permit) (emphasis added).

Indeed, the district court considered the ROA and found it did not absolve Terminals of its duties under the Title V Permit, because:

(1) Pursuant to the ROA, Refining became a "co-permittee" to the Title V Permit, rather than a "sole holder," the latter of which "seemingly would have extinguished Terminals's obligations under the permit;"[9]

(2) The ROA was not "addended to the Title V Permit or otherwise shared with the EPA;"[10]

(3) The "EPA's administration of the Title V Permit [did not] appear to be affected by the [ROA] given that the EPA addressed its May 14, 2021 Emergency Order to both Refining and *Terminals*;"[11] and

(4) In its Emergency Order, the EPA determined Terminals is "responsible for [the Facility's] Clean Air Act compliance obligations, including for its Refinery Operations, in multiple air permits," including the Title V permit, which "covers the [Facility's] Refinery Operations."[12]

---

[9] A22 (Apr. Mem. Op.); A1192 (Elizee Testimony) (testifying that Refining never become the sole holder of the Title V Permit).

[10] A23 (Apr. Mem. Op.).

[11] *Id.* (emphasis added).

[12] A4723-24 (Emergency Order).

These findings were confirmed by the testimony of Jeffrey Charles, Terminals's Chief Operating Officer, who testified that the Title V Permit was never amended to make Terminals responsible for "*anything less than the entire [Facility]*,"[13] and the  testimony of Catherine Elizee, Terminals's employee in charge of Title V compliance, who testified that Terminals was a co-permittee under the Title V Permit during the entire time the Refinery operated.[14] Terminals is therefore liable for the operations of the entire Refinery, including the Refinery's release of toxic chemicals onto Plaintiffs' land, regardless of whether it owned or operated the Refinery. Plaintiffs are thus likely to succeed on the merits of their negligence per se, private nuisance, and negligent trespass claims.

### C.     The ROA and TOA did not—and could not—relieve Terminals of its duties under the Title V Permit.

Without addressing, much less refuting, Terminals's liability for the Releases under the plain language of the Title V Permit, Terminals argues that "States and territories, including the U.S. Virgin Islands, may employ their own standards and requirements, such as those contained in the TOA and ROA," pursuant to 42 U.S.C. § 7416, and it is therefore "the agreements with the GVI, not the Title V permit, [that] govern the obligations related to the Refinery's operation." Br. at 26-27. But

---

[13] A1226 (Charles Testimony).

[14] A1191 (Elizee Testimony).

this argument is nonsensical—the Title V Permit itself was issued by the GVI. A3345-46 (Title V Permit). And in any event, Terminals waived the argument by failing to raise it below.

To preserve a matter for appellate review, a party "must unequivocally put its position before the trial court at a point and in a manner that permits the court to consider its merits." *Garza v. Citigroup Inc.*, 881 F.3d 277, 284 (3d Cir. 2018) (quoting *Shell Petroleum, Inc. v. United States*, 182 F.3d 212, 218 (3d Cir. 1999)). "It is well established that arguments not raised before the district court are waived on appeal." *Id.* at 284 (quoting *DIRECTV Inc. v. Seijas*, 508 F.3d 123, 125 n.1 (3d Cir. 2007)). Terminals did not argue before the district court that the GVI's agreement with Terminals and Refining—agreements to which the EPA was not a party—created any standard that somehow obviated Terminals's Title V Permit obligations. In fact, Terminals never even *mentioned* "cooperative federalism" or cited 42 U.S.C. § 7416 until its briefing before this Court.

Even so, Terminals cites no authority for its position that 42 U.S.C. § 7416 allows the Virgin Islands government to relieve Title V permittees of their legal obligations under the Clean Air Act. *See* Br. at 26. Instead, under the "cooperative federalism" on which Terminals now attempts to rely, "states are expressly [only] allowed to employ standards *more* stringent than those specified by the federal requirements." *Bell v. Cheswick Generating Station*, 734 F.3d 188, 190 (3d Cir.

2013) (emphasis added) (citing 42 U.S.C. § 7416). Allowing states and territories to give Title V permittees an end-run around EPA's permitting requirements would not be a "more stringent" standard. Moreover, Terminals does not cite any language from the TOA or ROA that could conceivably be read to displace the federally mandated obligations imposed by the Title V Permit.

In fact, the plain language of the ROA and TOA reinforces Terminals's continuing obligations to ensure compliance with the Title V Permit, rather than trumping those requirements. Each agreement specifically provides that "[f]or the avoidance of doubt, nothing herein is intended to negate or obviate any condition or use restriction set forth in any permit, consent decree, or Environmental Law." A5046 (TOA), A5116 (ROA). The Title V Permit itself provides that "[e]xcept as identified as 'Territory-only enforceable' or 'local-only enforceable' requirements in this permit, all terms and conditions contained herein shall be enforceable by the EPA and citizens of the United States under the Clean Air Act, as amended, 42 U.S.C. § 7401, et seq." A3554 (Title V Permit). None of the provisions relevant here are "Territory-only enforceable" or "local-only enforceable," and Plaintiffs therefore have the right to enforce those provisions against Terminals.

Accordingly, Terminals has no legal basis to avoid its Title V Permit obligations. Indeed, Terminals had the contractual right and actual ability to ensure compliance with the terms of the Title V Permit, but it chose not to do so. In addition

to the TOA and ROA, Terminals and Refining entered into a "Shared Services Agreement" identifying multiple "Shared Authorizations," which included the "Title V operating permit," and which provided Terminals the right to "perform such obligations on behalf of [Refining]," if Refining failed to do so. A5190 (Shared Services Agreement); A5221 (Shared Authorizations within the Shared Services Agreement). Upon Refining's failure to comply with the Title V Permit, Terminals had the ability under the Shared Services Agreement to ensure compliance with its obligations under the Title V Permit. *Id.*

The district court correctly determined that Terminals had a duty to ensure compliance with the Title V Permit such that Plaintiffs are likely to succeed on the merits of their claims for negligence per se, nuisance, and negligent trespass.

## II. The District Court Correctly Found that Irreparable Harm Would Result to Certain Residents in the Covered Area in the Absence of Injunctive Relief

The district court did not make a clear error in its factual findings that residents eligible for the Water Program—i.e., those who reside within a certain geographic area and qualify for certain economic criteria—demonstrated a significant risk of harm that could not be compensated after the fact by money damages. Nor did the district court err in granting a narrowly tailored injunction that provides relief to a limited subset of Plaintiffs and putative class members "who cannot afford to purchase water without trading off other basic necessities." A10 (Apr. Mem. Op.).

## A. Standard of Review

In addition to proving likelihood of success on the merits, the moving party for a preliminary injunction must also demonstrate a probability of irreparable harm. *Reilly*, 858 F.3d at 176, 179; *Issa*, 847 F.3d at 142 ("A plaintiff seeking a preliminary injunction must prove irreparable harm is 'likely' in the absence of relief."). When evaluating the need for a preliminary injunction, courts apply a lower evidentiary standard than they would at trial, considering affidavits and other hearsay materials. *See Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 718-19 (3d Cir. 2004) ("It is well established that 'a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.'") (quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)). As discussed *supra* in Section I(A), when reviewing the granting or denial of a preliminary injunction, this Court reviews findings of fact for clear error, legal conclusions are reviewed de novo, and the decision to grant or deny an injunction is reviewed for abuse of discretion. *Osario-Martinez*, 893 F.3d at 161.

## B. The evidence shows contamination from the Releases.

Terminals's critique of the evidence upon which the district court relied to conclude that Plaintiffs established contamination from the Releases that continues to threaten residents in the Covered Area contains a significant omission: Terminals's own experts, employees, and data supplied evidence confirming the

continued existence of contamination. So, while the district court appropriately concluded that contamination continues presently based upon Plaintiffs' analysis of swab samples and putative class member testimony, Terminals omits the more fulsome picture of the evidence underpinning the district court's factual findings.

Initially, Terminals incorrectly contends that no evidence ties contamination to any Release. But the Terminals employee in charge of Title V compliance, Catherine Elizee, confirmed that the February 4 Release included oil. A1095 (Elizee Testimony). And Plaintiffs' expert, Dr. Kaltofen, Terminals's expert, Dr. Murray, and Catherine Elizee all agreed that the May 12 Release involved pitch oil, which degrades very slowly and persists in the environment for *decades*. A704-05 (Dr. Kaltofen Testimony); A1110-1111 (Elizee Testimony); A1418 (Dr. Murray Testimony). Plaintiffs also presented evidence of testing that was indicative of contamination. Specifically, the analysis of swab samples, which captured contamination on the porous concrete walls of the cisterns, detected total petroleum hydrocarbons ("TPH") in cisterns in five estates included within the Covered Area. A32 (Apr. Mem. Op.) (summarizing A4993, Dr. Kaltofen Data). This sampling established evidence of petroleum contamination—not bacteria contamination, as Terminals attempted to argue. A959-62 (Dr. Henry Testimony).

But again, the evidence most glaringly omitted from Terminals's argument is the evidence of its *own* response to the Release events. Catherine Elizee testified that

after the February 4 Release, Terminals "emptied, cleaned, and refilled" cisterns "whose lab results showed a detection" for oil and grease. A1097-99 (Elizee Testimony). Jeffrey Charles confirmed that in Sedgwick's response to the May 12 Release, it found "oil on homes" and "oil in cars," A1270 (Charles Testimony), and Sedgwick employee Roland Riviere testified that "the majority" of properties inspected by Sedgwick "had some sort [of] impact" from the Releases. A2302 (Riviere Testimony). Any time Sedgwick located any contamination on a resident's property, it offered compensation that included amounts that Terminals believed were sufficient to clean that residence's cistern. A1273 (Charles Testimony). Although Terminals, in hindsight, describes these offers as having been made "out of an abundance of caution," Plaintiffs presented testimony from residents who confirmed that Sedgwick representatives informed them that their properties "were affected by the oil." A787-89 (Urgent Testimony); A800 (Webster Testimony); A916-17 (Carino Testimony); A939-42 (Thompson Testimony). It was reasonable for the district court, weighing this evidence, to conclude that Plaintiffs proved the contamination was caused by the Releases.

### C. The evidence supports a conclusion of present contamination and present harm.

The district court next correctly concluded that the contamination continues in the present. A41 (Apr. Mem. Op.). This finding did not, as Terminals argues, result from the district court shifting the burden to Terminals. Rather, the district

court analyzed testimony from both Plaintiffs' and Terminals's experts, who agreed that the "the various chemical compounds emitted by the release events tend to persist over time." A40 (Apr. Mem. Op.); A705 (Dr. Kaltofen Testimony); A1418 (Dr. Murray Testimony). The district court then concluded that this fact, coupled with testimony from witnesses whose cisterns still show evidence of the presence of oil, supported a finding that contamination remains present. A41 (Apr. Mem. Op.); A537-39 (Allen-Murphy Testimony); A801-02 (Webster Testimony). Only then did the district court explain that Terminals's argument, based on Dr. Murray's opinion that there would be "less petroleum" present today than directly following the releases, "failed to dispel the notion that there is present contamination." A40-41 (Apr. Mem. Op.).

Having concluded that contamination persists, the district court next analyzed whether that contamination poses present harm. To do so, the district court took guidance from the Supreme Court of the United States's decision in *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167 (2000), which the district court acknowledged arose "in a slightly different context," but was nonetheless "instructive." A37 (Apr. Mem. Op.). As the district court explained, in *Laidlaw*, the Supreme Court concluded that the plaintiffs had established "injury in fact" by showing that they had curtailed their usage of the North Tyger River based upon knowledge of "continuous and pervasive illegal discharges of pollutants" into

that river. A45-46 (Apr. Mem. Op.) (citing *Laidlaw*, 528 U.S. at 181–85). Because

showing "injury in fact" requires showing "harm," the district court appropriately

reasoned that Plaintiffs here showed present harm through evidence that plaintiffs

and putative class members should not rely on their cisterns for water because

multiple sources—including the press, government agencies, and Terminals's own

agents—advised residents not to do so in light of the contamination caused by the

Release events. A46-47 (Apr. Mem. Op.).

## D. The evidence supports the "Covered Area" outlined by the district court.

As set forth above, the district court conducted a detailed analysis of data from

Sedgwick summarizing properties where Sedgwick identified contamination and,

viewing this data in conjunction with testimony of Plaintiffs' experts and resident

witnesses, delineated a Covered Area to be used to determine geographic eligibility

for injunctive relief. *See* Statement of Case Section III(b), *supra*. Terminals attempts

to minimize its own data, arguing that Sedgwick offered to settle with any resident

whose property was marked by a "speck" of oil and thus that these offers of

settlement somehow do "not reflect actual, on the ground immediate harm." Br. at

48. But again, Sedgwick's own employee confirmed that "the majority" of properties

inspected by Sedgwick "had some sort [of] impact" from the Releases. A2302

(Riviere Testimony). This same employee also confirmed that the area in which

Sedgwick performed inspections would have included *more* properties and estates,

but for the fact that this work came to an abrupt halt due to Limetree's nonpayment. *See* A93 (July Mem. Op.).

In any event, the district court did not rely solely on the Sedgwick data to delineate the Covered Area. For each set of estates included within the Covered Area (the "core estates"; the "overinclusive estates" on the western, southern, and eastern boundaries and on the interior; the "underinclusive estates" on the western edge of the island; Clifton Hill; and Frederiksted, Hesselberg, Hogensborg, and La Grange), the district court used the Sedgwick data (or lack thereof) as a starting point, and then considered whether any combination of Dr. Sajo's air modeling, Dr. Kaltofen and Dr. Henry's sampling data, proximity to the Refinery, proximity to estates with high rates of contamination, or evidence of Terminals performing remediation (in the case of Clifton Hill) *also* supported a geographic area's inclusion in the Covered Area. A92-97 (July Mem. Op.). The Covered Area is reasonably delineated based on substantial evidence submitted to the district court as to the areas of St. Croix impacted by the Releases.

### E. The relief sought is not compensable with money damages.

Those individuals eligible for the Water Program do not have sufficient funds to purchase water, and their alternative avenues for procuring water—their cisterns—are unsafe as a result of their contamination. Unable to obtain clean water from their cisterns or pay for water without foregoing other basic necessities, these

residents are left without potable water for their drinking supply and household uses. While Terminals dismisses the district court's careful grant of injunctive relief as merely "free water," Br. at 49, the court did not simply find that a lack of safe and clean water, on its own, constitutes irreparable harm. Rather, it determined that irreparable harm only exists for individuals who cannot afford to purchase additional water and who are forced to decide whether to use contaminated water or forego other basic necessities in order to buy the water that they need. A52-53 (Apr. Mem. Op.); A1495 (Mar. 7 Tr.).

In making this determination, Terminals avers that the district court misapplied the caselaw on which it relied. Br. at 50 (citing *Lyda v. City of Detroit*, No. 13-CV-53846, 2014 WL 6474081, at *1 (Bankr. E.D. Mich. Nov. 19, 2014), *aff'd sub nom. In re City of Detroit*, No. 15-CV-10038, 2015 WL 5461463 (E.D. Mich. Sept. 16, 2015), *aff'd in part, vacated in part sub nom. In re City of Detroit, Mich.*, 841 F.3d 684 (6th Cir. 2016); *Concerned Pastors for Soc. Action v. Khouri*, 217 F. Supp. 3d 960, 971–72 (E.D. Mich. 2016)). Terminals is mistaken on several counts.

Terminals maintains that the *Lyda* case is factually distinct and non-precedential but does not point to any error in the substance of that court's "reject[ion]" of the argument that irreparable harm could not exist where alternative sources of water, including purchasing water at local stores, were available. Br. at

50; *compare Lyda*, 2014 WL 6474081, at *12. The court in *Lyda* explained (and Terminals does not challenge) that irreparable harm can still exist if the alternative sources of water are "much more expensive, and many of the affected people are already in poverty," and obtaining sufficient quantities of water through those sources is "challenging." *Id.* Relying upon this reasoning, the district court correctly concluded that irreparable harm exists here, but only for those residents who "cannot afford to purchase the amount of water they need." A53 (Apr. Mem. Op.).

Terminals next inappropriately focuses its attention on those individuals who bought bottled water before the Releases occurred. Br. at 51-52. Terminals reasons that, because these individuals were in the practice of purchasing drinking water before the Releases contaminated their cisterns, they could not have experienced irreparable harm like the plaintiffs in *Khouri* who were forced to "hunt" for water as a part of their "daily lives." *Id.* at 62–63. But the fact that residents purchased some bottled water before the Releases does not mean those residents did not also rely on their cistern water, which they now should not, forcing them to forego basic necessities to buy *additional* bottled water. So as the district court reasoned, citing *Khouri*, for those entitled to injunctive relief, even if they can currently purchase some water, "the status quo is not proving 'completely effective' in providing safe and reliable water to residents." A50 (Apr. Mem. Op.).

**F. The evidence Plaintiffs presented at the hearings establishes a foundation for group injunctive relief.**

Terminals wrongly contends that the district court erred in its application of *Adams v. Freedom Forge, Corp.*, 204 F.3d 475 (3d Cir. 2000). In fact, *Adams* supports the district court's findings with respect to irreparable harm.

As an initial matter, Terminals mischaracterizes the district court's order as rubber-stamping a "mass injunction against Terminals" and maintains that the district court improperly inferred "irreparable harm to thousands of potential claimants" "without any present-day supporting evidence" and without properly considering this Court's precedent. *See* Br. at 2. In truth, Plaintiffs requested that the district court grant relief far broader than that which it ordered. A14 (Apr. Mem. Op.) (explaining Plaintiffs requested relief included remediation of cisterns and injunctive relief to *all* Plaintiffs and putative class members). Though Plaintiffs assert that they were entitled to the entirety of the relief sought, the district court disagreed, and it issued a narrowly tailored injunction providing relief to a more limited subset of Plaintiffs and putative class members "who cannot afford to purchase water without trading off other basic necessities." A10 (Apr. Mem. Op.).[15] The district court specifically declined to enter a "mass injunction." A52 (Apr. Mem. Op.).

---

[15] The district court then held its Phase Two hearing to determine the criteria to identify those entitled to injunctive relief.

Moreover, the district court directly addressed *Adams*, rejected Terminals's interpretation of the case, and explained that "there is nothing in [*Adams*'s] holding that precludes Plaintiffs from seeking, or this Court from entering, a preliminary injunction affording relief to putative class members." A28 (Apr. Mem. Op.).

The district court's understanding of *Adams* and its holding is correct. Briefly, in *Adams*, a group of approximately 130 retirees and their spouses sought injunctive relief requiring retirees' former employer to uphold its promise to provide them with their preexisting self-insured health benefits plan, under which the insureds did not have to pay premiums. In vacating the district court's order granting injunctive relief to all plaintiffs, this Court determined that the *Adams* plaintiffs had not supplied a "foundation from which one could infer that all (or virtually all) members of a group are irreparably harmed." 204 F.3d at 487–88.[16] The Court affirmed the award of injunctive relief to two plaintiffs who had individually made the requisite showing. *Id*.

The district court thus correctly noted that *Adams* simply "presents the question here as to whether Plaintiffs have provided an adequate basis from which

---

[16] *See also id*. at 489 (discussing *United Steelworkers of Am. v. Fort Pitt Steel Casting*, 598 F.2d 1273 (3d Cir. 1979), and observing that "it seems . . . the court had sufficient evidence from which to infer that such loss constituted a risk of irreparable harm for all, or practically all, the employees.").

this Court can infer that the putative class members (and Plaintiffs themselves) 'specifically and personally' risk irreparable harm absent an injunction," while acknowledging that the inquiry was bound in fact and "depends in many cases on . . . the particular resources available to each member of the class to weather hardships pending a trial." A29 (Apr. Mem. Op.) (quoting *Adams*, 204 F.3d at 490–91).

Here, the district court's award of injunctive relief to a subgroup of Plaintiffs and the putative class was based on substantial evidence that "establishes that a meaningful proportion of the population on behalf of whom Plaintiffs seek relief do not have the requisite financial resources to secure sufficient water to meet their and their families' needs." A52-53 (Apr. Mem. Op.). This included the following:

- Resident witnesses describing how "they and other residents continue to use their cistern water for some household uses despite believing it to be unsafe";[17]

- Testimony from Jeffrey Charles, Terminals' Chief Operating Officer, confirming that Terminals itself, through Sedgwick, identified 2,200 of

---

[17] *See* A50-51 (Apr. Mem. Op.) (describing the testimony of Margaret Thompson, Jo Anne Allen-Murphy, and Marisela Webster).

approximately 2,300 and 2,400 homes it inspected as impacted (approximately 92-96%);[18]

- Testimony from multiple residents that they cannot afford to professionally clean their cisterns;[19]

- Testimony from multiple residents that they and others have "no choice" but to use cistern water for household uses, leading to the inference that these residents do not have the requisite financial resources to secure sufficient water;[20] and

- Testimony regarding residents taking significant and unusual steps, such as collecting rainwater in buckets, going to friends' houses to bathe, or waiting hours in line for water distribution, to satisfy water needs while avoiding exposure to cistern water.[21]

This evidence is more than sufficient to establish that those residents will suffer irreparable harm in the absence of injunctive relief. And, to ensure consistency with *Adams*, the district court limited the availability of this relief to only those residents

---

[18] A2203, A2264-65, A2270-72 (Charles Testimony).

[19] *See* A540 (Allen-Murphy Testimony); A804 (Webster Testimony).

[20] A51-A52 (Apr. Mem. Op.); *see also id.* (explaining that Margaret Thompson purchases water using social security benefits and Carolyn Urgent could not both purchase water and pay her family's bills).

[21] A51-52 (Apr. Mem. Op.).

who meet criteria for both contamination (by virtue of living within the Covered Area) *and* economic need (by virtue of participation or eligibility to participate in certain government welfare programs).

Nonetheless, Terminals persists with an erroneous (but convenient) reading of *Adams*, arguing that Plaintiffs have failed to show irreparable harm because "fewer Plaintiffs (only one) testified than in *Adams* (ten), and no one presented evidence about foregoing basic necessities to purchase water." Br. at 30-31. But this Court did not require in *Adams* that evidence in support of injunctive relief take any specific form; this Court focused in *Adams* on the sufficiency of the plaintiffs' testimony only because that is the form of evidence that the plaintiffs presented in that case.[22] *Adams* did not foreclose the use of other evidence to establish a basis to infer that putative class members risk irreparable harm. In fact, this Court in *Adams* recognized that evidence could be presented "through affidavits, deposition testimony, or other documents, about the particular situations of the moving parties." 204 F.3d at 487. And the evidence the district court considered here was sufficient for an inference that *all* residents meeting certain criteria will suffer irreparable harm

---

[22] Terminals also seems to misread into *Adams* a requirement that *all* named plaintiffs qualify for the injunctive relief ordered by a district court. Br. at 29. Rather, *Adams* requires only that the individuals actually granted relief by a court's preliminary injunction be those who are "specifically and personally" at risk of irreparable harm. *Adams*, 204 F.3d at 487.

in the absence of injunctive relief. That finding should be upheld. *Id.* at 484 (questions of fact reviewed for clear error).

## III. The District Court Correctly Ordered a Nominal Bond

### A. Standard of Review

This Court reviews the amount of a bond for an abuse of discretion. *Neo Gen Screening, Inc. v. TeleChem Int'l, Inc.*, 69 F. App'x 550, 554 (3d Cir. 2003). As previously discussed, to show an abuse of discretion an appellant must demonstrate that the district court's decision was "arbitrary, fanciful or clearly unreasonable." *Stecyk*, 295 F.3d at 412 (citation omitted). Terminals cannot make that showing here.

### B. The nominal bond is substantially justified.

Terminals asserts that the district court "did not provide any analysis" or "reasoned basis" in setting the $50,000 bond, which it claimed the district court "arbitrarily determined—without any stated justification." Br. at 54. In fact, the district court ordered briefing solely on the bond issue across both phases of the injunction proceedings; received extensive argument from the parties; and carefully considered the factual record, the various bond-related proposals of the parties, and the legal precedent of this Circuit before imposing the bond. A103-110 (July Mem. Op.); A2595-2633 (June 9 Tr.). The result is a bond that is unquestionably within the district court's discretion to order. *Zambelli Fireworks Mfg. Co., Inc. v. Wood*, 592 F.3d 412 (3d Cir. 2010) (quoting *Frank's GMC Truck Center, Inc. v. General*

*Motors Corp.*, 847 F.2d 100, 103 (3d Cir. 1988) (explaining that the amount of any bond is "left to the discretion of the court")).[23]

Conspicuously absent from Terminals's critique is any mention of the district court's consideration of evidence that the population entitled to injunctive relief was indigent, or that Plaintiffs' application clearly implicated the public interest, precisely the analysis endorsed by this Court. *See Temple Univ.*, 941 F.2d at 219–220 (recognizing salient factors such as "the hardship that a bond requirement would impose on the applicant" and "the special nature of suits to enforce important federal rights or 'public interests,'" and finding that "[a] district court should consider the impact that a bond requirement would have on enforcement of such a right, in order to prevent undue restriction of it"); *see also PharMethod, Inc. v. Caserta*, 382 F. App'x 214, 222 (3d Cir. 2010) (noting *Temple* "had broad implications for the general welfare").

Though the district court ultimately determined that it did "not agree that the *Temple* exception . . . should be employed here," it did so "particularly in light of Plaintiffs' recent offer to post a considerable sum notwithstanding their indigency."

---

[23] *See also Temple Univ. v. White*, 941 F.2d 201, 220 n.28 (3d Cir. 1991) (noting that a that nominal bond would have been sufficient upon a determination that the district court erred in waiving bond); *Doe 1 v. Perkiomen Valley Sch. Dist.*, 585 F. Supp. 3d 668, 705 (E.D. Pa. 2022) (explaining that "a district court may require a nominal bond even absent an exception to Rule 65").

A108 (July Mem. Op.). The district court nevertheless reached the conclusion, supported by evidence in the record, that "this case has attributes of the nature that could arguably place it within the class of 'certain narrowly drawn circumstances' in which the Third Circuit deemed a waiver of security to be available in *Temple*." A107 (July Mem. Op.) (citing *Temple Univ.*, 941 F.2d at 219). Further, relying on the detailed findings in its Phase One opinion, the district court asserted that it "does not doubt that the issuance of this injunction is in the public interest or that the balance of the hardships tips overwhelmingly in favor of Plaintiffs here." A107 (July. Mem. Op.). In addition, the district court observed that "this injunction does not 'prevent[] commercial, money-making activities,' *Zambelli*, 592 F.3d at 147, and the Plaintiffs are indigent." A108 (July Mem. Op.) (citing Apr. Mem. Op.).[24]

In requiring the $50,000 bond, the district court declined to impose Terminals's testing-in-lieu-of bond proposal, because "[f]irst, and perhaps most obviously, the testing protocol does not function as a true alternative to the bond requirement" as "the costs associated with sampling and testing cisterns under the protocol would be passed on to beneficiaries of the program [i.e., putative class

---

[24] The Court in *Zambelli* noted that it "never excused a District Court from requiring a bond where an injunction prevents commercial, money-making activities," but that it had "recognized exceptions in other contexts only where 'the balance of [the] equities weighs overwhelmingly in favor of the party seeking the injunction' and when the District Court 'make[s] specific findings.'" 592 F.3d at 426 (*citing Elliott v. Kiesewetter*, 98 F.3d 47 (3d Cir. 1996); *Temple*, 941 F.2d at 219 n.26).

members], only a fraction of whom [moved for the injunction]." A108-09 (July Mem. Op.). Moreover, the district court expressed concern that implementation of a testing protocol, which the district court concluded was "exceptionally complicated," would not be administratively feasible and imposing "even a substantial fraction" of the costs associated with the testing protocol "on the indigent population afforded relief by this injunction is untenable and would ultimately prove fatal to the program." A109 (July Mem. Op.). And, finally, the testing protocol posed the risk that "households that, as a result of any testing protocol, receive a result that disqualifies them from the program would falsely believe that their cistern water is safe to drink if a test were to disqualify them from the water program." A109-110 (July Mem. Op.).

The district court also recognized that the practical effect of imposing Terminals's proposal of a bond amount "that will adequately compensate Terminals for the costs and damages sustained in running the Program" is that no one entitled to participate in the Water Program will be able to do so. Of course, Terminals is aware of the implications of its demand. As the district court noted, Terminals made its "creative" testing protocol bond proposal "cognizant of the fact that imposing a bond equivalent to the annual cost of the program's operations would be fatal to the program in light of the program's likely costs and Plaintiffs' limited financial means." A108.

Furthermore, while the district court was mindful of the costs of the injunctive relief to Terminals, noting the "magnitude" of the relief and that the bond requirement was "certainly minimal relative to the anticipated costs associated with the water program," the district court balanced the hardship between the parties and found that such balancing "tips overwhelmingly in favor of Plaintiffs here." A107, 110 (July Mem. Op.). Accordingly, the district court determined that $50,000 was an amount "appropriate notwithstanding the Plaintiffs' indigency in light of the need to make Plaintiffs 'think carefully' before accepting preliminary relief." A110 (July Mem. Op.). The district court also ordered that Plaintiffs pay an additional $50 for each household that participates in the water program beyond the first 1,000 households.[25] A110 (July Mem. Op.).

Imposition of this bond is consistent with this Court's precedent. *See Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 804 (3d Cir. 1989).[26] The

---

[25] To the extent Terminals implies, in passing, that this additional provision is an improper retroactive increase to the bond, *see* Br. at 52, the Court should note that this provision was clearly based on Plaintiffs' own proposal, offered as an alternative to the extent the district court did not find it appropriate to waive the bond or impose a nominal bond of $250. A104 (July Mem. Op.). Thus, there is no concern, as in *Sprint*, that Plaintiffs did not know what their exposure was when the district court set the bond amount. *Sprint Commc'ns Co. L.P. v. CAT Commc'ns Int'l, Inc.*, 335 F.3d 235, 241 (3d Cir. 2003).

[26] Terminals divided the $50,000 initial bond amount across an estimated initial 1,000 households and argued that the district court "provided no analysis as to how $50 per household is meant to cause Plaintiffs to 'think carefully' before seeking an injunction." Br. at 55. This creates the false impression that each Plaintiff was only

authority offered by Terminals is readily distinguishable or serves only to further support the district court's decision given the relevant factual circumstances. For example, *Mallet* concerned a commercial dispute between manufacturers where the district court set a bond amount based only on a comparison with bonds imposed in similar cases and without engaging in a case-specific analysis. *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 392 (3d Cir. 2021). In contrast, this is a non-commercial case implicating an important public interest (providing safe and clean water), where the injunctive relief is provided to indigent people, and where the district court has clearly engaged in an analysis of the particular facts at hand.

This Court should affirm the district court's well-supported analysis and conclusions with respect to the bond requirement.

## IV. The Two Remaining Factors for Granting Injunctive Relief Also Weigh in Favor of Plaintiffs, Which Terminals Does Not Dispute

While Terminals does not make any argument that (1) the balance of harm does not favor Plaintiffs or that (2) the relief Plaintiffs seek is not in the public interest, it is abundantly clear that the hardship Plaintiffs will incur without injunctive relief clearly outweighs any harm that may befall Defendants and the public interest favors Plaintiffs' position.

---

required to post $50 to satisfy the bond requirement. Of course, and as the district court made clear, Plaintiffs are required to post $50,000 regardless of whether a minimum of 1,000 households actually participate in the Water Program. A110 (July Mem. Op.); A62 (July Order).

### A.    Standard of Review

The district court's finding that the balance of equities and the public interest factors weighed in favor of granting an injunction is viewed in accordance with the standard articulated in Section I(A) *supra*. A district court considers these factors after determining that the moving party has shown both a likelihood of success on the merits and a probability of irreparable harm. *Reilly*, 858 F.3d at 176, 179.

### B.    The balance of harm weighs in favor of injunctive relief.

The district court found that "Plaintiffs have the more persuasive argument" regarding the balance of harm. A55 (Apr. Mem. Op.). Terminals does not, in its brief, offer any argument to refute the "seriousness and magnitude" of the harm that has befallen the eligible residents, nor does Terminals argue that the economic harm it may experience would outweigh the harm to Plaintiffs. *Id.* Nor could Terminals, because the harm caused by lack of access to safe, reliable water is obvious and severe. And Terminals "can hardly claim to be harmed [where] it brought any and all difficulties occasioned by the issuance of an injunction upon itself." *Kos Pharm., Inc.*, 369 F.3d at 728 (quoting *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990)). Additionally, Terminals's only possible harm— bearing the costs of continuing the water program—cannot outweigh the harm to Plaintiffs. *See Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 991 (9th Cir. 2020)

(finding, when compared to economic harm, "the balance of harms will usually favor the issuance of an injunction to protect the environment").

### C. Plaintiffs' injunctive relief is in the public interest.

Looking "beyond the parties' respective interests [to] gauge the injunction's potential effects on the community as a whole," the relief awarded is unquestionably in furtherance of the public interest: "we have come to presuppose access to safe and affordable water as Americans." A57 (Apr. Mem. Op.). Terminals does not challenge the district court's findings on these elements because it cannot. "[T]he public interest at stake here, the quality of public drinking water and the health and safety of the consumers, is fundamental." *United States v. Alisal Water Corp.*, 431 F.3d 643, 656 (9th Cir. 2005). Moreover, an injunction would promote the Virgin Island Legislature's public policy "to promote health, safety and welfare" and "prevent injury to human, plant and animal life, and property." VI ST T. 12, § 201 (Virgin Islands Air Pollution Act); *see also Oxford House, Inc. v. Twp. of Cherry Hill*, 799 F. Supp. 450, 465 (D.N.J. 1992) (finding that where the legislature has announced a strong public policy that an injunction would promote, the "public interest factor weighs heavily in favor of the issuance of a preliminary injunction.").

## CONCLUSION

For the reasons set forth herein, the district court's narrowly tailored award of injunctive relief should be affirmed.

Respectfully submitted,

Dated:  March 1, 2024
_s/ Shanon J. Carson_
Shanon J. Carson (PA 85957)
Yechiel Michael Twersky (PA 312411)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
scarson@bm.net
mitwersky@bm.net

Kerry J. Miller
Rebekka C. Veith
C. Hogan Paschal
Carly E. Jonakin
FISHMAN HAYGOOD, L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, LA 70170
Telephone: (504) 586-5252
kmiller@fishmanhaygood.com
rveith@fishmanhaygood.com
hpaschal@fishmanhaygood.com
cjonakin@fishmanhaygood.com

Daniel H. Charest
Quinn M. Burns
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, TX 75202
Telephone: (469) 904-4550
dcharest@burnscharest.com
qburns@burnscharest.com

Lee J. Rohn
Rhea R. Lawrence
1108 King Street, Suite 3
Christiansted, St. Croix
U.S. Virgin Islands 00820
Telephone: (340) 778-8855
lee@rohnlaw.com
rhea@rohnlaw.com

Hugh Lambert
J. Christopher Zainey
Brian Mersman
LAMBERT ZAINEY SMITH & SOSO, APLC
701 Magazine Street
New Orleans, LA 70130
Telephone: (504) 581-1750
hlambert@lambertainey.com
czainey@lambertzainey.com
bmersman@lambertzainey.com

John K. Dema
LAW OFFICES OF JOHN K. DEMA, PC
1236 Strand Street, Suite 103
Christiansted, St. Croix, VI 00820
jdema@demalaw.com

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF BAR MEMBERSHIP

I, Shanon J. Carson, hereby certify that I am a member in good standing of the Bar of the United States Court of Appeals for the Third Circuit.

Dated: March 1, 2024

*s/ Shanon J. Carson*
Shanon J. Carson (PA 85957)
Yechiel Michael Twersky (PA 312411)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
scarson@bm.net
mitwersky@bm.net

*Counsel for Plaintiffs-Appellees*

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief contains 11,409 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using 14-point Times New Roman font with Microsoft Word.

Dated: March 1, 2024

*s/ Shanon J. Carson*
Shanon J. Carson
Yechiel Michael Twersky
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
scarson@bm.net
mitwersky@bm.net

Kerry J. Miller
Rebekka C. Veith
C. Hogan Paschal
Carly E. Jonakin
FISHMAN HAYGOOD, L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, LA 70170
Telephone: (504) 586-5252
kmiller@fishmanhaygood.com
rveith@fishmanhaygood.com
hpaschal@fishmanhaygood.com
cjonakin@fishmanhaygood.com

Daniel H. Charest
Quinn M. Burns
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, TX 75202
Telephone: (469) 904-4550
dcharest@burnscharest.com
qburns@burnscharest.com

Lee J. Rohn
Rhea R. Lawrence
1108 King Street, Suite 3
Christiansted, St. Croix
U.S. Virgin Islands 00820
Telephone: (340) 778-8855
lee@rohnlaw.com
rhea@rohnlaw.com

Hugh Lambert
J. Christopher Zainey
Brian Mersman
LAMBERT ZAINEY SMITH & SOSO, APLC
701 Magazine Street
New Orleans, LA 70130
Telephone: (504) 581-1750
hlambert@lambertainey.com
czainey@lambertzainey.com
bmersman@lambertzainey.com

John K. Dema
LAW OFFICES OF JOHN K. DEMA, PC
1236 Strand Street, Suite 103
Christiansted, St. Croix, VI 00820
jdema@demalaw.com

*Counsel for Plaintiffs-Appellees*

**CERTIFICATE OF VIRUS CHECK AND IDENTICAL DOCUMENTS**

I hereby certify that this brief, as filed electronically, was scanned for computer viruses using Microsoft Defender. This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of this electronic brief is identical to the text of the paper copies.

Dated: March 1, 2024

 *s/ Shanon J. Carson*
Shanon J. Carson
Yechiel Michael Twersky
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
scarson@bm.net
mitwersky@bm.net

Kerry J. Miller
Rebekka C. Veith
C. Hogan Paschal
Carly E. Jonakin
FISHMAN HAYGOOD, L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, LA 70170
Telephone: (504) 586-5252
kmiller@fishmanhaygood.com
rveith@fishmanhaygood.com
hpaschal@fishmanhaygood.com
cjonakin@fishmanhaygood.com

Daniel H. Charest
Quinn M. Burns
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, TX 75202
Telephone: (469) 904-4550
dcharest@burnscharest.com
qburns@burnscharest.com

Lee J. Rohn
Rhea R. Lawrence
1108 King Street, Suite 3
Christiansted, St. Croix
U.S. Virgin Islands 00820
Telephone: (340) 778-8855
lee@rohnlaw.com
rhea@rohnlaw.com

Hugh Lambert
J. Christopher Zainey
Brian Mersman
LAMBERT ZAINEY SMITH & SOSO, APLC
701 Magazine Street
New Orleans, LA 70130
Telephone: (504) 581-1750
hlambert@lambertainey.com
czainey@lambertzainey.com
bmersman@lambertzainey.com

John K. Dema
LAW OFFICES OF JOHN K. DEMA, PC
1236 Strand Street, Suite 103
Christiansted, St. Croix, VI 00820
jdema@demalaw.com

*Counsel for Plaintiffs-Appellees*

## STATEMENT REPRESENTING THE CONSENT OF
## ALL PLAINTIFFS-APPELLEES

Pursuant to Fed. R. App. Pro. 28(i), and this Court's Order, (ECF No. 5), Plaintiffs-Appellees are filing a single consolidated Appellees' Brief. Counsel for all Plaintiffs-Appellees join, and consents to the filing of this brief.

Dated: March 1, 2024

                    *s/ Shanon J. Carson*
Shanon J. Carson
Yechiel Michael Twersky
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
scarson@bm.net
mitwersky@bm.net

Kerry J. Miller
Rebekka C. Veith
C. Hogan Paschal
Carly E. Jonakin
FISHMAN HAYGOOD, L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, LA 70170
Telephone: (504) 586-5252
kmiller@fishmanhaygood.com
rveith@fishmanhaygood.com
hpaschal@fishmanhaygood.com
cjonakin@fishmanhaygood.com

Daniel H. Charest
Quinn M. Burns
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, TX 75202
Telephone: (469) 904-4550
dcharest@burnscharest.com
qburns@burnscharest.com

Lee J. Rohn
Rhea R. Lawrence
1108 King Street, Suite 3
Christiansted, St. Croix
U.S. Virgin Islands 00820
Telephone: (340) 778-8855
lee@rohnlaw.com
rhea@rohnlaw.com

Hugh Lambert
J. Christopher Zainey
Brian Mersman
LAMBERT ZAINEY SMITH & SOSO, APLC
701 Magazine Street
New Orleans, LA 70130
Telephone: (504) 581-1750
hlambert@lambertainey.com
czainey@lambertzainey.com
bmersman@lambertzainey.com

John K. Dema
LAW OFFICES OF JOHN K. DEMA, PC
1236 Strand Street, Suite 103
Christiansted, St. Croix, VI 00820
jdema@demalaw.com

*Counsel for Plaintiffs-Appellees*

# CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2024, I electronically filed the foregoing with the Clerk of this Court using the CM/ECF System, which will send a notification of electronic filing to all counsel of record.

Dated: March 1, 2024

*s/ Shanon J. Carson*
Shanon J. Carson
Yechiel Michael Twersky
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
scarson@bm.net
mitwersky@bm.net

Kerry J. Miller
Rebekka C. Veith
C. Hogan Paschal
Carly E. Jonakin
FISHMAN HAYGOOD, L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, LA 70170
Telephone: (504) 586-5252
kmiller@fishmanhaygood.com
rveith@fishmanhaygood.com
hpaschal@fishmanhaygood.com
cjonakin@fishmanhaygood.com

Daniel H. Charest
Quinn M. Burns
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, TX 75202
Telephone: (469) 904-4550
dcharest@burnscharest.com
qburns@burnscharest.com

Lee J. Rohn
Rhea R. Lawrence
1108 King Street, Suite 3
Christiansted, St. Croix
U.S. Virgin Islands 00820
Telephone: (340) 778-8855
lee@rohnlaw.com
rhea@rohnlaw.com

Hugh Lambert
J. Christopher Zainey
Brian Mersman
LAMBERT ZAINEY SMITH & SOSO, APLC
701 Magazine Street
New Orleans, LA 70130
Telephone: (504) 581-1750
hlambert@lambertainey.com
czainey@lambertzainey.com
bmersman@lambertzainey.com

John K. Dema
LAW OFFICES OF JOHN K. DEMA, PC
1236 Strand Street, Suite 103
Christiansted, St. Croix, VI 00820
jdema@demalaw.com

*Counsel for Plaintiffs-Appellees*